**E-FILED**
Tuesday, 24 April, 2007  12:47:03 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

In the matter of the Arbitration between

| | | |
|---|---|---|
| VERMILION COAL COMPANY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| BLACK BEAUTY COAL COMPANY, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**VERMILION'S COMPLAINT TO VACATE IN PART
ARBITRATION AWARD**

Plaintiff, Vermilion Coal Company ("Vermilion" or "Petitioner"), by and through its attorneys, Deborah G. Cole and John Barr as its Complaint to Vacate in Part the Award of the Arbitration Panel states as follows:

1.      This is an action to vacate in part the Award issued by a three person arbitration Panel pursuant to the Federal Arbitration Act, *9 U.S.C. A. § 10,* the Federal Rules of Civil Procedure, and the applicable federal and state laws for the State of Illinois.

**<u>Nature of the Case</u>**

2.      In August of 2002, Vermilion, Lessor, discovered that its Lessee, Black Beauty Coal Company ("Black Beauty" or "Respondent"), a wholly owned subsidiary of Peabody Coal Company, was falsifying reports and taking improper deductions from amounts owed to Vermilion for royalties and wheelage under a Coal Mining Lease.  For nine (9) months, Vermilion tried unsuccessfully to obtain compliance from Black Beauty of its Lease obligations. Black Beauty repeatedly expressly refused to pay the correct

amount of royalties, while continuing its objected-to conduct. Eventually, Vermilion had no choice but to send a Notice of Default to Black Beauty demanding payment and requesting adequate assurances of Black Beauty's performance of its contractual obligations.  Incredibly, Black Beauty *still* refused to cure its default triggering termination of the Lease and arbitration.

3.      The ensuing arbitration took three (3) years and seven (7) months before a Final Decision and Award was issued by the three person Panel.  Ultimately, Vermilion prevailed on the threshold issue of Black Beauty's improper deduction of Black Lung Excise Taxes ("BLET") and Abandoned Mine Land Fees ("AMLF") as "severance" taxes and was awarded a portion of the monies for non-payment of amounts owed by Black Beauty for royalties and wheelage and certain of its costs in the arbitration. Unfortunately, however, Vermilion was forced to spend more than $1.5 million dollars in costs and attorneys' fees and the Umpire Arbitrator denied Vermilion its express remedies and the bulk of its damages provided under the Lease and in accordance with applicable law.

4.      This is an action to vacate in part the final arbitral award issued by the panel of arbitrators in the above referenced arbitration consisting of Vermilion's party arbitrator, Susan Getzendanner (Retired U.S. District Court Judge), Black Beauty's party arbitrator, G. Daniel Kelley, Jr., Esq., and Thomas Lambros (Retired U.S. District Court Judge) acting as the Umpire Arbitrator (hereinafter collectively referred to as the "Panel"). The Final Award was issued on January 31, 2007, and delivered to Petitioner on February 7, 2007 (the "Final Award"). Vermilion contends that the Panel's Final Award, which in turn embodies the interim award in the same proceedings dated March

28, 2005 (the "Interim Award") (hereinafter the Final Award and the Interim Award are collectively referred to as the "Award"), should be vacated in part.

5.    Vermilion petitions this Court to vacate those portions of the Award other than the determination of the non-deductibility of Federal Black Lung Excise Taxes ("BLET") and Federal Abandoned Mine Land Fees ("AMLF") from Black Beauty's calculation of royalties and wheelage due to Vermilion under the Lease and the award of certain of the costs of arbitration to Vermilion as the prevailing party.  Specifically, the Award should be vacated as to those parts of the Award relating to: (i) The denial of Vermilion's claims for breach of contract; (ii) Default/termination; (iii) Anticipatory repudiation; (iv) Fraud; (v) Breach of express duty of good faith and fair dealing; (vi) The remedies for such claims; and (vii) The failure to include expert and attorneys' fees expended by Vermilion in the award of costs.  This Petition to vacate in part is brought pursuant to *9 USCS § 10 (a)(4 )*on the basis that the Umpire Arbitrator exceeded his powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made; *9 USCS § 10 (a)* (3) because the Umpire Arbitrator refused to hear evidence material to the controversy; and, *9 USCS § 10 (a)* (2) on the basis that there was evident partiality on the part of the Umpire Arbitrator.

## The Parties

6.    Vermilion (as Lessor) and Black Beauty (as Lessee) are parties to a Coal Mining Lease (the "Lease") leasing certain lands and coal mining rights located in Vermilion County, Illinois (the "Coal Property").  A copy of the Lease is attached, marked Exh. "A", and incorporated by reference.

7.    Vermilion is a corporation incorporated under the laws of the State of Delaware, having its principal place of business in the State of Illinois. Vermilion does business in this judicial district.

8.    Upon information and belief, Black Beauty is an Indiana general partnership whose general partners are Thoroughbred, LLC, a Delaware limited liability company and Black Beauty Coal Resources Inc., both of which are wholly-owned subsidiaries of Peabody Energy, Inc., a Delaware corporation with its principal place of business in Missouri. Black Beauty has its principal place of business in the State of Indiana and conducts business in this judicial district.

## JURISDICTION AND VENUE

9.    Jurisdiction is proper before this Court pursuant to the Federal Arbitration Act, 9 U.S.C. 1, *et. seq.* and 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs and is between citizens of different states.

10.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and the Coal Property is located in Vermilion County.

## Factual Allegations[1]

11.    Vermilion (Lessor) and Black Beauty (Lessee) are parties to a Coal Mining Lease for property located in Vermilion County, Illinois.  Catlin Coal Company, Inc, ("Catlin") the predecessor lessee, assigned the lease to Black Beauty in 1999. In

---

1.    The Appendix attached to this Petition states the factual allegations detailed in the evidence submitted by Vermilion in the arbitration proceedings for the Court's reference as necessary.

4

accordance with the provisions of Section 2.4 of the Lease, production royalties and wheelage are required to be paid to Vermilion by Black Beauty.

12.    In August of 2002, Vermilion discovered that Black Beauty was improperly deducting Black lung Excise Tax ("BLET") and Abandoned Mine Land Fees ("AMLF) as "severance" taxes from the Gross Sales Price ("GSP") of coal sold to bona fide purchasers.  Black Beauty was falsely reporting the adjusted sales price as the GSP in its faxed reports to Vermilion. Immediately upon discovery of the improper deductions, Vermilion notified Black Beauty of its error in the calculation of GSP for the calculation of royalties and wheelage.  Despite more than five (5) letters, e-mails, telephone calls and meetings with Black Beauty and/or its attorneys over a period of nine (9) months, Black Beauty expressly refused to pay royalties and wheelage in accordance with the Lease terms; and continued its improper conduct in breach of the Lease. Black Beauty claimed that BLET and AMLF were "sales taxes and/or severance" taxes and therefore proper deductions under Section 2.4 of the Lease. Black Beauty also claimed that it was not responsible for prior period obligations from periods before it had acquired the Lease from Catlin because it was a "remote assignee" of predecessor lessee Catlin.[2] Group Exh. B.

---

2.    Black Beauty argued that after the assignment of the Lease from Catlin Coal, Inc. to Catlin Coal, LLC and then from Catlin Coal, LLC to Catlin Coal, LLC (with Black Beauty as the sole member), and then from Catlin Coal, LLC to Black Beauty, Defendant continued to calculate royalties and wheelage in the same manner as its predecessor in interest. The evidence showed, however, that the assignment from Catlin Coal, LLC (with Black Beauty as the sole member) to Black Beauty did not include an assumption of liabilities as required under Section 14.1of the Lease *and* the assignee did not advise Vermilion in writing or otherwise of the assignment as required under Section14.1of the Lease.

13.     Black Beauty's failure to make due and punctual payment of royalties and wheelage constituted an "event of default" under Section 22.1 of the Lease titled "Default: Termination by Lessor" which states:

If any one or more of the following events (herein sometimes call Events of Default) shall occur: (a)  If default shall be made in the due and punctual payment of any rent, royalty *or any part thereof, when and as the same may become due and payable*…and such default shall continue for thirty (30) days after notice by Lessor to Lessee…then and in such event, Lessor at any time thereafter while such default or condition is continuing, may give written notice to Lessee specifying the occurrence giving rise to such Event of Default, or Events of Default, and stating that the lease shall terminate on the date specified in such notice, which shall be at least twenty (20) days after the giving of such notice. Upon the date specified in such notice, this lease and the estate and interest hereby demised shall terminate and all rights of Lessee under this lease shall cease.

14.     Finally, on May 12, 2003, after Black Beauty failed to pay royalties and wheelage in accordance with the lease despite numerous demands,[3]  Vermilion gave written notice of default and made a further demand for adequate assurance of specific performance.[4]  See, Exh. C.  Again, Black Beauty expressly refused to pay the correct amount of royalties, and continued to breach the Lease. On May 12, 2003 Vermilion

---

[3].     Black Beauty could have made payment under protest and then arbitrated the dispute, but chose to take no action ignoring Vermilion's request for compliance and submitting as their sole support for their position a Black's Law Dictionary definition of "severance" tax and case law which supported Vermilion's position that BLET and AMLF were state imposed taxes or fees.

[4].     Section 22.4 of the Lease titled <u>No Waiver, etc. by Lessor</u> provides that "…no acceptance of full

filed suit seeking injunctive, and declaratory relief; and notified Black Beauty that the Lease was terminated pursuant to Section 22.1 of its terms. By agreement of the parties, the matters were submitted to arbitration in accordance with Section 24.1 of the Lease.

15.     The relevant provisions of the Lease governing the arbitration proceedings are contained in Section 24.1.  In arriving at a decision and award, the arbitrators are "bound by any relevant state and federal law applicable to the substantive issue or issues so submitted for arbitration."  See, Exh. A, Section 24.1. The role of the Panel is to resolve disputes which arise under the Lease.

16.     The Arbitration Panel initially consisted of Hon. Susan Getzendanner, Vermilion's Party Arbitrator, Hon. Gene E. Brooks, Black Beauty's Party Arbitrator, and Hon. Thomas Lambros, the Umpire Arbitrator.  After the death of Black Beauty's Party Arbitrator, G. Daniel Kelley was selected by Black Beauty to act as the third member of the Panel.  Immediately upon selection of the initial Panel, the parties discussed bifurcation of liability and damages/remedies issues.  Failing to reach an agreement, the Panel entered a scheduling order and deferred the issue of bifurcation for later resolution. The parties agreed that the arbitration rules would be the Federal Rules of Civil Procedure and the Federal Arbitration Act.

17.     After initial written discovery, the parties filed motions for summary judgment on the issue of the deductibility of BLET and AMLF as "severance" taxes.

---

or partial performance of any covenant, agreement, term or condition of this lease or to exercise any right, power or remedy consequent upon a breach thereof, *and no acceptance of full or partial performance or payment of royalties during the continuance of any breach, shall constitute a waiver of or consent to any such breach* or of such covenant, agreement, term or condition."

Vermilion submitted its Motion for Partial Summary Judgment without expert testimony. Black Beauty's Cross Motion for Summary Judgment attached an affidavit of their "expert" Professor Peter Maxfield.[5]  In June of 2004, the Panel heard arguments of counsel on the motions for summary judgment and reserved ruling.  Specifically, Umpire Lambros (without finding the Lease ambiguous) requested that the parties present extrinsic evidence on the issues of intent and customs and practices in the coal mining industry regarding BLET and AMLF.  Accordingly, Vermilion retained experts and deposed numerous persons relative to the Umpire Arbitrator's request for extrinsic evidence.[6]

18.     In July of 2004, the parties were asked to identify the issues for hearing by the Panel.  Accordingly, Vermilion submitted its Issues for Arbitration. See, Exh. D. On August 24, 2004, the Panel issued its order regarding the issues to be arbitrated at the 11/08/04 hearing.  See, Exh. E.  In its order, the Panel bifurcated from the 11/08/04 hearing "remedies for any breach including accounting, damages, or termination." See, Par. 1(c), Exh. E.   Additionally, it reserved its right to determine jurisdiction and hear

---

5.     In support of its Motion for Summary Judgment, Black Beauty offered expert testimony from Professor Peter C. Maxfield and statements made by various persons at subcommittee hearings reported in the legislative history of the act which created AMLF.  Vermilion's Motion for Partial Summary Judgment did not rely on expert testimony.  Vermilion only retained its experts *after* Judge Lambros specifically advised the parties that he wanted extrinsic evidence to be offered at the hearing relating to industry custom and practices, intent of the parties, and Black Beauty's arguments relating to legislative issues including those raised by Professor Maxfield. Following his deposition, Black Beauty did not use Professor Maxfield as a trial expert.

6.     Vermilion argued in its Motion for Summary Judgment that expert testimony and evidence regarding "intent" was not necessary in order to determine the issue of whether BLET and AMLF were deductible as "severance" taxes because the issue was a question of law.  In his Award, Umpire Lambros ultimately decided the issue based upon applicable law (most of which was cited by Vermilion in its Motion) without reliance on expert opinion or fact testimony.  If the ruling had been made at the summary judgment stage, hundreds of thousands of dollars would have been saved on the costs of arbitration.

evidence and argument on certain of Vermilion's other issues at a time following the 11/08/04 hearing. See, par. 2 Exh. E.

19.    The hearing proceeded for two (2) weeks in Cleveland, Ohio.  Each party presented evidence (including expert testimony) and arguments.  In accordance with the Panel's August 24, 2004 Order, Vermilion **did not** present any evidence on the bifurcated remedies/damages issues.

20.    On March 28, 2005, the Panel issued a Decision and Award on certain of the Issues submitted for arbitration.[7]  Both party arbitrators filed dissents, and the decision of Umpire Lambros controlled.  Following the issuance of the initial Award, the parties entered into negotiations relating to Black Beauty's payment of amounts previously deducted for BLET and AMLF to Vermilion in accordance with the award.[8]

21.    In June of 2006, Vermilion voluntarily dismissed the "reserved" issues submitted for arbitration and filed its Motion for Costs and Attorneys' Fees accompanied by its Bill of Costs.[9]  In response, Black Beauty filed a Cross Motion for Costs which was insufficient due to a lack of a Bill of Costs.   After various motions and communications between the parties and the Panel, the Panel deliberated and on January 31, 2007, the Final Decision and Award was issued by the Panel granting

---

7.    The Decision and Award did not address certain of the bifurcated remedial issues or certain of the issues submitted by Vermilion and reserved by the Panel in its 08/24/04 Order.

8.    Black Beauty's payment to Vermilion in the amount of $372,329.44 for improper deductions of BLET and AMLF was made on September 9, 2005, subject to Black Beauty's "reserving all rights in remitting these sums."

9.    Section 24.1 of the Lease requires that the final award of the arbitrators "shall as a part thereof decide by whom the costs of arbitration shall be borne and paid and the amount of such costs including reasonable compensation for the arbitrators."

Vermilion a portion of its costs.[10]   Again, dissents were filed by both party arbitrators and the decision of Umpire Lambros controlled.

## Procedural History of Arbitration Proceedings

22.    Upon motion of Black Beauty and agreement of the parties, the matters set forth in Vermilion's Complaint were transferred to arbitration.   Vermilion and Black Beauty submitted their issues for arbitration to the Panel. Vermilion and Black Beauty's Arbitration Demands are attached as Exh. F.

23.    Black Beauty's issues submitted for arbitration focused primarily on the BLET/AMLF issue.  Similarly, Vermilion's Counter-Demand for Arbitration included the threshold issues relating to whether BLET and AMLF were "sales tax and/or severance" taxes. Generally, Phase I of the Arbitration focused on whether BLET and AMLF are deductible from GSP as severance taxes before computing royalties and wheelage fees.  Each of the parties' specific submissions addressed the issue of Black Beauty's deduction of BLET and AMLF from the Gross Sales Price ("GSP") before calculating royalty and wheelage fees. Black Beauty also submitted testimony regarding the number of people employed at the leased premises, and the amount of its investment.

## Pre-Hearing Orders of the Panel

24.    Periodically throughout the arbitration proceeding, the Panel issued orders relating to matters including the parties' submissions.  In the initial Scheduling Order,

---

10.    In the Final Award, Vermilion was awarded $308,955.01 for certain of its costs of arbitration plus the additional arbitrators' fees for Susan Getzendanner and Umpire Lambros from July 2006 through the date of the final award.

the Panel declined to order bifurcation of liability and damages, stating that it would address the issue of bifurcation, if appropriate, at a later date.

25.    In an effort to streamline the issues for hearing and to expeditiously resolve the BLET/AMLF issue, Vermilion submitted a Motion for Partial Summary Judgment in February of 2004 and Black Beauty filed its Reply and Cross Claim Motion for Partial Summary judgment in March of 2004.  Pursuant to the Panel's Order of January 13, 2004, limited depositions relating to the parties' motions were allowed at that stage of the proceedings.  After full briefing of the issues relating to the motions, the Panel heard arguments on Vermilion's Motion for Partial Summary Judgment and Black Beauty's Motion for Summary Judgment on June 22, 2004.  The Decision of the Panel relating to the Motions was that there was no ruling at that time and the issues raised in the Motions were reserved for the November 8, 2004, hearing.  Umpire Lambros (without finding the contract ambiguous) stated at the hearing on the Summary Judgment Motions that prior to ruling he wanted the parties to offer extrinsic evidence regarding the intent of the parties at the time of the execution of the Lease and the custom and practice in the coal mining industry relating to the BLET/AMLF issues presented in the Motions.

26.    In July and August of 2004, the parties tendered to the Panel their issues for arbitration at the November hearing.  On August 24, 2004, the Panel entered an Order regarding the issues for arbitration.  In its August 24th Order, the Panel limited the evidence and argument to be presented at the 11/08/04 hearing to "paragraphs 1 through 18" and "paragraph 27 only as it relates to estoppel" of Vermilion's Issues for Arbitration submitted July 13, 2004.  Vermilion's Issues for Arbitration are attached as

11

Exh. E.  Additionally, in its August 24th Order the Panel bifurcated from the 11/08/04

hearing "remedies for any breach including accounting, damages, or termination" and

"reserve[d] the right to determine jurisdiction and hear evidence and argument as to

Paragraphs 19-26 and any remaining issues of Paragraph 27, as identified in

Vermilion's Issues for Arbitration submitted July 13, 2004, at a time following the

11/08/04 hearing decision." The August 24[th] Order of the Panel is attached as Exh. E.

    27.    In complying with Umpire Lambros' request for extrinsic evidence

concerning the custom and practice in the coal mining industry concerning the issue of

the deduction of BLET and AMLF as "severance" taxes, Vermilion retained various

experts to offer opinion testimony at the hearing.  Following extensive briefing relating to

Vermilion's Rule 26(a) expert witness disclosures and Black Beauty's motion to strike

Vermilion's experts, the Panel ruled that discovery would proceed and Vermilion was

allowed to offer the opinion testimony along with other evidence and fact testimony.

    28.    The arbitration hearing began on 11/08/04 and concluded on 11/19/04. At

the hearing Vermilion was limited to the presentation of evidence on liability issues in

accordance with the August 24, 2004, Order.  Accordingly, Vermilion presented little or

no evidence or argument on the bifurcated issues of remedies for any breach including

accounting, damages, or termination. Vermilion intended to, and would have, submitted

testimony on the bifurcated issues that it had invested more than $20 million in the

leased property, and that several hundred older investors relied upon the income

derived from royalties for retirement income. However it was not permitted to submit this

evidence because of the rush to judgment on the bifurcated issues.

29.    Following the arbitration hearing, the parties submitted post hearing briefs to the Panel on the law relating to the liability issues included in the arbitration.

**Interim Decision and Award on Bifurcated Liability Issues**

30.    On April 8, 2005, the Panel issued the interim decision and award of Umpire Lambros, and the separate opinions of Arbitrator Getzendanner and Arbitrator Kelley.  In his opinion, Umpire Lambros identified as the **primary** issue of the dispute the bifurcated liability issue relating to the deductibility of the Black Lung Excise Tax ("BLET") and Abandoned Mine Land Fee ("AMLF") in computing gross selling price for the purposes of calculating royalties and wheelage fees pursuant to the Lease.  In ruling in favor of Vermilion on the "primary" issue, Umpire Lambros made numerous statements that strongly affirmed the veracity of Vermilion's position of the issue since its inception in August of 2002 "that **BLET and AMLF cannot be deducted from the gross selling price** because **BLET and AMLF are not "severance" taxes, using the plain and ordinary meaning of the word, but are federal special purpose taxes not deductible within the terms of this lease."**  (Emphasis added).  *See,* Interim Award, page 5 attached as Exh. G. Included among the statements made by Judge Lambros' ruling in Vermilion's favor on the BLET/AMLF issue are the following:

- The words "any sales tax and/or severance" tax are not ambiguous.

- The overwhelming evidence and law of record speak of a severance tax as a tax imposed by states.

- The plain and ordinary meaning of severance tax is a tax imposed by a *state* on the severance of natural resources from the ground.

- A thorough review of authorities has indelibly seared the word "severance" tax with a plain and ordinary meaning to be a *state tax* and not a federal tax despite some comparable elements.

- The term "severance" tax and the sense of that term are words that are understood to be state taxes. The term or sense of the words "severance" tax are used regularly as meaning state taxes and the term is characteristic specifically of a state tax.

- The words "severance" tax in conventional and standard usage is generally regarded as a state tax and its usage in the lease cannot be construed to mean a federal tax because of the descriptive term "any". "Any", in the sense used, means any state sales tax and/or severance tax; and, although, the scope of "any" covers the whole world of state severance and state sales taxes, it does no go to another universe of words to include federal taxes.

Umpire Lambros also cited the United States Supreme Court case of *Commonwealth Edison Co. v. State of Montana, et al.,* 453 U.S. 609, 101 S.Ct. 2946 (1981), a case relied upon by Vermilion throughout the arbitration proceedings, stating that "both the concurring and dissenting opinions make it quite apparent that the court recognized

severance taxes to be state taxes on coal and other minerals within the domain of the various states."

31.     To Vermilion's surprise, the Interim Award and Decision also contained rulings on certain of the other issues submitted by Vermilion including certain remedial issues which Umpire Lambros had bifurcated from the initial hearing. The parties were instructed to contact the case administrator regarding further matters including the costs of arbitration and bifurcated remedial issues which were to be considered and determined at the final hearing. Both of the party arbitrators filed dissents. See, Exh. G.

32.     Upon receipt of the Interim Decision, Vermilion and Black Beauty calculated and reached a consensual resolution regarding amounts due to Vermilion that arose out of Black Beauty's AMLF and BLET deductions, for the period beginning November 1, 1999, with interest.  On September 9, 2005, Black Beauty made payment to Vermilion in the amount of $372,329.44. However, since *Vermilion was denied the opportunity to present evidence or argument on issues relating to accounting, damages, termination or other remedies provided by law or as specifically set forth in the Lease as a result of the bifurcation of liability and damage/remedial issues*, Vermilion was uncertain as to how to proceed in light of those portions of the Decision in which determinations were made regarding the remaining bifurcated remedial issues (i.e. termination). Moreover, the instruction that Vermilion coordinate with the case administrator regarding the scheduling of a hearing on remedial issues which had already been decided appeared to be moot.

33.    Accordingly, Vermilion respectfully submitted a request to the Umpire Arbitrator that the Final Order of the Panel include the following:

- Language documenting that in accordance with the Decision and Award, the parties have resolved the accounting issues relating to the reversal of Black Beauty's deductions of AMLF/BLET with interest.  Black Beauty shall not deduct BLET or AMLF from any payments made to Vermilion/Lessor for royalties and wheelage under the Lease;

- A decision as to by whom the costs of arbitration were to be borne and paid and the amount of such costs including reasonable compensation for the arbitrators.

- Findings of Fact and Conclusions of Law regarding those portions of the Decision and Award dated March 28, 2005 (the "Decision") relating to Vermilion's claims for breach of contract, default/termination, anticipatory repudiation, fraud, breach of express duty of good faith dealing, and remedies.

- A termination of the Panel's jurisdiction over the issues submitted by the parties' to arbitration.

34.    On June 28, 2006, Vermilion submitted its Motion to Finalize Order and For An Award of Costs and Attorneys' Fees and its Voluntary Dismissal of Reserved Issues. Black Beauty submitted a Cross Motion for Costs.

**Final Decision and Award**

35.    On January 31, 2007, the Panel entered its Final  Decision and Award on Bifurcated Remedial Issues (the "Final Order"). Exh. H.  In the Final Order, the Umpire

16

Arbitrator reiterated his opinion that Black Beauty did not default upon, breach or repudiate or breach the Lease and, finding Vermilion to be the prevailing party, awarded to Vermilion certain of its costs of the arbitration. Once again, both of the party arbitrators filed dissents and, in accordance with Section 24.1 of the Lease, the decision of the umpire arbitrator is conclusive and binding. In his Final Order, the Umpire Arbitrator made the following rulings on bifurcated remedial issues:

- Vermilion's Motion to Finalize Order and for an Award of Costs and Attorneys' Fees is granted in part and denied in part with an award of $308,955.01 being awarded to Vermilion for "costs" to be paid by Black Beauty.

- Black Beauty is ordered to pay the Panel's outstanding arbitrator fees from July 2006 to the date of the Final Order.

- Black Beauty's Cross Motion for Costs is denied and overruled in its entirety.

- Vermilion's November 2, 2006, Request for Findings of Facts and Conclusions of Law is denied and overruled.

- Black Beauty's Motion to Strike Vermilion's Request for Findings of Facts and Conclusions of Law is denied.

- All issues before the Panel having been resolved, the arbitration proceedings were concluded.

36.    The Analysis and Discussion portion of the Umpire Arbitrator's Final Order sets forth the basis for the rulings made by the Umpire Arbitrator in the Final Order. Some of the bases for the Umpire Arbitrator's Final Order included:

- That the term "costs of arbitration" under Section 24.1 of the Lease does not include attorneys' fees under the "American Rule" and cited Illinois case law and the Illinois Arbitration Act.

- That the term "costs of arbitration" under Section 24.1 of the Lease does not include expert fees under cited Illinois case law and in the absence of statutory authority.

- That Black Beauty's actions did not rise to the level of a *material* breach and thus termination of the contract was not an appropriate remedy (citing to the Interim Award language that "…the deduction now constitutes a breach for monetary compensation, the deductions were not fraudulent nor did they constitute a breach of such level to be a repudiation. The deductions in the computation did not constitute a total breach.").

- That Black Beauty's improper deduction of BLET and AMLF from the calculation of royalties and wheelage; and its knowing, willful, express refusal to pay correct royalties in the future; constituted a "good faith dispute" or a "good faith erroneous interpretation" of the Lease which did not rise to the level of repudiation of the Lease.

- That, as stated in his Interim Award, Black Beauty was not obliged to respond to Vermilion's notice of default by disavowing its purportedly good faith belief that BLET and AMLF were permissible deductions in the royalty computation under the Lease and that such conduct was not a total breach.

- That by Vermilion's exercising its rights under Section 22.1 of the Lease in sending a Notice of Default and stating that the Lease would terminate in accordance with the Lease terms if Black Beauty failed to cure its default, Vermilion "invited" the costs associated with its claims for repudiation and remedies for breach including termination.

- That Vermilion's discovery of the improper deduction of BLET and AMLF by Black Beauty and its predecessors after 6 years of performance of the Lease did not warrant Vermilion's exercise of its right to terminate the Lease under Section 22.1.[11]

- That Vermilion, as the prevailing party on the *main threshold legal issue underlying the arbitration* – i.e., whether BLET and AMLF was a severance tax and should be deducted in computing royalties from the gross selling price, is entitled to an award of $308,955.01 of its costs. [12] Vermilion's award for costs did not include Vermilion's portion of the outstanding arbitrator/arbitration fees which, in accordance with the Final Order were to be assessed to Black Beauty directly.

---

11    This analysis ignores the evidence that Black Beauty hid its noncompliance by submitting false reports to Vermilion as set forth in paragraph 12 herein.  Vermilion objected to the deductions of BLET and AMLF from royalty and wheelage calculations immediately following discovery of same.

12.    Vermilion's Bill of Costs and Attorneys' Fees submitted to the Panel in the arbitration proceedings detailed $477,103.74 in costs and $1,059,966.61 in attorneys' fees up to and not including the preparation and filing of the Motion for Costs and Attorneys' Fees and related pleadings.

**Grounds for Vacating the Arbitration Award**

**<u>COUNT I</u>**

**Pursuant to 9 U.S.C. § 10(a) (4) of the Federal Arbitration Act
The Umpire Arbitrator Exceeded His Powers**

37.    Vermilion repeats and realleges paragraphs 1-36 above as if fully set out herein.

38.    The Lease, by its stated terms, constrains the powers of the arbitrators to an extraordinary extent. Section 24.1 of the agreement states, "In arriving at a decision and award, said arbitrators *shall be bound by any relevant state and federal law* applicable to the substantive issue or issues so submitted for arbitration…" Section 24.1 goes on to state, "The binding arbitration provision set forth herein shall not serve to limit or diminish the right of either party to this lease Agreement to seek injunctive relief for breach hereof." Section 22 of the Lease provides considerable self help remedies to the Lessor, including *termination*, repossession, non-waiver, injunctive relief, and a broad range of additional "rights powers or remedies provided for in this lease or otherwise.".

39.    Pursuant to 9 U.S.C. § 10(a) (4) of the Federal Arbitration Act, grounds for vacating the Award include where the Umpire Arbitrator exceeded his powers by failing to follow the clear or defined terms of the Lease; the Award otherwise failed to draw its essence from the agreements of the parties; or, the Umpire Arbitrator imperfectly executed his powers as demonstrated by the following:

      a.    The Umpire Arbitrator entered an Award finding that BLET and AMLF are clearly not "severance" taxes and cannot be deducted from Black Beauty's calculation of royalties and wheelage under

Section 2.4 of the Lease. As stated in paragraph 13 of this Petition, the express provisions of the Lease set forth events of default and Vermilion's (as Lessor) "self-help" remedies for default, including termination of the Lease.  Black Beauty's deduction of BLET/AMLF from the calculation of royalties due to Vermilion under the Lease was an event of default as defined in Section 22.1(a) of the Lease. In his Award, the Umpire Arbitrator **overrode the express provisions of the Lease** in ruling that Black Beauty's improper deduction of BLET/AMLF was not an event of default entitling Vermilion to remedies including termination and damages.

b.    The Umpire Arbitrator ruled that the Lease was not terminated in accordance with its own stated terms because of Black Beauty's refusal to cure its default as required by the contract. This determination clearly flies in the face of the express terms of the Lease and the undisputed facts. The Umpire Arbitrator's Award fails to apply the clear and unambiguous language of the Lease, and fails to draw its essence from the Lease.

c.    The Interim Award concludes that arbitration is a condition precedent to default/ termination or the fact of a breach. The Lease does not contain any such requirement for arbitration. The law does not support this conclusion. The Umpire Arbitrator's Award fails to follow the clear and unambiguous language of the Lease, fails to

draw its essence from the Lease, and fails to apply the law as required by Section 24.1 of the Lease.

d.   The Interim Award includes a ruling based upon a theory of good-faith breach of contract or equitable grounds for denying Vermilion damages for Black Beauty's breach of contract. The Umpire Arbitrator exceeded his powers by failing to follow the clear and defined terms of the Lease and the Award fails to draw its essence from the Lease, and fails to apply the law as required by Section 24.1 of the Lease.

e.   After finding in favor of Vermilion on the threshold issue that BLET and AMLF were not deductible, the Umpire Arbitrator denied Vermilion recovery for payment deficiencies prior to November 1, 1999.  There is no possible interpretation of the Lease or nor does the evidence support the finding that Vermilion is not entitled to payment deficiencies prior to November 1, 1999. [13]

---

13.   The evidence has shown that at the time of the assignment to Black Beauty, Vermilion signed an "estoppel" certificate. The Estoppel Certificate stated on its face that the estoppel certificate was being requested by Catlin Coal Company, Inc. "in order to induce Black Beauty Coal Company to enter into a business transaction with Catlin Coal Co., Inc." Vermilion's President, Keady amended the estoppel certificate drafted and presented by Black Beauty to expressly withhold representations and warranties and reserve all of Vermilion's rights regarding compliance of the predecessor lessee, Catlin. Specifically, the Addendum signed by Mr. Keady stated that that contained an Addendum stating that to the "best of Lessor's knowledge" that there were no breaches of the Lease by Lessee, but that Lessor had relied on Lessee's representations and had not performed any independent audit or inspection. Black Beauty argued that the Estoppel Certificate signed by Vermilion was the instrument pursuant to which Black Beauty did not assume any prior period liabilities for unpaid royalties or wheelage.  An additional "estoppel" argument raised by Black Beauty at the hearing involved Vermilion's execution of a Collateral Assignment of Rents, Profits and Proceeds in connection with the refinancing of loan with Terre Haute National Bank. (Tr. 1536-1541).  Black Beauty claimed that as a result of a statement made to Terre Haute Bank by Vermilion on February 16, 2000, that "the Lease is in full force and effect, Black Beauty Coal Company is the Lessee thereunder and neither Lessor nor Lessee is in breach thereunder," therefore Vermilion is estopped from making its claims for breach against Black Beauty.  The testimony of Fred Keady established that the certificate that Vermilion provided to its secured lender, Terre Haute First

22

Specifically, Section 14.1 of the Agreement states, "Lessee shall have the right to mortgage, assign, sublease, or set over any of its estate, interest or rights hereunder or any part thereof…**with the written assumption by the transferee of all of the obligations of Lessee in a form satisfactory to Lessor**…" (Emphasis added).[14] Additionally, Section 22.4 of the Agreement contains a non-waiver clause, "**No Waiver, etc. by Lessor.** No failure by Lessor to insist upon the strict performance of any covenant, agreement, term or condition of this lease or to exercise any right, power or remedy consequent upon a breach thereof, and no acceptance of full or partial performance or payment of royalties during the continuance of any such breach, shall constitute a waiver of or consent to any such breach or of such covenant, agreement, term or condition. No waiver of any breach shall affect or alter this lease, but each and every covenant, agreement, term and condition of this lease shall continue in full force and effect with respect to any other then existing or subsequent breach thereof." The Umpire Arbitrator did not follow the clear and unambiguous language of the Addendum to

---

National Bank, was given in reliance upon Black Beauty's own representations and upon its false royalty reports, before Vermilion discovered Black Beauty's systematic underpayments; and was given solely for the benefit of the bank.

14.    The evidence has shown that the form of assignment from Catlin Coal, LLC (with Black Beauty as the sole member) to Black Beauty, which was drafted by counsel for Black Beauty did not conform to the Lease because it did not contain an assumption of all the obligations of the predecessor lessee as required by Section 14.1.

the Estoppel Certificate and Sections 14.1 and 22.4 of the Lease
and the Award fails to draw its essence from the Lease when
denying recovery for payment deficiencies prior to November 1,
1999. The Umpire Arbitrator exceeded his powers by ignoring the
clear and defined terms of the Lease and the Addendum to the
Estoppel Certificate.

f.      The Umpire Arbitrator determined that Black Beauty's practice in
improperly deducting BLET/AMLF from its calculation of royalties
and wheelage due to Vermilion as Lessor constituted a "breach for
monetary compensation" which did not go to the essence of the
contract such as to constitute it to be a total breach. As stated in
paragraphs 30-35 of this Petition, the express provisions of the
Lease set forth events of default and Vermilion's remedies for
default. The Umpire Arbitrator exceeded or imperfectly executed his
powers by ignoring the clear and defined terms of the Lease, and
failed to apply the law as required by Section 24.1 of the Lease.

g.      The Interim Award also attempts to propound a theory of good-faith
breach of contract, without citing any relevant legal conclusions of
law in support thereof. The Umpire Arbitrator exceeded or
imperfectly executed his powers by ignoring the clear and definite
terms of the Lease, and failed to apply the law as required by
Section 24.1 of the Lease.

h.    The Umpire Arbitrator determined that Black Beauty did not repudiate the Lease.  The evidence has shown that Vermilion repeatedly demanded that Black Beauty pay the correct amount of royalty and wheelage (and even offered to compromise on the recovery of prior period underpayments); it twice demanded adequate assurance of specific performance from Black Beauty. In light of the fact that Black Beauty had already perfected its repudiation by clearly stating its refusal to perform in the future while continuing its present breach, these further demands for adequate assurance by Vermilion demonstrated an extra degree of caution and restraint before it changed its position and terminated the Lease in accordance with Section 22.1; and filed its lawsuit. The Umpire Arbitrator exceeded or imperfectly executed his powers by ignoring the clear and defined terms of the Lease, and failed to apply the law as required by Section 24.1 of the Lease.

i.    The Umpire Arbitrator determined that Black Beauty did not commit fraud. However, the evidence showed that Black Beauty reported adjusted selling prices on royalty reports provided to Vermilion without disclosing the nature of the adjustments, or even that there were any adjustments (deduction of BLET/ AMLF as severance taxes); and case law has established a bright-line test in for fraud in this exact situation.  Moreover, the evidence further showed that Black Beauty's own internal reporting had blank columns where

25

severance taxes would ordinarily be listed, therefore it, itself, knew it had not incurred any severance taxes. The denial of Vermilion's fraud claim in the Award by the Umpire Arbitrator exceeded or imperfectly executed his powers by ignoring the clear and definite terms of the Lease, and failed to apply the law as required by Section 24.1 of the Lease.

40.    WHEREFORE, Petitioner respectfully moves this Court for an order vacating all portions of the Award except the Panel's award of compensatory damages for Black Beauty's breach of contract in deducting BLET and AMLF from the calculation of royalties and wheelage from payments made to Vermilion under the Lease and the costs awarded to Vermilion. Petitioner further requests the court to either decide the vacated issues itself, or to remand the determination of those issues to a new panel of arbitrators for a determinative hearing.

## **COUNT II**

### **Pursuant to 9 U.S.C. § 10(a)(2) of the Federal Arbitration Act**
### **The Umpire Arbitrator Demonstrated Evident Partiality**

41.    Vermilion repeats and realleges paragraphs 1-36 above as if fully set out herein.

42.    Pursuant to 9 U.S.C. § 10(a)(2) of the Federal Arbitration Act, the Award should be vacated as to the rulings regarding breach, default/termination, repudiation, and fraud on the grounds that the Umpire Arbitrator demonstrated evident partiality Specifically, Section 26 of the Lease includes an express covenant of good faith and fair dealing. It states, "It is the intention of both parties to successfully promote and operate an underground coal mine to remove and sell the coal encompassed in this agreement.

26

To that end, both parties agree to cooperate with each other and that each owes the other a duty of good faith dealing." The evidence has shown that Black Beauty persistently and flagrantly breached its duty of good faith dealing by vexatiously resisting Vermilion's attempts to enforce the Lease, by driving up Vermilion's costs of arbitrating this matter, and by retaliating against Vermilion for its efforts to enforce the Lease. However, in his Award Umpire Arbitrator Lambros studiously ignored Vermilion's entreaties for the benefit of its bargain in this regard; and actually turned the argument around and threw it in Vermilion's face by conjuring "quasi-good-faith affirmative defenses" for Black Beauty (not raised by Black Beauty) in the matters of breach, default/termination, repudiation, and fraud, contrary to the express provisions of the Lease and applicable Illinois law. These quasi good faith affirmative defenses raised *sua sponte* by the Umpire Arbitrator demonstrate evident partiality on the part of the Umpire Arbitrator.

43.    WHEREFORE, Petitioner respectfully moves this Court for an order vacating all portions of the Award except the Panel's award of compensatory damages for Black Beauty's breach of contract in deducting BLET and AMLF from the calculation of royalties and wheelage from payments made to Vermilion under the Lease and the costs awarded to Vermilion. Petitioner further requests the court to either decide the vacated issues itself, or to remand the determination of those issues to a new panel of arbitrators for a determinative hearing.

## COUNT III

### Pursuant to 9 U.S.C. § 10(a) (3) of the Federal Arbitration Act
### The Umpire Arbitrator Refused to Hear Evidence Material to the Controversy

44.     Vermilion repeats and realleges paragraphs 1-36 above as if fully set out herein.

45.     Pursuant to 9 U.S.C. § 10(a) (3) of the Federal Arbitration Act, The Award should be vacated as to those portions denying Vermilion's remedies and damages for default and Black Beauty's breach of its obligations under the express provisions of the Lease on the grounds that the Umpire Arbitrator refused to hear evidence material to the controversy by his "rush to judgment regarding the bifurcated issues.  Specifically, the Panel's Order of August 24, 2004, bifurcated liability issues from accounting, damages and termination as more fully set forth in Paragraph 18  herein.  Contrary to his own order, the Umpire Arbitrator preemptively, and without notice decided the matters that were bifurcated for a second hearing, without holding the scheduled hearing, prior to his ruling on remedies for Black Beauty's breach, including his ruling against Vermilion on the issue of termination of the Lease. Vermilion was denied the opportunity to present evidence on the remedies for breach, including termination.

46.     Arbitration of this matter has utterly failed to provide its promised benefits of promptness and economy. The arbitrators' awards failed to make Vermilion whole for nearly $200,000 (including interest) of prior period underpayments, without stating any finding of fact or conclusion of law in support of that omission. Vermilion was awarded less than 2/3 of its costs of arbitration, and none of the legal fees it incurred in the agonizing and drawn-out arbitration process. Vermilion's additional remedies of termination, and its claims for breach of contract, repudiation, fraud, and breach of Black Beauty's express duty of good faith dealing were brushed off by the Umpire arbitrator in plain disregard of the stated terms of the Lease and the requirements of

applicable law. No lessor should have to suffer such treatment at the hands of any lessee.

47.    The enforcement of private contracts is a fundamental "raison d'etre" of the Judiciary—indeed of government itself. The Umpire Arbitrator's failure to enforce the Lease in accordance with its stated terms, applicable law, and the undisputed facts was an abdication of that most sacred duty, and calls the arbitration process into disrepute.

48.    WHEREFORE, Petitioner respectfully moves this Court for an order vacating all portions of the Award except the Panel's award of compensatory damages for Black Beauty's breach of contract in deducting BLET and AMLF from the calculation of royalties and wheelage from payments made to Vermilion under the Lease and the costs awarded to Vermilion. Petitioner further requests the court to either decide the vacated issues itself, or to remand the determination of those issues to a new panel of arbitrators for a determinative hearing.

Attorney for Vermilion Coal Company

s/ Deborah G. Cole
ARDC No. 6184806

DGCole Law
1400 North LaSalle Street
Chicago, Illinois 60610
Tel: (312) 751-0272
Fax: (312) 751-4133
ARDC No. 6184806
dcole@dgcolelaw.com

John Barr
Barr & Barr
1301 East Mound Road, Suite 350
Decatur, IL 62525-0050
Tel: (217) 875-5311
Fax: (217)875-5742
ARDC No. 00120308
sej4barr@aol.com

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

VERMILION COAL COMPANY

## DEFENDANTS

BLACK BEAUTY COAL COMPANY

**(b)** County of Residence of First Listed Plaintiff  **Vermilion County**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  **Vanderburgh**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Deborah G. Cole

DG Cole Law, 1400 N. LaSalle St., Chicago, IL 60610, 312-751-0272

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
(U.S. Government Not a Party)

☒ 2   U.S. Government
Defendant

☒ 4   Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
9 U.S.C.10, et seq.

Brief description of cause:
Complaint to vacate part of arbitration award

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE

DOCKET NUMBER

DATE
**April 24, 2007**

SIGNATURE OF ATTORNEY OF RECORD
Deborah G. Cole

**FOR OFFICE USE ONLY**

RECEIPT #   AMOUNT   APPLYING IFP   JUDGE   MAG. JUDGE

**E-FILED**
Tuesday, 24 April, 2007  12:47:34 PM
Clerk, U.S. District Court, ILCD

## Appendix

1.      Vermilion owns fee coal, minerals, oil and gas in Vermilion County, Illinois. Its holdings include proven and probable coal reserves of more than 100 million recoverable tons in the Illinois #6 and Illinois #7 coal seams.  On November 21, 1994, Vermilion entered into the Lease leasing certain lands and coal mining rights (the "Leased Premises") that comprised most of the proven coal reserves on the Coal Property to Laswell Coal Co. ("Laswell") in exchange for, inter alia, Vermilion's rights to receive certain royalties and payments as provided in the Lease. The Leased Premises, at the onset of the Lease, included approximately 11,500 acres and an estimated 91 million recoverable tons of coal.  Pursuant to the Lease, Vermilion had a reasonable expectation that 91 million tons of coal would be mined and sold from the Illinois #6 and Illinois #7 coal seams. The Lease has a primary term of twenty (20) years beginning on November 21, 1994, subject to renewal for up to two (2) additional twenty year periods in accordance with the Lease provisions.

2.      In December of 1994, the Lease was assigned by Laswell to Catlin Coal Company, Inc (Catlin"), an Indiana corporation founded by Ronald E. Laswell, its President.  In late 1995, Catlin began construction of the Riola coal mine on the Leased Premises. The Riola mine began to produce coal in 1996, and reached its commercial capacity of about 1,000,000 tons per year by 1998.  The Riola mine initially included about 11,000,000 recoverable tons of Vermilion coal and, based upon information and belief, a roughly equal amount of coal leased from third parties. The Riola Mine shipped a number of grades of coal by truck to a number of different electric power plants and industrial boiler operators. Some of the coal shipped from the Riola mine was sold f.o.b.

1

mine, and some was sold and delivered to buyers' plants. (Black Beauty closed the Riola mine in June 2006, having mined 3,343,856 tons of coal leased from Vermilion and 4,961,200 tons leased from others.)

3.    On or about October 29, 1999, Catlin assigned and transferred its right, title and interest in the Lease, to Catlin Coal, LLC, ("Catlin LLC") an Indiana limited liability company, an entity organized, based upon information and belief, by Defendant Black Beauty. On November 1 1999, Catlin LLC was liquidated and pursuant to an Assumption agreement between Catlin LLC and Black Beauty, Catlin LLC assigned its right, title and interest in the Lease to Black Beauty, and Black Beauty undertook to assume **less than** all of Catlin LLC's obligations pursuant to the Lease. Black Beauty thereafter caused Catlin LLC to assign to it all of the rights of the Lessee under the Lease.

4.    On November 1, 1999, Black Beauty took over operation of the 1,000,000 ton/year Riola mine.

5.    In the late summer of 2001, Black Beauty began construction of the Vermilion Grove mine. The Vermilion Grove mine shipped its first coal in late December 2001, and had its first full month of operation in January of 2002.  The Vermilion Grove mine reached a production level of about 2,000,000 tons per year in late 2003 or early 2004.  Virtually all of the coal reserves assigned to the Vermilion Grove mine are leased by Black Beauty from Vermilion pursuant to the Lease. The Vermilion Grove mine was designed to, and did through August 2002, ship all of its coal by rail to a single buyer, in "unit-train" lots of 10,000 tons, more or less. All the coal from Vermilion Grove was sold f.o.b. mine through at least August 2002.

2

6.    The Lease provides, in relevant part, that the Lessee shall pay rents and royalties to Vermilion on any and all coal mined and sold. Royalties to be paid to Vermilion by Black Beauty include:

(a)    A Production Royalty of 5.0% of Gross Proceeds (Gross Selling Price times the number of tons shipped); and,

(b)    Wheelage of *the higher of* (I) fifteen cents per ton, or (ii) 1.0% of Gross Proceeds of third party coal produced from the mine; and,

(c)    A Minimum Advance Royalty of $600,000.00 on each contract anniversary after 2001 *(*lesser amounts before). The Lessee may recoup the Minimum Advance Royalty   against produced tons but not against wheelage tons.

7.    Article II of the Lease entitled "Production Royalty" provides in relevant part in Section 2.1 that Lessee shall pay to Lessor as rent, a Production Royalty in the amount of "Five percent (5.0%) of Lessee's Gross Sales, as hereinafter defined..." Section 2.4 further provides that for purposes of calculating royalties due to the Lessor, Gross Selling Price ("GSP") is defined as "the actual price paid for coal sold to a bona fide purchaser f.o.b. the loading point after preparation, if any, and loading for final destination*, less any sales tax and/or severance imposed thereon,* but without deduction for selling commissions, advertising, credit losses, or *other expenses*..." [Emphasis added].  Section 2.5 of the Lease states that "Gross Sales shall be defined as Gross Selling Price, multiplied by the number of tons mined and sold from the leased premises during the time period for which the Production Royalty amount is to be calculated."

3

8.    Article XI of the Lease covers payments owed to the Lessor from the Lessee for wheelage for transportation or shipment of coal from any property not owned by Lessor into, over, through or under the Coal Property,  and provides in relevant part that "In the event Lessee transports or ships coal from any property not owned by Lessor into, over, through or under any of the leased premises, Lessee shall pay to Lessor fifteen (15) cents per net ton of that coal, or, one percent (1.0%) of the average gross selling price per net ton of that coal, as gross selling price is defined in Section 2.4 above, whichever is greater, as wheelage for such transportation or shipment."

9.    In June of 2002, Vermilion noticed that the GSP reported by Black Beauty for the Vermilion Grove Mine, upon which its Production Royalty and wheelage payments were based, had fallen below $20.00/ton, and below those of the Riola mine. This was substantially less than Vermilion's understanding of the contractual selling price of $24.00 per ton, f.o.b. the Vermilion Grove mine to Black Beauty's single customer at that mine. Vermilion requested written clarification of Black Beauty's selling price and royalty calculations from Black Beauty. After several telephone conversations and voice mails, no written report was forthcoming, so Vermilion President Frederick Keady ("Keady") requested a meeting with Black Beauty representatives to obtain an explanation of the shortfall.

10.    During the months of December 2001 through June 2002, Black Beauty also deducted a $0.30 per ton "Loading Fee" from Gross Selling Price before calculating the Royalty payable to Plaintiff Vermilion from its operation of the Vermilion Grove Mine. When Vermilion's President attended a meeting on August 14, 2002 (the "August Meeting") which Keady requested for the purpose of investigating the variation in Gross

Selling Price at the Vermilion Grove mine, representatives of Black Beauty admitted the improper deduction and presented Keady with a check in the amount of $6,970.37 in restitution for the improper deductions from the royalties and wheelage due and payable to Vermilion.

11.    At the August Meeting, Black Beauty produced a schedule that revealed several deductions from the contractual selling price for coal shipped from the Vermilion Grove mine. Black Beauty also admitted to making certain other deductions from its gross proceeds before calculating the royalty and wheelage payments owed to Vermilion from Black Beauty's gross sales.  In addition to the "loading fee", Black Beauty admitted that it was also deducting (as "surtaxes") 4.4% of Gross Selling Price, or about $0.95/ton for BLET; and, $.015/ton for AMLF payments from the actual coal sales price per ton that it received from Buyers, prior to calculating the GSP per ton for the purpose of calculating earned royalties and wheelage fees ("ERWF") payable to Vermilion pursuant to the Lease.

12.    The reason that Vermilion did not discover the improper deductions until its August 14, 2002 meeting with Black Beauty officials was that Black Beauty had at all applicable times until February 15, 2005, submitted a faxed report to Vermilion that set forth an adjusted selling price as though it were the actual gross selling price that Black Beauty received from buyers, and then continued to set forth a computation of the amount of royalties and wheelage based on the adjusted selling price **from which BLET and AMLF had already been deducted.** Prior to August 15, 2002, Black Beauty reported selling prices to Vermilion in its monthly report (although it was not required to

5

do so), but never disclosed that it had adjusted those prices by improperly deducting BLET and AMLF.

13.    On August 18, 2002 Vermilion made an initial claim to Black Beauty for unpaid back royalties, wheelage, and interest payments in the amount of $236,725.50. On August 19, 2002, Black Beauty paid Vermilion $111,171.25 "under protest".

14.    On September 30, 2002, Vermilion sent Black Beauty a letter further documenting its demand that Black Beauty desist from deducting BLET and AMLF from Gross Sales before computing Vermilion's Royalties and wheelage fees; and make payment of prior period royalty and wheelage deficiencies that resulted from the Black Beauty's and Catlin's improper deduction of BLET and AMLF from the actual coal sales price per ton prior to calculating the Gross Selling Price per ton for the purpose of calculating ERWF payable to Vermilion plus interest, pursuant to the Lease for the period since production began in 1996.

15.    On October 10, 2002, Vermilion sent Black Beauty a revised and final claim for royalty and wheelage deficiencies in the amount of $291,612.94. The claim included the amounts that arose from the improper deduction of BLET and AMLF from Gross Selling Price before calculating the royalty and wheelage due to Vermilion, and an additional $76,658 that arose from wheelage payments of $0.15 per ton during the years 1996-1999 instead of the higher rate of 1.0% of Gross Selling Price that was required by the stated terms of the Lease. However, Black Beauty continued to deduct BLET and AMLF from GSP in defiance of Vermilion's objections.

16.    On October 20, 2002, Vermilion sent Black Beauty a certified letter demanding that it desist deducting BLET and AMLF from GSP and that it make

6

payment for past due royalty and wheelage deficiencies in accordance with the Lease. Vermilion also stated that it was "commercially insecure in Black Beauty's performance of the Lease" and demanded adequate assurance of Black Beauty's performance of its obligations as Lessee.

17.     On October 23, 2002, Black Beauty, through its legal counsel, sent Vermilion a letter denying Vermilion's claim for royalty and wheelage deficiencies and repudiating Black Beauty's present and future obligation to calculate the Gross Selling Price per ton for the purpose of calculating ERWF payable to Vermilion pursuant to the Lease without deducting BLET and AMLF. Black Beauty claimed that BLET and AMLF were "sales taxes and/or severance" taxes and therefore proper deductions under Section 2.4 of the Lease. Black Beauty also claimed that it was not responsible for prior period obligations from periods before it had acquired the Lease from Catlin because it was a "remote assignee" of Catlin.1

18.     By its express refusal to desist from its improper deduction of BLET and AMLF from the gross selling price Black Beauty actually received for coal that it mined and shipped pursuant to the Lease, while continuing its improper and objected-to conduct, Black Beauty repudiated its present and future obligation to pay correct royalties and wheelage pursuant to the Lease. Black Beauty then set off its August 2002

---

1. Black Beauty argued that after the assignment of the Lease from Catlin Coal, Inc. to Catlin Coal, LLC and then from Catlin Coal, LLC to Catlin Coal, LLC (with Black Beauty as the sole member), and then from Catlin Coal, LLC to Black Beauty, Defendant continued to calculate royalties and wheelage in the same manner as its predecessor in interest. The evidence showed, however, that the assignment from Catlin Coal, LLC (with Black Beauty as the sole member) to Black Beauty did not include an assumption of liabilities as required under Section 14.1of the Lease *and* the assignee did not advise Vermilion in writing or otherwise of the assignment as required under Section14.1of the Lease.

provisional payment of $111,171.25 against the Annual Minimum Royalty payment due to Vermilion on November 21, 2002.

19.    Between November 21, 1994 and December 31, 2006, Black Beauty and its predecessors mined and sold approximately 9,238,725 tons of coal leased from Vermilion. The amount of Vermilion's coal remaining unmined in the leased premises is approximately 83 million tons.

20.    On December 22, 2002, Vermilion again sent a letter to Black Beauty in accordance with the notice provisions of the Lease (the December 22 Letter). The December 22 Letter stated, "Since August, when Lessor objected to Lessee's practice of deducting BLET and AMLF from the amounts that it invoices the buyers of coal produced and shipped pursuant to the Coal Mining Lease, Lessee has continued with that practice, in spite of Lessor's objections. By its conduct since that time, and by setting off the provisional payment against the Advance Royalty, Lessee has unilaterally imposed its interpretation of the Coal Mining Lease on Lessor." The December 22nd Letter went on to say, " While Black Beauty may not agree with some or all of Lessor's demands in this matter, it is Lessor's position that Lessee is obligated to pay these amounts, subject to a final determination of whether each element of payment is in accordance with the Coal Mining Lease. We don't believe that you have the right to withhold payment on your whim.", and "[y]our conduct has caused, and continues to cause, us irreparable harm."  The December 22nd Letter further stated, "Lessee's conduct has caused Lessor to be commercially insecure in Lessee's performance of the Coal Mining Lease."; and, "Lessor will suffer further irreparable harm if this matter is not

resolved immediately. This is a demand for adequate assurance of specific performance of the above captioned Coal Mining Lease."

21.    On January 13, 2003, Black Beauty, through its counsel, responded to Vermilion's December 22nd Letter. In the January 13th letter, Black Beauty reasserted its position that "BLET and AMLF are "severance" taxes", denying any liability for prior wheelage payments claimed due by Vermilion, and again repudiated its obligation to pay the correct amount of royalties and wheelage fees for the remaining term of the Lease. In its letter, Black Beauty stated that Vermilion's arguments were "not persuasive".

22. Black Beauty perfected its repudiation by willfully continuing its breach while clearly stating its refusal to perform in the future. Black Beauty further repudiated its obligations pursuant to the lease by refusing to provide adequate assurance of specific performance after Vermilion so demanded. Black Beauty's course of conduct as Lessee caused Vermilion to be commercially insecure regarding Black Beauty's performance of its obligations under the Lease, and regarding Vermilion's ability to obtain the benefit of its bargain under the Lease.

23.    Article XXII of the Lease entitled DEFAULT provides in Section 22.1 Default: Termination by Lessor as follows:

If ...one...of the following events...shall occur:

(a) *If default shall be made in the due and punctual payment of any rent, royalty or any part thereof, when and as the same may become due and payable*, or in the payment of taxes and insurance premiums or any other amounts to be borne by Lessee hereunder,

or in the furnishing or receipts and certificates of payment therefore

when due, or in the furnishing of any of the books, records or

reports by Lessee to be furnished under this lease, *and such*

*default shall continue for thirty (30) days after notice by Lessor to*

*Lessee...then and in any such event, Lessor at any time thereafter*

*while such default or condition is continuing*, *may give written notice*

*to Lessee* specifying the occurrence giving rise to such Event of

Default, or Events of Default, and stating *that the lease shall*

*terminate* on the date specified in such notice, which shall be at

least twenty (20) days after the giving of such notice. Upon the date

specified in such notice, this lease and the estate and interest

hereby demised shall terminate and all rights of Lessee under this

lease shall cease.  [Emphasis added]

24.    In accordance with the default provisions of the Lease, Vermilion gave

notice to Black Beauty of its improper deduction of BLET and AMLF from royalty and

wheelage payments owed to Vermilion pursuant to the Lease.  Vermilion notified Black

Beauty of its default in making due and punctual payment of ERWF in its initial claim to

Black Beauty on August 16, 2002; in Vermilion's letter dated September 30, 2002; in

Vermilion's claim to Black Beauty dated October 10, 2002; in Vermilion's certified letter

to Black Beauty dated October 20, 2002; and, in Vermilion's letter dated December 20,

2002.  Despite Vermilion's abundant notice to Black Beauty of  its failure to make

payments of royalties and wheelage owed to Vermilion pursuant to the Lease, Black

Beauty continued to act in default of its contractual obligations in violation of the Lease.
Group Exhibit B

25.     On May12, 2003 Vermilion gave written notice to Black Beauty, pursuant to Section 22.1 of the Lease, specifying the events of Black Beauty's default and stating that the Lease shall terminate on June 1, 2003, and that as of that date of termination of the Lease, all rights of Black Beauty under the Lease shall cease. Exhibit C.

26.     Black Beauty's refusal to cure its breach caused Vermilion to be commercially insecure, because Black Beauty's breach put it at risk of, and ultimately did cause Vermilion to fall into default of its first mortgage and other debts. That caused loss of credit standing, and personal suffering and shame to Vermilion and its principals. Vermilion utilized one of the remedies available to it under the Lease, when it acted to terminate the Lease.

27.     Black Beauty flatly and brazenly refused to pay the correct amount of royalties and wheelage and continued to breach its contractual obligations as Lessee.

28.     Section 22.1(a) of the Lease defines a default as a breach in payment that is not cured within 30 days of Lessor's demand. Section 22.1 of the Lease further provides a period to be prescribed by Lessor of not less than 20 days to cure a default, and provides by its stated terms for termination if the default is not cured within the prescribed period. Black Beauty continued to act with impunity, and ignored the Notice of Default served upon it by Vermilion. The Lease, in accordance with its own terms, was terminated. Vermilion filed a lawsuit for equitable and injunctive relief pursuant to Sections 22 and the last sentence of Section 24 of the Lease in the Circuit Court of Vermilion County Illinois on May 12, 2003. Vermilion allowed Black Beauty to remain on

the leased premises as tenant-at-will pending resolution of the dispute.

E-FILED
Tuesday, 24 April, 2007  12:47:53 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT A

Jun 16 2003  10:56   P.02
Current Lease.

## COAL MINING LEASE

THIS LEASE, made as of November 21, 1994, between Vermilion Coal Company, a corporation of Delaware ("Lessor"); and Laswell Coal Co., Inc., an Indiana corporation ("Lessee");

### WITNESSETH

In consideration of the sum of Ten Dollars ($10.00) cash, receipt of which is hereby acknowledged, and the performance and observation of the terms of this lease as hereinafter set forth to be performed and observed by lessee, and receiving as rent the royalties, rentals, and other payments hereinafter provided for, Lessor hereby leases to Lessee, for the period of twenty years from the date hereof, subject to termination or renewal for up to two (2) additional twenty year periods until all the coal which can be economically mined and removed has been mined and removed and the reclamation thereof has been finally approved by all the state and/or Federal agencies which now have or shall hereafter have jurisdiction or control of such mining operations. and all the bonds therefor have been fully released, all as hereafter provided in Article XX hereof, the sole and exclusive right of mining and removing, by any method of mining, all Illinois No. 6 and Illinois No. 7 seam coal of those certain parcels of land, identified respectively as Area A & B, containing in aggregate 9,371 net acres, more or less, of Illinois Number 6 seam coal; and Area E, containing in the aggregate 2,725 net acres, more or less, of Illinois Number 6 seam coal, as further described in Exhibit A (a map) to this Coal Lease Agreement.

The rights herein leased are limited to such as Lessor possesses and has the lawful right to lease and to such as Lessor owns under the deeds covering said lands or said coal and appurtenant rights, and it is agreed that Lessor does not warrant its title to the leased premises or any portion thereof. However, upon the assertion of an adverse claim to any portion of the leased premises, Lessor shall render all assistance possible to Lessee in defense against such adverse claim. It is further agreed that if a court decree (after exhaustion of appeals) or by agreement of the parties hereto it is determined that the adverse claim is valid and such adverse claim is of such nature that Lessor does not have sufficient title to such portion of said leased premises to permit Lessee's mining of the coal therein, then, to the extent the Lessee has paid royalties to Lessor on coal mined in such portion, such royalties shall be refunded to Lessee.

Lessor also grants to Lessee for the period of this lease all of the coal mining rights and

privileges that Lessor owns under the deeds by which it now holds title to the lands included herein.

EXCEPTING AND RESERVING, HOWEVER, from this lease, and to the Lessor all of the oil, gas and other minerals and mineral substances, timber, natural gas and electric energy storage values, together and other products and values of every kind and description therein and thereon, with the right to exploit, mine, remove and take away the entire amount and body thereof, for all purposes other than those for which this lease is made with the right to remove the same; PROVIDED, HOWEVER, that exercise of the ownership and rights so excepted and reserved shall not unreasonably interfere with the requirements, convenience and safety of operations of Lessee.

Lessor and Lessee recognize the importance of environmental protection and the necessity of proper ecological balance and to further these objectives Lessee agrees to conduct all operations hereunder on the leased premises with utmost caution and in compliance in every respect with all applicable laws of the State of Illinois and the United States of America now existing or hereafter enacted, and all rules and regulations promulgated thereunder.

IT IS UNDERSTOOD, however, that the lands included in this lease are in an area committed to the mining and removal of coal and other minerals and that coal mining operations and other enterprises have been conducted by a lessee or lessees of Lessor or its predecessors in, upon and under the surface of said lands and in the general vicinity thereof, and, as one of the conditions for this lease, Lessee, its successors and assigns, shall indemnify and save harmless Lessor, its officers, agents and employees, and its successors and assigns, and its or their lessees, from all claims and damages or other relief, caused by or resulting from, directly or indirectly, any unnatural condition upon or under said lands and/or adjacent lands of Lessor as a result of such mining or other activities. IT IS A CONDITION HEREOF, that Lessee, its successors and assigns shall have no claim or right of recovery against Lessor, its successors and/or assigns, and its or their lessees, for any such damage. It is the intention hereof that said land is hereby leased to Lessee, AS IS, IN THE PRESENT CONDITION and subject to the rights of others as hereinabove set forth.

THIS LEASE is subject to the following terms and provisions which Lessee covenants with Lessor to perform and observe, viz:

2

## ARTICLE I

## COVENANT TO DEVELOP; PERMITTING

Section 1.1 **Development.** Lessee shall at all times diligently and energetically open, develop and maintain operations in order that so long as fair prices are obtainable its capacity for mining, preparing and shipping coal shall be sufficient to meet the demands and requirements of the market to the extent that the same can reasonably be done hereunder; and Lessee shall report promptly in writing to Lessor any suspension of operations, reasons therefor and expected duration thereof.

Section 1.2 **Permitting.** Lessee agrees that upon execution of this lease, it will, in its name and at its expense, promptly commence the necessary procedures with the appropriate state and/or federal agencies having jurisdiction of such mining operations and obtain and maintain in effect the requisite permit or permits for the conduct of such mining operations. Lessee also agrees to continue with subsequent required permitting procedures with said state and/or federal agencies to the end that the mining operations contemplated under this lease shall be continuous, insofar as possible under applicable laws, and the regulations promulgated thereunder, until all the coal herein leased, which can be mined and removed by such mining methods as Lessor may approve, has been mined and removed. In the event this Lease shall be terminated or canceled for any reason prior to completion of operations hereunder and Lessee shall have obtained the requisite permit or permits for the conduct of such mining operations from such agencies, then Lessee hereby covenants and agrees that it shall promptly, upon request of Lessor, assign and/or otherwise transfer said permit or permits, pursuant to applicable state and Federal laws and regulations, to such other party or parties as Lessor may designate; provided, however, the assignee shall assume all obligations in connection with said permits, including all bonds associated therewith and release Lessee from such obligation and bonds.

Section 1.3 Whenever the term "such mining methods as Lessor may approve" is used in this Lease, such term shall mean that: Lessor shall not have any right to approve or disapprove Lessee's mining methods, so long as Lessee's proposed mining methods do not result in material adverse consequences to Lessor or Lessor's successors and assigns, it being specifically understood and agreed that Lessee plans and intends to utilize room and pillaring method of mining for the removal of all coal.

## ARTICLE II

## PRODUCTION ROYALTY

Section 2.1 **Amount of Royalty.** Lessee shall pay to Lessor as rent, a royalty of the greater of:

(a) Five percent (5.0%) of Lessee's Gross Sales, as hereinafter defined; or
(b) The Advance Minimum Annual Rental, as set forth in Article III herein, for
coal mined hereunder, to be calculated, reported and paid on a quarterly basis.

Section 2.2 **Date for Payment of Royalty: Interest.** On or before the twentieth (20th) day of each calendar quarter, Lessee shall pay to Lessor for the coal mined hereunder during the immediately preceding calendar quarter at the higher rate set forth in Section 2.1 above. Lessee will pay interest to Lessor on any royalty amounts due and not paid by the 20th day of the calendar month at the effective prime interest rate as then charged by Morgan Guaranty Trust Company of New York and calculated daily from the date said amounts are due.

Section 2.3 **Reporting of Quantity of Coal Mined and Sold.** Lessee shall, on or before the fifteenth (15th) day of each calendar month, furnish to Lessor a written report, certified as to correctness by such agent as Lessee may designate having personal knowledge of the facts, showing the quantity of coal mined hereunder during the immediately preceding calendar month, using as a basis the weights of all coal shipped and ascertaining the quantity of all other coal in a manner satisfactory to the Chief Engineer of Lessor, and accounting properly for changes in raw and clean coal inventories; and Lessee shall comply with any further rules and regulations for the accurate ascertainment and report of the quantity of coal mined hereunder of the selling price thereof that may reasonably be prescribed by said Chief Engineer.

In the event Lessee shall mix coal produced hereunder with other coal prior to shipment, Lessee shall comply with such reasonable rules and regulations as the Chief Engineer of Lessor shall from time to time prescribe for the purpose of ascertaining with reasonable accuracy the quantity of coal produced hereunder.

Section 2.4 **Calculation of Royalty: Gross Selling Price Defined.** For the purpose of calculating Gross Sales, the term "Gross Selling Price" as used herein shall mean the actual price

4
Revised Mar. 6, 1995

paid for coal sold to a bona fide purchaser f.o.b. the loading point after preparation, if any, and loading for final destination, less any sales tax and/or severance imposed thereon, but without deduction for selling commissions, advertising, credit losses, or other expenses, but with adjustment for transportation expenses paid by lessee, coal quality bonuses or penalties, and discounts or allowances actually allowed to arms-length wholesalers; provided, however, that if Lessor gives notice to Lessee in writing that in Lessor's reasonably judgment a particular transportation contractor or purchaser is not a bona fide purchaser or arm's length wholesaler or transportation contractor, Lessor may elect to substitute therefor the prevailing market price of coal or such transportation contractor; provided further, that for any coal consumed on or off the leased premises without sale by Lessee the gross selling price for the purpose of computing the royalty shall be the prevailing market price, as determined above, of such coal at the time of shipment from the leased premises or, if used on the leased premises, at the time of use.

The term "bona fide purchaser" shall mean a purchaser who pays valuable consideration in good faith without intending to take unfair advantage of third parties, including Lessor, and in no case shall that phrase include persons or parties affiliated with Lessee, either directly or through any joint ownership.

Section 2.5 Calculation of Gross Sales.  Gross Sales shall be defined as Gross Selling Price, multiplied by the number of tons mined and sold from the leased premises during the time period for which the Production Royalty amount is to be calculated.

5
Revised Mar. 6, 1995

**Section 2.6 Unmined or Lost Coal.** Tonnage royalty which may be owed by Lessee for coal in place left unmined or rendered unminable or that may be lost or destroyed on the leased premises as provided in Section 7.1 hereof shall be based on the fair market value of such coal as determined above, if properly sized and cleaned, at the time when such coal should have been mined or at the time when such coal is lost or destroyed, as may be appropriate under the terms of this lease.

Lessor's approval of Lessee's mining plan constitutes a waiver of any claim by Lessor that Lessee left unmined coal or rendered coal unminable so long as Lessee reasonably executed and complied with such mining plans. Lessor shall have ninety (90) days from receipt of updated mining maps from Lessee within which to make any claim with respect to Lessee not following or reasonably executing its mining plan under this section; Lessor's failure to make such claim within ninety (90) days shall constitute a waiver and, thereafter, Lessor is forever barred from making any claim as to unmined or unminable coal.

### ARTICLE III

### ADVANCE MINIMUM ANNUAL RENTAL

**Section 3.1. Amount and Payment; Interest.** Lessee shall pay to Lessor, as advance minimum annual rental on account of coal mined or to be mined as advanced minimum annual rental on account of coal mined or to be mined hereunder, the sum of Twenty Thousand Dollars ($20,000) the first year and the sum of Forty Thousand Dollars ($40,000) for

6

the second year, beginning on the date first herein set forth, and ending on the three hundred and sixty-fifth day thereafter. The advance minimum annual rental for the third and subsequent lease contract years are set forth in Table 1 below.

**Section 3.2 Lessee's Right to Drop Leased Acreage.** At any time not less than sixty (60) days prior to any anniversary of this Lease Agreement, Lessee may elect to drop either Areas A & B or Area E, from the lease by giving written notice to Lessor pursuant to the notice provisions hereto. In the event that Lessee elects to drop acreage, the advance minimum annual royalty applicable to the acreage retained by Lessee, as set forth in Table 1 below shall be payable for future lease contract years.

## Table 1—Schedule of Advance Minimum Annual Royalties

| Lease Contract Year | Attributable to Areas A&B | Attributable to Area E | Combined Advance Minimum Royalty for Areas A B&E | |
|---|---|---|---|---|
| 1 | $ 15,000 | $ 5,000 | $ 20,000 | 94 |
| 2 | $ 30,000 | $ 10,000 | $ 40,000 | 94 |
| 3 | $ 45,000 | $ 15,000 | $ 50,000 | 66 |
| 4 | $ 95,000 | $ 30,000 | $100,000 | 93 |
| 5 | $ 190,000 | $ 60,000 | $200,000 | 92 |
| 6. | $ 285,000 | $ 90,000 | $300,000 | 33 |
| 7 | $ 380,000 | $ 120,000 | $400,000 | 2 4677 6 |
| 8 & subsequent | $ 475,000 | $ 150,000 | $500,000 | 4 9 1 |

**Section 3.3 Payment Dates.** Payment of advance minimum annual rental shall be made on each anniversary of this Lease Agreement. Lessee shall pay interest to Lessor on the amount of any advance minimum annual rental due and not paid by the date such rental is due at the effective prime interest rate as then charged by Morgan Guaranty Trust Company of New York and calculated daily from the date said amounts are due.

**Section 3.4 Recoupment.** Lessee shall receive a credit against royalties due on coal mined during each calendar year to the extent of the amount of advance minimum annual rental paid for that calendar year to the extent of the amount of advance minimum annual rental paid for the preceding four (4) calendar years. Accordingly, Lessee shall not be required to remit any royalties until the royalties earned equal such minimum paid by Lessee. However, in no event shall Lessee pay less than the advance minimum annual

Revised Page 7
Jan. 23, 1995

royalties as set forth in Section 3.2

Section 3.5 **Failure to Perform; Force Majeure Excuse**. In the event of unavoidable interruption of or delay in its operations, due to strikes, accidents, acts of God, inadequate car supply, or causes of like character not within the control of Lessee, in any year, Lessee shall be excused from its obligation of diligent development and continuous operation pursuant to Section 1.1 for any period of time over thirty days during which Lessee's operations are delayed because of any of such causes. During the pendency of any Force Majeure, Lessee shall be obligated to use its best efforts to mitigate the cause of Force Majeure. However, the parties hereto recognize and agree that Lessee's obligation to pay advance minimum annual rental under the preceding Section 3.1 hereof is absolute, and shall not be subject to any force majeure excuse unless Lessee has previously paid total royalties which exceed the annual minimum royalties.

Section 3.6 **Modification of Minimum Rental**. Whenever, in the opinion of the Chief Engineer of Lessor and such agent as Lessee may designate, the quantity of unmined coal remaining which Lessee is or has become obligated to mine has been reduced or depleted so as to justify a modification, reduction, or suspension of advance minimum annual rental, such advance minimum annual rental may be modified, reduced, or suspended as the Chief Engineer of Lessor may in his sole discretion permit, and Lessee shall mine the same at the rate of production royalty provided for in Article II above.

## ARTICLE IV

### LESSEE'S RECORDS; INSPECTION

Section 4.1 Lessee shall keep books of account at the mine, or such other place as Lessor may approve in writing, of the quantity of coal mined, used at the mines and shipped hereunder and said books shall be open at all reasonable times for inspection by Lessor or its agents for the purpose of comparing and verifying the reports rendered by Lessee under Article II hereof or for obtaining information as to the quantity of coal mined, used at the times and shipped during the period.

## ARTICLE V

### ENVIRONMENTAL LIABILITIES

Section 5.1 Lessee shall be responsible for any pollution of air or water resulting from

coal and coal products, slack, dirt, slate and other waste materials deposited by it on the leased premises or arising or resulting from Lessee's operations hereunder, and Lessee shall indemnify and save harmless Lessor, its officers, agents and employees, from all claims, demands, prosecutions, fines, and judgments against Lessor, its officers, agents or employees, by reason of any such pollution and shall pay all costs and expenses incurred by Lessor, its officers, agents or employees, in defending any such claims, demands and prosecutions, and, at Lessee's expense, upon request of Lessor, Lessee shall defend Lessor against any and all such claims.

### ARTICLE VI

### LESSEE'S MINING OPERATIONS

Lessee covenants that it will use due care and diligence to protect the lands included herein from waste, injury or damage and to that end Lessee shall conduct its operations hereunder pursuant to Sections 6.1 and 6.2 hereof.

Section 6.1 Mining Practices and Compliance with Laws. Lessee shall, in accordance with plans of mining and descriptions thereof provided for in Section 6.2 below, but subject to the provisions of the state and/or federal law pertaining to the conduct of the mining of coal, mine the coal in the most effectual, workmanlike and proper manner, according to approved and suitable methods of modern mining utilizing rooms and pillar mining, and so that said mining shall not unreasonably interfere with the proper exercise of the rights hereinbefore excepted and reserved to Lessor; and Lessee shall comply in every respect with the laws of the State of Illinois and the United States of America now existing or hereafter enacted, and all the rules and regulations promulgated thereunder, relating to the conduct of operations for the mining of coal. However, in no event shall Lessee be obliged to mine coal that is not economically profitable for Lessee to mine.

Section 6.2. Approval of Mining Plans. Lessee shall mine the coal in accordance with plans of mining and reclamation and descriptions thereof which shall be submitted by Lessee but not put in operation until approved by all appropriate regulatory authorities. Upon Lessor's request, Lessee shall furnish Lessor:

(i) a copy of Lessee's application for the mining permit, including the reclamation plan required by applicable Illinois law with the maps and drawings attached thereto; and

(iii) a statement of the post mining land use which is proposed to be made of the property herein following reclamation obligations

for review by said Chief Engineer, prior to its being filed with the state and/or federal regulatory agency responsible for issuance of such mining permits. No change in any plan so approved by applicable regulatory agencies shall be submitted to such agencies without the same being submitted to said Chief Engineer for his review.

In the event that Lessee deems it necessary for its mining operations to deviate materially from those set forth in its mining plans which have been previously submitted to Lessor and approved by Lessor, Lessee shall notify Lessor as to the details of such proposed modification of its mining operation for Lessor's review and approval. Should Lessor not object to such proposed deviation within sixty (60) days, the same shall be deemed approved by Lessor.

Should Lessee encounter an emergency which reasonably requires a material modification of its mining plans, Lessee shall notify Lessor of such emergency; unless Lessor objects to such modification within thirty (30) days, Lessor's failure to object shall be deemed as a waiver of Lessor's right to object to said modification.

Lessor shall not unreasonably withhold consent to the mining plans of Lessee. Withholding of consent for the following reasons shall be deemed to be unreasonable:

(a) In order to induce Lessee to modify the economic terms and conditions of this coal lease in favor of Lessor.

(b) In order to influence the sequence of mining Lessor's coal versus third-party coal which Lessor undertakes to include in its mine plan, for economic reasons.

**Section 6.3 Mining Sequence of Coal Seams.** It is conclusively agreed by the parties hereto that notwithstanding the fact that Lessee has the right hereto to mine both the Illinois No. 6 and Illinois No. 7 seams of coal within the leased premises, mining of the Illinois No. 6 seam of coal shall take precedence in the sequence of mining. Any mining plan which undertakes to mine the Illinois No. 7 seam of coal prior to, or concurrently with the nearby Illinois No. 6 seam of coal shall be subject to the express consent of Lessor, which may be withheld for any reason.

10

# ARTICLE VII

## LESSEE'S LIABILITY FOR NONCOMPLIANCE

**Section 7.1** If at any time Lessee shall not conduct operations as provided in ARTICLE VI hereof and loss of coal which Lessee is obligated to mine or loss of other coal of Lessor may thereby result or be threatened, the Chief Engineer of Lessor shall have authority to determine where and in what particular those provisions of said ARTICLE VI are being violated, and, in the event of a failure of Lessee to cure such violation within thirty (30) days of receipt of written notice from Lessor specifying such violation, to enter for Lessor and stop the work at such place until Lessee shall comply with said ARTICLE VI; and Lessee shall pay to Lessor the full amount of royalty, at the rate provided in ARTICLE II hereof, on the estimated tonnage of coal lost which Lessee is obligated to mine by reason of failure of Lessee to conduct operation as required by said ARTICLE VI, in the same manner as if said coal had been mined and removed; and Lessee shall compensate Lessor for the full amount of any other coal of Lessor that is lost by reason of the failure of Lessee to conduct operations as required by said ARTICLE VI.

# ARTICLE VIII

## ENGINEERING REQUIREMENTS; AUTHORITY OF CHIEF ENGINEER OF LESSOR; SURVEY DATA; PRESERVATION OF SURVEY CONTROL (TRIANGULATION) STATIONS

**Section 8.1 Engineering Requirements; Authority of Chief Engineer of Lessor.** Lessee shall employ a competent engineer to make surveys, determine elevations, prepare plans and maps of the mine workings and prepare and keep up, on a scale to the approval of the Chief Engineer of Lessor, a map which shall be posted every three (3) months and shall show accurately and completely, the boundaries of the lands included herein, as submitted by Lessee to applicable governmental authorities. Lessor and its agents shall at all times have access to the maps, plans and tracings of Lessee, and may take therefrom copies of such portions as may be desired.

**Section 8.2 Survey Data; Preservation of Survey Control (Triangulation) Stations.** Upon Lessor's request, Lessee shall furnish Lessor's Chief Engineer with a copy of all information, including but not limited to, maps, survey field books and traverse sheets, resulting from surveying performed on behalf of the Lessee within the leased premises. Lessee shall use

11

due care to avoid the destruction of survey control or triangulation stations. However, if in Lessee's operation hereunder it becomes necessary to destroy one of said survey control or triangulation stations, then Lessor shall be notified at least thirty (30) days in advance of such destruction.

## ARTICLE IX

### FAILURE TO FURNISH PLANS OR MAPS

**Section 9.** If Lessee fails to furnish any plan or map as provided for in ARTICLE VIII hereof for fifteen (15) days after written demand therefor by the Chief Engineer of Lessor, Lessor may at its option employ a competent engineer to make surveys and to prepare such plan or map and Lessee shall pay to Lessor the full amount of expenses so incurred.

## ARTICLE X

### PREVENTION OF FIRES; DUTIES OF LESSEE

Lessee shall use all reasonable care and precaution to prevent the occurrence of fires in timer of brush on the surface overlying the lands included herein and to cause the prompt extinguishment of any such fires, and shall cooperate with Lessor and his other Lessees or agents in extinguishing such fires on adjoining lands that may be liable to spread to or over said surface overlying the lands included herein. Lessee shall be responsible for all damage caused by fire to timber or forest growth or in any other respect on the surface overlying the lands included herein or adjoining lands that may be due to negligence of Lessee, its employees, agents or contractors.

## ARTICLE XI

### COAL FROM OTHER LANDS; WHEELAGE

**Section 11.1** In the event Lessee transports or ships coal from any property not owned by Lessor into, over, through or under any of the leased premises, Lessee shall pay to Lessor fifteen cents (15¢) per net ton of that coal, or, one percent (1.0%) of the average gross selling price per net ton of that coal, as gross selling price is defined in Section 2.4 above, whichever is greater, as wheelage for such transportation or shipment. Lessee shall report and make payment, pursuant to the provisions of Section 2.2 and 2.3 above, for coal transported or shipped hereunder. Lessee may transport or ship coal from any property not owned by Lessor into, over, through or under any of the leased premises at the sole discretion of Lessee, however, wheelage fees payable by Lessee to Lessor hereto shall not be subject to recoupment of Advance Minimum

12

Annual Rentals pursuant to Section 3.2 hereof. Furthermore, Lessee shall not deposit refuse derived from any property not owned by Lessor on the leased premises if Lessor serves upon Lessee a written objection thereto. However, nothing in this lease shall preclude Lessee from having the right to deposit gob, coal ash or fly ash (including all other refuse derived from coal burning boilers) into those portions of the underground mine which have been mined by Lessee, so long as Lessee has obtained all applicable governmental permits to do so. Furthermore, Lessor shall receive twenty percent (20%) of all net profits (if any) derived from the placement of said ash or refuse in said mine.

## ARTICLE XII

### INDEMNIFICATION

**Section 12.1** Lessee shall conduct operations hereunder on its own behalf and not as agent or employee of Lessor and there shall be no privity of contract between Lessor and employees of Lessee. All employees, agents, contractors, subcontractors, and vendors of Lessee, whether on a wage or profit sharing basis, shall be selected, hired, directed, paid, and discharged only by Lessee. Lessee shall and hereby agrees to indemnify and save harmless Lessor, its officer, agents and employees, from and against any and all claims, demands, suits, judgments, recoveries and liabilities for injury to or death of any person or persons whomsoever and for loss of or damage to any property whatsoever, arising or in any manner growing out of the operations or activities of Lessee under or in connection with this lease. Lessee hereby further agrees to indemnify and save harmless Lessor, its officers, agents and employees, from and against any and all penalties, fines, prosecutions, statutory recoveries (whether civil or criminal) and government actions which arise from or are occasioned by the operations or activities of Lessee under or in connection with this lease.

### ARTICLE XIII

### TAXES AND ASSESSMENTS; COAL APPRAISAL REPORTS

**Section 13.1** Taxes and Assessments. During the term of this lease and any extensions or renewals pursuant to ARTICLE XX hereof, Lessee shall pay and bear and reimburse Lessor for the expense of all taxes and assessments of every kind and character that may be levied or assessed by the Governmental authority against or upon the lands included herein or Lessor's ownership thereof, including, without limitation, excise, privilege or license

13

taxes based upon the acreage of land owned by Lessor in the State of Illinois, any exemption of acreage therefrom to be prorated to the acreage included in this lease; ad valorem taxes; and taxes levied or assessed on the coal mined hereunder, the privilege of mining said coal, the improvements or other property of Lessee in or on said lands, the leasehold rights of Lessee, and the income accruing to Lessee therefrom; and Lessee shall repay to Lessor the amount of any such taxes and assessments as shall be paid by Lessor, provided that, Lessor shall continue to be responsible for real estate taxes levied by Vermillion County and its various taxing districts on the undeveloped coal lands, leased to Lessee hereto, but not the improvements thereupon, which shall be the responsibility of Lessee, along with all other taxes which may be levied (except any taxes due on monies paid by Lessee to Lessor).

Section 13.2 Method of Payment. Lessee shall pay such taxes and assessments to Lessor on or before the last day of each month. Each monthly payment shall be equivalent to one twelfth (1/12) of Lessee's proportionate leasehold share of such taxes and assessments as estimated and calculated as lessor shall determine. In case where Lessee's improvements occupy common acreage with the leased premises, taxes for both land and improvements shall be paid by Lessee.

Section 13.3 Unmined Coal Taxes. There is presently no unmined coal tax in the State of Illinois. In the event that such a tax is enacted, and becomes payable, such tax shall be payable by Lessee, except to the extent it incorporates, and supersedes, taxes on coal lands, in which that portion shall be paid by Lessor.

## ARTICLE XIV
## ASSIGNMENT

Section 14.1 Lessee shall have the right to mortgage, assign, convey, sublease, or set over any of its estate, interest or rights hereunder or any part thereof, or any of its rights or interests in buildings and other improvements placed upon the leased premises by the Lessee, with the written assumption by the transferee of all the obligations of Lessee in form satisfactory to Lessor, with the clear understanding that such written consent will be subject to the royalty rates and other provisions hereinabove set forth for coal mined from the area, or coal seams therein, which are assigned, conveyed, subleased, or set over. In the event of the assignment of this lease to a third party, Lessor reserves the right to readjust the terms of this agreement as

14

follows:

(a) The Minimum Advance Annual Rental shall be Six Hundred Thousand Dollars ($600,000) per year in year 9 and subsequent years.

(b) The Production Royalty shall be five percent (5%) of Gross Selling Price times the quantity sold.

If, within ninety (90) days of receiving notice of a proposed assignment, Lessor shall not have elected to readjust the terms hereof, they shall remain as is; provided that Lessee may assign this lease to a qualified coal operating company, which is affiliated with Lessee, without any change in the commercial terms thereof.

Section 14.2 Bankruptcy of Lessee. No judicial or other sale or transfer of any kind, whether under any writ, order or decree issued by any court or judicial officer or tribunal, or in compliance with any order or decree of any court or equity or in any proceedings in bankruptcy, shall have the effect of transferring this lease or any of the estate, interest or rights of Lessee for any time or term, except with the written consent of Lessor and the written assumption by the transferee of all the obligation of Lessee in form satisfactory to Lessor.

## ARTICLE XV

### WORKER'S COMPENSATION; LESSEE'S DUTIES

Section 15.1 Lessee shall subscribe to and operate under the provisions of the Illinois Worker's Compensation Act, and make all necessary payments thereto, and such coverage shall also include drivers of any trucks which may be hired, rented or leased. Lessee shall, upon request, furnish to Lessor certificate of such compliance, together with paid premium receipts.

If at any time the subscription to said Worker's Compensation Act shall cease to be in force and effect, then Lessee shall suspend, and Lessor may stop, all operations of Lessee hereunder until such subscription shall be reinstated.

## ARTICLE XVI

### BLACK LUNG BENEFITS; INDEMNIFICATION; EVIDENCE OF FINANCIAL RESPONSIBILITY

Section 16.1 Lessee hereby guarantees and agrees to indemnify and save harmless Lessor, its officers, agents and employees, from the payment of or any liability for benefits which

15

may be required under the Black Lung Benefits Act (30 U.S.C. 901, et seq.) and under any laws or regulations of the State of Illinois, and Lessee agrees that during the primary period and renewals, if any, of this lease, it will furnish annually to Lessor evidence of financial responsibility for such black lung benefits under applicable federal and state laws, as well as regulations issued thereunder. Such evidence of financial responsibility shall consist of the following:

(a) in the event the Worker's Compensation law of the State of Illinois has been included in the list published by the Secretary of Labor of the United States of America under the Black Lung Benefits Act (30 U.S.C. 901, et seq.), such evidence shall consist of a certification from the officers administering the Worker's Compensation program for the State of Illinois certifying as to Lessee's black lung benefits coverage under those Worker's Compensation laws;

(b) in the event the Worker's Compensation laws of the State of Illinois are not included in the list published by the Secretary of Labor of the United States of America under the Black Lung Benefits (30 U.S.C. 901, et seq.), Lessee shall either:

(1) qualify as a self-insurer in accordance with regulations prescribed by said Secretary of Labor, or

(2) insure and keep insured, with any stock company or mutual company or association, or any other person or fund, including any State fund, which is authorized under the laws of the State to insure Worker's Compensation, all black lung benefits payable under applicable federal and state statutes and regulations issued thereunder, and furnish a satisfactory certificate to Lessor evidencing such insurance coverage.

## ARTICLE XVII

### WAGE AND BENEFITS; INDEMNIFICATION AND BOND

**Section 17.1** Lessee hereby guarantees and agrees to indemnify Lessor, its officers, agents and employees, from payment of or any liability for, or resulting from, wages and benefits which may be due Lessee's employees or contractors.

## ARTICLE XVIII

### INSURANCE; CESSATION OF OPERATIONS

**Section 18.1** Amount of Insurance. As a condition precedent to the commencement of sinking the mine contemplated hereunder Lessee shall arrange for the maintenance of public liability insurance, with a good solvent casualty insurance company or

16

companies satisfactory to Lessor, which insurance shall indemnify said Lessor against legal liability for loss by reason of personal injury, death or property damage sustained as a result, or by reason, of the operations hereunder, with a minimum limit of Five Million Dollars ($5,000,000.00) for bodily injury, death and property damage and furnish to Lessor certificates of such insurance, together with paid premium receipts. This coverage shall also include any trucks or other equipment hired, rented or leased in operations hereunder.

It is understood and agreed, however, that the minimum limits of coverage set forth above are not intended and will in no manner limit the recoveries of Lessor under the indemnity provisions of ARTICLE V, XII and XVI, above.

Section 18.2 Cessation or Suspension of Operations. If at any time of these insurance coverages shall cease to be in force and effect, then, upon written demand of Lessor, Lessee shall suspend all operations hereunder until such insurance shall be reinstated.

## ARTICLE XIX

### LESSOR'S RIGHT TO INSPECT MINING OPERATIONS

Section 19.1 Lessor, and the Lessor's employees, agents and engineers, shall at all times have the right and privilege of entering the works and mines of Lessee in or upon the lands included herein to inspect, examine, survey or measure the same or any part thereof for the purpose of verifying the reports of Lessee as to the amounts of coal mined or removed, or for any other lawful purpose, and for these purposes to use freely the means of access to said works and mines, without hindrance or molestation.

## ARTICLE XX

### OBLIGATION TO MINE; RENEWAL; DUTY TO RECLAIM; TERMINATION

Section 20.1 Obligation to Mine; Renewal. Lessee shall mine and remove all of the coal which can be economically mined and removed hereunder by modern mining methods of room and pillar mining and if, at the expiration of the original period hereof, Lessee has not mined and removed all of the coal which it is or may become obligated to mine, then this lease shall, at the election of Lessee, be renewed for an additional twenty (20) year periods, upon the same terms and provisions, but subject to the full payment of all royalties, rentals and other payments due hereunder, until all of said coal which can be economically mined and removed by

17

approved mining methods has been mined and removed from the leased premises; and whenever during said original period or any renewal thereof, as herein provided, Lessee shall have mined and removed all of said coal by such approved mining methods and shall have paid all royalties, rental and other payments due or accrued hereunder then Lessee's obligation to mine coal and make payment of minimum annual rental hereunder shall terminate.

However, Lessee shall have the right, at any time, and without being in default of this Lease, to cease its mining activities and remove its improvements made without any liability to Lessor, except for royalties already owed Lessor by reason of having mined and removed coal. Provided that, not withstanding the foregoing, the Minimum Annual Rental shall double to $1,000,000 per year on the third lease anniversary following the cessation of any activities by Lessee.

Section 20.2 Duty to Reclaim; Payment of Amounts Due; Termination. In the event the lease herein shall not be renewed at the end of the original period hereof or any renewal or extended period thereof, or all of said coal has been mined and removed, then this lease shall continue to be renewed or extended for additional one (1) year periods, at a nominal rental to be determined by Lessor, until all the reclamation of the lands disturbed by mining operations under the lease herein has been completed and finally approved by the state and/or federal agency or agencies having jurisdiction of such mining operations and all the bonds for such reclamation have been fully released by such agency or agencies. Upon such release of all of said bonds this lease shall terminate. Further, in the event Lessee has not made payment of all royalties, rental and other payments due hereunder at the end of the original period hereof or any renewal or extended period thereof, then Lessor, at its option, may extend the term of this lease until all of such payments have been made. Provided, however, this section (20.2) is only applicable if Lessee sinks an underground mine on Lessor's surface property, or utilizes surface mining means to remove said coal.

## ARTICLE XXI

### CANCELLATION OF LEASE

Section 21.1 Cancellation by Lessee. After Lessee's satisfaction of all mining and reclamation obligations contained in Article XX hereof and when all the merchantable and minable coal hereby leased shall have been mined and Lessee shall have paid all royalties and

rentals with respect to such coal, Lessee may give Lessor 90 days' notice of its intention to cancel this lease, and, if Lessor shall determine that Lessee has fully performed its obligations under this lease, the same shall be deemed canceled effective the day before the contract anniversary of that contract year.

Section 21.2 **Removal of Property Following Cancellation**. If this lease is canceled pursuant to Section 21.1, Lessee shall have 90 days in which to remove from the properties leased hereby all Lessee's equipment, buildings and other improvements and personal property and any of the same not so removed shall, at Lessor's option, become the property of Lessor without charge or be removed by Lessor at Lessee's cost and expense; provided, however, that Lessee shall not remove any equipment, buildings, improvements or personal property unless Lessee shall have fully performed all matters to be performed by it hereunder.

### ARTICLE XXII

### DEFAULT

Section 22.1 **Default; Termination by Lessor**. If any one or more of the following events (herein sometimes called Events of Default) shall occur:

(a) If default shall be made in the due and punctual payment of any rent, royalty or any part thereof, when and as the same may become due and payable, or in the payment of taxes and insurance premiums or any other amounts to be borne by Lessee hereunder, or in the furnishing or receipts and certificates of payment therefor when due, or in the furnishing of any of the books, records or reports by Lessee to be furnished under this lease, and such default shall continue for thirty (30) days after notice by Lessor to Lessee; or,

(b) If default shall be made by Lessee in the performance of or compliance with any of the covenants, agreements, terms or conditions contained in this lease, other than those referred to in the foregoing subsection (a) of this Section 22.1, and such default shall continue for a period of sixty (60) days after written notice thereof from Lessor to Lessee, and Lessee shall not within such period commence with due diligence the curing of such default and thereafter shall fail or neglect to prosecute and complete with due diligence and dispatch the curing of such default; or,

(c) If Lessee shall file a voluntary petition in bankruptcy or shall be adjudicated bankrupt or insolvent, or shall file any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future federal, state or other statute, law or regulation, or shall seek or consent to or acquiesce in the

19

61

appointment of any trustee, receiver, or liquidator of Lessee or of all or any substantial part of the property leased hereby or of any or all the rents, revenues, issues, earnings, profits, or income thereof, or shall make any general assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due;

then and in any such event, Lessor at any time thereafter while such default or condition is continuing, may give written notice to Lessee specifying the occurrence giving rise to such Event of Default, or Events of Default, and stating that the lease shall terminate on the date specified in such notice, which shall be at least twenty (20) days after the giving of such notice. Upon the date specified in such notice, this lease and the estate and interest hereby demised shall terminate and all rights of Lessee under this lease shall cease.

Section 22.2 Repossession, etc. by Lessor. Lessee expressly waives any right to prior notice or any process of law other than the issuance of the warrant of distraint, and Lessee further expressly waives any right to hearing prior to the levy of such warrant and sale thereunder and at any time after such termination of this lease, Lessor, without further notice, may enter and re-enter the premises for all proper purposes and repossess itself by all legal means, including summary proceedings, of its prior and former estate and may remove Lessee and all persons claiming through Lessee from the property leased hereby.

Section 22.3 Survival of Lessee's Obligations; Damages. No such termination of this lease, or repossession of the property leased hereby, by force, summary proceedings, ejectment or otherwise, shall relieve Lessee of its liability and obligations under this lease and such liability and obligations, including, without limitation, the indemnity commitments contained in ARTICLES V, XII and XVI herein this lease, shall survive any such termination or any such repossession. In the event of any such termination, Lessee shall pay to Lessor the advance minimum annual rentals, production royalties and other charges required to be paid by Lessee up to the time of such termination of this lease.

Section 22.4 No Waiver, etc. by Lessor. No failure by Lessor to insist upon the strict performance of any covenant, agreement, term or condition of this lease or to exercise any right, power or remedy consequent upon a breach thereof, and no acceptance of full or partial performance or payment of royalties during the continuance of any such breach, shall constitute a waiver of or consent to any such breach or of such covenant, agreement, term or condition.

20

No waiver of any breach shall affect or alter this lease, but each and every covenant, agreement, term and condition of this lease shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

Section 22.5 **Injunction Against Breach.** In the event of any breach or threatened breach by Lessee of any of the covenants, agreements, terms or conditions of this lease, Lessor shall have the right to invoke any rights, powers and remedies allowed at law, in equity or by statute or otherwise, whether or not specifically provided in this lease.

Section 22.6 **Lessor's Remedies Cumulative, etc.** Each right, power and remedy of Lessor provided for in this lease shall be cumulative and concurrent and shall be in addition to every other right, power or remedy provided for in this lease or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by Lessor of any one or more of the rights, powers or remedies provided for in this lease or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by Lessor of any or all other rights, powers or remedies provided for in this lease or by statute or otherwise.

## ARTICLE XXIII
## CONDEMNATION

Section 23.1 If the coal herein leased, or any portion thereof, shall be taken in, or in any manner affected by, condemnation for any public or quasi-public use under any statute or by right of eminent domain, or by private purchase in lieu of condemnation, by a public body vested with the power of eminent domain, then, and in each and every such event, Lessor shall be free to conduct all negotiations for compensation or damages, including without limitation, participation in viewers proceedings and the institution of litigation concerning such taking, with the understanding that in the case of each and every condemnation or taking Lessor shall notify Lessee of same, and Lessor and Lessee shall be paid out of an such award or compensation in damages as follows:

(a) If the award for the coal in any such condemnation or taking shall exceed the amount of the royalty that would have been due Lessor had the coal been then mined, based upon recent sales by Lessee or, if no such sales exist, based upon recent sales by others of coal of comparable quality, all of such award which is in excess of said royalty amount shall be the property of and be paid to Lessee.

21

(b) If such award for the coal shall be equal to or less than said royalty amount, then all of such award shall be the property of and be retained by Lessor.

(c) Any specific award for Lessee's buildings, structures or improvements, or surface lands acquired by Lessee after the date of this lease shall be paid to Lessee. Any award for surface lands which are owned by Lessor as of the date of this lease shall be the property of the Lessor.

Lessee shall cooperate with Lessor in all matters hereunder, including joining in any litigation or settlement if Lessor determines such to be necessary; provided, that any such condemnation or taking shall not otherwise affect Lessee's duties and obligations under this lease, except as provided herein.

## ARTICLE XXIV
## ARBITRATION

**Section 24.1** If there should arise any matters in dispute hereunder, on which Lessor and Lessee cannot finally agree, such matter or matters shall be referred to a board of arbitrators consisting of three (3) disinterested, competent persons, one selected by Lessor and one by Lessee, as hereinafter provided, and the two thus selected shall select the third, who shall have the power of an umpire and be known as umpire-arbitrator. The decision and award of such arbitrators, or any two of them, or, in case of disagreement among all the arbitrators, of the third or umpire-arbitrator, shall be conclusive and binding upon Lessor and Lessee and promptly complied with.

The party desiring arbitration shall give written notice to the other party, stating definitely the point or points in dispute and naming the person selected as arbitrator; and it shall be the duty of the other party, within fifteen (15) days after receiving such notice, to name an arbitrator, and these two shall select the third arbitrator; and in the event the party notified does not name an arbitrator within said period of fifteen (15) days, the party serving such notice may select a second arbitrator and the two thus selected shall select the third arbitrator.

In the event of failure of the two arbitrators, selected as aforesaid, to agree, within twenty (20) days from notice to them of their selection, in choosing the third arbitrator; then such arbitrators shall jointly notify, in writing, the parties of their failure to agree. The parties shall then, within fifteen (15) days from the date of such notification, jointly select the third arbitrator. In the event the parties are unable to so select the third arbitrator, and within said fifteen (15) day period, they shall then jointly select the names of the three (3) potential third arbitrators. None of

22

these three (3) potential arbitrators shall represent, or have any affiliation with, either party. Once the list of said three (3) potential arbitrators has been prepared, each party shall then strike the name of one (1) potential third arbitrator from said list. The person remaining after the parties have exercised their strikes shall be the umpire-arbitrator.

The umpire-arbitrator thus chosen shall give to Lessor and Lessee written notice as to the time and place of hearing, which hearing shall be not less than ten (10) nor more than twenty (20) days after his selection, and at the time and place appointed shall proceed with the hearing unless, for some good cause of which the arbitrators shall be the judge, it shall be postponed until some later date within a reasonable time. Both Lessor and Lessee shall have full opportunity to be heard, orally and in writing, on any question thus submitted. In arriving at a decision and award, said arbitrators shall be bound by any relevant state and federal law applicable to the substantive issue or issues so submitted for arbitration, and shall make such decision and award in writing, and deliver a copy to both Lessor and Lessee, and shall as a part thereof decide by whom the costs of arbitration shall be borne and paid and the amount of such costs including reasonable compensation for the arbitrators. The binding arbitration provision herein set forth shall not serve to limit or diminish the right of either party to this Lease Agreement to seek injunctive relief for breach hereof.

## ARTICLE XXV
### CHIEF ENGINEER

Whenever the term "Chief Engineer of Lessor" is used in this lease, it is agreed between the parties that such engineer shall be a fully qualified underground coal mining engineer who has been employed previously as a chief underground coal mining engineer for an underground coal mine in the Midwest area of the United States of America, or Frederick D. Keady.

## ARTICLE XXVI
### CONTROLLING LAW

Section 26.1  In all coal mining operations and other activities conducted hereunder Lessee shall comply with all the laws of the United States of America and the State of Illinois now or hereafter enacted, and all rules and regulations promulgated thereunder by any governmental agency, relating to such coal mining operations or other activities. Any disputes as to the meaning and application of any of the provisions of this lease shall be determined under the laws

23

of the State of Illinois.

It is the intention of both parties to successfully promote and operate an underground coal mine to remove and sell the coal encompassed in this agreement. To that end, both parties agree to cooperate with each other and that each owes to the other a duty of good faith dealing.

## ARTICLE XXVII

### NOTICE

**Section 27.1** The giving of any notice to, or making of any demand on, any party to this Lease Agreement shall be sufficient if in writing, addressed to the respective party, and mailed via registered mail, return receipt requested, at the following addresses:

| If to Lessor: | If to Lessee: |
|---|---|
| President | Ron Laswell, President |
| Vermilion Coal Company | Laswell Coal Co., Inc. |
| 191 Waukegan Road | 11776 Daniel |
| Northfield, Illinois 60093 | Terre Haute, Indiana 47802 |
| Telephone:    708-501-3110 | Telephone:    812-894-2673 |
| Facsimile:    708-501-3355 | Facsimile:    812-894-2442 |

## ARTICLE XXVIII

### HEADINGS

**Section 28.1** The headings of the ARTICLES in this lease are for convenience only and shall not be used to construe or interpret the scope or intent of this lease or in any way affect the same.

## ARTICLE XXIX

### SURVIVAL

**Section 29.1** No termination or cancellation of this lease shall relieve either of the parties hereto from any obligations or liabilities incurred by it under this lease as of the time of such termination or cancellation.

## ARTICLE XXX

### TERMS BINDING UPON SUCCESSION AND ASSIGNS

**Section 30.1** All of the terms and provisions hereof to be performed and observed by the respective parties hereto shall be binding upon, and inure to the benefit of, their successors, and assigns.

24

**WITNESS** the following signatures and seals, as of the date first hereinabove written.

Executed in two counterparts.

**VERMILION COAL COMPANY, LESSOR**

*Frederick D. Keady*
Frederick D. Keady, President

**LASWELL COAL CO., INC., LESSEE**

*Ronald E. Laswell*
Ronald E. Laswell, President

attest

attest

**STATE OF INDIANA**   )
                       )   To wit:
**COUNTY OF VIGO**     )

I, James O. McDonald, a Notary Public of said County, do certify that Frederick D. Keady, President, who signed the writing above, dated November 21, 1994, for said Vermilion Coal Company, has this day in my said county, before me, acknowledged the said writing to be the act and deed of said Corporation.

Given under my hand and official seal this 21st day of November, 1994.

*James O. McDonald*
James O. McDonald, NOTARY PUBLIC

My commission expires:

October 5, 1996

A Vigo County, Indiana resident

25

AUG. 15. 2002  4:13PM

**STATE OF INDIANA** )
                     )    To wit:
**COUNTY OF VIGO**   )

I, James O. McDonald, a Notary Public of said County, do certify that Ronald Laswell, President, who signed the writing above for Laswell Coal Co., Inc., dated November 21, 1994, for Laswell Coal Co., Inc., has this day in my said county, before me, acknowledged the said writing to be the act and deed of said Corporation.

Given under my hand and official seal this 21st day of November, 1994.

James O. McDonald, NOTARY PUBLIC

My commission expires:

October 5, 1996                A Vigo County, Indiana resident

This instrument was prepared by Vermilion Coal Company

26

E-FILED
Tuesday, 24 April, 2007  12:48:14 PM
Clerk, U.S. District Court, ILCD

# GROUP EXHIBIT B

**Subject:** Coal Mining Lease Dated Nov. 21, 1994
**From:** Frederick Keady <fkeady@attglobal.net>
**Date:** Fri, 16 Aug 2002 16:16:33 -0500
**To:** wparke@bbcoal.com

**Exhibit Q**

E. Wayne Parke
Chief Operating Officer
Black Beauty Coal Company
4414 N. Fares Ave.
Evansville IN 47702
wparke@bbcoal.com
          August 16, 2002

Re: Method of computation of Gross Selling Price for the purpose of
determining royalties pursuant to that certain Coal Mining Lease dated
November 21, 1994, by and between Vermilion Coal Company ("Lessor") and
Catlin Coal Company, as assigned and Assumed by Black Beauty Coal
Company ("Lessee")

Dear Wayne:

Our August 14th meeting was helpful in reconciling the apparent
difference between the stated selling price of the PSI Energy Coal Sales
Agreement of $24.01/ton FOB mine, and the adjusted selling prices of
$20.00/ton, more or less, that Lessee has used to calculate royalties.
However, some issues still need to be reconciled. This letter sets forth
Lessor's position regarding certain elements that have been deducted in
the past by Lessee in calculating the royalties payable to Lessor
pursuant to the above captioned lease.

The timing for resolving this matter is very important to Lessor.
Because of the disappointing level of royalties that arise from the Coal
Mining Lease, we had to invest personal cash to make our bank payment
last month, which gave this matter a very personal dimension for our
shareholders. It has been a kind of "perfect storm" as large adverse
variances in volume, price, mine development pace, and leased v.
third-party coal mining all are occurring at the same time.

Lessor must make a bank payment on August 22nd. We hereby request that
Lessee promptly carefully reconsider, and reverse, its past practice of
deducting Black Lung and AML Excise taxes from Gross Sales Revenue
before calculating Earned Royalties and Wheelage Fees pursuant to the
Coal Mining Lease. If we can agree that these amounts should properly be
included in Gross Selling Price as defined in the Coal Mining Lease, and
the deficiency paid prior to August 22nd, Lessor would agree to waive
any penalties or consequential damages with regard to this matter.

Loading Fees: At the August 14th meeting, you and other officials of
Lessee explained that a "loading fee" of $0.30 per ton was deducted from
the coal shipped from the Vermilion Grove Mine. You provided me with a
revised "Advanced & Earned Royalty Report". The revised calculation set
forth on the report indicated that an additional $6,970.37 was due for
Vermilion Grove coal that was shipped from December 2001 through June
2002, and provided a check in that amount. You have since indicated to
me that no such "Loading Fee" has been deducted from shipments from the
Riola Mine. We request written representations of Lessee in this regard,
and reserve further rights..

Black Lung and AML Excise Taxes: At the meeting yesterday, you presented
me with schedules that indicated that these taxes accounted for
$1.25/ton of shipped coal ($1.10 & $0.15 per ton respectively). You also
told me that it was the Lessee's position that these adjustments to the

2:07-cv-02082-MPM-DGB # 1-4 Page 3 of 21

Coal Mining Lease Dated Nov. 21, 1994                    mailbox:///C|/Documents%20and%20Settings/Administrator/Applic...

Gross Selling Price as defined in the Coal Mining Lease were in accordance with the stated terms Section 2.4 of the Coal Mining Lease.

Section 2.4 of the Coal Mining Lease states: "For the purpose of calculating Gross Sales, the term "Gross Selling Price" as used herein shall mean the actual price paid for coal sold to a bona fide purchaser f.o.b. the loading point after preparation, if any, and loading for final destination, less any sales tax or severance imposed thereon, but without deduction for selling commissions, advertising, credit losses, or other expense, but with adjustment for transportation expenses paid by lessee, coal quality bonuses or penalties, and discounts or allowances actually allowed to arms-length wholesalers; provided however, that if Lessor gives notice to Lessee in writing that in Lessor's reasonably [sic] judgment a particular transportation contractor or purchaser is not a bona fide purchaser or arms-length wholesaler or transportation contractor;…"

It is the position of Lessor that the deduction of $1.25 per ton of Black Lung and AML Excise Taxes that Black Beauty has deducted from the price it receives for coal, for the purpose of calculating Gross Selling Price is improper. These are neither sales taxes nor severance taxes, but rather part of Lessee's operating costs. These excise taxes are not deductible from the price used to calculate royalties paid to the Federal Government pursuant to the various Federal Coal Leases, nor are they deductible pursuant to any private leases of major coal lessors of which I am aware.

Sales and severance taxes, as referred to in the Coal Mining Lease, are assessed by State and local governments as a percentage of sales against the production and shipment of coal. While Illinois has a sales tax, sales to businesses that consume the coal in the further production of goods or services are exempt from state and local sales tax. Illinois, unlike some other states, does not presently have a coal severance tax.

By contrast, Black Lung and AML excise taxes are assessed by the Federal Government. They are expressed in terms of dollars per ton, not percent of sales. In Federal tax forms and instructions, Black Lung and AML fees are plainly referred to as excise taxes.

An improper adverse adjustment to Gross Selling Price of $1.25/ton would result in the underpayment of Production Royalties by $0.0625 per ton produced and sold from the Leased Premises; and underpayment Wheelage Fees of $.0125 per ton of third-party produced and sold. If Black Lung and AMT Excise Taxes were improperly deducted from Gross Selling Price on all shipments since mining operations began, the amount of underpaid royalties and wheelage could be as much as $250,000, before interest and penalties.

Btu and Moisture Penalties: The documents and verbal explanations that were provided at the meeting yesterday have adequately explained the BTU and moisture penalties that were assessed by PSI Energy. I do not plan to investigate this matter further at this time. However, we reserve all rights in this regard, including the request of further documentation with regard to these deductions from Gross Selling Price.

Sulfur Penalties: At the August 14th meeting, you provided me with schedules that set forth the basis that PSI Energy used to calculate quality penalties. On the schedule that I was given, the guaranteed sulfur, expressed in terms of pounds of sulfur dioxide per million BTU's shipped ("#SO2/MMBTU") was a value of 3.0#SO2/MMBTU. Since the field average of the Leased Premises is 2.5#SO2/MMBTU, the listed value appeared reasonable.

It was then explained that the premiums and penalties in the Coal Sales Agreement are calculated based on a guarantee of 1.2#SO2/MMBTU (a value

V00624

2:07-cv-02082-MPM-DGB    # 1-4    Page 4 of 21

Coal Mining Lease Dated Nov. 21, 1994                    mailbox:///C|/Documents%20and%20Settings/Administrator/Applic...

that is coincidentally the same as the Phase 2 "Acid Rain" compliance
standard of the Implementation Rules of the Clean Air Act Amendments of
1001) rather than the 3.0#SO2/MMBTU value that was on the schedule. It
was further explained to me that the (inevitable) penalties incurred as
a result of shipping a 2.5# coal against a 1.2# guarantee, were being
satisfied by the tender of SO2 Emissions Allowances "Emission
Allowances"), rather than a cash adjustment in the price received by
Lessee for coal shipped to PSI Energy pursuant to the Coal Supply
Agreement.

When I inquired about the valuation basis of the Emission Allowances, as
they come into play for the purpose of adjusting Gross Selling Price for
the purpose of calculating coal royalties and wheelage, Shelly Davis and
Brad Smith indicated that the allowances were valued at $0.18 per
0.1#SO2/MMBTU. That translates to $3,600.00 per ton of SO2. One
allowance is worth one ton of SO2. A preliminary survey of spot SO2
Emission Allowances indicates they have sold at the annual EPA auction
for prices between $65.00 and $180.00. Most allowances are bought and
sold privately, and those prices are said to be about 10% lower than the
auction prices.

We need to better understand the basis whereby coal quality price
premiums or penalties are used to adjust Gross Selling Price as it is
used to calculate or adjust the coal royalties or wheelage fees payable
to Lessor pursuant to the Coal Mining Lease. Why was a level of 1.2
lbSO2/MMBTU guaranteed in the contract when the reserve was known to
average 2.5#SO2/MMBTU? Why does the report that I was given set forth a
guarantee level of 3.0#SO2/MMBTU? What is the mechanism of the
calculation that is used to adjust the Gross Selling Price for sulfur
dioxide?

Prior Period Miscalculations: Our outside auditors advised us earlier
this year that they have questions about whether some prior period
royalties were calculated correctly. I am not sufficiently familiar with
this subject to include it in this letter, so I only bring the matter to
your attention for future discussion.

Sincerely,

Frederick D. Keady P.E.
President, Vermilion Coal Company

V00625

# ermilion Coal Company

An Iron Carbide Technologies Company

1979 Johns Drive

Telephone: 847-832-9007

Glenview, IL 60025

Facsimile: 847-832-9010

September 30, 2002

Black Beauty Coal Company
Att:    Dave Yager, Land Manager
414 S. Fares Avenue
Evansville IN 47714

**Exhibit U**

### Coal Mining Lease (the "Contract") dated Nov. 21, 1994:
### Black Lung Excise Tax & AML Fees

Dear Dave:

This letter sets forth Vermilion Coal Company's ("VCC") reasons, and the support thereof, for VCC's position that Black Lung Excise Taxes ("BLET") and AML fees ("AMLF") are not deductible by the Lessee from the actual coal sales price per ton prior to calculating the gross selling price per ton for the purpose of calculating Earned Royalties and Wheelage Fees ("ERWF") payable to VCC pursuant to the above captioned Coal Mining Lease (the "Contract"), as amended and assigned.

This letter also addresses the issue of whether any royalty and wheelage deficiencies that arose from BLET and AMLF that were deducted in a manner that did not comply with the stated terms of the Contract for coal produced during contract months prior to November 1999 are payable by Black Beauty Coal Company ("BBCC") or by Catlin Coal Company ("CatlinCC").

VCC agrees with BBCC's position that the "limited ad valorem" form of the BLET (4.4% of sales) is the applicable tax rate rather than the "flat per ton tax" of $1.10 per ton, as applied in the schedule that I transmitted to Wayne Parke in August.[1]

VCC's rationale for its position arises from several sources, and is set forth in the following sections of this letter. Paragraph headers generally describe the nature of the

---

[1] It is also possible that the BLET could be, or could have been, further reduced by a credit for excess moisture, which while not affecting the amount of Earned Royalty and Wheelage payable to VCC, earn significant savings for BBCC.

BB067776

sources discussed in each section. We are still awaiting some documents, and will provide those when they are received.

**A.    BLET and AMLF fall outside the Contract definition of permitted deductions because they are neither "Severance Taxes" nor "Sales Taxes" but rather are "Excise Taxes" or "Fees".**

1.    The Contract Does Not Provide for Deduction of BLET and AMLF.

a)    Section 2.1 of the Contract provides for a Production Royalty in the amount of *"Five Percent (5.0%) of Lessee's Gross Sales, as hereinafter defined; ...".*

b)    Section 2.4 of the Contract provides, *"For the purpose of calculating Gross Sales, the Term "Gross Selling Price" as used herein shall mean the actual price paid for coal sold to a bona fide purchaser f.o.b. the loading point after preparation, if any, and loading for final destination, less any sales tax and/or severance tax imposed thereon, but without deduction for selling commissions, advertising, credit losses, or other expenses..."* [emphasis added].

c)    Section 2.5 of the Contract provides, *"Gross Sales shall be defined as Gross Selling Price, multiplied by the number of tons mined and sold from the leased premises during the time period for which the Production Royalty amount is to be calculated."*

d)    The state of Illinois has not, and does not presently, impose a severance tax on coal.

e)    The State of Illinois does impose a "Retail Sales Tax" on final sales of goods and services; however sales of coal to electric and other utilities or manufacturers are exempt from Sales Tax.

2.    All documents promulgated by all Federal and State tax authorities clearly and exclusively describe BLET and AMLF as "Excise Taxes" or "Fees", and nowhere describe or refer to either BLET or AMLF as a "severance" tax.

a)    Internal Revenue Service Black Lung Tax Forms and Instructions describe BLET as *"a manufacturer's excise tax"*.

b)    The *Payer Handbook* published by the Federal Office of Surface Mining ("OSM") sets forth the AMLF throughout as *"a reclamation fee"*.

BB067777

2

c) The tax publications of Research Institute of America, an authority used by most tax professionals, sets forth the BLET as *"a manufacturer's excise tax"*.

d) Numerous publications of the State of Illinois set forth the AMLF as a *"reclamation fee"* or as a *"fee"*.

e) The IRS Audit Guide TPDS84915Q clearly sets forth that BLET is a "Coal Excise Tax".

3. Statutes and other records of Congress clearly and exclusively describe BLET as *"taxes"* or *"excise taxes"*; and describe AMLF as *"excise taxes"*, or *"fees;* and nowhere refer to either BLET or AMLF as *"severance taxes"*.

a) United States Code ("USC"), Title 26, Subtitle D, Chapter 32, Subchapter B, Section 4121 "Imposition of Tax", provides in Subsection (a) (1), *"there is hereby imposed on coal from mines located in the United States sold by the producer, a tax equal to the rate per ton determined under subsection (b)*.

b) The Joint Committee Report of the Joint Committee on Taxation of the United States Congress (published annually, more or less) sets forth a *'Schedule of Federal Excise Taxes"*. The report expressly identifies BLET as one of the *'Excise Taxes Dedicated to Health-Related Trust Funds"*, and further describes BLET in detail.

c) The CRS Report to Congress entitled *"Excise Tax Financing of Federal Trust Funds"*, dated January 5, 1993, specifically identifies both BLET and AMLF as excise taxes, and discusses both in detail.

d) United States Code ("USC"), Title 30, Chapter 25, Subchapter IV, Section 1232 "Reclamation Fee" provides in Subsection (a), *"All operators of coal mining operations subject to the provisions of this chapter shall pay to the Secretary of the Interior, for deposit in the find, a **reclamation fee** of 35 cents per ton of coal produced by surface coal mining and 15 cents per ton of coal produced by underground coal mining."* [Emphasis added.]

4. Available Case Law Clearly Describes BLET and AMLF as "Excise Taxes".

a) Seventh Circuit case 97-1210, *Amax Coal Company v United States*, related to computation of BLET as it related to excess moisture. In its opinion, the 7th

BB067778

3

Circuit Court of Appeals stated, *"this case explores the depths of the Black Lung Excise Tax ("BLET"), Internal Revenue Code Section 4121 (1986):"*

b) A 1986 Virginia case, *Barnwell et al v Millers Cove Energy Company and Harlan Lee Land Company* ruled the deduction of BLET and AML prior to calculation of production royalty improper. Millers Cove (a sister company of VCC) and its 60%-owned land company, Harlan Lee, had deducted BLET and AMLF before calculating the royalty payable to Harlan Lee, which was 40%-owned by plaintiffs. We are obtaining the opinion in this case.

c) In the Seventh Circuit case 85-2826, *U.S. v Tri-No Enterprises (an appeal of a decision in the US District Court for the Central District of Illinois)*, the Court found that the reclamation fee payments imposed by SMCRA are excise taxes. [VCC has other cases, but these are submitted in the interest of time.]

5. State of Illinois Documents Clearly Refer to BLET as "Excise Taxes", and refer to AMLF as "Taxes" or "Fees".

6. Deductions of BLET and AMLF are not permitted in Federal Coal Leases.

a) As stated in its Audit Manual, the Federal Minerals Management Service, the lessor of all Federal Coal, does not permit deduction of BLET and AMLF before calculating the royalty payable by lessees of Federal coal.

7. Therefore, BLET and AMLF may not be deducted from the coal sales price before the Earned Royalty and Wheelage are calculated.

**B. The present Lessee, BBCC, is responsible for payment of all prior period Earned Royalties and Wheelage, including the period when the Contract was performed by CatlinCC, the previous Lessee.**

1. At the time that the Contract was assigned to and assumed by BBCC, VCC expressly did not waive any prior period performance obligations of Lessee, and is entitled to seamless performance by BBCC for both its period of tenure and prior periods, in accordance with applicable law.

BB067779

4

a)   VCC marked up the Estoppel Certificate to conform with its then-current knowledge and the then-current fact situation, and added an Addendum B to the Estoppel Certificate that expressly stated: *"Lessor has relied upon Lessee's representations rather than lessor's rights of financial audit and engineering inspection pursuant to, inter alia, Sections 4.1, 8.1, 8.2, and 19.1 of the Coal Mining Lease in this regard, and by its execution of this Estoppel Certificate, Lessor does not waive, and expressly retains all rights pursuant to the Coal Mining Lease."*

b)   While VCC does not possess any document that evidences that BBCC assumed the Contract, it does have a copy of a document styled "Assignment of Leases" dated October 29th, 1999, by and between VCC's then-current Lessee, Catlin Coal Co., Inc., and Catlin Coal LLC ("CCLLC"), that were recorded in Vermilion County on November 4th, 1999. CCLLC is an affiliate of BBCC, from which BBCC later obtained an assignment, and assumed the obligations of the Contract. In any event, all of VCC's remedies are valid and enforceable against the current lessee, and it is not necessary for VCC to attempt to enforce those remedies against CCC.

This is the core of VCC's position in this regard. Please consider this a draft document. VCC reserves the right to modify its arguments or to supplement its documentation in regard of this case. After the appropriate BBCC officials have reviewed these documents, please call me to discuss next steps.

Sincerely,

Frederick D. Keady P.E.
President

BB067780

Exhibit **S**

# Vermilion Coal Company

An Iron Carbide Technologies Company

1979 Johns Drive                           Glenview, IL 60025
Telephone: 847-832-9007                    Facsimile: 847-832-9010
                                           October 10, 2002

Black Beauty Coal Company
Att:  Dave Yager, Land Manager
414 S. Fares Avenue
Evansville IN 47714

*[handwritten notes: Rec'd 10/9/02  xc: DAN H. GENE A. WAYNE P. MARK H. MIKE O. DIANE G. CHARLES C.]*

Coal Mining Lease (the "Contract") dated Nov. 21, 1994;
Black Lung Excise Tax & AML Fees; Wheelage Payments

Dear Dave:

An updated spreadsheet regarding the above captioned claim is transmitted herewith. There are several differences between this compilation and the one that I submitted to Wayne Parke on August 20th. This compilation reflects a rate of Black Lung Excise Tax ("BLET") of 4.4% of Gross sales. It is computed on a monthly basis. It accounts separately for the Riola and Vermilion Grove operations in months where both mines operated, except for December 2001, where they are combined.

While charting these computations, we discovered that wheelage fees for the years 1997-1999 were calculated improperly by using the rate of $0.15/ton rather than the correct rate of 1.0% of Gross Sales. The agreement specifies the greater of the two. This resulted in an increase in the amount of the claim of $76,658, before interest. No selling price was reported in those years, so an "Imputed Gross Selling Price" was calculated from other figures that were reported, in order to arrive at a liquidated amount for this element of the claim.

We believe these calculations are correct, and that BBCC is responsible for paying the amount of $291,612.94, less what it has already paid. If BBCC disagrees with this computation please let me know as soon as possible. While much of these amounts arise from periods prior to November 1, 1999, these obligations were assumed by BBCC when it assumed the above captioned Coal Mining Lease.

I have e-mailed a separate copy of this letter and the accompanying Excel spreadsheet to you and to Wayne Parke, to facilitate BBCC's ability to check these calculations. We would like to resolve this matter by October 22, and reiterate VCC's willingness to waive any claims for damages, costs, and legal fees, provided this matter can be resolved promptly and amicably.

                                           Sincerely,

                                           *[signature]*

ecc:    E. Wayne Parke                     Frederick D. Keady, P.E.
        Fred L. Hubbard                    President

BB068341

CALCULATION OF ROYALTIES AND WHEELAGE PAYABLE ON BLACK LUNG/AMT EXCISE TAXES
COAL MINING LEASE DATED NOVEMBER 21, 1994 BY AND BETWEEN VERMILION COAL CO.
AND BLACK BEAUTY COAL CO.: SUMMARY OF LEASED AND THIRD-PARTY COAL SHIPPED

SUMMARY

| YEAR | AMOUNT |
|------|--------|
| 1996 | $7,138.10 |
| 1997 | $46,983.73 |
| 1998 | $46,329.60 |
| 1999 | $68,038.51 |
| 2000 | $43,600.66 |
| 2001 | $27,639.41 |
| YTD 2002 | $51,882.92 |
| TOTAL | $291,612.94 |

BB068342

CALCULATION OF ROYALTIES AND WHEELAGE PAYABLE ON BLACK LUNG/AMT EXCISE TAXES
COAL MINING LEASE DATED NOVEMBER 21, 1994 BY AND BETWEEN VERMILION COAL CO.
AND BLACK BEAUTY COAL CO.: SUMMARY OF LEASED AND THIRD-PARTY COAL SHIPPED

PERIOD: Production Year 1996

| Month | Imputed Gross S.P. | Adjusted Gross S.P. | Price Difference | Reported Shipments (tons) Earned | Wheelage | Total | Underpaid Shipments (tons) Wheelage | Underpaid Amount Royalty | Wheelage | Total | Interest Rate | Accrued Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| May-96 | $20.00 | $21.08 | $1.08 | 4,272 | 0 | 4,272 | 0 | $230 | $0 | $230 | 8.25% | $75 |
| Jun-96 | $20.00 | $21.08 | $1.08 | 6,987 | 0 | 6,987 | 0 | $376 | $0 | $376 | 8.25% | $120 |
| Jul-96 | $20.00 | $21.08 | $1.08 | 5,325 | 0 | 5,325 | 0 | $287 | $0 | $287 | 8.25% | $90 |
| Aug-96 | $20.00 | $21.08 | $1.08 | 6,614 | 0 | 6,614 | 0 | $356 | $0 | $356 | 8.25% | $111 |
| Sep-96 | $20.00 | $21.08 | $1.08 | 9,504 | 0 | 9,504 | 0 | $512 | $0 | $512 | 8.25% | $157 |
| Oct-96 | $20.00 | $21.08 | $1.08 | 19,547 | 0 | 19,547 | 0 | $1,053 | $0 | $1,053 | 8.25% | $319 |
| Nov-96 | $20.00 | $21.08 | $1.08 | 12,344 | 0 | 12,344 | 0 | $665 | $0 | $665 | 8.25% | $199 |
| Dec-96 | $20.00 | $21.08 | $1.08 | 37,100 | 0 | 37,100 | 0 | $1,999 | $0 | $1,999 | 8.25% | $589 |
| Total | | | | 101,694 | 0 | 101,694 | 0 | $5,478 | $0 | $5,478 | | $1,660 |

Royalty 5.00%
Wheelage 1.00%
Total

|  |  |
|---|---|
| Total | $5,478.30 | $1,659.80 |

Total Amount Payable (Including Interest): $7,138.10
Interest accrued through: 10/22/2002

Footnotes: Price is imputed. No gross sales price or wheelage rate was reported.

BB068343

**CALCULATION OF ROYALTIES AND WHEELAGE PAYABLE ON BLACK LUNG/AMT EXCISE TAXES COAL MINING LEASE DATED NOVEMBER 21, 1994 BY AND BETWEEN VERMILION COAL CO. AND BLACK BEAUTY COAL CO.: SUMMARY OF LEASED AND THIRD-PARTY COAL SHIPPED**

**PERIOD: Production Year 1997**

| Royalty Due Date | Imputed Gross S.P. | Adjusted Gross S.P. | Price Difference | Reported Shipments (tons) | | | Underpaid Amount | | | | Interest Rate | Accrued Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Earned | Wheelage | Total | Royalty | Wheelage | WhlgAdj | Total | | |
| 2/20/97 | $20.00 | $21.08 | $1.08 | 43,472 | 0 | 43,472 | $2,342 | $0 | $0 | $2,342 | 8.25% | $664 |
| 3/20/97 | $20.00 | $21.08 | $1.08 | 47,155 | 0 | 47,155 | $2,540 | $0 | $0 | $2,540 | 8.25% | $710 |
| 4/20/97 | $20.00 | $21.08 | $1.08 | 18,048 | 17,566 | 35,613 | $972 | $189 | $878 | $2,040 | 8.25% | $562 |
| 5/20/97 | $20.00 | $21.08 | $1.08 | 0 | 37,314 | 37,314 | $0 | $402 | $1,866 | $2,268 | 8.50% | $615 |
| 6/20/97 | $20.00 | $21.08 | $1.08 | | 51,028 | 51,028 | $0 | $550 | $2,551 | $3,101 | 8.50% | $828 |
| 7/20/97 | $20.00 | $21.08 | $1.08 | | 55,432 | 55,432 | $0 | $597 | $2,772 | $3,369 | 8.50% | $885 |
| 8/20/97 | $20.00 | $21.08 | $1.08 | | 59,982 | 59,982 | $0 | $648 | $2,997 | $3,645 | 8.50% | $943 |
| 9/20/97 | $20.00 | $21.08 | $1.08 | | 52,907 | 52,907 | $0 | $671 | $2,645 | $3,215 | 8.50% | $818 |
| 10/20/97 | $20.00 | $21.08 | $1.08 | | 62,398 | 62,398 | $0 | $672 | $3,120 | $3,792 | 8.50% | $949 |
| 11/20/97 | $20.00 | $21.08 | $1.08 | | 77,903 | 77,903 | $0 | $839 | $3,895 | $4,734 | 8.50% | $1,165 |
| 12/20/97 | $20.00 | $21.08 | $1.08 | 13,664 | 37,864 | 51,528 | $731 | $409 | $1,898 | $3,038 | 8.50% | $735 |
| 1/20/98 | $20.00 | $21.08 | $1.08 | 19,482 | 36,239 | 55,721 | $1,049 | $380 | $1,812 | $3,252 | 8.50% | $773 |
| Total | | | | 141,721 | 488,733 | 630,454 | $7,635 | $5,266 | $24,437 | $37,337 | | $9,647 |

Royalty 5.00%
Wheelage 1.00%
Total $37,336.87

Total Amount Payable (including Interest):  $46,983.73
Interest accrued through:  10/22/2002

Footnotes: Wheelage Adjustment reflects the difference between correct amount of 1% of GSP and applied amount of $0.15/ton.

BB068344

CALCULATION OF ROYALTIES AND WHEELAGE PAYABLE ON BLACK LUNG/AMT EXCISE TAXES
COAL MINING LEASE DATED NOVEMBER 21, 1994 BY AND BETWEEN VERMILION COAL CO.
AND BLACK BEAUTY COAL CO.: SUMMARY OF LEASED AND THIRD-PARTY COAL SHIPPED
PERIOD: Production Year 1998

| Royalty Due Date | Imputed GrossS.P. | Adjusted GrossS.P. | Price Difference | Reported Shipments (tons) Earned | Wheelage | Total | Underpaid Amount Royalty | Wheelage | Whig Adj | Total | Interest Rate | Accrued Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/20/98 | $20.00 | $21.08 | $1.08 | 60,001 | 0 | 60,001 | $3,232 | $0 | $0 | $3,232 | 8.50% | $755 |
| 3/20/98 | $20.00 | $21.08 | $1.08 | 55,041 | 0 | 55,041 | $2,985 | $0 | $0 | $2,985 | 8.50% | $680 |
| 4/20/98 | $20.00 | $21.08 | $1.08 | 72,378 | 0 | 72,378 | $3,899 | $0 | $0 | $3,899 | 8.50% | $878 |
| 5/20/98 | $20.00 | $21.08 | $1.08 | 65,835 | 0 | 65,835 | $3,547 | $0 | $0 | $3,547 | 8.50% | $784 |
| 6/20/98 | $20.00 | $21.08 | $1.08 | 59,052 | 0 | 59,052 | $3,181 | $0 | $0 | $3,181 | 8.50% | $690 |
| 7/20/98 | $20.00 | $21.08 | $1.08 | 72,777 | 0 | 72,777 | $3,920 | $0 | $0 | $3,920 | 8.50% | $834 |
| 8/20/98 | $20.00 | $21.08 | $1.08 | 70,387 | 0 | 70,387 | $3,792 | $0 | $0 | $3,792 | 8.50% | $791 |
| 9/20/98 | $20.00 | $21.08 | $1.08 | 73,319 | 0 | 73,319 | $3,950 | $0 | $0 | $3,950 | 8.50% | $807 |
| 10/20/98 | $20.00 | $21.08 | $1.08 | 68,420 | 0 | 68,420 | $3,686 | $0 | $0 | $3,686 | 8.50% | $738 |
| 11/20/98 | $20.00 | $21.08 | $1.08 | 21,731 | 53,763 | 75,494 | $1,171 | $579 | $2,688 | $4,438 | 8.25% | $670 |
| 12/20/98 | $20.00 | $21.08 | $1.08 | 0 | 0 | 0 | $0 | $0 | $0 | $0 | 6.00% | $0 |
| 1/20/99 | $20.00 | $21.08 | $1.08 | 0 | 53,895 | 53,895 | $0 | $581 | $2,695 | $3,275 | 7.75% | $915 |
| Total | $20.00 | | | 618,939 | 107,658 | 726,597 | $33,342 | $1,160 | $5,383 | $39,885 | | $8,444 |
| Royalty | 5.00% | | | | | | | | | | | |
| Wheelage | 1.00% | | | | | | | | | | | |

Total Amount Payable (including interest):  $48,329.60

Interest accrued through:  10/22/2002

BB068345

CALCULATION OF ROYALTIES AND WHEELAGE PAYABLE ON BLACK LUNG/AMT EXCISE TAXES
COAL MINING LEASE DATED NOVEMBER 21, 1984 BY AND BETWEEN VERMILION COAL CO.
AND BLACK BEAUTY COAL CO.: SUMMARY OF LEASED AND THIRD-PARTY COAL SHIPPED

**PERIOD: Production Year 1999**

| Royalty Due Date | Imputed Gross S.P. | Adjusted Gross S.P. | Price Difference | Reported Shipments (tons) Earned Wheelage | Total | Underpaid Amount Royalty | Wheelage | WhlcAdj | Total | Interest Rate | Accrued Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/20/99 | $20.00 | $21.08 | $1.08 | 0 | 67,575 | 67,575 | $0 | $728 | $3,379 | $4,107 | 7.75% | $764 |
| 3/20/99 | $20.00 | $21.08 | $1.08 | 0 | 75,524 | 75,524 | $0 | $814 | $3,776 | $4,590 | 7.75% | $824 |
| 4/20/99 | $20.00 | $21.08 | $1.08 | 0 | 81,790 | 81,790 | $0 | $881 | $4,089 | $4,971 | 7.75% | $871 |
| 5/20/99 | $20.00 | $21.08 | $1.08 | 0 | 70,088 | 70,088 | $0 | $755 | $3,504 | $4,260 | 7.75% | $729 |
| 6/20/99 | $20.00 | $21.08 | $1.08 | 0 | 71,482 | 71,482 | $0 | $770 | $3,574 | $4,344 | 7.75% | $725 |
| 7/20/99 | $20.00 | $21.08 | $1.08 | 0 | 83,234 | 83,234 | $0 | $897 | $4,162 | $5,058 | 7.75% | $823 |
| 8/20/99 | $20.00 | $21.08 | $1.08 | 0 | 75,321 | 75,321 | $0 | $812 | $3,766 | $4,578 | 8.00% | $728 |
| 9/20/99 | $20.00 | $21.08 | $1.08 | 0 | 81,581 | 81,581 | $0 | $879 | $4,079 | $4,958 | 8.00% | $768 |
| 10/20/99 | $20.00 | $21.08 | $1.08 | 0 | 79,348 | 79,348 | $0 | $855 | $3,967 | $4,822 | 8.25% | $725 |
| 11/20/99 | $20.00 | $21.08 | $1.08 | 0 | 85,167 | 85,167 | $0 | $918 | $4,258 | $5,176 | 8.25% | $766 |
| 12/20/99 | $20.00 | $21.08 | $1.08 | 0 | 80,784 | 80,784 | $0 | $870 | $4,039 | $4,910 | 8.25% | $897 |
| 1/20/00 | $20.00 | $21.08 | $1.08 | 0 | 84,883 | 84,883 | $0 | $915 | $4,244 | $5,169 | 8.50% | $711 |
| Total | | | | 0 | 938,776 | 938,776 | $0 | $10,093 | $46,839 | $56,932 | | $9,107 |

Royalty 5.00%
Wheelage 1.00%
Total $20.00

Total Amount Payable (Including Interest):    $66,038.51
Interest accrued through:    10/22/2002

$58,831.69
$9,106.82

Footnotes: Wheelage Adjustment reflects the difference between correct wheelage rate of 1% of GSP and applied rate of $0.15/ton.
Price is imputed. No gross sales price or wheelage rate was reported.

BB068346

CALCULATION OF ROYALTIES AND WHEELAGE PAYABLE ON BLACK LUNG/AMT EXCISE TAXES
COAL MINING LEASE DATED NOVEMBER 21, 1994 BY AND BETWEEN VERMILION COAL CO.
AND BLACK BEAUTY COAL CO.: SUMMARY OF LEASED AND THIRD-PARTY COAL SHIPPED
PERIOD: Production Year 2000

| Royalty Due Date | Reported Gross S.P. | Adjusted Gross S.P. | Price Difference | Reported Shipments (tons) | | | Underpaid Amount | | | Total | Interest Rate | Accrued Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Earned | Wheelage | Total | Royalty | Wheelage | WhlrAdj | | | |
| 2/2/00 | $18.99 | $20.02 | $1.03 | | 84,225 | 84,225 | $0 | $868 | $0 | $868 | 8.50% | $116 |
| 3/20/00 | $16.93 | $19.96 | $1.03 | 0 | 85,020 | 85,020 | $0 | $874 | $0 | $874 | 8.75% | $113 |
| 4/20/00 | $19.12 | $20.16 | $1.04 | 0 | 90,122 | 90,122 | $0 | $935 | $0 | $935 | 8.75% | $117 |
| 5/20/00 | $18.94 | $19.97 | $1.03 | 66,571 | 0 | 66,571 | $3,424 | $0 | $0 | $3,424 | 9.00% | $415 |
| 6/20/00 | $18.90 | $19.93 | $1.03 | 81,173 | 0 | 81,173 | $4,166 | $0 | $0 | $4,166 | 9.00% | $487 |
| 7/20/00 | $18.74 | $19.76 | $1.02 | 81,809 | 0 | 81,809 | $4,169 | $0 | $0 | $4,169 | 9.50% | $470 |
| 8/20/00 | $19.30 | $20.35 | $1.05 | 82,084 | 0 | 82,084 | $4,290 | $0 | $0 | $4,290 | 9.50% | $466 |
| 9/20/00 | $18.71 | $19.72 | $1.02 | 101,320 | 0 | 101,320 | $5,157 | $0 | $0 | $5,157 | 9.50% | $539 |
| 10/20/00 | $18.28 | $19.28 | $1.00 | 85,318 | 0 | 85,318 | $4,256 | $0 | $0 | $4,256 | 9.50% | $427 |
| 11/20/00 | $18.23 | $19.22 | $1.00 | 76,890 | 0 | 76,890 | $3,828 | $0 | $0 | $3,828 | 9.50% | $368 |
| 12/20/00 | $18.20 | $19.19 | $0.99 | 84,463 | 0 | 84,463 | $4,200 | $0 | $0 | $4,200 | 9.50% | $386 |
| 1/2/00 | $17.91 | $18.89 | $0.98 | 63,127 | 0 | 63,127 | $3,098 | $0 | $0 | $3,098 | 9.50% | $427 |
| Total | | | | 722,765 | 259,367 | 982,132 | $36,592 | $2,677 | | $39,270 | | $4,331 |

Royalty 5.00%
Wheelage 1.00%

Total Amount Payable (Including Interest): $43,600.66          $39,269.62
Interest accrued through: 10/22/2002                          $4,331.04

Footnotes: Wheelage Adjustment reflects the difference between correct wheelage rate of 1% of GSP and applied rate of $0.15/ton.

BB068347

xc: DAN H.
GENE A.
WAYNE P. ✓
MARK H. ✓
MIKE O.
DAVE G.
DEE ANN J.
ERIC G.

# Vermilion Coal Company

An Iron Carbide Technologies Company

**1979 Johns Drive**
**Telephone: 847-832-9007**

Glenview, IL 60025

Facsimile: 847-832-9010

October 20, 2002
Certified Mail 7000 0520 0017 1807 8860
Copy to Fax: 812-424-6551

Black Beauty Coal Company
Att:    E. Wayne Parke, Chief Operating Officer
414 S. Fares Avenue
Evansville IN 47714

**V**
**Exhibit V**

### Coal Mining Lease (the "Contract") dated Nov. 21, 1994; Black Lung Excise Tax & AML Fees; Wheelage Payments

Dear Wayne:

On August 15ᵗʰ, we met in the offices of Black Beauty Coal Company ("Lessee") to discuss the issue of whether the amount of royalties that Lessee has paid and is paying to Vermilion Coal Company ("Lessor") pursuant to the above captioned Coal Mining Lease is the correct amount. At that meeting, I expressed Lessor' position that Lessee's practice of deducting Black Lung Excise Taxes ("BLET") and Abandoned Mined Land Fees ("AMLF") from Gross Sales before calculating royalties and wheelage is improper.

Lessor submitted a claim for royalties in the amount of $236,725.50 in prior period royalties and wheelage. Based on that claim, lessee made a provisional payment of $111,171.25, on a "without prejudice" basis. Lessee set forth several arguments in defense of its practices that related to the method of calculation of BLET; whether BLET and AMLF are "severance taxes"; and whether Lessee is responsible for royalties and wheelage arising from production in months prior to November 1999.

Since that time, Lessor has revised its method of calculating BLET in accordance with Lessee's observation, and submitted abundant documentation in support of its position that Lessee's practice of deducting BLET and AMLF from Gross Sales before calculating royalties and wheelage is improper. In the process of refining its computation of the amounts owed, Lessor discovered that Wheelage payments for the years 1997-1999, were calculated on the basis of $0.15/ton rather than *the higher of $0.15/ton or 1.0% of Gross Sales*, as set forth in the Lease. These revisions resulted in a prior period amount due of $291,612.94, or $180,441.69 after allowing for the provisional payment of August 19ᵗʰ.

Lessor has received no concrete sign that Lessee is making this matter a priority, or that any progress is being made in regard to this issue. Lessor has received no documentation that would support its practice of deducting BLET and AMLF from Gross Sales before calculating royalties and wheelage. Lessor has not received any encouraging response to its request that Lessee pay an reasonable additional provisional amount of $55,000, subject to a final resolution of our differences by October 31ˢᵗ.

BB009971

The amount of time that has passed since this matter was raised has caused Lessor to be commercially insecure in Lessee's performance of the above captioned Coal Mining Lease. Lessee's duty to pay the correct amount of royalties and wheelage is of the essence of the bargain inherent in the above captioned Coal Mining Lease. Lessor will suffer irreparable harm if this matter is not resolved immediately. Lessor hereby demands that Lessee pay the remaining balance of prior period royalties and wheelage of $180,441.69 at once. This is a demand for specific performance of the above captioned Coal Mining Lease.

Sincerely,

Frederick D. Keady, P.E.
President

cc:     Dave Yager, Land Manager, BBCC
        Fred L. Hubbard

BB009972


Exhibit Y

# Vermilion Coal Company

An Iron Carbide Technologies Company

**1979 Johns Drive**                                    **Glenview, IL 60025**
**Telephone: 847-832-9007**                      **Facsimile: 847-832-9010**

December 20, 2002

Certified Mail
Copy to Fax: 812-424-6551

Black Beauty Coal Company
Att:    Dan Hermann, President
414 S. Fares Avenue
Evansville IN 47714

### Coal Mining Lease dated Nov. 21, 1994 (the "Lease"):
### Black Lung Excise Tax & AML Fees; Wheelage Payments

Dear Mr. Hermann:

On August 14th, I met with Wayne Parke and other officials in the offices of Black Beauty Coal Company ("Lessee") to discuss the issue of whether the amount of royalties that Lessee has paid and is paying to Vermilion Coal Company ("Lessor") pursuant to the above captioned Lease is the correct amount. At that meeting, I expressed Lessor' position that, among other issues, Lessee's practice of deducting Black Lung Excise Taxes ("BLET") and Abandoned Mined Land Fees ("AMLF") from Gross Sales before calculating royalties and wheelage is not in keeping with the stated terms of the Lease.

Lessor submitted a claim for royalties in the amount of $236,725.50 in prior period royalties and wheelage. Based on that claim, lessee made a provisional payment of $111,171.25, on a "without prejudice" basis. Lessee set forth several arguments in defense of its practices that related to the method of calculation of BLET; whether BLET and AMLF are "severance taxes"; and whether Lessee is responsible for royalties and wheelage arising from production in months prior to November 1999.

Since that time, Lessor revised its method of calculating BLET in accordance with Lessee's suggestions, and submitted abundant documentation in support of its position that Lessee's practice of deducting BLET and AMLF from Gross Sales before calculating royalties and wheelage is not in accordance with the stated terms of the lease. In the process of refining its computation of the amounts owed, Lessor discovered that Wheelage payments for the years 1997-1999, were calculated on the basis of $0.15/ton rather than *the higher of $0.15/ton or 1.0% of Gross Sales*, as set forth in the Lease. These revisions resulted in a prior period amount due of $291,612.94.

Lessor received a letter, dated October 23, 2002, from Lessee's Attorney Charles Compton that purported to respond to the legal and factual documentation that Lessor had submitted in support of its claim. Pursuant to the advice of its counsel, and in connection with its payment of the Advance Royalty due on November 21, 2002, Lessee deducted

the amount of the $111,171.25 provisional payment that it had paid to Lessor on August 20th, and confirmed in its transmittal letter that the October 23rd letter from Charles Compton represented its position with regard to Lessor's claim. Mr. Compton's letter did nothing to educate Lessor or give us any comfort. We are left with the impression that Lessee did not even read the detailed claim that we submitted. In fact, we are troubled by the by both the peremptory tone of the Compton letter and the implication that being a "remote assignee" can somehow insulate a party that has assumed a contract from an obligation to perform its contractual pursuant to the Lease.

In the August 14th meeting, Black Beauty provided some explanation of the surprisingly large sulfur penalties that were being imposed by PSI Cinergy in Vermilion Grove mine shipments, and settled by Black Beauty by tendering purchased Sulfur Emissions Allowances rather than cash. In my August 15th letter to Wayne Parke, I also requested additional information regarding Lessee's method of valuing sulfur penalties to the extent that they affect Lessor's royalties and wheelage. Lessor has not received any answers to these concerns. I hereby again request a complete and coherent quantitative explanation of how sulfur penalties are calculated, why they are so large, and why (as noncash costs) they should be deducted from the Gross Selling price that is used to calculate Lessor's royalties.

Since August, when Lessor objected to Lessee's practice of deducting BLET and AMLF from the amounts that it invoices the buyers of coal produced and shipped pursuant to the Lease, Lessee has continued with that practice, over Lessor's objections. By its conduct since that time, and by setting off the provisional payment against the Advance Royalty, Lessee has unilaterally imposed its interpretation of the Lease on Lessor.

To add insult to injury, Lessee, acting unilaterally and expressly contrary to Lessor's written instructions, set off $42,122.93 in production royalties that arose from production in the month of November against the already reduced advance royalty that Lessee paid on November 20th. This is not in keeping with the course of dealing of the Lease in all prior years, when both Black Beauty and Catlin paid November production royalties in cash on December 21st, and did not begin to recoup advance royalties until the December royalty payable January 20th.

While Black Beauty may not agree with some or all of Lessor's demands in this matter, it is Lessor's position that Lessee is obligated to pay these amounts, subject to a final determination of whether each element of payment is in accordance with the Lease. We don't believe that Lessee has the right to withhold payment due pursuant to the Lease on Lessee's whim.

We are very disappointed with the way that you have treated us. Lessee's conduct has caused, and continues to cause, Lessee irreparable harm. Your conduct has made us feel like "poor relatives". Lessee's conduct has caused Lessor to be commercially insecure in Lessee's performance of the Lease. Lessee's duty to pay the correct amount of

royalties and wheelage is one of the essential elements of the Lease. We urge Lessee to live up to its contractual obligations pursuant to the Lease.

Lessor will suffer further irreparable harm if this matter is not resolved immediately. Lessor hereby demands that Lessee pay the outstanding balance due pursuant to the Lease of prior period royalties and wheelage of $300,891.02 (adjusted for October and November results and interest), plus the $42,122.93 November production royalty that was improperly recouped—a total of $343,013.95, at once. This is a demand for adequate assurance of specific performance of the above captioned Lease.

After these funds are paid, both parties should use their best efforts to expeditiously reason together to settle these differences in interpreting the Lease. When we reach a final determination on each of these matters, Lessor will continue to honor its obligations pursuant to the Lease, including refunding any payments of Lessee that are determined to be not in accordance with the Lease. Time is of the essence. We will await your prompt response to our demand for adequate assurance of specific performance in accordance with the Lease.

Sincerely,

Frederick D. Keady, P.E.
President

cc:   E. Wayne Parke, COO,
      Dave Yager, Land Mgr.
      Mike O'Donnell, Mgr. Land Acquisition

BB067885

3

E-FILED
Tuesday, 24 April, 2007  12:48:25 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT C

# Vermilion Coal Company

### An Iron Carbide Technologies Company

1979 Johns Drive
Telephone: 847-832-9007

Glenview, IL 60025
Facsimile: 847-832-9010

May 12, 2003

<u>Via Certified Mail</u>

Black Beauty Coal Company
Attn: Dan Hermann, President
414 S. Fares Avenue
Evansville IN 47714

### <u>Notice of Lessee's Default of Coal Mining Lease Dated Nov. 21, 1994 (the "Lease")</u>

Dear Mr. Hermann:

Vermilion Coal Company is the Lessor ("Lessor"), and Black Beauty Coal Company is the Lessee ("Lessee"), pursuant to the above captioned Lease. Lessee has defaulted in the performance of its Lease obligations by its actions including:

1. Improperly deducting a $0.30 per ton "Loading Fee" from the Gross Selling Price ("GSP") of coal from the Vermilion Grove mine before calculating the amount of Gross Proceeds upon which royalties and wheelage payable to Lessor are calculated; and,

2. Deducting Black Lung Excise Taxes ("BLET") and Abandoned Mine Land Fees ("AMLF") from the Gross Selling Price ("GSP") as defined in the Lease, resulting in reduced payments to Lessor.

Lessor has demanded that Lessee cease its wrongful calculation of royalty and wheelage, and to repay prior period underpayments. Lessee, over Lessor's objections, has refused to pay the correct amount of royalty and wheelage or to pay amounts due from prior periods. Moreover, Lessee has continued its wrongful practice of deducting BLET and AMLF from GSP before calculating the amount of royalty and wheelage payable to Lessor and has anticipatorily repudiated its obligation to make future payments to Lessor in accordance with the Lease.

Lessee is hereby notified that Lessee's actions constitute events of default under the stated terms of the Lease. **As a result of Lessee's default of its Lease obligations, the Lease will be terminated effective June 1, 2003.** Lessor has instituted legal proceedings against Lessee and is seeking legal and equitable remedies for Lessee's wrongful conduct.

Lessee may remain in possession of the Leased Premises as a tenant-at-will ("Tenant") after the effective date of termination, under the same economic terms as the terminated lease until the matter is adjudicated by the trial court, *provided that* Tenant pays Lessor the disputed amounts of $380,692.81 that arose from prior period underpayments, plus accrued interest to the payment date; and observes all the other terms of the Lease.

BB068136

Lessor reserves the right, at its sole discretion, to change any term or terms of Tenant's occupancy (including the fact of occupancy itself) subject only to reasonable notice after the effective date of termination. Lessor also reserves all further remedies available to it under law or equity.

Sincerely,

Frederick D. Keady P.E.
President

BB068137

E-FILED
Tuesday, 24 April, 2007  12:48:35 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT D



# *Black Beauty*
# *Coal Company*

Exhibit C

June 3, 2003

*via: Certified Mail, Return Receipt Requested*

Frederick D. Keady, P.E.
President
Vermilion Coal Company
1979 Johns Drive
Glenview, IL 60025

      Re:   Notice of Demand for Arbitration

Dear Mr. Keady:

      Black Beauty Coal Company ("Black Beauty") is the assignee of the original Lessee's interest under the Coal Mining Lease, dated November 21, 1994, as amended (the "Lease") between Vermilion Coal Company ("Vermilion"), as Lessor and Laswell Coal Co., Inc., as original Lessee.

      A dispute has arisen between Black Beauty and Vermilion regarding the proper computation of Production Royalties and wheelage owed by the Lessee to the Lessor and the rights and obligations of the parties with respect thereto. Vermilion has filed a complaint against Black Beauty, Cause No. 03-CH-101, in Vermilion County, Illinois in the Circuit Court in the Fifth Judicial Circuit (the "Complaint") and has also purported to terminate the Lease by notice dated May 12, 2003 (the "Purported Termination Notice"). Black Beauty objects to both the filing of the Complaint and the Purported Termination Notice.

      Section 24.1 of the Lease provides, in its relevant part, that "[i]f there should arise any matters in dispute hereunder, on which Lessor and Lessee cannot finally agree, such matter or matters shall be referred to a board of arbitrators consisting of three (3) disinterested, competent persons, one selected by Lessor and one by Lessee, as hereinafter provided, and the two thus selected shall select the third, who shall have the power of an umpire and shall be known as umpire-arbitrator. The decision and award of such arbitrators, or any two of them, or, in the case of disagreement among all arbitrators, of the third or umpire-arbitrator, shall be conclusive and binding upon Lessor and Lessee and promptly complied with."

BB068215

Frederick D. Keady, P.E.
President
Vermilion Coal Company
Page 2
June 3, 2003

Black Beauty demands an arbitration to:

1.  Determine whether (i) Black Lung Excise Taxes ("BLET"), imposed
    upon the act of mining coal pursuant to Regulation Section 48.4121-1
    of the regulations promulgated pursuant to the Internal Revenue Code
    of 1986, and (ii) Abandoned Mine Land fees ("AML") imposed upon
    the act of mining coal pursuant to §870.12 of the regulations
    promulgated pursuant to the Surface Mining Control and Reclamation
    Act of 1977, are to be excluded from the "Gross Selling Price" of coal
    in computing Lessee's "Gross Sales" for purposes of calculating
    Production Royalties and wheelage;

2.  Determine the rights and obligations of the parties if BLET and AML
    are not to be deducted in computing Gross Selling Price and any
    under-calculation of Production Royalties has occurred as a result
    thereof; and

3.  Determine whether the allegations and claims for relief set forth in
    the Complaint and the Purported Termination Notice are properly and
    exclusively the subject of mandatory arbitration pursuant to the terms
    of the Lease and determine the appropriate relief and damages
    payable to Black Beauty for Vermilion's failure to comply with the
    mandatory arbitration requirements of the Lease.

BB068216

Frederick D. Keady, P.E.
President
Vermilion Coal Company
Page 3
June 3, 2003

Black Beauty hereby appoints the Honorable Gene E. Brooks as its party-appointed arbitrator. Judge Brooks is a former Federal District Court Judge for the Southern District of Indiana and meets the requirements for competency and disinterestedness contained within the Lease. The contact information for Judge Brooks is as follows:

> Honorable Gene E. Brooks
> Bowers Harrison, LLP
> 25 N.W. Riverside Drive
> P.O. Box 1287
> Evansville, IN 47706-1287
> Telephone: 812-426-1231
> Facsimile: 812-464-3676

Sincerely,

BLACK BEAUTY COAL COMPANY

Daniel S. Hermann, President

I:\DATA\BBCC\Vermilion Coal Lease\ltr to keady 052803.wpd

BB068217

# Vermilion Coal Company

An Iron Carbide Technologies Company

**1979 Johns Drive**

**Telephone:  847-832-9007**

**Glenview, IL 60025**

**Facsimile: 847-832-9010**

June 20, 2003

Certified Express Mail

Fed Ex

Copy to Fax: 812-424-6551

Black Beauty Coal Company

Att:    Dan Hermann, President

414 S. Fares Avenue

Evansville IN 47714

### <u>Coal Mining Lease dated Nov. 21, 1994 (the "Lease");</u>
### <u>Appointment of Party Arbitrator; Counter-Demand for Arbitration</u>

Dear Mr. Hermann:

This is to notify Black Beauty Coal Company, the Lessee ("Lessee") pursuant to the above captioned Lease, that Vermilion Coal Company (Lessor") hereby appoints Susan Getzendanner as its party arbitrator. Ms. Getzendanner is a former Federal District Court Judge for the Northern District of Illinois and meets all of the requirements for competency and disinterestedness as required by the Lease.

Ms. Getzendanner's contact information is as follows:

Ms. Susan Getzendanner

1410 North LaSalle Street

Chicago, IL 60610

Telephone: (312) 944-2629

Facsimile:  (312) 944-7805

E-mail: sgetzendanner@mindspring.com

Lessor further makes a counter-demand for the arbitration of the issues set forth in the attached summary sheet and of all issues as set forth in the verified complaint that is also transmitted herewith. Lessor reserves all further rights in this matter as set forth in the Lease and pursuant to applicable law.

Sincerely,

Frederick D. Keady, P.E.

President

cc:    Charles L. Compton, Ziemer Stayman Weitzel & Shoulders  *(USPS)*



PLAINTIFF'S
EXHIBIT
**A**

## Vermilion Coal Company v Black Beauty Coal Company
## Arbitration of that Certain Coal Mining Lease ("Lease")
## Dated November 21, 1993, as Assigned and Amended
## Issues to be Arbitrated

1.      Whether Black Lung Excise Tax ("BLET") and Abandoned Mine Land Fees
("AMLF") are 'sales tax and /or severance" tax to be deducted from the Gross Sales Price
("GSP") Black Beauty ("Lessee") receives from bona fide purchasers for coal sold f.o.b.
the loading point after preparation, if any, and loading for the final destination before
calculating royalty and wheelage fees to be paid to Lessor Vermilion Coal Company
("Lessor") in accordance with Article II, Section 2.4 of the Lease.

   a.      If BLET and AMLF are not "sales tax and/or severance" then what is the
           amount:
           i.      of prior period royalty and wheelage that Lessee owes to Lessor?
           ii.     of interest on prior period amounts that Lessee owes to Lessor?

2.      Whether Lessee breached its express and implied duty of good faith and fair
dealing under the Lease by its conduct in deducting Loading Fees, BLET and AMLF
from GSP?

3.      Whether Lessee's actions including the reporting of GSP and calculations of
royalty and wheelage fees owed to Lessor constitute "Events of Default" under Section
XXII of the Lease entitling Lessor's to seek any and all remedies for Lessee's default,
including, without limitation, termination of the Lease?

4.      Whether Lessee's unequivocal and expressed statement of its intent to continue in
its conduct of deducting BLET and AMLF from its calculation of royalty and wheelage
fees owed to Lessor under the Lease after Lessee received Lessor's demands for adequate
assurance of specific performance constitute Lessee's actual repudiation of the Lease?

5.      Whether Lessee's unequivocal and expressed statements of its intent to continue
in its conduct of deducting BLET and AMLF from its calculation of royalty and
wheelage fees owed to Lessor under the Lease after receipt of Lessor's demands for
adequate assurance of specific performance constitute Lessee's anticipatory repudiation
of the Lease?

6.      Whether Lessor's filing of a complaint in state court prior to Lessee's notice of
Lessee's arbitration demand constitutes the "filing of an action" under the legal doctrine
of anticipatory repudiation thereby terminating Lessor's Lease obligations?

7.      What amounts of damages is Lessor entitled to recover for Lessee's actions
including, without limitation, any expectation damages suffered by Lessor as a result of
Lessee's default and Lessee's actual and anticipatory repudiation of its contractual
obligations under the Lease?

E-FILED
Tuesday, 24 April, 2007  12:48:49 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT E

## VERMILION'S ISSUES FOR ARBITRATION

### A.    Issues set forth in Vermilion's initial Counter-Demand for Arbitration:

1.    Whether Black Lung Excise Tax ("BLET") and Abandoned Mine Land Fees ("AMLF") are 'sales tax and /or severance' tax to be deducted from the Gross Sales Price ("GSP") Black Beauty ("Defendant") actually receives from bona fide purchasers for coal sold f.o.b. the loading point after preparation, if any, and loading for the final destination before calculating royalty and wheelage fees to be paid to Plaintiff Vermilion Coal Company ("Plaintiff") in accordance with Article II, Section 2.4 of the Lease.

   a.    If BLET and AMLF are not "sales tax and/or severance" then what is the amount:
      i.    Of prior period royalty and wheelage the Defendant owes to Plaintiff?
      ii.    Of interest on prior period amounts that Defendant owes to Plaintiff?

2.    Whether Defendant breached its express and implied duty of good faith and fair dealing under the Lease by its conduct in deducting Loading Fees, BLET and AMLF from GSP?

3.    Whether Defendant's actions including the reporting of GSP and calculations of royalty and wheelage fees owed to Plaintiff constitute "Events of Default" under Section XXII of the Lease entitling Plaintiff to seek any and all remedies for Defendant's default, including, without limitation, termination of the Lease?

4.    Whether Defendant's unequivocal and expressed statement of its intent to continue in its conduct of deducting BLET and AMLF from its calculation of royalty and wheelage fees owed to Plaintiff under the Lease after Defendant received Plaintiff's demands for adequate assurance of specific performance constitute Defendant's actual repudiation of the Lease?

5.    Whether Defendant's unequivocal and expressed statements of its intent to continue in its conduct of deducting BLET and AMLF from its calculation of royalty and wheelage fees owed to Plaintiff under the Lease after receipt of Plaintiff's demands for adequate assurance of specific performance constitute Defendant's anticipatory repudiation of the Lease?

6.    Whether Plaintiff's filing of a complaint in state court prior to Defendant's notice of Defendant's arbitration demand constitutes the "filing of an action" under the legal doctrine of anticipatory repudiation of the Lease?

7.    What amount of damages is Plaintiff entitled to recover for Defendant's actions including, without limitation, any expectation damages suffered by Plaintiff as a result of Defendant's default and Defendant's actual and anticipatory repudiation of its contractual obligation under the Lease?

8.    Whether Defendant's failure to cure its default after proper Notice of Default by Plaintiff resulted in the termination of the Coal Mining Lease.

Vermilion's Counter-Demand for Arbitration is attached as Exhibit A.

Page -1-

**B.    Additional issues set forth in Vermilion's Verified Complaint incorporated by reference into Vermilion's Counter-Demand for arbitration:**

**Count II**

9.    Vermilion seeks an accounting from Black Beauty for all royalty and wheelage payments made, or which should have been made, under the Lease and to properly account for all coal which Black Beauty has mined from the Leased Property since November 21, 1994, to insure that all royalty payments due and owing to Plaintiff have been properly accounted for, and fully paid.

a.    A true and complete recapitulation of the number of run-of-mine ("Raw") tons of Royalty coal and Wheelage coal that were produced each month from the Riola and Vermilion Grove mines since January 1, 1996, along with a month-end inventory of Raw coal; and,

b.    A true and complete recapitulation of the number of Raw tons that were prepared for shipment and placed into prepared ("Clean") coal inventory at each mine.

c.    A true and complete summary of the contracted-for selling price ("Contract Price") with each buyer of the coal produced and shipped pursuant to the Lease; all contractually-required adjustments ("Price Adjustments")to the Contract Price for coal quality or other reasons; the actual Gross Selling Price that was received by the Defendant for each ton of coal shipped from the Riola and Vermilion Grove mines in each month since January 1, 1996; and a complete reconciliation of any Price Adjustments for which the consideration of settlement was other than cash; and,

d.    A true and complete reconciliation of the number of leased and third-party acres mined each month since January 1, 1996 with a proper map identification of the acreage mined and Raw tons of coal produced from each area; and,

e.    A detailed recapitulation of the method of calculating the amount of royalty and wheelage due and payable to Vermilion by Defendant, on a monthly basis, for each month since January 1, 1996.

**Count III**

10.    Whether Black Beauty's deduction of Black Lung Excise Taxes ("BLET"), Abandoned Mine Land Fees *or any other costs* from the f.o.b. Gross Selling Price for coal produced and sold pursuant to the Lease, before calculating the royalties and wheelage due and owing to Plaintiff, constitute events of default under the Lease?

11.    Whether, as a result of Defendant's default in the due and punctual payment of any rent, royalty or any part thereof, when and as the same became due and payable to Plaintiff, the Lease was terminated in accordance with Article XXIV of the Lease.

## Count IV

12.    Whether Catlin's underpayment of wheelage fees during the years of 1997, 1998 and 1999 in which Catlin paid wheelage for third party coal mined pursuant to the Lease at the rate of $0.15 per ton when the Gross Selling Price received by the Lessee pursuant to the Lease was substantially greater than $15.00 per ton ( in accordance with the stated terms of the Lease, the Lessee is obligated to pay wheelage at the greater of $0.15 per ton or 1.0% of Gross Selling Price) was a breach of their contractual obligations to Vermilion.

## Count V

13.    Whether Black Beauty engaged in a scheme to defraud the Plaintiff despite the fact that Black Beauty owed a duty to Plaintiff to fairly and accurately disclose to Plaintiff how Black Beauty was calculating said royalties. Specifically, whether Black Beauty (the only party in a position to know how the royalties were being calculated):

a.    knowingly and intentionally failed to disclose that BLET and AMLF were being deducted by Defendant from the Gross Selling Price; and,

b.    knowingly and intentionally calculated a false and misleading "f.o.b. Mine" price that it then used to compute Plaintiff's royalties and wheelage; and,

c.    knowingly and intentionally withheld from Plaintiff that Defendant was altering its actual Gross Selling Price to a lower price that it then used to compute Plaintiff's royalties & wheelage; and,

d.    knowingly and intentionally transmitted a false and misleading monthly report to Plaintiff.(reporting is required by Section 2.3 of the Lease).

14.    Whether Black Beauty's fraudulent scheme was furthered by the misleading and deceptive written monthly statements that Black Beauty sent to Vermilion. The reports submitted by Black Beauty fraudulently failed to disclose the actual Gross Selling Price of the coal; fraudulently failed to disclose the fact that Black Beauty was improperly deducting its BLET and AMLF excise taxes and other operating costs of Defendant from said Gross Selling Price in calculating and determining the royalties and wheelage to be paid to the Plaintiff; and, fraudulently presented an amount ( $/ton f.o.b. mine) that Black Beauty had altered to a lower amount and purported to be the Gross Selling Price per ton.

15.    Whether Black Beauty knowingly and intentionally misrepresented the royalty and wheelage payments owed to Vermilion in its misleading and deceptive written monthly statements.

16.    Whether Black Beauty intended for Vermilion to rely on these misleading and deceptive written monthly statements and to continue in its performance of its obligations as Plaintiff under the Lease.

17.    Whether Black Beauty acted in reckless disregard of Vermilion's rights as Lessor in accordance with the Lease.

**Count VI**

18.    Whether Black Beauty's clear and unequivocal refusal to calculate and make royalty and wheelage payments owed to Vermilion in accordance with the Lease constitutes Defendant's anticipatory repudiation of the Lease, and thus renders Black Beauty in default under the terms and conditions of the Lease.

Vermilion's Verified Complaint is attached as Exhibit B.

**C.    Issues regarding other deductions taken by Black Beauty [1]**

19.    Whether Defendant's actions in deducting PSI's "expenses" or "costs" from the Gross Sales Price ("GSP") prior to calculating royalty or wheelage payments is authorized by the Lease.[2]

---

[1]    Issues set forth in Vermilion's Verified Complaint and incorporated by reference into Vermilion's counter-demand for arbitration included a demand for a true and complete summary of the contracted-for selling price ("Contract Price") with each buyer of the coal produced and shipped pursuant to the Lease; all contractually-required adjustments ("Price Adjustments")to the Contract Price for coal quality or other reasons; the actual Gross Selling Price that was received by the Lessee for each ton of coal shipped from the Riola and Vermilion Grove mines in each month since January 1, 1996; a complete reconciliation of any Price Adjustments for which the consideration of settlement was other than cash; and, a detailed recapitulation of the method of calculating the amount of royalty and wheelage due and payable to Vermilion by Defendant, on a monthly basis, for each month since January 1, 1996. *See* Count II. Additionally, Vermilion's action for breach of contract against Black Beauty includes any "other costs" improperly deducted by Black Beauty in calculating amounts due to Vermilion under the Lease. *See* Count III. As a result of discovery in these proceedings, Vermilion has learned that Black Beauty made other deductions from the Gross Selling Price in violation of the Lease. Moreover, Black Beauty has, since the filing of this action taken substantial additional deductions from the GSP which with prior deductions amount to more than *one-third* of the reported contractual gross selling price. These deductions include so-called "PSI quality adjustments"; and "freight adjustments" (even though the PSI contract sets forth that coal be sold "F.O.B. Mine") in addition to the deductions for BLET/AMLF from the GSP; and, deductions taken as a result of Black Beauty's questionable method of valuing the Sulfur Dioxide emissions allowances that Black Beauty uses to settle sulfur penalties. Many of the costs that Black Beauty deducted during August, September, October and November of 2003 appeared to be capital or operating costs associated with preparing coal to customer's specifications (PSI), trucking coal between Riola and Vermilion Grove mines, or damages paid to PSI for costs incurred at the power plant because of "problem coal" (not taken from the Leased Premises). These are **not** allowable deductions under the Lease.

[2]    Although counsel for Black Beauty advised Judge Lambros that the issues in this matter were limited to those issues addressed in the motions for partial summary judgment filed by Vermilion and the motion for summary judgment filed by Black Beauty relating to the BLET/AMLF deductions taken by Black Beauty, the record in this case including the Petition for Bifurcation filed by Black Beauty evidence the error in Mr. Shoulders' statement. *See* Black Beauty's Petition for Bifurcation attached as Exhibit C. In

20.    Whether Defendant breached its express and implied duty of good faith and fair dealing under the Lease by its conduct in deducting PSI "expenses" or "costs"?

21.    Whether Defendant's actions in deducting PSI "expenses" or "costs"from the GSP constitute "Events of Default" under Section XXII of the Lease entitling Lessor to seek any and all remedies for Defendant's default, including, without limitation, termination of the Lease?

### D.    Supplemental Issues Discovered Since the Filing of this Action.[3]

22.    Whether Defendant has willfully or negligently mined inferior quality coal from lands leased from third parties and commingled that inferior coal with coal produced from land leased from Plaintiff in violation of the Lease.

---

particular, in her August 29, 2003 letter to counsel for Black Beauty ( attached as Exhibit G to Black Beauty's Petition) counsel for Vermilion states "[When Vermilion initially suggested a bifurcated proceeding, it was with the understanding that the first phase of the arbitration would address the issue of whether the correct amount of Royalty, Wheelage and Fees were paid by Lessee to Lessor for the period from November 21, 1994 through the present ("Prior Period Royalty, Wheelage and Fees"). The determination of this issue includes, without limitation, the issues as set forth in the attached revised scheduling order. Although the issue of whether Black Lung Excise Tax ("BLET") and Abandoned Mine Land Fees ("AMLF") constitute a "severance or sales tax" and may properly be deducted from the Gross Sales Price ("GSP.") before calculating Royalty and Wheelage fees to be paid to Plaintiff pursuant to Article II of the Lease is a central issue in this phase of the arbitration, it is not the *sole* issue for determination by the Panel. Certainly Black Beauty (having already admitted to improperly deducting a nonexistent "loading fee") cannot be surprised by the scope of the issues encompassed in the broader issue of Defendant's payments of Royalty, Wheelage and Fees to Plaintiff since these issues have been identified in numerous telephone discussions, conferences, correspondence and claims made by Vermilion to Defendant over the past year." Further, the scheduling order attached to Ms. Cole's August 29, 2003 letter in describing the scope of the initial phase of the arbitration proceeding stated, "Both parties reserve the right to amend the issues to be determined in Phase I of this arbitration proceeding in the event that discovery reveals any other matter relevant to the correct payment of prior period royalty, wheelage and fees owed to Plaintiff by Defendant in accordance with the stated terms of the Lease, including the determination of appropriate restitution (if any) to be paid by Defendant." *See* Scheduling Order attached to Vermilion's counsel's August 29[th] letter. *See also* paragraphs 6 and 7 of Vermilion's Motion for Sanctions detaining the parties' exchanges of draft scheduling orders attached as Exhibit D

[3]    The parties have agreed that the Federal Rules of Civil Procedure are to be applied in this arbitration. *See* Scheduling Order attached as Exhibit E.  FRCP 15 allows the amendment or supplementation of pleadings.  Since the filing of this action, Plaintiff has discovered additional past, present and continuing violations of the Lease by Defendant. Since Defendant continues to remain as a tenant-at-will on the property until adjudication of Plaintiff's claims, judicial economy and fairness require that Plaintiff be permitted to have all of the matters relating to Defendant's conduct in violation of the Lease tried in one proceeding.

23.    Whether Defendant has willfully and maliciously represented to third parties that inferior quality coal mined from lands leased by Defendant from third-parties and commingled with coal mined from land leased from Plaintiff was produced from Plaintiff's property.

24.    Whether Defendant has willfully or negligently conducted its operations in breach of the stated terms of the Coal Mining lease, including but not limited to Sections 1.1, 1.2, 1.3, 2.6, 6.1, 6.2, 7.1 14.1, 20.1, by wasting or abandoning Plaintiff's coal without compensating or obtaining the consent of Plaintiff.

25.    Whether Defendant has willfully or negligently conducted its operations in breach of the stated terms of the Coal Mining lease, including but not limited to Sections 1.1, 1.2, 1.3, 2.6, 6.1, 6.2, 7.1,14.1 and 20.1, by failing to employ proper diligence, expertise and supervision in the design, construction and operation of the Vermilion Grove coal mine.

26.    Whether Plaintiff has breached its express and implied duty of good faith and fair dealing and its obligations pursuant to the Lease to mine the coal from Plaintiff's property by willfully and maliciously mining coal from lands leased from third-parties thereby with the intent to deny Plaintiff the economic benefits to which Plaintiff is entitled.

E.    **Issues relating to the assignment to and assumption of the Coal Mining Lease by Black Beauty**

27.    Whether Black Beauty can unilaterally modify Plaintiff's rights under the Lease by the form and substance of the Assignment drafted by counsel for Black Beauty Coal Company from the original or the intermediate lessee.

F.    **Damages**

28.    Following the ruling by the Panel on each of the liability issues submitted by Vermilion for arbitration, Vermilion is seeking to expeditiously recover its damages from Black Beauty on Plaintiff's claims.

**E-FILED**
Tuesday, 24 April, 2007  12:49:01 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT F

## IN RE: ARBITRATION PROCEEDINGS

VERMILION COAL COMPANY,          )
                                 )
                  Claimant,      )          ARBITRATION PANEL:
                                 )
v.                               )          THOMAS LAMBROS
                                 )          SUSAN GETZENDANNER
BLACK BEAUTY COAL COMPANY,       )          G. DANIEL KELLEY
                                 )
                  Respondent.    )

### ORDER REGARDING ISSUES TO BE ARBITRATED AT 11/8/04 HEARING

Counsel for Parties presented in both written and oral formats, their respective positions as to the issues to be decided by this Panel at the 11/08/04 Hearing. The Panel having reviewed the written papers, listened to oral argument on 08/24/04 by counsel for both sides, questioned counsel for both sides and then deliberated, hereby orders the following:

1.    At the 11/08/04 Arbitration Hearing to take place in Cleveland, Ohio, the parties will present evidence and argument as to the following paragraphs as identified in Vermillion's Issues for Arbitration submitted July 13, 2004:

(a) Paragraphs 1 through 18;
(b) Paragraph 27 only as it relates to estoppel; and
(c) Remedies for any breach including accounting, damages, or termination will be bifurcated from the 11/08/04 hearing.

2.    The Panel hereby reserves the right to determine jurisdiction and hear evidence and argument as to Paragraphs 19-26 and any remaining issues of Paragraph 27, as identified in Vermillion's Issues for Arbitration submitted July 13, 2004, at a time following the 11/08/04 hearing decision.

IT IS SO AGREED AND ORDERED.

THOMAS D. LAMBROS, Umpire

/s/ Susan Getzendanner          /s/ G. Daniel Kelley
SUSAN GETZENDANNER              G. DANIEL KELLEY

Exhibit 10

E-FILED
Tuesday, 24 April, 2007  12:49:34 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT G

## IN RE THE MATTER OF THE ARBITRATION OF

| | | |
|---|---|---|
| VERMILION COAL COMPANY, | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| and | ) | **DECISION and AWARD** |
| | ) | |
| BLACK BEAUTY COAL COMPANY, | ) | |
| | ) | |
| **Respondent.** | ) | |

This arbitration involves a lease for coal lands located within the Illinois Coal Basin in Vermilion County, Illinois. Vermilion Coal Company ("Vermilion") is the lessor and Black Beauty Coal Company ("Black Beauty") is the lessee by assignment. The Illinois Coal Basin is known for its high sulfur coal which was in particular demand following the enactment of the Clean Air Act.

Vermilion markets and leases land within the Illinois Basin. Black Beauty operates coal mines and particularly an underground coal mine consisting of two portals, a preparation plant, and train load out facilities on the leased land.

In 1994, Ron Laswell, president of Laswell Coal Company and Fred Keady, president of Vermilion negotiated and entered into the original lease. Under the original lease the rent was paid as a royalty consisting of twenty (20) percent of the lessee's gross operating profit. In 1995, Ron Laswell and Fred Keady negotiated and entered into the amended lease. Under the amended lease the royalty calculation was changed to five (5) percent of the gross selling price.

Shortly thereafter the amended lease was assigned to Catlin Coal Company ("Catlin"), a Laswell Coal Company entity. In 1999, the amended lease was assigned by Catlin to Black Beauty.

The amended lease provides that "any sales tax and/or severance" tax may be deducted in computing gross selling price for purposes of calculating royalties and wheelage fees.

In August 2002, disagreements arose between Vermilion and Black Beauty regarding the deductibility of the Black Lung Excise Tax ("BLET") and Abandoned Mine Land Fee ("AMLF") in computing royalties and wheelage fees. Vermilion and Black Beauty were not able to finally agree on these matters in dispute. Such matters were

referred to a panel of arbitrators as provided in the amended lease following a confrontational exchange between the parties, resulting in Vermilion filing a lawsuit; Black Beauty countering with a demand for arbitration; and the Court in the Circuit County for the Fifth Judicial Circuit of Illinois, Vermilion County, Danville, Illinois (Case No. 03-CH-101) staying the litigation and directing the matter to arbitration as agreed by the parties.

Although ruling on the parties' cross motions for summary judgment was deferred while the case proceeded to a hearing on the merits, there being a substantial controversy on a number of material facts and law applications to those facts, the motions are overruled as are all other pending non-dispositive motions.

Both Ron Laswell and Fred Keady are smart and well versed in the coal mining business. The lease was a product of negotiations both as to the substance, terms and conditions. They crafted the original lease based on a gross operating profit calculation and they left no doubt about the deductibility of the two federal taxes at issue, BLET and AMLF as shown in Exhibit C incorporated into the original lease at Art. II, Sec. 2.5(g). The amended lease had a different concept, one based on price rather than profit. The reference to deductibility of taxes in the amended lease was "any sales tax and/or severance" tax without any attached schedule. Another revision made by Laswell and Keady to the amended lease was the redaction and removal of Sec. 2.5(g). The concept or basis for computing royalties was effectively changed from gross operating profit to gross selling price as of March 6, 1995.

The primary issue of this dispute is whether BLET and AMLF are severance taxes and entitled to deductibility in computing royalties from the gross selling price. Lessor answers this issue with an emphatic "No!" Lessee answers with an emphatic "Yes!" Thus, this dispute comes down to an interpretation of the word "severance" tax; more specifically, whether that term as used in the amended lease includes or excludes federal BLET or AMLF as deductions in gross selling price calculations.

The threshold issue in a dispute between the parties regarding the meaning of a contract provision is whether the contract is ambiguous. *Ford v. Dovenmuehle Mortgage Co.*, 651 N.E.2d 751, 754, 273 Ill. App. 3d 240, 244 (Ill. App. Ct. 1995). A contract is not ambiguous simply because the parties disagree to its meaning. *Young v. Allstate Ins. Co.*, 812 N.E.2d 741, 748, 351 Ill. App. 3d 151, 157 (Ill. App. Ct. 2004); *Id.* Therefore, the court must determine whether the contract's provisions are susceptible to more than one reasonable interpretation by examining the contract as a whole. *Ford*, 651 N.E.2d at 754, 273 Ill. App. 3d at 244. The court will then examine the plain language of the contract followed by credible evidence concerning the parties' intentions to determine whether the contract's provisions are susceptible to more than one reasonable interpretation. *See Ocean Atl. Dev. Corp. v. Aurora Christian Sch., Inc.*, 322 F.3d 983 (7th Cir. 2003); *See also* Richard A. Lord, Williston on Contracts § 30:4 (4th ed. 2004).

The words "any sales tax and/or severance" tax are not ambiguous.

Unambiguous words within a contract will be given their plain and ordinary meaning. *Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 687 (7th Cir. 2004); *Harrison v. Sears, Roebuck & Co.*, 546 N.E.2d 248, 253 (Ill. App. Ct. 1989). Plain and ordinary meaning may be determined by reference to a dictionary. *Young*, 812 N.E.2d at 749, 351 Ill. App. 3d at 158. The Internet may be used as further reference. *Vencor Hosp. S., Inc. v. Blue Cross & Blue Shield of RI*, 86 F.Supp.2d 1155, 1161 (S.D. Fla. 2000).

The overwhelming evidence and law of record speak of a severance tax as a tax imposed by states. Black's Law Dictionary defines "severance tax" as, "[a] tax imposed on the value of oil, gas, timber, or other natural resources extracted from the earth." 1471 (7th ed. 2004). This definition makes no reference as to whether severance taxes are state or federal taxes.  Yet, the Merriam-Webster on-line dictionary defines severance tax as, "a tax levied by a *state* on the extractor of oil, gas, or minerals intended for consumption in other states." (*emphasis* added) http://www.m-w.com. Furthermore, a search of "severance tax" on popular internet search engines, such as Google and Yahoo, produce web pages related to only severance taxes imposed by states, i.e. Michigan, Colorado, Louisiana, Alabama, Tennessee and Wyoming. Accordingly, the plain and ordinary meaning of severance tax is a tax imposed by a *state* on the severance of natural resources from the ground.  A thorough review of authorities has indelibly seared the word "severance" tax with a plain and ordinary meaning to be a *state tax* and not a federal tax despite some comparable elements.

The term "severance" tax and the sense of that term are words that are understood to be state taxes.  The term or sense of the words "severance" tax are used regularly as meaning state taxes and the term is characteristic specifically of a state tax. The words "severance" tax in conventional and standard usage is generally regarded as a state tax and its usage in the lease cannot be construed to mean a federal tax because of the descriptive term "any." "Any," in the sense used, means any state sales tax and/or severance tax; and, although, the scope of "any" covers the whole world of state severance and state sales taxes, it does not go to another universe of words to include federal taxes.

If the lease said "any taxes" then there would not be a limitation as to scope of taxes. When "any" was restricted to "sales and/or severance" then the scope of those taxes are limited to state taxes because "sales and/or severance" have a common meaning and in and of themselves have come to be known as state taxes.

No analysis of this interpretative and definitive issue of severance tax would be complete without a consideration of the United States Supreme Court case of *Commonwealth Edison Co. v. State of Montana, et al.*, 453 U.S. 609, 101 S.Ct. 2946 (1981). While this case held that Montana's severance tax did not violate either the commerce or the supremacy clause, both the concurring and dissenting opinions make it quite apparent that the court recognized severance taxes to be state taxes on coal and other mineral within the domain of the various states.  In its reference to the various

state severance taxes the court said, "In the first place, there is no real distinction in terms of economic effects between severance and other types of state taxes that have been subjected to commerce clause scrutiny." (emphasis added)

Further in its continued reference to state severance taxes and never any analogy to any federal taxes, the court in referring to the *Powerplant and Industrial Fuel Use Act of 1978*, said "Sec. 601a(2) of the Act clearly contemplates the continued existence, not pre-emption of state severance taxes on coal."

In a concurring opinion by Mr. Justice Powell, he said "Furthermore there can be no question that Montana may constitutionally raise general revenue by imposing a severance tax on coal mined in the State. The entire value of the coal, before transportation, originates in this State, and mining of the coal depletes the resource base and wealth of the State, thereby diminishing a source of taxes and economic activity." Mr. Justice Powell went on to say, "In many respects, a severance tax is like a real property tax, which has never been doubted as a legitimate means of raising revenue by the situs State to tax income derived from the use of the property."

Aside from the main concern of this Supreme Court case of whether the Montana severance tax was placing a burden on interstate commerce because most of its coal was being shipped interstate rather than intrastate, the reason that this case is vital in the analysis we have to make here, is that this case addresses the unique feature that makes a severance tax applicable to our fifty states only and not other special purpose taxes enacted by the federal government. While there is other language in the case that speaks to the fact that the federal government has not pre-empted this area of taxation and this case always refers to severance tax as state tax, most persuasive of this fact is the Supreme Court's reference to it being like a property tax.

The illumination upon our interpretation issue comes from the historical trail provided by the Supreme Court partially in its reference, "Most of the States raise revenues by levying a severance tax on mineral production. The first of such tax was imposed by Michigan in 1846. By 1979, 33 States have adopted some type of severance tax."

The distinction one must grasp in this interpretative analysis is that the word "severance" when defining a tax, can only apply to the state, upon which or within which, the coal taken is situated. Quite aside from similarities of other taxes based upon production and sales the justification for the state taxation and that application of the word severance to states only is the diminution of the value of an asset unique to the state. Any other tax imposed on the product of that severance is a special purpose tax to be called whatever term the taxing authority uses but the word severance when applied to a tax has acquired a generic meaning limited to only the 50 states and in certain instances, Indian tribes.

For our purposes, the decisive issue turns on the operating incidence of the tax and that is the coal being a part of the earth belonging to the State and it being taken

away. No other government taxing authority has an interest in that taking away – only the State owning the resource.

Therefore, it is the finding and conclusion of this Decision that BLET and AMLF cannot be deducted from the gross selling price. BLET and AMLF are not "severance" taxes, using the plain and ordinary meaning of the word, but are federal special purpose taxes not deductible within terms of this lease.

While this decision gives the word "severance" its plain and ordinary meaning in the eyes of the law as decided by this Panel, the members of which who are not in full agreement and while this plain and ordinary meaning shall now control the affairs of the parties to the lease, the use of the word "severance" against the backdrop of the historical relations among the parties, renders it reasonably possible of misunderstanding, giving to the parties a basis for a good faith difference of views as to whether the word "severance" applied to the federal taxes at issue here.

The lawyers for the parties defined and established the parameters and boundaries of this arbitration process, specifically, the issues to be decided as set forth in the so called bifurcation stipulation. Having addressed the primary issue of translating the word severance tax, the next phase of this decision examines the remaining stipulated liability issues. Those issues are breach of contract, fraud and anticipatory repudiation.

In advancing these claims, the lessor, Vermilion says that since November 21, 1994, Black Beauty or its predecessors, without the knowledge or consent of Vermilion deducted BLET and AMLF payments for coal produced and sold pursuant to the lease before calculating the royalties and wheelage due and owing to the lessor. Vermilion further says it had no knowledge of such action by Black Beauty until August 14, 2002, and that since November 1, 1999 until August 14, 2002, Black Beauty knowingly and intentionally omitted and concealed that it was deducting these taxes in calculating the royalties and wheelage due under the lease. The assertions by Vermilion claim that Black Beauty knowingly and intentionally misrepresented the royalty and wheelage payments by submitting false monthly reports. While Vermilion sets forth in its complaint the disagreement between Vermilion and Black Beauty as to whether BLET and AMLF fell within the definition of "severance tax", it claims that in October 2002 and November 2002 Black Beauty repudiated its obligations to calculate royalties and wheelage and to make its payment as required by the lease.

Black Beauty responds that even if the Panel finds Black Beauty and Catlin's interpretation of the lease is incorrect, there is no factual basis for finding Black Beauty committed fraud. Black Beauty further asserts that during a six year course of performance that included cumulative payments of approximately $3.3 Million without objection during which period Vermilion twice confirmed that royalties and wheelage had been and were being calculated correctly is conduct that does not constitute fraud nor a repudiation and is not an event of default. On the issue of disclosure, Black Beauty asserts that Vermilion had an extensive right to audit and also imposed an obligation upon Black Beauty to accurately report the amount of coal mined. It

emphasizes that the reporting requirements addressed the amount of coal produced but did not include a requirement of reporting deductions, thus it cannot be found to engage in fraud for failing to disclose items not included in the lease agreement.

In reviewing these liability issues, initially an examination of the undisputed facts as they relate to the fraud and repudiation claims will direct us to proof imperatives. In 1995, the parties to the original lease, Vermilion and Catlin, amended the lease and production commenced. Until August 2002, and thereafter, Black Beauty deducted, without objection by Vermilion, BLET and AMLF taxes in computing gross selling price for royalty purposes. After over six years of performance, and acceptance of approximately $3.3 Million in royalties and wheelage, Vermilion objected. Thereafter, and to date, Catlin and Black Beauty have paid a total of approximately $5.5 Million in royalties and wheelage.

In late 1999, Black Beauty took over the lease by assignment and expanded the production capacity of the lease land by investing over $50 Million in a new portal. Before assuming the lease, Black Beauty required Vermilion to confirm that there was no dispute or default under the lease. Accordingly, Vermilion executed an estoppel certificate to that effect.

Following Black Beauty's acquisition of the lease, Vermilion refinanced its debt through a new lender, Terre Haute First National Bank. Vermilion's new lender required Black Beauty to subordinate its interest in the lease and the document acknowledged that no default existed under the lease.

In the continuum of events since the inception of the lease in 1994, the estoppel certificate was signed by Vermilion on July 15, 1999, and the bank subordination agreement was signed on February 16, 2000.

Before the dispute over deductibility of BLET and AMLF surfaced in August 2002, nearly eight years passed and from the date of the commencement of coal production nearly six years passed before Vermilion raised an objection to the deduction of BLET and AMLF in the royalty computations, Vermilion received 42 royalties and wheelage reports and payments from May 1996 to October 1999 in the sum of $1,097,774.26. Thereafter, and since Black Beauty took over the lease, Vermilion received 34 royalty and wheelage reports and payments from November 1999 to August 2002 in the sum of $2,177,950.03. Within those periods of time, Vermilion signed the estoppel certificate and requested Black Beauty to execute a subordination agreement.

From the beginning of the lease, Laswell and Catlin deducted BLET and AMLF. Thereafter, Black Beauty deducted as did Catlin, BLET and AMLF. The 76 reports were submitted as required under Article II, Section 2.3 of the Amended Lease for the reporting of quantity of coal mined and sold.

Essentially the above recitations of undisputed facts are the gravamen of the fraud and repudiation claims. Neither the conduct of Catlin nor Black Beauty reach a

level or extreme of culpability or malevolence to support or warrant a finding of fraud or any of its components of malice, willfulness and deception as alleged by the lessor.

Despite the hostility demonstrated between the lessor and lessee during the adversarial protocol of the arbitration proceeding and lessor's persistence in achieving a repudiation of the lease, the evidence overwhelming shows too much has gone into this relationship between the lessor and lessee and the lease to allow the sounding of the death knell for this lease. The facts do not support it. The law does not allow it. Fifty million dollars has been invested in a second portal to enhance production capability. Until the dispute arose, six years of performance and over $3 Million in royalty payments resulted from the labor of over 200 coal miners and supportive staff. The reports were not deceptive. They reported what the lease required. Whatever event, eight years down the road, caused lessor to question the deduction of BLET and AMLF cannot alter all the events and commitments made earlier. Sure, it would have been more prudent for the reports to have included more detailed and categorized deductions. Unfortunately neither did they nor did the lease so require. Sure, it would have been more prudent for the lessor to have made an inquiry early on as to how the royalty payments were being computed and what if anything was being deducted. Unfortunately, six years of reporting passed before a question was raised. While we are dealing with the question here and interpreting the lease, none of the facts, actions or events constitutes fraud nor a repudiation based on applicable Illinois law nor do Black Beauty nor Catlin's deduction of BLET and AMLF constitute such a material breach as to constitute a repudiation of the lease. Whatever the intentions of the parties were since the outset of the contract, BLET and AMLF were deducted in the royalty computation. Laswell and Catlin did it and Black Beauty did the same thing after it took over the assignment. Now with this decision interpreting the words severance tax, Laswell, Catlin and Black Beauty's performance under a later determined incorrect or erroneous interpretation, while not necessarily excusing them from providing a monetary remedy, does not under the facts and circumstances of this case constitute fraud nor repudiation of the lease.

The Illinois law applied to the above facts and rationale including applicable textual foundations, Restatement (Second) Contracts and Williston on Contracts will be discussed in this analysis but before doing so, I will address the decision compelled by the estoppel certificate.

The estoppel certificate bars any claims preceding its execution, being the period up to the assignment from Catlin to Black Beauty. More specifically, Black Beauty is not obligated for claims of underpayments by Catlin Coal, Inc. or any of the lessees before the assignment to Black Beauty in computing royalties and third party wheelage.

While Vermilion seeks refuge from the estoppel agreement based on its addendum to the agreement, there is no reporting requirement that was violated under the lease which would excuse Vermilion from the estoppel agreement

The principles of law applicable to the facts of this case are deeply imbedded in Illinois law going back to the 1928 case of *Milton v. Stone,* 36 F.2d 583.

In one sentence, the *Milton* case long ago established the ruling applicable to the facts of this case when it said, "Instead of repudiating the contract, this was an offer on the part of defendant to enforce the performance of it, <u>as defendant understood it</u>."  I placed emphasis on the four words "as defendant understood it" for those words are the essence of the claim of repudiation in this case.  Each lessee here, Laswell, Catlin and Black Beauty understood the contract to mean different things than Vermilion.

Out of this foundational case of *Milton* springs the Illinois rule that an erroneous interpretation asserted in good faith is not repudiation.

The judge in *Milton* cited to the United States Supreme Court cases of *Dingley v. Oler*, 117 U.S. 490 (1886); Roehm v. Horst, 178 U.S. 1, 20 S.Ct. 780 (1900), both of which including the United States Supreme Court case of *Mobley v. New York Life Ins. Co.*, 295 U.S. 632, 55 S.Ct. 876 (1935) are cited and relied upon by the revered Mr. Justice Cardoza in *New York Life Ins. Co. v. Viglas*, 297 U.S. 672, 56 S.Ct. 615 (1936), wherein he wrote, "Repudiation there was none as that term is known to the law."  In his emphasis that the element of good faith is inherent in any scrutiny of a repudiation claim, Mr. Justice Cardoza further stated in *New York Life*, "There is nothing to show that the insurer was not acting in good faith in giving notice of its contention that the disability was over."

In clearly stating that good faith is an imperative to be considered in a repudiation consideration, he went onto say, "If it made a mistake there was a breach of a provision of the policy with liability for any damages appropriate there to."  In his next sentences, Mr. Justice Cardoza clinched the result of the *New York Life* case which serves as a basis for the result and factual and legal outcome of this case before the Panel, "We do not pause at the moment to fix the proper measure.  Enough in this connection that at that stage of the transaction there has been no renunciation and abandonment of the contract as a whole."  <u>Id</u>.

These cases are important because they teach us that good faith is an appropriate and necessary consideration in a repudiation claim.

That principle has found its way into the Restatement 2d Contracts which we are told by the United States Court of Appeals for the Seventh Circuit in *In re Michael Krueger*, 192 F.2d 733 (1999), specifically that the Restatement of Contracts forms basis for Illinois contract law.  With that authority we can conclude our analysis and decision of the repudiation issue by citing specifically to the Restatement's Chapter 10, Performance and Non-Performance, Sections 250, 243, and 241.  Here the Restatement 2d of Contracts has promulgated a set of guidelines for determining whether a breach is of such degree as to constitute a repudiation.  In other words, the question is whether a breach is a technical violation which can be cured by monetary compensation or whether the breach goes to the essence of the contract such as to constitute it to be total breach.

The commentaries and illustrations relevant to these sections recognize the basic strictures of contract law as to upholding the sanctity of an agreement but

recognize that in upholding the integrity of an agreement, a standard of objective reasonableness is essential in determining materiality. In other words, a contract's durability will not be rendered brittle by such rules that permit one to escape a contractual obligation on the basis of non-performance which is not of such a degree as to be a total breach. The breach must go the very essence of the deal. The standards for determining the degree of breach is objective reasonableness rather than purely subjective belief.

In this case there are many factors which satisfy the standard of objective reasonableness. The long period of deducting BLET and AMLF by both the original lessees and the later new lessee, the acknowledgment in an estoppel certificate and later a subordination agreement that the lease was not in default with no evidence that any monthly reports fail to comply with the reporting requirements of the lease, 72 payments in excess of $3 Million, over $50 Million invested by lessee, Black Beauty, in the construction of a new portal to increase coal production, the employment of over 200 people to fulfill the lease objectives are all factors in the application of this objective reasonableness standard which are consistent with one of the guideline criteria of comporting with the standards of good faith and fair dealing. Further, in this objectivity analysis, it would be manifestly unfair to impose forfeiture on the lessee given the $50 Million investment in the construction of a new portal compared to the amount of the claimed underpayment in deducting the federal taxes in computing royalty payments which are more sensibly recoverable by monetary compensation rather than ending the contract by declaring a repudiation and forfeiture.

Applying the Restatement guideline standards in determining whether the contract was repudiated, the evidence in this case falls far too short to establish a total breach of the lease. While the conduct of deductions of taxes was premised on a good faith misunderstanding and belief that the taxes were deductible can be remedied by adequately compensating the lessor monetarily, it cannot under the circumstances of this case, end the contractual obligation. As the parties so prudently provided for an arbitration process to resolve disputes of the kind that spawned the problem here, it now has been resolved by the contract interpretation here and the lease should proceed in furtherance of its objectives subject, of course, to a consideration of monetary compensation.

Illinois law with its own cases and their embracing noteworthy authorities including the Restatement compels the analysis here rejecting the claim of repudiation as that evidence having been viewed in its entirety has not established that the breach was so central to the parties' agreement that it defeated the essential purpose of the lease contract.

While Vermilion steadfastly seeks to block out any consideration of good faith misunderstanding of the contract as a relevant consideration of the claims of breach, fraud or repudiation, Vermilion, nonetheless, has forcibly thrust the issue of faithfulness into all of the liability issues by its own complaint allegations and arbitration brief arguments. On page 25 of Vermilion's Arbitration Brief the issue of good faith and bad

faith was expressly raised as a dominant and critical issue with these words, "Defendant's intentional acts rise to the level of bad faith and fraud."

Again on page 37 of Vermilion's Post-Hearing Brief, good faith was asserted again as a dominant issue with these words, "Black Beauty breached its obligation of good faith."

There is no evidence upon which anyone can assign bad faith to Ron Laswell as he jumpstarted the coal mining operation under the lease from Vermilion in 1994. For five years until the assignment to Black Beauty from his Catlin Company, Laswell and Catlin deducted BLET and AMFL in the royalty computation. Laswell and Catlin had a good faith belief that they were deductible taxes. That's an issue in this case. Vermilion made it an issue. Thereafter, from 1999 until August 2002, and until the present time, Black Beauty continued to deduct BLET and AMFL the same way that Laswell did, the same way that the lessee before the assignment did. During this total period of eight years, Vermilion never objected nor raised a question until August 2002. The evidence does not support the deception or fraud allegation of Vermilion.

While the determination by this arbitration forum has interpreted the word "severance" favorably for Vermilion and the deduction now constitutes a breach for monetary compensation, the deductions were not fraudulent nor did they constitute a breach of such level to be a repudiation. The deductions in the computation process did not constitute a total breach.

I repeat these findings as they are critical in the final liability issue which Vermilion has placed before the Panel and that is the repudiation issue cast in wording of anticipatory and present upon which Vermilion seeks a finding that the conduct of Black Beauty constitutes an event of default under the Sec. 22.1 of the lease.

Illinois law does not embrace such rigid contract rules with such inflexibility as to ignore the facts and circumstances of the case and the relationships of the parties and business realities of the deal. *Milton, Dingley, Roehm, Mobley, New York Life* and the *Restatement* imbed good faith into the Illinois contract equation. Illinois does not so improvidently construe and interpret contracts as to render disputes to be gaming contests with the loser of an interpretation issue losing all. Illinois law makes appropriate accommodation for compensating for a mistaken interpretation but will come down with the hammer if it's an egregious breach reaching the level of being a total breach which this case is not.

Vermilion ties into the repudiation claim Sec. 22.1 of the lease relating to Notice of Default and seeks to achieve a lease termination based on a notice of default to Black Beauty. Additionally Vermilion seeks a default determination for Black Beauty's failing to agree and accept Vermilion's interpretation of the lease word "severance".

The lessee was not obliged to respond to lessor's notice of default by disavowing its good faith belief. This was not a situation where lessee refused to pay rent. It was

solely a situation where the parties disagreed as to whether certain taxes were deductible in the royalty computation. Again, this was not a total breach.

Vermilion asserts that underpayments based on erroneous royalty calculations substantially impaired the value of the contract and upon Black Beauty's continuing to make payments with deductions that were being made when it inherited the lease by assignment resulted in Vermilion falling into default on its mortgage obligations. Considering that Vermilion received over $3 Million in royalties over six years of performance, with the underpayment of approximately $300,000 based on a good faith erroneous interpretation can hardly support a finding of an event of default upon which a termination of contract can be premised.

The dispute over the meaning of the word "severance" as a deduction should have gone to arbitration for clarification before the notice was sent out. The parties had a bona fide dispute and this lease should not be construed to permit the party who loses a good faith dispute to lose all. It has already been determined that a repudiation did not occur. Accordingly, it was not an event of default, and the notice and demand was untimely. It can become timely if the lessee fails to comply with this arbitration decision.

This joinder and merger of the liability claims and default claim are set forth in Vermilion's Post-Hearing Brief in subpart IV captioned "Repudiation and Default". Here and specifically on page 34 of this Brief, Vermilion states, "Vermilion has sued for anticipatory and present repudiation as a result of Black Beauty's repudiation of so much of the contract as to impair substantially the value of the lease as to Vermilion, the non-repudiating party."

This joinder of claims is further asserted on pages 34 through 39 of Vermilion's Post-Hearing Brief in asserting its grounds for commercial insecurity. Here Vermilion claims, "The grounds for insecurity are reasonable under the facts and evidence. Black Beauty breached its obligation of good faith."

This matter relating to Sec. 22.1 is addressed in this Decision because the lessor, Vermilion chose to combine it with the repudiation claim which has heretofore been thoroughly considered and decided.

All of these issues and claims have been extensively dealt with above factually and with an analysis of controlling Illinois law. This award is issued in accordance with the findings and conclusions above.

The bifurcated liability issues having been addressed and decided in this decision and award, the bifurcated remedial issues including costs of arbitration shall be considered and determined at the bifurcated remedial issues hearing. While the foregoing is the decision and award of the umpire-arbitrator, to the extent the separate decisions and opinions of the other arbitrators do not constitute an agreement by all or at least two of the arbitrators on any issue, this decision and award by the umpire-arbitrator, as to any such issues, shall be conclusive and binding as provided by Article XXIV, Arbitration Sec. 24.1, which provides in pertinent part as follows:

**Section 24.1** If there should arise any matters in dispute hereunder, on which Lessor and Lessee cannot finally agree, such matter or matters shall be referred to a board of arbitrators consisting of three (3) disinterested, competent persons, one selected by Lessor and one by Lessee, as hereinafter provided, and the two thus selected shall select the third, who shall have the power of an umpire and be known as umpire-arbitrator. The decision and award of such arbitrators, or any two of them, or, in case of disagreement among all the arbitrators, of the third or umpire-arbitrator, shall be conclusive and binding upon Lessor and Lessee and promptly compiled with.

Scheduling of any issues for hearing before the Panel relating to bifurcated remedial issues should be coordinated with the case administrator.

IT IS SO AWARDED.

*Thomas D. Lambros*

DATED: March 28, 2005

Thomas D. Lambros
Umpire Arbitrator

### OPINION OF PARTY ARBITRATOR, SUSAN GETZENDANNER, CONCURRING IN PART AND DISSENTING IN PART FROM THE DECISION AND AWARD OF THE UMPIRE ARBITRATOR

This arbitration involves a long-term coal lease between the landowner, Vermilion Coal Company ("Vermilion" or the "Lessor") and Black Beauty Coal Company ("Black Beauty" or the "Lessee"). I was appointed a party arbitrator by the Lessor. Black Beauty appointed its party arbitrator and the party arbitrators selected the "umpire arbitrator," who is the Chair of the three member arbitration Panel. The Decision and Award (the "Award") was prepared by the Chair. The party arbitrators were provided an opportunity to concur or dissent.

#### Summary of the Award.

The underlying issue in this arbitration is decided in Vermilion's favor. The Vermilion lease allows only the deduction of "sales and/or severance taxes" to arrive at Gross Selling Price of the coal for purposes of calculating the 5% royalty due Lessor. The original lessee, since 1995, and its assignee, Black Beauty, since November 1999, at all times deducted two federal taxes, BLET (black lung tax) and AMLF (reclamation fee). In August of 2002, when Black Beauty for the first time was confronted the issue of its authority to deduct BLET and AMLF, it decided that they were deductible as "severance tax," and that has remained Lessee's position. Vermilion's position is that severance tax is a tax imposed by a state, and not a federal tax.

The Award holds (1) the language of the lease is unambiguous and as a matter of law "severance tax" is a state imposed tax; and (2) that from and after the date the Award becomes final, the Lessee shall calculate royalties without deducting BLET and AMLF. The Award concludes that BLET and AMLF had been improperly deducted from Gross Selling Price, and finds that Vermilion is entitled to an award of monetary damages from and after the assignment of the lease to Black Beauty, but that Vermilion waived any claim for prior damages by executing as estoppel certificate. The amount of damages to be awarded, and Vermilion's demand for an accounting of all prior royalty calculations, at Lessee's cost, and for the costs of this arbitration, are to be determined at the bifurcated remedy hearing.

Next the Award addresses the remaining stipulated liability issues. Those issues are breach of contract, fraud and anticipatory repudiation." (Award at 5.) Under the breach of contract claim, Lessor sought to enforcement termination of the lease under its contractual right to exercise that remedy. Under the remaining claims, Lessor sought expectation damages and as equitable relief termination of the lease.

First the Award considers the fraud and repudiation claims, being its analysis with "an examination of the undisputed facts as they relate to the fraud and repudiation claims. . . ." (Award at 6.) The principal fact cited is that Vermilion did not complain about the deductions until August of 2002. The Award notes that "[a]fter six years of performance, and acceptance of approximately $3.3 Million in royalties and wheelage, Vermilion objected. Thereafter, and to date, Catlin [the original lessee] and Black Beauty have paid a total of approximately $5.5 Million in royalties and wheelage." (Award at 6.) A total of 76 reports of royalty payment were submitted to Vermilion as required under Section 2.3 of the lease for the reporting of quantity of coal mined and sold. (*Id.*)

The other facts noted by the Award are first that in connection with the assignment of the lease to Black Beauty in November 1999, on July 19, 1999, Vermilion executed an estoppel certificate with it hade amended before signing. On February 16, 2000, in connection with a refinancing of bank debt, "Vermilion's new lender required Black Beauty to subordinate its interest in the lease and the document acknowledges that no default existed under the lease." (*Id.*)

These are the "undisputed facts" that the Award cites as the "gravamen of the fraud and repudiation claims." (Award at 6.) The Award denies the claims of fraud, actual and anticipatory contract repudiation, and anticipatory repudiation based on Lessee's failure to respond to Lessor's Demand for Adequate Assurance. In denying these claims, the Award relies on the Lessee's good faith dispute as to the deductibility of BLET and AMLF, the absence of a "total breach," the lack of materialty of the non-payment, and the harshness of the remedy versus the nature and extent of the failure to pay royalties. The Award cites cases like *Milton v. Stone*, 36 F.2d 583 (1928), and authorities like *Restatement Contracts 2d*, Sections 250, 2143 and 241, that deal with repudiation claims and the concept of "total breach."

2

The final claim considered is Lessor's breach of contract claim under Section 21.1 of the lease. This section, entitled "Default; Termination by Lessor," provides that any failure to pay "any part" of the royalty "shall constitute" a default and, if the default is not cured within 30 days, Lessor may send a notice of termination of the lease. If in 20 days the default still is not cured, the lease terminates on the date set in the notice. Vermilion properly exercised this remedy in May 2003, and according to the notice of termination, the lease terminated effective June 1, 2003.

The claim is denied. To deny this claim, the Award applies the authorities and findings that it relies on to deny the fraud and the repudiation claims, and on the same "undisputed facts" that are the "gravaman of the fraud and repudiation claims."

Although the Award does not address Illinois law that good faith or bad faith are irrelevant to breach of contract, the Award does an end around the issue. It asserts that "Vermilion made it an issue." (Award at 10.) The Award states that while Vermilion has sought to block out any consideration of good faith, "Vermilion, nonetheless, has forcibly thrust the issue of faithfulness into all of the liability issues by its own complaint allegations and arbitration brief arguments." (Award at 9.) "Vermilion ties into the repudiation claim Sec. 22.1 of the lease relating to Notice of Default and seeks to achieve a lease termination based on a notice of default [should be termination] to Black Beauty." (Award at 10.)

Having blamed Vermilion for thrusting the good faith issue into the breach of contract claim, and tying its breach of contract claim to the repudiation claim, the Award treats the breach of contract claim as though it was a claim for repudiation, and denies it for the same reasons. Specifically, the Award holds that where there is a good faith dispute as to the meaning of the lease, and a total breach of a repudiation of the contract has not occurred, the dispute must be arbitrated before an event of default can occur and a notice of termination can be served on the Lessee. Because the arbitration is not yet concluded, the Award held that there "was not an event of default, and the notice [of termination] and demand was untimely. It can become timely if the lessee fails to comply with this arbitration decision." (Award at 11.)

3

The Award construes the lease to deny termination under Section 22.1 on two grounds: (1) "this lease should not be construed to permit the party who loses a good faith dispute to lose all;" and (2) "It has already been determined that a repudiation [of the lease] did not occur." (Award at 10.)

## Summary of Issues on Which I Concur and Dissent.

I concur in the findings of the Award on the proper interpretation of the disputed language of the lease and the Award's conclusion that a "thorough review of authorities has indelibly seared the word 'severance' tax with a plain and ordinary meaning to be a state tax and not a federal tax despite some comparable elements." (Award at 3.) Thus, as a matter of law the deduction of BLET and AMLF was not permitted under the lease. These findings are in accord with Illinois law.

With respect to monetary damages, I concur in the decision to award monetary damages from the assignment of the lease to Black Beauty to the present. I dissent from the denial of monetary damages for defaults that occurred prior to the assignment of the lease based on the estoppel certificate.

I express no opinion on the denial of Lessor's claims for actual and anticipatory repudiation based on the findings of the "undisputed facts," and the finding of a good faith dispute, lack of materiality, harshness of remedy, and absence of total breach. I express no opinion on the findings denying relief under the Demand for Adequate Assurance based on the finding that Lessor was not rendered commercially insecurity.

I dissent from the denial of Lessor's claim under Section 22.1 of the lease. The breach of contract claim stands on its own merits and is not tied to the repudiation claim. The so-called "undisputed facts," and the finding of a good faith dispute, lack of materiality, harshness of remedy, and absence of total breach, have no relevance to Lessee's default under the lease and Vermilion's exercise of its contractual right to send notice of default and a notice of termination. The Award is contrary to express provisions of the parties' contract, which under Illinois law courts are required to enforce, not re-write.

4

## DISSENTING OPINION

### I.    Illinois Law Requires Enforcement of Express Contract Provisions.

To the extent the Award re-writes the parties' lease and reassigns the duties and reallocates the risks set forth in the contract, it is contrary to Illinois law, which the Panel is required to apply. Under the arbitration and choice of law provisions of the lease, the Award must decide each of the substantive issues being arbitrated under Illinois law. To the extent the Award's findings are not in accordance with Illinois law, the Award is beyond the jurisdiction of the Panel and wrongly decided.

Under Illinois law, express contractual provisions must be enforced, not rewritten. The Seventh Circuit frequently has repeated the obligation of courts to enforce express provisions of a contract. In *Continental Illinois Bank & Trust Co. v. Everett*, 964 F.2d 701, 705 (7th Cir. l992), the Court explained:

> When the contracting parties draw up their own provisions, court enforce them. People write things down in order to assign duties and allocate risks -- functions vital to economic life yet defeated if courts prefer hypothetical bargains over real ones or use the ambiguities present in all language to frustrate the achievement of certainty.

See also *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990). The lease is unambiguous. The Award is directly contrary to express provisions of the lease, discussed below, and hence violates Illinois law.

### II.    "Good Faith Is Not a Defense to a Breach of Contract Claim.

The Award holds that there is no default if the non-performing party has a good faith belief that it has no obligation to perform. However,"[f]ault is irrelevant to a breach of a contract. Whether one intentionally, carelessly, or innocently breaches a condition, he is still considered in breach of that contract." *Illinois Jurisprudence, Commercial Law*, Section 5:22. Whether Black Beauty breached the lease in good or bad faith, the lease was breached and a default occurred.

### III.    The Award Attempts to Avoid Illinois Law Claiming Vermilion Injected the Good Faith Issue Into Its Section 21.1 Claim

The Award attempts to avoid clear Illinois law that good faith is not relevant to breach of contract by claiming that Vermilion "forcibly thrust the issue of faithfulness into all of the liability

5

issues," tied the repudiation and breach of contract claims together, and "joined and merged" the repudiation and breach of contract claims. This attempt to infuse the good faith into into the Section 21.1 breach of contract claim fails. Since this is the issue under which the Award claims the right to deny the breach of contract claim, it is worth the time first to go through the Award's claims and then go through what the Award relies on to support its claims.

> **A.    Award Introduces the Good Faith Issue Into the Section 21.1 Claim and Ties that Claim to the Repudiation Claim**

First the Award states that it was Vermilion that injected good faith into the Section 21.1 claim:

> > **While Vermilion steadfastly seeks to block out any consideration of good faith misunderstanding of the contract as a relevant consideration of the claims of breach, fraud or repudiation, Vermilion, nonetheless, has forcibly thrust the issue of faithfulness into all of the liability issues by its own complaint allegations and arbitration brief.**

(Award at 9.) In this regard, the Award relies on pages 25 and 37 of Vermilion's Brief. These references, the allegations of the complaint, and the arguments made in the Brief, are discussed in subsection B. below..

Next the Award blames Vermilion for tying together the repudiation and breach of contract claims:

> > **I repeat these findings as they are critical in the final liability issue which Vermilion has placed before the Panel and that is the repudiation issue cast in wording of anticipatory and present upon which Vermilion seeks a finding that the conduct of Black Beauty constitutes an event of default under the Sec. 22.1 of the lease.**
>
> > *    *    *
>
> > **Vermilion ties into the repudiation claim Sec. 22.1 of the lease relating to Notice of Default and seeks to achieve a lease termination based on a notice of default to Black Beauty.**

(Award at 10.)

6

This joinder and merger of the liability claims and default claim are set forth in Vermilion's Post-Hearing Brief in subpart IV captioned "Repudiation and Default." Here and specifically on page 34 of this Brief, Vermilion states, "Vermilion has sued for anticipatory and present repudiation as a result of Black Beauty's repudiation of so much of the contract as to impair substantially the value of the lease as to Vermilion, the non-repudiating party."

This joinder of claims is further asserted on pages 34 through 39 of Vermilion's Post-Hearing Brief in asserting its ground for commercial insecurity. Here Vermilion claims, "The grounds for insecureity are reasonable under the facts and evidence. Black Beauty breached its obligation of good faith."

This matter relating to Sec 22.1 is addressed in this Decision because the lessor, Vermilion chose to combine it with the repudiation claim which has been thoroughly considered and decided.

All of these issues and claims have been extensively dealth with above factually and with an analysis of controlling Illinois law. This award is issued in accordance with the findings and conclusions above.

(Award at 11.)

B.    There Is No Support for the Award's Conclusion that the Breach of Contract Action Can Be Denied Based on the Same Grounds as the Repudiation Claim.

The first reference relied on by the Award is page 25 of Vermilion's Brief (the "Brief") where, the Award states, there is a reference to Black Beauty's "intentional acts." This is clearly a reference to the fraud claim and not breach of contract, which does not require proof of any intentional act other than the act of breach.

Next, the Award states that on page 37 of the Brief "good faith was asserted again [by Vermilion] as a dominant issue with these words, 'Black Beauty breached its obligation of good faith'." (Award at 10.) Next the Award relies on the section of the Brief entitled "Repudiation and Default," particularly pages 34-39, which includes page 37. These references will be discussed together.

In the "Repudiation and Default" section of its Brief, Vermilion goes through its claims, in the following order: A. Repudiation; B. Anticipatory Repudiation; C. Substantial Impairment (resuling from

repudiation); D. Demand for Adequate Assurance (as a separate
basis for finding anticipatory repudiation); E. Grounds for
Commercial Insecurity (the prerequisite for a Demand for Adequate
Assurance; and F. Notice of Default (quoting Section 22.1 and
arguing that "[u]nder the plain language of the Lease, this right [to
terminate] became fixed and unconditional after Black Beauty's
default and failed to remedy the default.") (Brief at 34-39.) Clearly
the section on Repudiation and Default separates out the Section
21.1 claim from the claims based on repudiation.

As for the reference to good faith on page 37, that was
contained in the sub-section entitled "Grounds for Commercial
Insecurity." Vermilion was explaining its grounds for commercial
insecurity in order to support its Demand for Adequate Assurance.
Lessee's failure to timely respond to the Demand for Adequate
Assurance was pleaded as grounds for anticipatory breach, as
discussed on the preceding page of the Brief. Vermilion concludes
its argument by stating that "[t]he grounds for insecurity are
reasonable under the facts in evidence. Black Beauty breached its
obligation of good faith."

The obligation of good faith referred to in the Brief is the duty
of good faith performance of contractual obligations that is implicit
in every contract. Lessor does refer to this good faith obligation but
Lessor did not plead a claim based on the duty of good faith. Nor
could it. In Illinois contract law, the implied duty of good faith is a
gap-filling approach designed for an issue that could not have been
contemplated at the time of drafting, and which therefore was not
resolved explicitly by the parties. *Continental Illinois Bank v.
Everett*, 964 F.2d at 705 (7th Cir. 1992).

A reference to the obligation of good faith does not
incorporate "good faith" as an issue or a defense to a breach of
contract claim. There is no such defense. Vermilion's reference to
Black Beauty's good faith obligation to support its claim of
commercial insecurity does not incorporate good faith into Lessor's
Section 21.1 claim.

      C.     Breach of Contract Under Section 21.1 of the Lease
           Was Pleaded in Lessor's Original Complaint.

The Award also generally relies on the allegations in the state
court complaint filed by Vermilion. Nothing in the complaint
supports the conclusion that the repudiation claims were merged
with the Section 21.1 breach of contract claim.

8

Count I of the state court complaint was a "Claim for Declaratory Judgment and Injunctive Relief Against Black Beauty for Breach of Lease." Vermilion asked the court to "[e]nter a declaratory judgment in favor of Vermilion and against Black Beauty finding that Lessee defaulted in its payment of royalties and wheelage under the Lease and that Vermilion was therefore entitled to terminate the lease." (Complaint at 15.) This is exactly the kind of injunctive relief that the Lessor was specifically entitled to pursue pursuant to the last sentence of the arbitration provision.

Vermilion pleaded the identical claim and sought the identical relief in this arbitration.

Count II of the Complaint is a Claim for an Accounting. Count IV is for Breach of Contract based on the failure to pay full wheelage; Count V is for Fraud and includes a discussion of actual and anticipatory contract repudiation; and Count VI is for Anticipatory Repudiation. Each of these claims is separately pleaded in the arbitration.

Count III of the state court complaint pleads a "Claim Against Black Beauty for Breach of Contract." Paragraph 47 alleges:

> As a result of Lessee's default *in the due and punctual payment of any rent, royalty or any part thereof, when and as the same may become due and payable* Lessor Vermilion terminated the Lease in accordance with Article XXII [Section 22.1] of the Lease. (Emphasis in original.)

The relief sought was for compensatory and consequential damages and entry of a declaratory judgment in favor of Vermilion that "Lessee defaulted in its payment of royalties and wheelage under the Lease and that Vermilion was therefore entitled to terminate the lease." This is the precise claim that Vermilion subgmitted to arbitration.

The claim for anticipatory repudiation was separately pleaded in Count VI of the complaint. The claims were not joined together.

### D. Vermilion's Arbitration Brief Separately Identified and Briefed the Breach of Contract Claim.

Whether Black Beauty's deduction of BLET and ALMF before calculating royalties constituted events of default under the lease was identified as a liability issue before the Panel. (Brief at 5.) The Brief asserted: "Under the plain language of the Lease, this right [to issue a notice of termination] became fixed and unconditional after Black Beauty defaulted and failed to remedy the default. Thereafter,

9

Vermilion was privileged to issue the notices of default [and termination], and thereby terminate plaintiff's tenancies after the *expiration of the twenty day period provided in the Lease.*" (*Brief at 39.*)

Issues Nos. 6 and 8, identified as reserved for the bifurcated hearing, were, respectively: "Whether Defendant's failure to cure its default after proper Notice of Default by Plaintiff resulted in the termination of the lease?", and "Whether as a result of Defendant's default in the due and punctual payment, when and as the same became due and payable to the Plaintiff, the lease was terminated in accordance with [Section 22.1] of the lease?" (*Brief at 5.*)

These issues make clear that Vermilion's claim was for breach of contract and enforcement of the remedy of termination. There is no support in the complaint or the Brief that would justify the Award's claim that Vermilion "forcibly thrust" the good faith issue into the breach of contract action and tied the liability claims together.

## IV.   Illinois Does Not Excuse A Mistake of Law.

The Award states that it "gives the word 'severance' its plain and ordinary meaning in the eyes of the law," yet concludes that the term was "reasonably possible of misunderstanding, giving to the parties a basis for a good faith difference of views as to whether the word 'severance' applied to the federal taxes at issue here." (*Award at 5.*) If, as a matter of law, severance tax is a state imposed tax, there is no room for a "reasonably possible misunderstanding" or a "good faith dispute" that BLET and AMLF were deductible.

The erroneous interpretation of an unambiguous contract is a mistake of law. Under Illinois law, a mistake of law cannot be excused. *LaSalle National Bank v. Mel Vega*, 520 N.E.2d 1129 (Ill.App. 1988). The Award's use of a "good faith dispute" to save Black Beauty from the consequences of its default under the lease and the notice of termination is contrary to Illinois law. Even if good faith was relevant to breach of contract, which it is not, Black Beauty should not be allowed to assert its good faith.

10

## V.  The Arbitration Provision Is Not An Exclusive Remedy And It Is Not A Condition Precedent to a Default.

To avoid the clear, unambiguous definition of a "default," the fact that under that definition a default occurred, and the consequences of the default under Section 21.1, the Award holds that there was no default and hence there could not be a timely notice of termination. In order to accomplish this, the Award construes the arbitration provision of the lease to find that arbitration is the *sine qua non* of default. This argument was not made by Black Beauty; it is the device created by the Award to avoid the explicit provisions of the contract.

### A.  Arbitration Does Not Trump Other Remedies.

Nothing in the arbitration provision supports the Award's conclusion that the parties must first arbitrate the good faith dispute to determine whose interpretation of the lease prevails before there can be a default.

The Award is inconsistent in its analysis because it does not use the arbitration provision to deny monetary damages on the ground that no default has occurred. Instead, the Award holds that the "deduction [of BLET and AMLF] now constitutes a breach for monetary compensation." (Award at 10.) It does this without explicitly acknowledging that the breach is in fact a default under Section 21.1. So the arbitration provision is used only to make the notice of termination untimely.

The lease provides that unresolved matters in dispute "shall be submitted" to arbitration. (Section 24.1.) This language makes arbitraton a binding, but not an exclusive, remedy. The remedy of termination is a self-executing remedy. Explicit provisions of the lease, described below, make it clear that other rights and remedies available to the Lessor, whether under the lease or under law, may be exercised cumulatively or in any order desired by the Lessor.

On its face, the arbitration provision clarifies that it is not an exclusive remedy. The last sentence of the arbitration provision states: "The binding arbitration provision herein set forth shall not serve to limit or diminish the right of either party to this Lease Agreement to seek injunctive relief for breach hereof."

Lessor had the option of going to court to seek injunctive relief of breach of contract, such as to enforce the termination of the

lease in accordance with the notice of termination, or any other form of relief that could be obtained under injunctive relief. That is exactly what Lessor did. It filed a suit for a declaratory judgment that the lease was terminated.

If Vermilion could go to court without first arbitrating the dispute on the contract language, it follows that it is entitled to exercise any remedy without first arbitrating the contract language dispute.

### B.    Arbitration Is Not a Condition Precedent to a Default.

The use of the arbitration provision to avoid the fact that a default occurred has no support in the provision itself, or the lease in its entirety. The arbitration provision does not say that arbitration is a condition precedent to the exercise of the remedy of termination or any other remedy provided under the lease or the law. Some coal leases do contain such language. An example of such a lease is the lease at issue in *Reis v. Peabody Coal Co.*, 997 S.W. 2d 49, 68 (Mo. Ct. App. 1999). (Interestingly, *Reis* is yet another case involving Peabody's improper deduction of BLET and AMLF in calculating the sales price of coal for purposes of determining royalties where the arbitration found in favor of the landowner/lessor and that ruling was upheld on appeal.)

The *Reis* court described the Peabody lease in that case as follows: "The lease requires the parties, as a condition precedent to bringing a legal action, to have questions arising under the lease decided by arbitration." In *Reis* the lessor was compelled to arbitrate rather than go to court. In contrast, Vermilion was entitled to terminate the lease without further written notice and to repossess the property through summary proceedings in the state court. It was allowed to go to court to enforce termination. And that is what Vermilion did before agreeing to stay the litigation pending the arbitration.

The arbitration provision must be construed within the context of the entire lease. The remedy and default provisions of the contract are inconsistent with the Award's use of the arbitration provision. The lease creates a self-help remedy of notice of termination. That remedy is cumulative and can be exercised at any time, regardless of whether arbitration has occurred. See discussion of the specific provisions of the lease in Sections VI and VII below.

Again, had the parties wanted arbitration to preceed before any other remedy was pursued by Lessor, the lease, like the lease in *Reis*, could have so provided.

12

C.    There Is No Good Reason to Construe the Arbitration
      Provision to Deny Breach and Deny Termination.

The reason behind the construction is acknowledged by the
Award: "The Parties had a bona fide dispute and this lease should
not be construed to permit the party who loses a good faith dispute
to lose all." (Award at 11.)  Termination is a harsh remedy, but it is
provided for under Section 21.1 of the lease.  The parties are
assumed to have understood the nature of the remedy when it was
agreed to.  The Lessee would not "lose all" on termination.
Importantly, *easily and without any economic risk, termination could
have avoided termination.*  See discussion of the harshness of the
remedy in Section IX, below.

VI.    The Award Re-writes the Default/Termination Provision of the
       Lease.

The Award holds that there was no event of default that could
trigger the Lessor's right to send a notice of termination of the
lease.  This reading of the contract violates the express provisions
of the Lease and hence has no basis in Illinois law.

A.    Section 22.1: "Default; Termination by Lessor."

This section provides that Lessee's failure to pay "any part" of
the royalties due under the Lease "shall constitute" a default or an
event of default unless the failure to pay is cured within 30 days of
notice of default.  If there is no cure, a default or an Event of Default
has occurred, and the Lessor has the right to send a notice of
termination:

> Lessor at any time thereafter while such default
> or condition is continuing, may give written notice to
> Lessee specifying the occurrence given rise to such
> Event of Default, or Events of Default, and stating that
> the lease shall terminate on the date specified in such
> notice, which shall be at least twenty (20) days after the
> giving of such notice.

(Section 22.1.)  The section concludes: If within the 20 day notice
period the default is not cured, "[u]pon the date specified in such
notice, the lease and the estate and interest hereby demised shall
terminate and all rights of Lessee under this lease shall cease."
This provision of the lease clearly contemplates a continuing default
that can trigger a notice of default, which, if the default is not cured
within 30 days, can ripen into a notice of termination.

The unambiguous language of the lease provides for a notice

13

of termination that specifies the date of termination, and if there is no cure during the notice period, "the lease shall terminate" on the date set forth in the notice. Nothing more is required to accomplish termination.

      **B.**    **Section 22.2 Allows Lessor Re-entry to the Property Without Further Notice And to Repossession Under Summary Proceedings in State Court.**

Termination is a self-executing self-help remedy. Section 22.2 specifically allows for re-entry and repossession of the property at any time following termination:

> [A]t any time after such termination of this lease, Lessor, without further notice, may enter and re-enter the premises for all proper purposes and repossess itself by all legal means, including summary proceedings, of its prior and former estate and may remove Lessee and all persons claiming through Lessee from the property leased hereby.

The right to repossess the property by summary proceedings allows Lessor to legally repossess the property through state court proceedings. Repossession does not require that the underlying dispute must be first resolved by arbitration.

Notwithstanding the express provisions of the lease governing events of default, notice of default, notice of termination, and right to repossession, the Award denies the occurrence of a default or an event of default (which are one and the same thing) and nullifies the notice of termination. There is no ambiguity in the definition of a default or how to exercise of a notice of default and termination. These provisions create and allow enforcement of the self-help remedy of termination.

**VII.**    **In Denying Termination, the Award Disregards Express Remedy Provisions of the Lease.**

      **A.**    **Section 22.5: All Rights May Be Invoked.**

Section 22.5 of the lease provides that in the event of "any breach or threatened breach" by Lessee of any covenant of the lease, "Lessor shall have the right to invoke any rights, powers and remedies allowed at law, in equity or by statute or otherwise, whether or not specifically provided in this lease." This provision permits Lessor to exercise any right, power or remedy, including seeking injunctive relief from a court, without going to arbitration.

14

**B.**    **Section 22.6:  Remedies Are Cumulative.**

This Section expressly makes Lessor's remedies cumulative:

> Each right, power and remedy of Lessor provided for in
> this lease shall be cumulative and concurrent and shall
> be in addition to every other right, power or remedy
> provided for in this lease or now or hereafter existing at
> law or in equity or by statute or otherwise, and the
> exercise or beginning of the exercise by Lessor of any
> one or more of the rights, powers or remedies provided
> for in this lease or now or hereafter existing at laws or
> in equity or by statute or otherwise shall not preclude
> the simultaneous or later exercise by Lessor of any or
> all other rights, powers or remedies provided for in this
> lease or by statute or otherwise.

By the plain language of this section, one remedy cannot be
denied because of the existence of another remedy, such as the
arbitration provision.  Lessor's remedies are not required to be
exercised in any particular order.  The Lessor can pick and choose
its remedies, including remedies not specifically included in the
lease.

**C.**    **Section 22.4:  Remedies Cannot Be Waived.**

A third provision, Section 22.4, makes it clear that the Lessor
may "insist upon the strict performance of any covenant, agreement,
term or condition of this lease [and] exercise any right, power or
remedy consequent upon a breach thereof. . . ." This Section
specifically provides that no failure to insist on strict performance
and no acceptance of full or partial performance "during the
continuation of any such breach, shall constitute a waiver of or
consent to any such breach. . . ."

On its face, Section 22.4 acknowledges that there can be both
an existing breach and a "continuation of any such breach." There
could never be a continuing breach if it takes an arbitration
decision to declare a breach. The provision does not say that
arbitration must occur before a default can be declared.

The totality of these express provisions of the lease make it
clear that Lessor can "insist upon the strict performance" of the
duty to pay full royalties and can "exercise any right, power or
remedy consequent upon a breach." Lessor can pursue any and all
remedies under the lease or the law before, during, or after the
arbitration of the underlying dispute.  Termination for a failure to
pay full royalties is a self-operating, self-help remedy.

15

**VIII.**   <u>Conditions Not Contained in or Consistent with the Express</u>
<u>Provisions of the Lease Cannot Be Read Into the Lease.</u>

The Award adds conditions to the express provisions of the
lease in order to deny that an event of default has occured. The first
is that there is no default if there is a good faith dispute. The
second is that there is no default unless there is a "total breach" or
contract repudiation. There is also some hint that fraudulent
conduct may also be required before there can be a default. (Award
at 9.)

**A.**   "No Default If There Is Good Faith" Condition.

The condition that there a default cannot occur if the non-
performing party in good faith believe there is no breach has no
basis in Illinois law. This issue is fully discussed above. The issue
of good faith may have reliance to anticipatory repudiation, but not
to breach of contract.

**B.**   The Materiality Condition.

The Award introduces concepts of materiality, total breach
and repudiation as prerequisites for a default that would allow a
notice of termination. These are all the same thing: If the breach is
immaterial, there is no total breach and if there is no total breach
there is no repudiation. Materiality of the breach is an issue in
claims of total breach and repudiation.

If Lessor was rely entirely on its claim of repudiation, and
seeking termination as an equitable remedy and expectation
damages, perhaps then, as the Award states with respect to
repudiation, "[t]he breach must go to the very essense of the deal."
(Award at 9.)   Lessor is not relying on its repudiation claim to
achieve termination. In its contract claim it is not asserting that it is
entitled to expectation damages or termination because there has
been a total breach. Lessor is not seeking equitable relief but
enforcement of the properly exercised remedy under Section 21.1.
It is not asking the Panel to formulate an appropriate remedy.

The lease defined its own standard of materiality. It provides
that any failure to pay any part of the rent consitutes a default. The
lease does not say that there has to be a non-payment of a material
part of the royalty before a default can be declared. There is no
room for a court to find that "any part" means "a material part" of
the royalty. A default is not defined as a "total breach" of the lease;
nor does it require a repudiation of the lease. The Award improperly
writes these conditions into Section 22.1. (Award 10.)

16

### C.    The Fraud Condition.

The Award notes that the deduction of BLET and AMLF "now constitutes a breach for monetary compensation, the deductions were not fraudulent nor did they constitute a breach of such level to be repudiation. The deductions in the computation process did not constitute a total breach."  (Award at 9.)  There is nothing in the lease that requires that the deductions have to be fraudulent before there can be a default that results in termination.

### IX.    The Award Improperly Construes the Lease to Avoid a Harsh Remedy Allowed Under the Lease.

The Award makes frequent mention of the Lessee's substantial investment in the lease coal property and concludes that a non-performing party who mistakenly but in good faith disputes that a default has occurred should not have to "lose all."  (Award at 11.)   The harshness of the remedy is part and parcel of the default provision of the lease and the parties are presumed to intend the consequences of their agreements.  But most importantly, the remedy easily could have been avoided by Black Beauty by paying under protest.  And Black Beauty failed to act after the termination notice was sent.  A party that could have protected itself should not seek strained interpretations of explicit contract provisions.  Finally, under Illinois law the Lessee does not "lose all."

### A.    Lessee Could Have Contractually Protected Itself Against Notice of Termination.

Following Learned Hand's advice, as noted by the Seventh Circuit in *Hemenway v. Peabody Coal Company*, 159 F.3d 255, 258 (7th Cir. 1996), Black Beauty could have protected itself:

> Learned Hand remarked that "in commercial transactions it does not in the end promote justice to seek strained interpretations in aid of those who do not protect themselves."

17

The Lessee could have protected itself against a breach based on performance that was undertaken in good faith. Courts often deal with contracts that limit breaching conduct to only negligence or other defined conduct. The lease could have said: "A failure to promptly pay full royalties when due shall constitute a breach unless the Lessee's failure to pay was based on a good faith belief that it was properly calculating royalties. Or it could have said: "Termination is a remedy available only upon a showing that the lessor's decision to pay less than full royalties is made in bad faith."

> **B.    Lessee Easily, and Without Risk, Could Have Avoided Termination.**

The fact, ignored by the Award, is that termination easily could have been avoided by Lessee. The fact that Lessee did not protect itself is not the concern of the arbitrators. It had a choice, and it failed to take advantage.

> **1.    Lessee Should Have Paid Under Protest.**

From the beginning of the dispute, Vermilion indicated that it would accept payment under protest. Black Beauty in fact made payment under protest, which it later reversed in reliance on its interpretation of the contract. Secondly, in accordance with Lessor's Demand for Adequate Assurance, Lessee could have paid the full royalty under protest, subject to being reimbursed if the deductions were proper.

Payment under protest would not have exposed Lessee to any economic risk. The Lessee, if proven correct in taking the deductions, would be able to recoup any payments made under protest by deducting those payments in an orderly fashion from future advanced and earned royalties due to the Lessor under the 20-60 year contract. The failure to pay under protest transfers the economic burden of the Lessee's unilateral decision not to pay entirely on the Lessor, the inherently weaker party.

18

There is no answer to the question of why a sophisticated, wealthy coal operator with 1400 leases in the Illinois basin took a chance on termination when it could have avoided termination by paying under protest. However, the Lessor does not have to prove why the Lessee acted so recklessly. That it did so is not in doubt.

2.      Lessor Could Have Sought to Enjoin Termination.

Even after the 20 day notice of termination was issued, Lessee could have taken action to avoid termination. Under Illinois law, a party to an arbitration provision may demand arbitration and then file a lawsuit in state court to enjoin any threatened action of the other party that would render the arbitration useless. I was involved in just such a case in the Circuit Court of Cook County that involved an interpretation of contract language and the issuance of a termination notice. The termination notice would have run if the non-breaching party had to wait for arbitration. The client's remedy was to go to state court and seek an injunction staying the running of the termination period. I am looking for a copy of the opinion and will attached it, or a summary of the case, as an exhibit to this Dissenting Opinion.

A major company with an important contract does not let a termination period mature because it thinks its interpretation of the contract is correct. Good faith beliefs do not cancel the other party's rights under the contract.

Black Beauty let the termination notice period run. It did nothing. Lessee did not even file an arbitration demand until days after the termination became effective. Lessee has no right to the assistance of the arbitration panel to avoid termination when by taking action it could have avoided that consequence.

19

C.    Lessor is Not Entitled to a Windfall Under Illinois Law.

The Award is wrong in stating that Black Beauty would lose all. Illinois law holds that the Lessor would not be entitled to a windfall on the termination. The Award simply assumes that Lessee will suffer the lose of its entire $50 million investment, and that result is not allowed under Illinois law.

X.    The "Undisputed Facts" that Are the "Gravaman of Fraud and Repudiation Claims" are Not Relevant to the Section 21.1 Claim.

Since the Award adopts its entire analysis denying the fraud and repudiation claims to support its denial of the Section 21.1 claim, the "undisputed facts" recited at page 6 of the Award must be addressed. The fact that Vermilion did not discover the deductions until August of 2002 cannot be used against it. The lease has a "No Waiver" provision that specifically states that Lessor's failure to complain and demand strict performance of the lease, and its acceptance of partial payment of royalties, does not waive any claim Lessor can bring based on the default of the contract.

Of note is the fact that the Award does not say that there was any way Vermilion could have learned about the deductions based on the royalty reports it received from the original lessee and Black Beauty. There was no red flag waived in Vermilion's eyes that would have prompted an earlier discovery of the deductions. In the *Reis* and *Hemenway* cases referred to above, the land owners did not discover the improper deductions for 13 years in one case and 20 years in the other case. While it is true that Vermilion had the right to audit the books and records, so did the landowners in *Reis* and *Heminway*. In both cases, the land owner prevailed.

To the extent the Award relies on the estoppel certificate executed by Vermilion in connection with the assignment of the lease to Black Beauty as an undisputed fact that relates to the fraud and repudiation claims, the Award never discusses the content of

20

the Lessor's addendum to that certificate that changed it from a guaranty that there were no defaults under the lease to a statement that to the best of Vermilion's knowledge there were no defaults. See Part XII below for a further discussion of the estoppel certificate.

How the Award relies on the refinancing, and Vermilion's statement to the new lender that there were no defaults under the lease, and the fact that Black Beauty subordinated its position to the Bank, is never explained.  The bank financing did not prejudice Black Beauty because before the refinancing it was already subordinated to Lessor's debt, only before the refinancing the amount of the debt was much larger.  So how the refinancing figures into the claims for fraud and repudiation, and how it relates to the breach of contract claim, is impossible to judge.

XI.   **The Lessor Is Entitled to the Benefit of Its Bargain.**

Arbitrators, like courts, are not free to rewrite contracts.  As stated by the Seventh Circuit in *Hemenway v. Peabody Coal Company*, 159 F.3d 255, 258 (7th Cir. 1996):

> Contracts allocate risks, and judicial decisions changing those allocations after the fact not only lead to expensive litigation... but also make the institution of contract less useful ex ante.  Parties to contracts may prefer simple-minded textualism to costly disputes later on, even knowing that a plain-language reading sometimes goes wrong, and they may make adjustments -- in other parts of the contract, or in the royalty rate -- to compensate for this possibility.  Or perhaps they just made a mistake and now rue the choice.  Learned Hand remarked that "in commercial transactions it does not in the end promote justice to seek strained interpretations in aid of those who do not protect themselves.  (Citations omitted.)

21

*Hemenway* was another case involving Peabody Coal Company, which is Black Beauty's parent, where the Court held that BLET and AMLF were not deductible from the sales price of the coal before calculating royalties.

Lessor's bargain in this case was its agreement to allow a coal producer to mine a unique coal property in Illinois for 20 to 60 years in exchange for the coal producer's promise to pay royalties in accordance with the terms of the lease. The Lessor turned over to the discretion of the coal producer a property that, when first leased in 1994 held 91,000,000 tons of low sulfur coal. It was and is a very valuable property -- all given up by Lessor in exchange for the Lessee's promise to pay royalties pursuant to the royalty provision of the lease.

The dynamic of a long term coal lease is that the Lessor *controls the cash flow and holds both the assets and the cash* derived from those assets. The Lessor is the party with the economic power. The Lessor is a land owner who had given up his valuable asset in exchange for a promise to pay a royalty. The Lessor is the inherently weaker party. The Lessor is dependent on the Lessor to pay the royalty. The royalty is the only return on the Lessor's very substantial investment in the property. If the Lessor unilaterally decides not to pay the full royalty, only the threat of a severe consequence would allow the Lessor to protect itself against non-payment.

The termination remedy puts the burden of accurately calculating royalties, and the economic burden to pay those royalties, on the Lessor. The swiftness and the certitude of the termination remedy is necessary to balance the Lessor's dependence on the Lessor's payment of royalties.

22

XII.    **As a Matter of Law, the Estoppel Certificate Is Not A Waiver of Claims for Damages for Defaults by the Original Lessee.**

    A.    **The Assignment of the Lease Required An Assumption of the Liabilites of Original Lessee.**

The lease required that in the event of an assignment of the lease, there must be a "written assumption by the transferee of all the obligations of Lessee in form satisfactory to Lessor . . . ." (Section 14.1.)  There is no dispute that Black Beauty accepted the assignment of the lease and assumed all liabilities that existed at the time of the assignment.  Black Beauty claims that the past liabilities were waived by Vermilion by the estoppel certificate.

The Award holds that Vermilion waived its right to seek damages from Black Beauty for historic claims:  "Before assuming the lease, Black Beauty required Vermilion to confirm that there was no dispute or default under the lease.  Accordingly, Vermilion executed an estoppel certificate to that effect."  (Award at 4-5.)  Vermilion did not execute an estoppel certificate that confirmed there were no disputes or defaults under the lease.

The certificate, in the form it was presented to Vermilion, was a straight-forward statement that there were no disputes or defaults under the lease.  But Vermilion did not execute that certificate.  It added an addendum, a disclaimer that must be read as part of the certificate, that made it clear that the statement was based on Vermilion's present knowledge.

    B.    **The Disclaimer Eliminates Any Waiver of Unknown Historic Claims.**

The disclaimer informed the Lessee that the statement -- there are no defaults under the lease -- was a statement made to the best of Lessor's knowledge.  There is no dispute that Lessor had no knowledge of any default under the lease until August, 2002, many

years after the assignment of the lease to Black Beauty.  The statement, "to the best of my knowledge there is no default," was a true statement.  It was not a misrepresentation.  It did not guarantee there were no defaults.  The most that Lessee could rely on is that "to the best of Lessor's knowledge, there are no default."  That is a waiver of default known to the Lessor.  It is not a waiver of any and all defaults.

The disclaimer also informed Black Beauty that Lessor's knowledge was based on the royalty reports issued by the original lessee and that Lessor had not exercised any of its rights to conduct an audit of the books and record of the original lessee.  This information alerted Black Beauty that if it really wanted to know if there were any defaults, it should review the books and records of the original lessee.  Black Beauty failed to examine those books and records.

Finally, the disclaimer stated that by signing the certificate Lessor was not giving up any of its rights under the lease.  One of those rights was the "No Waiver" provision in Section 22.4 that specifically provides that no failure to insist on strict performance and no acceptance of full or partial performance during the continuation of "any such breach, shall constitute a waiver of or consent to any such breach. . . ."

Lessee presumably knew that the lease required it to assume past liabilities and that there was a no waiver provision in the contract.  The estopple certificate on its face, as amended by the disclaimer, does not as a matter of law constitute a waiver of past claims of which Lessor had no knowledge. The only impediment to a claim for past damages is the applicable statute of limitations.

   C.  There Is No Connection Between the Certificate and the Lessee's Reporting Requirements Under the Lease.

The Award concludes that Vermilion cannot seek refuge from the estoppel certificate based on the addendum because "there is no reporting requirement that was violated under the lease which would excuse Vermilion from the estopel agreement."  (Award at 6.)

24

IN THE MATTER OF THE    )                    Arbitration Panel:
                        )
ARBITRATION BETWEEN     )                    Hon. Thomas Lambros – Umpire
                        )                    Hon. Susan Getzendanner
VERMILION COAL COMPANY and )                 G. Daniel Kelley, Jr.
BLACK BEAUTY COAL COMPANY )

---

## DISSENTING OPINION

---

G. Daniel Kelley, Jr.
ICE MILLER
One American Square
Box 82001
Indianapolis, Indiana 46282
(317) 236-2100

# TABLE OF CONTENTS

Page

DISSENTING OPINION ...................................................................................1

I.    Royalty/Wheelage Issues .....................................................................1

      Contentions ...................................................................................1

      1994 Lease .....................................................................................2

      1995 Amendment ...........................................................................3

      Stipulated Correction .....................................................................4

      Binding Federal and State Law ......................................................4

      Legal And Plain Meaning ...............................................................7

      Language In The Context/History Of The Documents ..................13

      A Sales Tax And A Severance Tax – A Type Of Excise Tax .........15

II.   Mandatory Arbitration And Failure To Comply/Cure – Are Conditions To
      Any Breach....................................................................................17

III.  Conclusion.....................................................................................21

- i -

I.

## Royalty/Wheelage Issue

The Umpire Arbitrator has determined that the plain, unambiguous meaning of the words "any sales and/or severance tax", a question of law, does not encompass any federal severance tax or any federal sales tax, but only such a state tax. For the reasons set forth hereafter, this decision is not correct under Illinois law which we are bound to apply correctly. The Umpire Decision does not determine an issue, properly raised on the record, that would make it unnecessary to consider any questions or issues concerning breach or default, even if a decision were reached that federal severance taxes, the black lung excise tax (BLET) and the reclamation fee (the abandoned mine reclamation fee, AMLF), were not to be deducted from the gross selling price in making the earned royalty or the wheelage calculations.

**Contentions.** Both parties contend that the terms "any sales and/or severance tax thereon" are clear and unambiguous. Black Beauty contends that the clear and ordinary meaning of "any sales and/or severance tax thereon" encompasses any severance tax, whether federal, state or local, on the removal or sale of the coal and that BLET and AMLF[1] are assessed on the removal (severance) of a ton of coal from the earth with the tax rate being a flat rate per ton or a percent of the sales price. Initially, Vermilion's primary thrust was that BLET and AMLF are excise taxes and therefore cannot be severance taxes (*see* Vermilion's initial summary judgment brief), or that the BLET and AMLF are triggered by the first sale after severance and therefore

---

[1]*See* 26 U.S.C. § 4121 as to the black lung excise tax where the tax has varied since its enactment in 1978 and as to the "reclamation fee", *see* 30 U.S.C. § 1332(a) enacted by the 1977 Federal Surface Mining Reclamation and Control Act. Both taxes are at set at minimums with caps set at a percent of the first sale after the coal is removed or severed.

are not severance taxes. (Id.) Subsequently, Vermilion variously contended that a severance tax can only be a state or Indian tribe tax, but at other times states: "there could be a federal severance tax, but there is none." Vermillion Post-Hearing Brief, p. 9. Finally, Vermilion in its Post-Hearing Brief contends that AMLF's are not taxes, that the word "any" is ambiguous because it does not modify severance tax, that "and/or" is ambiguous and that the words "severance tax" are not in the plural and are therefore ambiguous. (Vermilion's Post-Hearing Brief, pp. 11-12).

**1994 Lease.** The original Coal Lease in question, effective November 21, 1994, was between Vermilion Coal Company and Laswell Coal Co., Inc. and executed by their respective president, Fred Keady and Ron Laswell, which lease Laswell Coal then assigned to Catlin Coal Inc. on November 28th, (Ex. 1 and Ex. 92). The original earned royalty was "twenty percent (20%) of Lessee's Gross Operating Profit as hereinafter defined . . . ." Section 2.1(a).[2] The wheelage to be paid on coal mined from property not owned by Lessor but transported or shipped "into, over, through or under any of the Leased Premises" was the greater of 1% of the average Gross Selling Price per ton as defined in Section 2.4.[3] or 15¢ a ton." § 11.1. "Gross Selling Price" allowed deductions for "any sales tax imposed thereon or other expense". Mr. Keady testified that the inclusion of "other expense" as a deduction was a mistake. Exhibit C to the original

---

[2] The Gross Operating Profit was defined pursuant to Section 2.5 as "the Gross Selling Price, less cash operating cost of production, less an allowance for depreciation subject to certain adjustments with the sample calculation set forth on Exhibit C."

[3] The Gross Selling Price was defined in Section 2.4 as meaning "the actual price paid for coal sold to a bona fide purchaser FOB the loading point after preparation, if any, and loading for final destination, **less any sales tax imposed thereon, or other expense**, but with adjustment for transportation expenses paid by Lessee, coal quality bonuses or penalties and discounts or allowances actually allowed to arm's-length wholesalers." To be noted is that in the original Lease, there was no statement that the Gross Selling Price was to be multiplied against the number of tons of coal mined and sold.

-2-

Lease deducted "black lung taxes" (BLET), the "reclamation tax" (AMLF) and other expenses.

**1995 Amendment.** In 1995, Ron Laswell and Fred Keady determined to change the earned royalty from a percent of gross operating profit to a percent of gross sales (Gross Selling Price x tons, like the wheelage rate had been) which amendment was initiated by Mr. Keady drafting revisions and sending to Mr. Laswell the revisions on March 3, 1995 (Ex. E-V). Subsequently on March 6, 1995, Jim McDonald, attorney for Catlin Coal and Ron Laswell, sent a letter to Mr. Keady concerning further changes to the revisions, including the following:

> Paragraph 2 of the lease, pages 4 and 5 have been further revised pursuant to your and Ron's telephone discussion. On page 5, second line, after the word 'sales', 'and/or severance' was added. With this revision sales and/or severance tax will be deducted in arriving at the 'Gross Selling Price', is defined in Section 2.4".

The redrafted Section 2.1 then provided for an earned royalty of 5% "of Lessee's Gross Sales as hereinafter defined . . . ." Section 2.5 then defined Gross Sales as "Gross Selling Price, multiplied by the number of tons mined and sold. . . ." Then, the provision over which the present dispute centers is the Amended Section 2.4 which was changed to the following by adding the underlined portion:

> "**Calculation of Royalties: Gross Selling Price Defined.**
> For the purpose of calculating gross sales, the term 'Gross Selling Price' as used herein shall mean the actual price paid for coal sold to a bona fide purchaser FOB the loading point after preparation, if any, and loading for final destination, less any sales tax and/or severance imposed thereon, but without deduction for selling commissions, advertising, credit losses or other expenses, but with adjustment for transportation expenses paid by Lessee, coal quality bonuses or penalties, and discounts or allowances actually allowed to arm's-length wholesalers; . . ."

-3-

While the Amendment changed the earned royalty from a percent of net to a percent of the gross revenue based on "gross selling price" as defined, the percent of gross sales (using the Gross Selling Price) remained the calculation for wheelage. However, the Gross Selling Price definition was changed — severance taxes were added as a deduction to the gross selling price and limiting language was added "but without deduction for selling commissions, advertising, credit losses or other expenses". The net profit calculation obviously was thrown out along with the Exhibit C deductions for "black lung taxes" and "reclamation tax".

**Stipulated Correction.** As indicated above, Mr. Keady drafted and presented the first draft of the 1995 changes excluding as deductions — "selling commissions, advertising, credit losses and other expense" to which Mr. Laswell and his attorney added the deduction of "and/or severance" after "any sales". However, the signed amendment was not in accordance with the instructions on Mr. McDonald's letter. The words "and/or severance" were to be added after the word "sales" so that the particular language should have read "any sales and/or severance tax thereon" rather than "any sales tax and/or severance". The parties have so stipulated. TR., November 8, 2004, pp. 44-45.

**Binding Federal and State Law.** The amended lease places a specific, limiting requirement upon the arbitrators' authority to follow applicable law: "In arriving at a decision, an award, said arbitrators shall be bound by any relevant state and federal law applicable to the substantive issue or issues so submitted to arbitration. . . ." (§ 24.1) So we must correctly discern and follow, as we are bound to do, applicable state and

- 4 -

federal law. Interestingly, the parties clearly contemplated the applicability of both state and federal law.

Under Illinois law applicable per § 26.D, whether a contract is unambiguous and the determination of unambiguous meaning are questions of law. The Illinois Supreme Court has determined that where there is an integration clause to a contract, the "four corners rule" would be applied and "facially clear, complete and unambiguous language would be enforced without the aid of extrinsic evidence," while noting without disapproval that the Illinois Appellate Court in many decisions has followed a provisional approach – "if after 'provisionally' reviewing the parol evidence, the trial judge finds that an 'extrinsic ambiguity' is present, then the parol evidence rule is admitted to aid the trier-of-fact in resolving the ambiguity." *Air Safety, Inc. v. Teachers Realty Corporation*, 185 Ill.2d 457, 706 N.E.2d 882, 884-886 (Ill. 1999). See also, *River's Edge Homeowners' Association v. City of Naperville*, 353 Ill.App.3d 874, 819 N.E.2d 806 (November 29, 2004 still pending appeal).

Generally, the parol evidence rule is related to meaning issues while integration is related to the scope of the contract. Both parol evidence and integration questions are matters of substantive law. Parol evidence may be relevant to determining integration. But integration is a threshold determination for the applicability of the parol evidence rule. Even in the face of an integration clause, if there is an ambiguity or a mistake, parol evidence is admissible.

-5-

Here, the parties discovered a mistake – hence, the stipulation that the Amended Lease was not correctly worded at the critical spot. This was based upon attorney McDonald's letter of March 6, 1995[4]

Neither the coal lease nor the amendment has an integration clause and as indicated above in the absence of an integration clause, Illinois may follow the provisional admission approach. Further, Illinois law supports using parol evidence to determine integration. *See Stevens v. Fanning*, 59 Ill.App.2d 285, 207 N.E.2d 136, 140 (Ill. App. 1965) ("whether the written contract was intended to be the complete and final agreement, must be determined from the language of the contract and the circumstances of the case. 'If it is silent in essential particulars, parol evidence is admissible to establish the missing parts, although inadmissible to contradict those unambiguous terms. . . .'") *See also, Monahan, Survey of Illinois Law: Contracts – A Disagreement Over Agreements: The Conflict in Illinois Law Regarding The Parol Evidence Rule and Contract Interpretation*, 27 S.Ill.L.J. 687 (2003).

While Illinois law "presumes" the parties to have used terms having no technical or legal meaning, *The Village of Glenview v. Northfield Woods, Water & Utility Co.*, 576 N.E.2d 238, 244 (Ill. App. 1991), obviously, this is a rebuttable, not a conclusive, presumption. Just what evidence determines this has not been much discussed under Illinois law. But as we shall see, the context here as well as the terms themselves and the required analysis rebut the presumption – demonstrating that these are legal terms which must be given legal meaning (which as it turns out is no different than the plain meaning).

---

[4] It also seems that there were other agreements outside the written word of the amended lease per Mr. Keady/Vermilion Coal's estoppel certificate.

- 6 -

**Legal And Plain Meaning.** The precise group of words, the meaning of which we must discern, are "less any sales and/or severance tax imposed thereon. . . ." This language contemplates two levels of inquiry – first, what do the terms "any severance tax" or "any sales tax" mean and second, whether the specific tax in question (here BLET and AMLF) are either of the taxes as defined – which in turn contemplate the review of applicable statutes, regulations and case law. Obviously, these words mean any tax on the sale of, or any tax on the severance (removal) of, the coal mined under the coal lease or any tax which might be combination of such taxes. But embedded in the two levels of the inquiry are more subtle issues – is the legislature's description of a tax relevant or binding in determining the type of tax? Can a tax be two types of a tax (*i.e.*, a sales tax and a severance tax)? Or is a severance tax or a sales tax a type of excise tax? Is there something inherent in a type of tax which implies that it is only a state tax or that a state is the only taxing entity with authority to pass the tax? Does the use of the funds from the tax determine the type of tax?

Moreover, the principals of the parties here were both long time participants in the leasing and mining of coal. The coal lease is a long, sophisticated legal document transferring rights to mine and sell the coal (and all that such entails under complicated legal concepts) encompassing multiple coal seams over acreage in the thousands involving the investment of millions, and creating cash flows in the millions.

This all takes on a very, very legal hue in meaning and even more so when other tax provisions and other language in the Lease and Amendment are considered. *See infra*, pp. 13-15. So, looking for the plain, ordinary meaning is a mistake of law because these terms and the several levels of inquiry encompass legal terms and legal analysis.

- 7 -

The parties here and the Umpire in the pursuit of plain meaning have been forced to look to applicable federal and state law to discern the meaning of these tax terms.[5] In addition to a plain English dictionary, the Umpire's decision looks to *Black's Law Dictionary*, the various state statute websites and relies extensively on a United States Supreme Court opinion to arrive at a determination of unambiguous meaning that the terms "severance tax" refer only to a state tax (and a tribal tax) as do the terms "sales tax" (whether tribal also is unclear). The Umpire's unambiguous meaning adds the words "state" in front of sales and "state" in front of severance so that the contract would read "any state sales and/or state severance tax". This certainly does not comport with the unambiguous meaning of these terms, whether the ordinary meaning or the legal meaning.

It is possible that taxing authority limits for a particular government might be implied or inferred from designating one type of tax or another – for instance, the Constitution of the United States restricts the power of Congress to directly tax (unapportioned) property but allows an "excise" tax or indirect type of tax.[6] So, the terms "property tax" could infer only a state or local tax. But a severance tax and a sales tax are excise (indirect) taxes and it cannot be implied that by using such terms, the parties were referring only to state taxes.

---

[5] Neither Vermilion nor Black Beauty have cited to this panel any case that had before it the question of the meaning of "any sales and/or severance tax" in a coal lease royalty context or for that matter even similar terms in any other context; nor have the parties cited any case that had before it the question of whether BLET or AMLF are or are not severance taxes or sales taxes; and this arbitrator has found none.

[6] *See infra*, pp. 15-17.

Generally, the definition or meaning of a type of tax does not include, infer or imply, a determination of the various taxing entity's authority to enact such tax or which entities have exercised such authority — such is not for definition but for analysis. Both legal and non-legal dictionary definitions demonstrate this.

Most dictionary definitions which define a severance tax and a sales tax (and some do not) do so without qualification as to the taxing entity. Again, a definition of a severance tax or sales tax has nothing to do with the authority of or the actual practice of various taxing entities. *Black's Law Dictionary* defines "tax" as "a monetary charge imposed by government on persons, entities or property to yield a public revenue. More broadly, the term embraces all governmental impositions. . . ." Then in alphabetical order, more than 50 taxes are defined. A "sales tax" is defined as "a tax imposed on the sale of goods and services, usu., measured as a percentage of their price." A "severance tax" is defined as "a tax imposed on the value of oil, gas, timber or other natural resources extracted from the earth." *See also, Webster's Third New International Unabridged Dictionary* defining "severance tax" as "a tax on the taking and use of natural resources imposed at the time the mineral or other product is extracted or severed from the earth" and "sales tax" as "a tax on the privilege of freedom of making sales of tangible personal property that is usu. measured by a percentage . . . of the purchase price, is collected for the government imposing the tax by the seller, and is distinguished from a tax imposed on the property itself." The *American Heritage Dictionary*. 2nd College Edition. provides no definition of "severance tax" and defines "sales tax" as "a tax levied on the retail price of merchandise and collected by the retailer."

-9-

The Umpire points to the definition in the *Marion-Webster On-Line Dictionary* of a severance tax as "a tax levied by a state on the extractor of oil, gas or minerals intended for consumption in other states" as including within the definition of the tax – the type of the taxing entity. It doesn't mention either a tribe and the United States as enacting such taxes – but we know such entities have enacted both. More important, the tax as described – a state taxing the severance of minerals which are to be consumed in another state – defines an unconstitutional tax which discriminates against interstate commerce under the United States Constitution[7] – demonstrating the errors which result when ordinary dictionaries stray into the legal world. Further, none defines "sales tax" as being only a state tax. Hence, as indicated by the Umpire, the dictionaries were not enough to add the word "state" to "any severance tax."

The Umpire's reliance on *Commonwealth Edison Co. v. State of Montana, et al.*, 453 U.S. 609 (1981) to conclude that the plain meaning of "any severance tax" is actually "any state severance" because coal is assertedly only a state resource – is misplaced. First, the case does not involve a question of the meaning of the terms "severance tax". Second, the case involved questions as to Montana's authority to impose a severance tax **on federal coal** (most coal in Montana is federal coal[8]) and whether the Montana severance tax discriminated against or burdened interstate commerce. No question was raised even indirectly concerning a federal severance tax. The Court concluded that Congress had explicitly allowed the states to impose severance taxes on the mining of **federal coal** in order for the states to defer the

---

[7] *See State of Montana, infra.*

[8] The Court noted "Buried beneath Montana are large deposits of low sulfur coal, most of it on federal land." 453 U.S. at 610.

expenses of "additional facilities and services caused by increased coal production . . . ."  453 U.S. at 609.  Hence, that the Court always referred to "a state," not "a federal," severance tax, has no significance.

But what *Montana* teaches is that **coal is not exclusively a part of the earth belonging to a state** – indeed the vast majority of the coal west of the Mississippi is in fact owned by the federal government (non-federal coal is generally not owned by state governments but by private parties) and that states only have the authority to tax the severance of federal coal if the federal government has chosen to allow it.  Hence, **major premises of the Umpire's decision –**

> that the word severance "can only apply to" the state in which the severed coal was situated[9] –
>
> and that "no other government taxing authority has an interest . . . ."[10]

**are not correct** – and provide no basis to limit the meaning by adding the word "state" to "any severance tax," much less to "any sales tax."

Both the BLET and the AMLF are taxes imposed by the federal government on the severance of coal[11] – to defray the social and governmental costs brought on by the

---

[9] "The distinction one must grasp in this interpretative analysis is that the **word "severance" when defining a tax, can only apply to the state, upon which or within which, the coal taken is situated** . . . the justification for the state taxation and [the] application of the word severance to states only is the **diminution of the value of an asset unique to the state** . . . but the word "severance" when applied to a tax has acquired a generic meaning limited to only the 50 states and in certain instances, Indian tribes.

[10] "For our purposes, **the decisive issue turns on** the operating incident of the tax and that is **the coal being a part of the earth belonging to the State** and it being taken away.  **No other government taxing authority has an** interest in that taking away – only the state owning the resource." (Umpire's Decision, pp. 4-5, emphasis added.)

[11] Both BLET and AMLF are imposed upon the coal's severance with the tax amount determined by the first sale.  *See 26 C.F.R. § 48.1, 4121-1(a) and 36 C.F.R. § 70.12.*  BLET imposes liability for the tax on the person who under State law owns the coal "immediately after

- 11 -

mining of the coal, much like the state severance taxes allowed on federal coal are to defray the governmental services and expenses necessitated by the coal mining activity. In fact, the abandoned mine land fees (50% or more) are returned to the states in order to reclaim the pre-SMCRA abandoned mine lands. The legislative history supports that these taxes relating to the increased cost of governmental services and other matters were viewed as a federal severance tax.[12]

---

the coal is **severed** from the ground with the amount determined first sale." Similarly, AMLF is imposed upon the operator per ton of coal produced by surface coal mining "or" by underground mining and the amount of the tax is determined by the first sale "after it is severed."

[12] See Hearing before the Subcommittee on Energy in the Environment of the Committee of Interior on Insular Affairs House of Representatives Hearing, 95th Congress (1977). (Statement of Aubrey J. Wagner, Chairman, Tennessee Valley Authority) ("Creation of the abandoned mine reclamation fund, which would be funded primarily by a **federal severance tax** on coal is good . . . Although this **severance tax** will not substantially increase the cost of coal, it will cause the fund to receive far more money than would be needed to achieve realistic goals.") (emphasis added); 123 Cong.Rec. S. 8083 (daily ed. May 20, 1977) (Statement of Sen. Long) ("[The] **fee**, which, from my point of view, **is completely indistinguishable from a severance tax** on a natural resource . . . [T]his fee . . . is the same thing we in Louisiana call a severance tax."); 123 Cong. Rec. H.37262 (daily ed. April 28, 1977) (Statement of Rep. Regula) ("Likewise, the abandoned mine reclamation fund provisions allowing a return to the states of up to 50% of the **severance fees** collected is a step in the right direction.") (emphasis added); Committee on Interior Insular Affairs, United States Senate, 29nd. Cong., 1st Sess., The Issues Related to Surface Mining, a Summary Review with Selected Readings. (Comm. Print 1971). (Sen. Baker requested the consideration of "the establishment of a **severance tax** on all coal and on other fuels at the federal level.") (emphasis added); H.R. Rep. No. 93-1072 (1974) ("The largest contributions to be made to the fund will come from a **severance fee** . . .") (emphasis added) Hearings on S.2777 before the Subcommittee on Minerals, Matters and Fuels of the Committee on Interior and Insular Affairs, United States Senate, 92nd. Cong. (1971) (Statement of Joel M. Pickelner, Legislative Information Specialist of the National Wildlife Federation) ("The ideal way of generating the funds would be to levy a per ton **severance tax** on all future mining, with the revenue going into a trust fund to reclaim previously stripped lands.") (emphasis added); Hearings before the Subcommittee on Mines and Mining of the Committee of Interior and Insular Affairs House of Representatives (1971) (Letter from American Mining Congress requested by Representative Skubitz regarding its position on the imposition of a national severance tax on strip mined coal whereby the American Mining Congress stated, "it opposed the imposition of a **national severance tax**.") (emphasis added); Hearings on H.R. 2 before the Subcommittee on Energy and the Environmental of the Committee on Interior and Insular Affairs House of Representatives (1977) (Statement of Rep. Regula) ("In the event there is some type of **severance tax** in this bill, I hope recognition would be given to the states that already have this kind of tax for reclamation of orphan lands and allow credit for it.") (emphasis added).

The terms "special purpose tax" may well be descriptive of the use of tax funds and legislatures many times name a tax by the purpose of the funds. Such does not define the type of tax under applicable tax law. No doubt the social security tax is a special purpose tax, but it is an income tax. Also, as we have seen in this proceeding, various states which have severance taxes have termed them to be excise taxes or vice versa[13] and the Black Lung tax is described as an excise tax, but these descriptions are not determinative of whether the tax is a severance tax. (See, infra, pp. 15-17.)

**Language In The Context/History Of The Documents.** A major aspect of the "four corners" rule is that word or phrases cannot be viewed in isolation and the meaning of words must be consistent with context and consistent with other similar language or subjects within the documents – here the original lease and the amendment. In looking to the four corners – when a specific taxing authority was being referenced by the parties so as to limit the meaning of a tax or to designate a tax by a specific taxing authority – then such terms were used by the parties; but when the meaning was more general, such terms were not used. See Section 13.1 through 13.3. The potential for a future tax by "Illinois" on "unmined coal" was specifically covered. (§ 13.3) Illinois had no severance or sales tax for coal. The entirety of the leased coal was in Illinois. Yet, "severance tax" was added as a deduction in the Amendment,

---

[13] Many of the state severance taxes are specifically designated as an excise tax. See Alabama 1971 Coal Severance Tax, Code of Ala. § 40-13-2 ("there is hereby levied . . . **an excise** and privilege tax on every person severing coal in Alabama" Arizona Severance Tax, A.R.S. § 42-5202 ("there is levied on any severor, and the Department shall collect, **an excise tax** denominated as a **severance tax**". These are but a few examples of the various state severance taxes that are designated as an excise tax.

- 13 -

without any qualification. Also, the Amended Lease clearly contemplated both federal and state law being applicable.[14]

Interestingly, Lessee was responsible for all taxes levied against the land by "governmental authority" — including any "excise" tax, as well as any tax on the "privilege of mining the coal" (*i.e.*, a severance tax) § 13.1, again without any limitation as to State or Federal taxing authorities — just like providing for the deductibility of "any sales tax" or "any severance tax". This added deduction was in face of both parties being knowledgeable in the coal industry and having previously dealt with the deductibility of the "reclamation tax" and the "black lung tax" to arrive at a net profit for royalty calculations. Further, the new language expressly specified non-deductible items but did not specify AML or BLET as non-deductible. **Nothing in the four corners supports inferring or implying a limitation on "any sales tax" or "on any severance tax".**

The evidence used by the parties to correct the mistake in the Amended Lease, the letter from attorney McDonald — as correctly setting forth the intent and now a part of the "four corners" — clearly stated that the insertion of "and/or severance" tax was so that severance taxes "will be deducted"; clearly referring to what was going to take place, not to potential future legislative enactments as in § 13.3. Again, Illinois had no

---

[14] In my mind, it is significant that Mr. Keady's initial response, once the disagreement as to the deductibility of BLET and AMLF surfaced, was that these taxes were excise taxes, not that severance taxes encompass only state severance taxes. *See* Ex. U, Mr. Keady's September 30, 2002 letter. This is not contemporaneous or prior negotiations encompassed by the parol evidence rule — rather, it is an admission.

severance or sales tax for coal.[15]  So in this context, the addition of "any severance tax" as being deductible takes on significance and meaning.  This is particularly so when the parties did not limit the taxing authority to only a state or county sales or severance tax – as they did for other taxes elsewhere in the Lease.

   **A Sales Tax And A Severance Tax – A Type of Excise Tax.**  During the summary judgment briefing, Vermilion's primary thrust was that BLET and AMLF are federal excise taxes not **severance taxes**.  *See* Argument, Part A.  **"BLET and AMLF are Federal Excise Taxes Not Severance Taxes,"**  Vermilion Summary Judgment Memorandum, p. 7 (heading).  Implicit in Vermilion's argument is that a severance tax cannot be an excise tax and vice versa.  The reality is the opposite – excise taxes are a broad form of a tax, including many different types of taxes, such as gift and estate taxes, sales taxes and severance taxes.  Further, most of the state severance taxes are stated to be an excise tax.[16]  So a severance tax is in fact a form of excise tax.

   The category of excise taxes arose early in the history of the United States, indeed from the Constitution and was used to differentiate a direct tax.  The word "excise" appears in Article I, § 8 of the Constitution establishing the general power of the government to "lay and collect taxes, duties, impose and excises. . . "which is limited by § 2 requiring "direct" taxes to be apportioned and § 9 which requires such

---

[15] Both Mr. Keady and his counsel have stated that if Congress had passed a federal severance tax, such would be encompassed within the words "any severance tax", but they claimed not so here, because BLET and AMLF are excise taxes.

[16] Many of the state severance taxes are specifically designated as an excise tax.  *See* Alabama 1971 Coal Severance Tax, Code of Ala. § 40-13-2 ("there is hereby levied . . . an excise and privilege tax on every person severing coal in Alabama" Arizona Severance Tax, A.R.S. § 42-5202 ("there is levied on any severor, and the Department shall collect, an excise tax denominated as a **severance tax**".  These are but a few examples of the various state severance taxes that are designated as an excise tax.

taxes to be "in proportion to the census" as required by the Constitution. The Supreme Court has consistently held "that a tax imposed upon a particular use of property or the exercise of a single power over property incident to ownership, is an excise and need not be apportioned. . . ." *Fromley v. McCaughn*, 280 U.S. 124, 36 (1929) (holding that a tax on gifts and transfers of property gift is not a direct tax but applicable only to a limited exercise of property rights). A review of the Internal Revenue Code reveals many and various types of excise taxes in addition to gift and estate taxes. *See* particularly, **"Title D, Miscellaneous Excise Taxes"**, 29 U.S.C. §§ 4061 thru 5270, including a **sales tax** on the sale of "gas guzzlers", a tax on gambling, a sales tax on the sale of certain chemicals, as well as on consumption or use of the chemical and list could go on and on. So the fact that a sales tax and severance tax may be a form of excise tax adds nothing to the deliberations. At the same time, Vermilion cannot be heard to argue that the AMLF is not tax, but a fee – having argued and presented various authorities, including various cases, that the "reclamation fee" is an excise tax.

Vermilion has also argued that BLET and ALMF are "excise taxes . . . triggered by the first sale of the personal property, not its severance." Vermilion's Brief in Support of its Motion for Partial Summary Judgment states (p. 11): "The natural resource related meaning of the word 'severance' is the removal of a natural resource from the earth and its accompanying conversion to personal property. As cited in many of the cases that pertain to BLET and AMLF, the payment of these excise taxes are (sic) triggered by the first sale of the personal property, not its severance." "Triggered" is not correct – rather, the amount of the tax is set by the first sale.[17] Neither tax (the AMLF

---

[17] *See* n. 11, *supra*.

- 16 -

and BLET) can be determined – that is, whether the flat rate or percent of value is to be the amount of the tax – until value is established by the first sale of the coal. Moreover, it is inconceivable that there would be any tax in the absence of the sale of the severed mineral – when there is cash to pay the tax. Indeed, the typical severance tax statute requires a severance and a sale before the imposition of the severance tax. *See Yankee Atomic Electric v. New Mexico and Arizona Land Company*, 632 F.2d 855 (10th Cir. 1980) (demonstrating that New Mexico's resources excise tax, severance tax and oil and gas severance tax were predicated "upon privilege of severance and sale," not merely severance. (AMSA 1978, §§ 725, *et seq.*, 726 *et seq.* and 730 *et seq.*). Vermilion has not demonstrated any severance tax which is imposed in the absence of a sale, whether by federal, state, tribe or other government or otherwise. Moreover, even were this true, it would simply transpose the BLET and AMLF into a form of sales tax or a combined form of severance and sales tax.

## II.

### Mandatory Arbitration And Failure To Comply/Cure – Are Conditions To Any Breach

As indicated earlier, even if BLET and AMLF should not have been deducted, there was no breach or default.

In regard to the coal Lease's mandatory arbitration requirement of "matters in dispute" and its effect on the question of default, cure or breach, this issue is well within any assertion of breach, default, failure to cure, material default or anticipatory repudiation – all are liability issues on which Vermilion carries the burden. Moreover, despite assertions to the contrary, Black Beauty clearly raised this issue and told

- 17 -

Vermilion about its burden in this regard.[18]  The requirement that the arbitrators first determine "matters in dispute" under the Lease before the disputed performance is due, or in default, or before cure is required and before there can be a breach (an uncured default) – results from the language of the various lease provisions.  The words "any matters in dispute", "default" and "breach", are used in the Lease in distinctly different contexts and with distinctly different meanings which inescapably lead to the conclusion that – the arbitration of a matter in dispute is required before the disputed obligation is due or in default and that there must be a failure to comply with the decision or cure before there can be a breach (i.e., there can be no breach until a cure period lapses and the default is uncured).  This is not a question of whether arbitration is an exclusive remedy, rather there has been no breach.

Section 24.1 (Arbitration) mandates that "any matters in dispute" must be arbitrated ("shall be referred to a Board of Arbitrators") and that the decision be "promptly complied with".  To be noted is that the words "default" and "breach" are not used in reference to what must be arbitrated – but rather any **"matters in dispute" must be arbitrated.**  At the same time, the last sentence of § 24.1 provides that the "binding arbitration provision herein" will not limit the right of either party to "seek injunctive relief for **breach hereof"** (which, of course, begs the question of what is a

---

[18] See Black Beauty's Response to Vermilion's Purported Issues for Arbitration, p. 3, "If the Panel determines that BLET and AMLF are not deductible under the terms of the Lease . . . , Vermilion will still have to set forth a theory and provide evidence that Black Beauty is **not entitled to have good faith dispute resolved in arbitration** before being found in **default.**  Vermilion will also have to show that submitting a good faith dispute to arbitration somehow constitutes anticipatory or actual repudiation.")

- 18 -

"breach"?). *See also*, § 22.5 re "Injunction Against Breach".[19]  Section 22.1 gives the Lessee the right to **cure any default** within 30 days of a notice as to non-payment of rent or royalties, or 60 days of a notice as to any other alleged default.  § 22.6 provides that all remedies "shall be cumulative and concurrent . . . ."[20]

The only conclusion which harmonizes these various provisions is that any "matter in dispute" must go to arbitration before there can be a default with respect to a disputed obligation and then a failure to "promptly comply with" the decision before there can be a breach (an uncured default).  Since any "default" is curable and notice is required before there is a default and before cure is required -- only an uncured default is a "breach."  Again, the term "dispute" is distinctly different from the terms "default" or "breach".  Clearly, a dispute precedes a default, and the arbitration decision must precede the opportunity to comply (cure) and an uncured default must occur for there to be a breach.  This result is even more certain when the procedure for the arbitration is considered -- this was designed to be quick and short (within 60 days) so that disputes would be quickly resolved and cured in the event arbitrators determine that the disputed performance is due.

So, it is explicit in the Lease that the parties **"shall" arbitrate** "any matters in dispute" **before any default** can be found, and must have an opportunity to cure (comply with the decision) **before a breach** (*i.e.*, an uncured default).  Whether this is

---

[19] "In the event of any breach or threatened breach by Lessee of the covenants, agreements, terms or conditions of this Lease, Lessor shall have the right to invoke any rights, powers and remedies allowed at law, in equity . . . ."

[20] Section 22.6 provides in part as follows: "Each right, power and remedy of Lessor provided for in this Lease shall be cumulative and concurrent and shall be an addition to every other right, power or remedy. . . ."

- 19 -

ambiguous or unambiguous, makes no difference. At the very least, these are implied conditions. *See, Engis Corporation v. Engis LTD,* 800 F.Supp. 627, 631 (N.D. Ill. 1992) ("[B]ecause contracts have both implied and express terms, the authority of an arbitrator to interpret a contract includes the power to 'discover' implied terms.")

Moreover, under Illinois law, in a declaratory judgment action a contractual cure period is delayed until final determination. *See, Richards v. Electric Controls Corp.,* 325 N.E.2d 775, 788 (Ill. App. 1975). ("There does not appear to be sufficient grounds to permit [plaintiff] to unilaterally terminate the agreement before the pending declaratory judgment action has been finally adjudicated, in the absence of a showing that [defendant] seeks to ignore the determination of the court when it is finally clarified by judicial action, and in light of the substantial basis for the dispute between [plaintiff] and [defendant] as to the construction of the various portions of the agreement in question.") As the court in *Richards* reasoned, it is the very purpose of a judicial action to obtain resolution of a controversy without requiring the litigants to irrevocably jeopardize their rights. Even more so here – where matters in dispute are required to be arbitrated before compliance with the disputed obligation (cure) is required and there can be no breach until the opportunity to cure has expired.]

It has also been argued that the cumulative or concurrent remedy provision controverts that arbitration of a matter in dispute is a condition precedent to the disputed performance being due and there being any breach (uncured default). But it is not a matter of concurrent remedies for a breach. There is simply no breach until after the arbitrators determine "a matter in dispute" after which no compliance or cure occur.

-20-

**Indeed, there has already been a ruling** (or Vermilion has agreed) that matters in dispute must first be determined by arbitration – before there can be a breach for which injunctive relief can be sought. **Vermilion filed an action in an Illinois state court seeking injunctive relief for a breach, but the Illinois judge required that matters in dispute go to arbitration first** (whether by Vermilion's stipulation or otherwise).

### III.

### Conclusion

For the foregoing reasons, we should determine that BLET and the AMLF were properly deducted, and even if not, there has been no breach or that Vermilion is estopped to assert such breach, or to claim any damages.

G. Daniel Kelley, Jr.
Arbitrator

INDY 1528316v.1

E-FILED
Tuesday, 24 April, 2007  12:49:53 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT H

## IN RE THE MATTER OF THE ARBITRATION OF

| | |
|---|---|
| VERMILION COAL COMPANY,<br><br>Claimant,<br><br>and<br><br>BLACK BEAUTY COAL COMPANY,<br><br>Respondent. | )<br>)<br>)<br>)<br>)   **FINAL DECISION**<br>)   **AND AWARD**<br>)   **ON BIFURCATED**<br>)   **REMEDIAL ISSUES**<br>)<br>) |

---

## I.     INTRODUCTION

The March 28, 2005 Decision and Award explicitly and sufficiently sets forth ample findings of fact and conclusions of law to support the finding that Black Beauty did <u>not</u> repudiate or breach the Lease, irrespective of Vermillion's success on the threshold issue relating to the deductibility of the severance taxes.

Accordingly, the merits of the underlying liability issues will not be revisited. However, the pending motions relating to the bifurcated remedial issues of costs and issues will be addressed in this Final Decision and Award.

## II.     BACKGROUND

On March 28, 2005, the Decision and Award memorializing the Panel's determination of the threshold liability issues presented to the Panel at the November 8, 2004, Arbitration Hearing. By agreement of the parties, all remaining remedial issues were bifurcated from the November 8, 2004 hearing and were to be decided by the Panel at a later date.

On or about June 28, 2006, Vermillion Coal Co. ("Vermilion") voluntarily dismissed the remaining liability issues that were not heard by the Panel at the November 8, 2004 hearing. Accordingly, the only remaining issues to be determined by the Panel relate to the respective motions for costs filed by Vermilion and Black Beauty Coal Company ("Black Beauty"). Both parties have

submitted extensive briefing arguing that they are each entitled to costs as the prevailing party, and have opposed the other party's respective motion for same.

On November 6, 2006, the Panel convened telephonically and deliberated on the motions before it relating to the bifurcated remedial issue of costs: 1) Vermilion's Motion to Finalize Order and for an Award of Costs and Attorney's Fees; 2) Black Beauty's Cross Motion for Costs; 3) Vermilion's November 2, 2006 Request for Findings of Facts and Conclusions of Law; and 4) Black Beauty's Motion to Strike Vermilion's Request for Findings of Facts and Conclusions of Law.

### III.   THE UMPIRE ARBITRATOR'S DECISION

In accordance with the applicable provisions of the Lease, as well as controlling Illinois law, the issues pending before the Panel are hereby determined, decided, and resolved as follows:

1) Vermilion's Motion to Finalize Order and for an Award of Costs and Attorney's Fees is GRANTED IN PART AND DENIED IN PART, with an award of $308,955.01 being awarded to Vermilion for "costs" to be paid by Black Beauty;

2) Black Beauty is ORDERED to pay the Panel's outstanding arbitrator fees from July 2006 to present;[1]

3) Black Beauty's Cross Motion for Costs is DENIED and OVERRULED in its entirety;

4) Vermilion's November 2, 2006 Request for Findings of Facts and Conclusions of Law is DENIED and OVERRULED; and

5) Black Beauty's Motion to Strike Vermilion's Request for Findings of Facts and Conclusions of Law is DENIED and OVERRULED.

---

[1] As Vermillion has been awarded its "costs" pursuant to this Decision, Vermillion's award does not include reimbursement for Vermillion's portion of the outstanding arbitration fees and Black Beauty is being ordered to pay these "costs" directly, as opposed to ordering Vermillion to pay its portion, only to then be reimbursed of said cost by Black Beauty.

## IV.   ANALYSIS AND DISCUSSION

Section 24.1 of the Lease reads:

> In arriving at a decision and award, said arbitrators shall be bound by any relevant state and federal law applicable to the substantive issue or issues so submitted for arbitration, and shall make such decision and award in writing, and deliver a copy to both Lessor and Lessee, and *shall as part thereof decide by whom the costs of arbitration shall be borne and paid and the amounts of such costs* including reasonable compensation for the arbitrators. (*emphasis* added)

Illinois follows the "American Rule" – absent statutory authority or a contractual agreement between the parties, each party to litigation *must* bear its own attorney fees and costs, and may not recover those fees and costs from an adversary. *Scholtens v. Schneider,* 173 Ill.2d 375, 384, 671 N.E.2d 657 (1996); *Saltiel v. Olsen,* 85 Ill.2d 484, 488-89, 426 N.E.2d 1204 (1981). A court may not award attorney fees as a matter of contractual construction in the absence of *specific language. Thread & Gage Co. v. Kucinski,* 451 N.E.2d 1292 (1st Dist. Ill., 1983).

Likewise, The Illinois Arbitration Act ("the Act") specifically states that:

> Unless otherwise provided in the agreement to arbitrate, the arbitrators' expenses and fees, together with other expenses, *not including attorney's fees,* incurred in the conduct of the arbitration, shall be paid as provided in the award. (*emphasis* added)

710 ILCS 5/10 (West 1992).

Thus, absent a contrary provision in the arbitration agreement, the Act authorizes arbitrators to assess all fees and costs associated with an arbitration proceeding, *except for attorney fees.* With respect to attorney fees, the Act neither permits nor prohibits the arbitrators' assessment of attorney fees. Rather, the Act delegates this decision to the parties. As such, an arbitrator's authority to assess attorney fees derives solely from the agreement to arbitrate. *See Hahn v. A.G. Becker Paribas, Inc.,* 164 Ill.App.3d 660, 668, 518 N.E.2d 218, 223 (1987)(under

Section 10 of the Act, attorney fees are not to be included in an arbitration award unless otherwise provided in the arbitration agreement).

In the present matter, Section 24.1 of the Lease provides that the Panel *shall* decide which party will bear the "costs" of the arbitration. The Lease does not specifically identify "attorney fees" as being "costs" as required by the Illinois case law or the Uniform Arbitration Act. Nor does the Lease require that costs be awarded. The Lease simply requires that the Panel make a decision as to "costs." Since Illinois law does not recognize attorney fees as "costs," the Panel has determined that attorney fees are not to be awarded in the present matter.

Likewise, in the absence of statutory authority, expert fees are not taxable as "costs." *See Lee Sterns Co v. Zimmerman*, 660 N.E.2nd 170 (Ill. App. 1995); *Naiditch v. Shaf Home Builders, Inc.*, 512 N.E.2d 1027 (Ill. App. 1987); *see also J.B. Esker & Sons, Inc. v. CLE-PA's Partnership*, 757 N.E.2d 1271 (Ill. App. 2001)(holding that "costs" does not encompass expert fees). The above analysis also applies to expert fees. Therefore, the Panel has determined that consulting and expert fees are not to be awarded in the present matter.

The issue then becomes what "costs" should be awarded by the Panel, and to whom should such costs be owed. The Panel's March 28, 2005, Decision makes clear that Vermillion was the "prevailing party" on the main threshold legal issue underlying the arbitration – i.e., whether BLET and AMLF was a severance tax and should be deducted in computing royalties from the gross selling price. Based on that consideration, the Panel *may* award Vermillion its costs if it so decides.

The March 28, 2005 Decision also makes clear, however, that Black Beauty's actions did not rise to the level of a *material* breach, and therefore, Vermillion was not the prevailing party on the issue of contract renunciation. To that end, the March 28, 2005 Decision held in pertinent part:

> While the determination by this arbitration forum has interpreted the word "severance" favorably for Vermilion and the deduction now constitutes a breach for monetary compensation, the deductions were not fraudulent nor did they constitute a breach of such level to be a repudiation. The deductions in the computation process did not constitute a total breach. (Decision and Award, p. 10 ¶ 3)

Accordingly, termination of the contract was not an appropriate remedy under these circumstances.

To the extent that Vermillion relies on Section 22.1 of the Lease to support its position that termination of the contract was appropriate, Vermillion overlooks several issues. It should first be noted that it was determined that there was a good faith dispute as to the deductibility of BLET and ALMF – the March 28, 2005 Decision noted that "the parties had a bona fide dispute" and Black Beauty's position was a "good faith erroneous interpretation" of the Lease. As a result, Black Beauty was entitled to arbitrate this good faith dispute without repudiating the Lease.

On this issue, the March 28, 2005 Decision states in relevant part:

> Vermilion ties into the repudiation claim Sec. 22.1 of the lease relating to Notice of Default and seeks to achieve a lease termination based on a notice of default to Black Beauty. Additionally Vermilion seeks a default determination for Black Beauty's failing to agree and accept Vermilion's interpretation of the lease word "severance".

> The lessee was not obliged to respond to lessor's notice of default by disavowing its good faith belief. This was not a situation where lessee refused to pay rent. It was solely a situation where the parties disagreed as to whether certain taxes were deductible in the royalty computation. Again, this was not a total breach. (Decision and Award, p. 10 ¶ 6-7)

More importantly, the majority of the Panel was not persuaded by Vermillion's persistent push for termination of the Lease, which inevitably prolonged and extended the costs throughout the course of the arbitration. As a result, it is believed that Vermillion "invited" some of the costs it accumulated by seeking renunciation of the Lease, alleging anticipatory repudiation and an entitlement to terminate the Lease based upon Black Beauty's conduct.

Specifically, Vermillion expanded the scope of the litigation in attempt to terminate the Lease and recover damages in excess of $90 million (as well as the forfeiture of Black Beauty's $50 million in improvements to the mining portal), yet the Panel's decision resulted in award of approximately $380,000 to Vermillion, which accounts for less than 1% of Vermillion's prayer for relief. Moreover,

Laswell, Catlin, and Black Beauty all deducted BLET and AMLF in like fashion. Only after 6 years of performance of the Lease, as well as $3.3 million in royalties, did Vermillion object. Furthermore, the amended lease was based on price rather than profit, did not include §2.5(g), and included general language of "any sales tax and/or severance" tax which inevitably led to the parties' divergent interpretation of the Lease provisions regarding the severance tax.

Accordingly, termination of the contract was not warranted and Vermillion's reliance on Section 22.1 is both misplaced and ignores the findings set forth in its March 28, 2005 Decision.

In light of the foregoing, the amount of costs expended by Vermillion in prevailing on the threshold issue of the severance tax has been quantified, and as such, Vermillion is entitled to its "costs" as that term is defined by Illinois law and the terms of the Lease.

Based on the foregoing, an award of $308,955.01 to Vermillion is warranted as the prevailing party (on the threshold issue) based upon:

| | |
|---|---|
| $189,990.34 | Vermillion's Arbitrator fees and its share of Umpire fees[2] |
| $8,205.86 | Vermillion's Storage fees |
| $41,231.20 | Vermillion's hearing related expenses paid by Mr. Keady |
| $69,527.61 | Vermillion's costs for transcripts, copying, etc. |
| $308,955.01 | |

Accordingly, Vermilion's Motion to Finalize Order and for an Award of Costs and Attorney's Fees is granted in part and denied in part, with an award of $308,955.01 being awarded to Vermilion for "costs" as outlined above.

In turn, Black Beauty's Cross Motion for Costs is denied and overruled in its entirety.

As the March 28, 2005 Decision and Award contained extensive Findings of Fact and Conclusions of Law, there is no reason to repeat the Findings of Fact and Conclusions of Law that were clearly set forth in that Decision. Accordingly, Vermilion's November 2, 2006 Request for Findings of Fact and Conclusions of Law is denied and overruled, as is Black Beauty's Motion to Strike.

---

[2] As outlined in Section III, above, Vermillion award for costs does not include Vermillion's portion of the outstanding arbitrator/arbitration fees as those fees will be assessed to Black Beauty directly.

Finally, it should be noted that there was disagreement among the arbitrators and both Arbitrator Getzendanner and Arbitrator Kelley dissent from this Final Decision and Award on Bifurcated Remedial Issues for unrelated reasons. (A copy of Arbitrator Getzendanner's dissenting opinion (Attachment 1) and Arbitrator Kelley's concurring and dissenting opinion (Attachment 2) are attached and follows this Final Decision and Award.)

Section 24.1 of the Lease states in pertinent part:

> The decision and award . . . in case of disagreement among all the arbitrators, of the third or umpire-arbitrator, shall be conclusive and binding upon Lessor and Lessee and promptly complied with.

As a majority of the Panel cannot agree on either the components of arbitration "costs," the appropriate sums of those costs, nor the party whom is entitled to be awarded those costs, this Final Decision and Award issued by the Umpire-Arbitrator is conclusive, binding, and dispositive on all remaining issues before the Panel.

## V.    CONCLUSION

Now that the bifurcated remedial issues have been resolved, all issues before the Panel have been resolved as contemplated by the Lease and the powers vested in the Panel. All liability determinations have been completed and the parties' respective motions for costs have been addressed and decided.

Accordingly, these arbitration proceedings before this Panel are now concluded, and no additional order is necessary to bring these proceedings to finality.

IT IS SO AWARDED.

*Thomas D. Lambros*

---
Thomas D. Lambros – Umpire Arbitrator

DATED: January 31, 2007

**IN RE THE MATTER OF THE ARBITRATION OF**

| | | |
|---|---|---|
| VERMILION COAL COMPANY, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | **FINAL DECISION** |
| and | ) | **AND AWARD** |
| | ) | **ON BIFURCATED** |
| BLACK BEAUTY COAL COMPANY, | ) | **REMEDIAL ISSUES** |
| | ) | |
| Respondent. | ) | |

## I.    INTRODUCTION

The March 28, 2005 Decision and Award explicitly and sufficiently sets forth ample findings of fact and conclusions of law to support the finding that Black Beauty did <u>not</u> repudiate or breach the Lease, irrespective of Vermillion's success on the threshold issue relating to the deductibility of the severance taxes.

Accordingly, the merits of the underlying liability issues will not be revisited. However, the pending motions relating to the bifurcated remedial issues of costs and issues will be addressed in this Final Decision and Award.

## II. · BACKGROUND

On March 28, 2005, the Decision and Award memorializing the Panel's determination of the threshold liability issues presented to the Panel at the November 8, 2004, Arbitration Hearing.  By agreement of the parties, all remaining remedial issues were bifurcated from the November 8, 2004 hearing and were to be decided by the Panel at a later date.

On or about June 28, 2006, Vermillion Coal Co. ("Vermilion") voluntarily dismissed the remaining liability issues that were not heard by the Panel at the November 8, 2004 hearing.  Accordingly, the only remaining issues to be determined by the Panel relate to the respective motions for costs filed by Vermilion and Black Beauty Coal Company ("Black Beauty").  Both parties have

submitted extensive briefing arguing that they are each entitled to costs as the prevailing party, and have opposed the other party's respective motion for same.

On November 6, 2006, the Panel convened telephonically and deliberated on the motions before it relating to the bifurcated remedial issue of costs: 1) Vermilion's Motion to Finalize Order and for an Award of Costs and Attorney's Fees; 2) Black Beauty's Cross Motion for Costs; 3) Vermilion's November 2, 2006 Request for Findings of Facts and Conclusions of Law; and 4) Black Beauty's Motion to Strike Vermilion's Request for Findings of Facts and Conclusions of Law.

### III.    THE UMPIRE ARBITRATOR'S DECISION

In accordance with the applicable provisions of the Lease, as well as controlling Illinois law, the issues pending before the Panel are hereby determined, decided, and resolved as follows:

1) Vermilion's Motion to Finalize Order and for an Award of Costs and Attorney's Fees is GRANTED IN PART AND DENIED IN PART, with an award of $308,955.01 being awarded to Vermilion for "costs" to be paid by Black Beauty;

2) Black Beauty is ORDERED to pay the Panel's outstanding arbitrator fees from July 2006 to present;[1]

3) Black Beauty's Cross Motion for Costs is DENIED and OVERRULED in its entirety;

4) Vermilion's November 2, 2006 Request for Findings of Facts and Conclusions of Law is DENIED and OVERRULED; and

5) Black Beauty's Motion to Strike Vermilion's Request for Findings of Facts and Conclusions of Law is DENIED and OVERRULED.

---

[1] As Vermillion has been awarded its "costs" pursuant to this Decision, Vermillion's award does not include reimbursement for Vermillion's portion of the outstanding arbitration fees and Black Beauty is being ordered to pay these "costs" directly, as opposed to ordering Vermillion to pay its portion, only to then be reimbursed of said cost by Black Beauty.

# IV.  ANALYSIS AND DISCUSSION

Section 24.1 of the Lease reads:

> In arriving at a decision and award, said arbitrators shall be bound by any relevant state and federal law applicable to the substantive issue or issues so submitted for arbitration, and shall make such decision and award in writing, and deliver a copy to both Lessor and Lessee, and *shall as part thereof decide by whom the costs of arbitration shall be borne and paid and the amounts of such costs* including reasonable compensation for the arbitrators. (*emphasis* added)

Illinois follows the "American Rule" – absent statutory authority or a contractual agreement between the parties, each party to litigation *must* bear its own attorney fees and costs, and may not recover those fees and costs from an adversary. *Scholtens v. Schneider,* 173 Ill.2d 375, 384, 671 N.E.2d 657 (1996); *Saltiel v. Olsen,* 85 Ill.2d 484, 488-89, 426 N.E.2d 1204 (1981). A court may <u>not</u> award attorney fees as a matter of contractual construction in the absence of *specific language. Thread & Gage Co. v. Kucinski,* 451 N.E.2d 1292 (1st Dist. Ill., 1983).

Likewise, The Illinois Arbitration Act ("the Act") specifically states that:

> Unless otherwise provided in the agreement to arbitrate, the arbitrators' expenses and fees, together with other expenses, *not including attorney's fees,* incurred in the conduct of the arbitration, shall be paid as provided in the award. (*emphasis* added)

710 ILCS 5/10 (West 1992).

Thus, absent a contrary provision in the arbitration agreement, the Act authorizes arbitrators to assess all fees and costs associated with an arbitration proceeding, *except for attorney fees.* With respect to attorney fees, the Act neither permits nor prohibits the arbitrators' assessment of attorney fees. Rather, the Act delegates this decision to the parties. As such, an arbitrator's authority to assess attorney fees derives solely from the agreement to arbitrate. *See Hahn v. A.G. Becker Paribas, Inc.,* 164 Ill.App.3d 660, 668, 518 N.E.2d 218, 223 (1987)(under

Section 10 of the Act, attorney fees are not to be included in an arbitration award unless otherwise provided in the arbitration agreement).

In the present matter, Section 24.1 of the Lease provides that the Panel *shall* decide which party will bear the "costs" of the arbitration. The Lease does not specifically identify "attorney fees" as being "costs" as required by the Illinois case law or the Uniform Arbitration Act. Nor does the Lease require that costs be awarded. The Lease simply requires that the Panel make a decision as to "costs." Since Illinois law does not recognize attorney fees as "costs," the Panel has determined that attorney fees are <u>not</u> to be awarded in the present matter.

Likewise, in the absence of statutory authority, expert fees are not taxable as "costs." *See Lee Sterns Co v. Zimmerman*, 660 N.E.2nd 170 (Ill. App. 1995); *Naiditch v. Shaf Home Builders, Inc.*, 512 N.E.2d 1027 (Ill. App. 1987); *see also J.B. Esker & Sons, Inc. v. CLE-PA's Partnership*, 757 N.E.2d 1271 (Ill. App. 2001)(holding that "costs" does not encompass expert fees). The above analysis also applies to expert fees. Therefore, the Panel has determined that consulting and expert fees are <u>not</u> to be awarded in the present matter.

The issue then becomes what "costs" should be awarded by the Panel, and to whom should such costs be owed. The Panel's March 28, 2005, Decision makes clear that Vermillion was the "prevailing party" on the main threshold legal issue underlying the arbitration – i.e., whether BLET and AMLF was a severance tax and should be deducted in computing royalties from the gross selling price. Based on that consideration, the Panel *may* award Vermillion its costs if it so decides.

The March 28, 2005 Decision also makes clear, however, that Black Beauty's actions did <u>not</u> rise to the level of a *material* breach, and therefore, Vermillion was <u>not</u> the prevailing party on the issue of contract renunciation. To that end, the March 28, 2005 Decision held in pertinent part:

> While the determination by this arbitration forum has interpreted the word "severance" favorably for Vermilion and the deduction now constitutes a breach for monetary compensation, the deductions were not fraudulent nor did they constitute a breach of such level to be a repudiation. The deductions in the computation process did not constitute a total breach. (Decision and Award, p. 10 ¶ 3)

Accordingly, termination of the contract was not an appropriate remedy under these circumstances.

To the extent that Vermillion relies on Section 22.1 of the Lease to support its position that termination of the contract was appropriate, Vermillion overlooks several issues. It should first be noted that it was determined that there was a good faith dispute as to the deductibility of BLET and ALMF – the March 28, 2005 Decision noted that "the parties had a bona fide dispute" and Black Beauty's position was a "good faith erroneous interpretation" of the Lease. As a result, Black Beauty was entitled to arbitrate this good faith dispute without repudiating the Lease.

On this issue, the March 28, 2005 Decision states in relevant part:

> Vermilion ties into the repudiation claim Sec. 22.1 of the lease relating to Notice of Default and seeks to achieve a lease termination based on a notice of default to Black Beauty. Additionally Vermilion seeks a default determination for Black Beauty's failing to agree and accept Vermilion's interpretation of the lease word "severance".

> The lessee was not obliged to respond to lessor's notice of default by disavowing its good faith belief. This was not a situation where lessee refused to pay rent. It was solely a situation where the parties disagreed as to whether certain taxes were deductible in the royalty computation. Again, this was not a total breach. (Decision and Award, p. 10 ¶ 6-7)

More importantly, the majority of the Panel was not persuaded by Vermillion's persistent push for termination of the Lease, which inevitably prolonged and extended the costs throughout the course of the arbitration. As a result, it is believed that Vermillion "invited" some of the costs it accumulated by seeking renunciation of the Lease, alleging anticipatory repudiation and an entitlement to terminate the Lease based upon Black Beauty's conduct.

Specifically, Vermillion expanded the scope of the litigation in attempt to terminate the Lease and recover damages in excess of $90 million (as well as the forfeiture of Black Beauty's $50 million in improvements to the mining portal), yet the Panel's decision resulted in award of approximately $380,000 to Vermillion, which accounts for less than 1% of Vermillion's prayer for relief. Moreover,

Laswell, Catlin, and Black Beauty all deducted BLET and AMLF in like fashion. Only after 6 years of performance of the Lease, as well as $3.3 million in royalties, did Vermillion object. Furthermore, the amended lease was based on price rather than profit, did not include §2.5(g), and included general language of "any sales tax and/or severance" tax which inevitably led to the parties' divergent interpretation of the Lease provisions regarding the severance tax.

Accordingly, termination of the contract was not warranted and Vermillion's reliance on Section 22.1 is both misplaced and ignores the findings set forth in its March 28, 2005 Decision.

In light of the foregoing, the amount of costs expended by Vermillion in prevailing on the threshold issue of the severance tax has been quantified, and as such, Vermillion is entitled to its "costs" as that term is defined by Illinois law and the terms of the Lease.

Based on the foregoing, an award of $308,955.01 to Vermillion is warranted as the prevailing party (on the threshold issue) based upon:

| | |
|---|---|
| $189,990.34 | Vermillion's Arbitrator fees and its share of Umpire fees[2] |
| $8,205.86 | Vermillion's Storage fees |
| $41,231.20 | Vermillion's hearing related expenses paid by Mr. Keady |
| $69,527.61 | Vermillion's costs for transcripts, copying, etc. |
| $308,955.01 | |

Accordingly, Vermilion's Motion to Finalize Order and for an Award of Costs and Attorney's Fees is granted in part and denied in part, with an award of $308,955.01 being awarded to Vermilion for "costs" as outlined above.

In turn, Black Beauty's Cross Motion for Costs is denied and overruled in its entirety.

As the March 28, 2005 Decision and Award contained extensive Findings of Fact and Conclusions of Law, there is no reason to repeat the Findings of Fact and Conclusions of Law that were clearly set forth in that Decision. Accordingly, Vermilion's November 2, 2006 Request for Findings of Fact and Conclusions of Law is denied and overruled, as is Black Beauty's Motion to Strike.

---

[2] As outlined in Section III, above, Vermillion award for costs does not include Vermillion's portion of the outstanding arbitrator/arbitration fees as those fees will be assessed to Black Beauty directly.

Finally, it should be noted that there was disagreement among the arbitrators and both Arbitrator Getzendanner and Arbitrator Kelley dissent from this Final Decision and Award on Bifurcated Remedial Issues for unrelated reasons. (A copy of Arbitrator Getzendanner's dissenting opinion (Attachment 1) and Arbitrator Kelley's concurring and dissenting opinion (Attachment 2) are attached and follows this Final Decision and Award.)

Section 24.1 of the Lease states in pertinent part:

> The decision and award . . . in case of disagreement among all the arbitrators, of the third or umpire-arbitrator, shall be conclusive and binding upon Lessor and Lessee and promptly complied with.

As a majority of the Panel cannot agree on either the components of arbitration "costs," the appropriate sums of those costs, nor the party whom is entitled to be awarded those costs, this Final Decision and Award issued by the Umpire-Arbitrator is conclusive, binding, and dispositive on all remaining issues before the Panel.

## V.    CONCLUSION

Now that the bifurcated remedial issues have been resolved, all issues before the Panel have been resolved as contemplated by the Lease and the powers vested in the Panel. All liability determinations have been completed and the parties' respective motions for costs have been addressed and decided.

Accordingly, these arbitration proceedings before this Panel are now concluded, and no additional order is necessary to bring these proceedings to finality.

IT IS SO AWARDED.

_Thomas D. Lambros_

_____
Thomas D. Lambros – Umpire Arbitrator


DATED: January 31, 2007

### Dissenting Opinion of Party Arbitrator Susan Getzendanner

The issue is what are the "costs of arbitration" to which Vermilion is entitled. I believe that the issue must be decided under the language of the arbitration agreement. I respectfully dissent from the analysis and conclusion of the Panel's Final Award.

It is the agreement to arbitrate, not the federal rules or the AAA rules, that governs Vermilion's entitlement to be paid the "costs of arbitration." Here, the agreement to arbitrate specified as follows:

> In arriving at a decision and award, said arbitrators [two party arbitrators and one neutral arbitrator] . . . . shall make such decision and award in writing, . . . and shall as a part thereof decide by whom the costs of arbitration shall be borne and paid and the amount of such costs including reasonable compensation for the arbitrators.

Vermilion's first argument was based on the breathe of this language. It then, possibly confusingly, argued "prevailing party" under Rule 54 (b), what costs are taxable under federal law, 28 U.S.C. § 1920, and an equitable entitlement to attorneys fees based on a "frivolous defense." Vermilion's first argument is persuasive.

The arbitration agreement is quite unlike the "taxation of costs" under 28 U.S.C. § 1920, which states: "A judge or clerk of any court of the United States **may tax** as costs the following," and what follows is a detailed list that includes numerous kinds of costs that may awarded, for example, fees for court appointed experts. The court or clerk of the court is free to pick and choose. The arbitration agreement does not permit the arbitrators to award only certain costs – it says only that the arbitrators shall determine by whom the "costs of arbitration shall be borne and paid." The language is broad and mandatory.[1]

---

[1] For example, witness fees of experts not appointed by the court are not recoverable under the federal rules. But they are recoverable as "costs of arbitration" under the broad language of the agreement to arbitrate..

1

ATTACHMENT 1

Rule 54 (b) specifically provides that "except when express provision therefore is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party **unless the court otherwise directs**." So under this Rule, the court is allowed to award costs other than attorneys' fees to the "prevailing party," unless the court "otherwise directs." Again the arbitration agreement does not permit the arbitrators to direct what specific costs of arbitration shall be paid and there is no provision forbidding attorneys fees as costs. In fact, Rule 54 (b) treats attorneys' fees as "costs" and then specifically excludes the recovery of attorneys fees as costs., with the caveat that fees may be awarded by the court.

Because the arbitration agreement speaks broadly of the costs of arbitration, a fair reading of the provision would require the full costs of the arbitration to be borne and paid by one of the parties to the arbitration. Under the agreement, costs of arbitration shall be awarded as part of the arbitrators' written decision and award. So "costs" is not the usually deminimus figure awarded to the prevailing party by a court. Such costs never come close to the real costs of a litigation. Here the costs of the arbitration must include what the arbitration actually cost. Vermilion is entitled to be made whole. It can only be restored to its position before the arbitration by being paid the entire cost of the arbitration.

There is no justification to deny Vermillion 100% of its costs because the Panel concludes that its chief executive was intent on pursuing termination of the lease and that goal was what drove the expense of the arbitration. Vermilion did not set up Black Beauty to be vulnerable to a termination remedy or expectation damages. Black Beauty easily could have limited the arbitration to the contract construction issue and to a remedy of full payment of the royalty. All Black Beauty had to do was pay the disputed part of the royalty under protest. It was Black Beauty that created its vulnerability to a greater scope of remedies beyond the amount due to the breach of contract.

Surely, Vermilion was intent on obtaining the termination remedy. But Vermilion did not start out that way. Vermilion tried for almost a year to get Black Beauty to concede the royalty issue or at the very least to pay the full royalty under protest and to prosecute that protest in an arbitration proceeding. All Black Beauty had to do was to pay the full royalty under protest and to pursue arbitration of the underlying issue.

2

It was not until after months of fruitless attempts to negotiate that
Vermilion began to exercise its rights under the lease. Those rights included the
right to gave a notice of breach based on the failure to pay the full royalty, or "any
part thereof." This notice was ignored by Black Beauty and the breach, under the
terms of the lease, ripened into an event of default.

Next, Vermilion demanded adequate assurance. I had not previously
encountered a demand for adequate assurance, which is a UCC concept. But in
1995, Judge Posner stated that it was likely that Illinois would apply the same
concept to contracts other than sales contracts. A demand for adequate assurance
is a powerful tool of the non-breaching party.

Vermilion's demand stated on its face that it would be satisfied if
Black Beauty would pay the full royalty under protest. So all Black Beauty had to
do was pay Vermilion the full royalty under protest and then prosecute that protest
in arbitration. The amount involved was so small (less than 5% of the royalty)
that Black Beauty's failure to pay under protest is incomprehensible.

As a last resort, Vermilion gave notice of termination. The contract
provided that once the notice is given, the breaching party has so many days to
respond, and if there is no timely response, the lease is terminated. Termination is
a self-executing remedy under the lease, and under the lease all remedies are
cumulative. All Black Beauty had to do was respond to the notice and pay under
protest. Incredibly, Black Beauty failed timely to respond to the notice of
termination.

Vermilion, which had sued Black Beauty, as it was entitled to under
the lease, agreed to arbitration of the issues raised in the litigation. By the time the
arbitration demand was filed, the lease had been terminated in accordance with the
terms of the lease. Is termination a harsh remedy for a "small breach" of contract?
Yes. But it is an express remedy under the contract. This simple point has been
ignored by the Panel.

The remedy is not harsh when you consider that all Black Beauty had
to do to avoid termination was to pay under protest. What would be harsh on the
facts of this case is to penalize Vermilion for pursuing an arbitration that should
have been avoided from the get-go, and from pursuing remedies that Black Beauty

3

easily could have eliminated from the arbitration.

Vermilion was forced to arbitrate the contract dispute. Accepting the Panel's generous conclusion that Black Beauty deducted the federal taxes based on past practices without thinking about whether they were severance taxes deductible under the lease, that does not mean Black Beauty was acting in good faith after Vermilion asserted that the deduction was improper. Black Beauty should have read the lease and reached the same conclusion that the Chairman of the Panel reached – without a doubt, plainly and unambiguously, the federal taxes were not severance taxes.

Black Beauty had no principled argument to support its position that the deduction was proper. It ignored the fact that in the industry severance taxes are state or Indian tribe taxes. It ignored its own internal records that showed "No severance taxes in Illinois." Instead Black Beauty relied on its corporate lawyer's reading of Black's Law Dictionary and two cases that on their face did not support the notion that the federal taxes were severance taxes.

Was Vermilion not forced to seek the remedy of termination? Without a doubt. It would have been malpractice not to pursue the remedy of termination. Black Beauty had two opportunities to respond to Vermilion's notices of default and of termination, and two opportunities to respond to Vermilion's demands for adequate assurance. The remedy of termination was pursued based entirely on Black Beauty's actions. Vermilion pursued termination in good faith. It is entitled to its full costs of the arbitration.

Dated: January __, 2007.

Susan Getzendanner

4

VERMILION COAL COMPANY     )
                              )
          Plaintiff,        )
                              )      Arbitration Panel:
          v.            )
                              )      Hon. Thomas Lambros - Umpire
BLACK BEAUTY COAL COMPANY,    )      Hon. Susan Getzendanner
                              )      G. Daniel Kelley
          Defendant.     )

---

### CONCURRING AND DISSENTING DECISION
### BY ARBITRATOR KELLEY

---

       I concur in part and dissent in part.

       The umpire decision awarding $300,000 plus of the claimed $1.5 million costs to Vermilion is appropriate on several grounds, while inappropriate on others. The attorney and expert fees were exceedingly excessive – having three law firms (including a St. Louis firm and a Chicago firm), having four to five experts who presented essentially no admissible evidence and were not even offered as such, trying to turn a simple good faith commercial dispute case into a fraud, putative damage, material breach and repudiation case, three experienced trial attorneys spending five to six days over two weeks in Cleveland reading depositions, etc., etc., etc. These excessive efforts on matters plainly invalid factually and legally – were unsuccessful. Vermilion lost on all issues but the simple issue of contract meaning which could have been heard and decided – in three months and with comparatively no fees.

       This record presents an extraordinary amount of ineffective attorney and expert efforts in a largely losing cause, all no doubt at the express direction of Mr. Keady who

ATTACHMENT 2

has extensive leasing and litigation experience on the same issue as here concerning tax deductions to arrive at a royalty under a coal lease. (I think Mr. Keady was involved in reported litigation on this subject, which was covered on Mr. Keady's cross, but I don't think I should spend the time to go through many, many boxes of material accumulated in this case to find all this.) Indeed, the efforts to turn this case, a simple "run-of-the mill" contract dispute, into a high stakes, "bet-the-$50 million-mine-crap-shoot" began immediately as Mr. Keady first raised the issue. All this was done despite Mr. Keady's having knowingly stood by for years accepting the performance which he belatedly decided was somehow fraudulent.

Viewed in this context, awarding but 20% ($300,000 plus) of the $1.5 million requested costs – is easily justified. However, there is no clear and unambiguous language in the Lease giving us the authority (and we have none in law, either) to award attorney or expert fees. Considering this in the context of the foregoing, the award of $300,000 plus in costs is not justified or supported. This award will serve only to encourage more of what we should discourage.

In regard to Vermilion's Request for Findings, etc., there can be no doubt that the panel's prior decision was final long, long before that request – so this panel no longer had (has) jurisdiction to change that decision. In fact, I suspect the case might be made that this panel has no jurisdiction now to award costs with the motion having come (November '06) so long after the decision (March '05). While Vermilion has unilaterally dismissed the "remaining" issues, the only colorable, open issues related to other claims not within our jurisdiction pursuant to the notice or the complaint.

-2-

G. Daniel Kelley

One American Square
Suite 3100
Indianapolis, IN 46282
(317) 236-2100