**E-FILED**
Friday, 28 September, 2007  10:55:04 AM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | |
|---|---|
| In the matter of the Arbitration between | ) |
| VERMILION COAL COMPANY, | ) Case No. 2:07-cv-02082 |
| | ) |
| Petitioner, | ) Judge Michael P. McCuskey |
| | ) |
| v. | ) Magistrate Judge |
| | ) David G. Bernthal |
| BLACK BEAUTY COAL COMPANY, | ) |
| | ) |
| Respondent. | ) |

**MEMORANDUM IN SUPPORT OF VERMILION COAL COMPANY'S MOTION TO VACATE ARBITRATION AWARD, IN PART**

Plaintiff Vermilion Coal Company ("Vermilion") submits the following Memorandum of Law in support of its Motion to Vacate, in Part, Arbitration Award,

**I.      Introduction**

Vermilion moves to vacate part of an arbitration award against Defendant Black Beauty Coal Company ("Black Beauty"), a wholly-owned unit of Peabody Energy.[1] Judicial review of arbitration awards is very narrow. The Federal Arbitration Act ("FAA") (9 USC §10) enumerates statutory standards for vacatur of arbitration awards.[2]

The Seventh Circuit has defined certain circumstances in which it will affirm a District Court's vacatur of an arbitral award pursuant to Section 10(4) of the FAA. These instances, each of

---

[1] This is a contract case brought before this Court pursuant to its diversity jurisdiction.

[2] There also exist in various forms so-called "judge-made" standards for vacatur. According to Seventh Circuit case law, the judge-made standards are largely baseless, except when an award directs a party to violate the law. *George Watts & Son v. Tiffany & Co.,* 248 F.3d 577 (7th Cir. 2001). This case does not require the Court to invoke any of the judge-made standards for vacatur.

which involves an arbitrator exceeding his authority, include flouting an express term of an agreement[3], or refusing to "adhere to the legal principles specified by contract". *George Watts & Son v. Tiffany & Co.,* 248 F.3d 577, 581 (7th Cir.2001); *Reliance Ins. Co. v. Raybestos Prods. Co.*, 2007 U.S. Dist. LEXIS 5487 (S.D. Ind. Jan. 24, 2007); *Health Servs. Mgmt. Corp. v. Hughes,* 975 F.2d 1253, 1267 (7th Cir. 1992). Nearly all courts applying the FAA acknowledge the importance of giving effect to arbitration agreements as they are written. See, *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.* 489 U.S. 468,479, 109 S.Ct. 1248  (1989). Where the parties agree to limit an arbitrator's power by requiring that he or she follow and apply the law, the reverse side of the general rule affording arbitrators virtually unlimited powers applies – the court reviews the arbitrator's decision for legal errors and vacates the award if it finds that the arbitrator failed to follow the law specified in the agreement. This is such a case.

The instant agreement uniquely limits arbitrator authority. (See, Lease attached as Exh. "A".) Section 22 of the agreement sets forth specific, self-implementing remedies for default. Section 24 includes a non-default provision and other Lessor remedies. Section 26 **binds** the arbitrators to substantive Illinois and federal law, and requires a written reasoned decision. Thus, unlike most arbitration cases, Ump. Arbitrator Lambros ("Ump. Lambros"), did ***not*** have the discretion traditionally afforded to arbitrators to apply his own form of "industrial justice" when ruling on liability and damage issues. For the reasons set forth herein, in Vermilion's Complaint,[4] incorporated by reference herein, and its Motion to Vacate in Part Arbitration Award, the Award should be vacated as to Ump. Lambros' rulings regarding waiver, estoppel, breach, default/termination, repudiation, and fraud.

## II. Ump. Lambros Exceeded His Powers under Applicable Federal and Illinois Law

---

[3] *Anheuser-Busch, Inc. v. Beer, Soft Drink, … Union*, 280 F.3d 1133 (7th Cir. 2002).

[4] Vermilion's Complaint Filed 04/24/07, Document #1 in Court docket including Exh.  A-G.

In ruling on a motion to vacate an arbitration award, the Court looks to Section 10(a) (4) of the FAA which states:

> (a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration… (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

The Seventh Circuit has interpreted the standard for review of arbitration awards under the FAA as set forth in *Tootsie Roll Indus., Inc. v. Local Union # 1,* 832 F.2d 81 (7th Cir. 1987) quoting from language approved in Supreme Court decisions:

> [A]n arbitrator is confined to interpretation and application of the …agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*Tootsie Roll* at 83, *quoting United Steelworkers v. Enterprise Wheel & Car Corp*., 363 U.S. 593, 597, 80 S. Ct. 1358, 1361 (1960)*; Ethyl Corp. v. United Steelworker,* 768 F.2d 180, 184-85 (7th Cir. 1985), cert. denied, 475 U.S. 1010 (1986).

The rulings of the Seventh Circuit, however, do not vitiate, but rather invite, judicial review of such an arbitrator's decision. *Anheuser-Busch, Inc., supra; George Watts & Son, supra;*, *Reliance Ins. Co., supra.* Parties who want their arbitrators to have fewer powers need only provide this by contract.  An arbitrator's disregard of such a command would be reviewable under Section 10(a)(4) of the FAA. Arbitrators are not free to dispense their own brand of industrial justice and *"may not ignore the plain language of the contract." United Paperworkers Internat'l Union v. Misco, Inc.,*

3

484 U.S. 29, 38, 108 S. Ct. 364 (1987) (emphasis added). *Anheuser-Busch, Inc., supra.*[5]   In the present case, Ump. Lambros exceeded his powers when he flouted the plain and unambiguous language of the Agreement. See,   *Reliance Ins. Co., supra.* (arbitrators allowed to exercise discretion because agreement did not require the application of substantive law).

---

[5] *Bidlack v. Wheelabrator Corp., 993 F.2d 603, 608 (7th Cir. 1993)* ("[a]lthough extrinsic evidence is admissible to show that a written contract which looks clear is actually ambiguous, perhaps because the parties were using words in a special sense…***there must be either contractual language on which to hang the label ambiguous or some yawning void. . .that cries out for an implied term***. Extrinsic evidence should not be used to add terms to a contract that is plausibly complete without them.") (citations omitted) (emphasis added); *Brotherhood of Maintenance Of Way Employees v. Atchison, Topeka & Santa Fe Ry. Co.*, 138 F.3d 635, 644-45 (7th Cir. 1997) (Wood, J., dissenting) ("The context of [Supreme Court decisions suggesting that "practice, usage and custom" may be used to interpret a labor contract] ***does not suggest that extrinsic evidence may be used to contradict explicit terms of a collective bargaining agreement. . .Neither case comes close to saying that extrinsic evidence may be used to contradict the plain language of an agreement when that subject has in fact been unambiguously addressed by the parties***") (citations omitted) (emphasis added); *Pabst Brewing Co. v. Corrao, 161 F.3d 434, 440 (7th Cir. 1998)* (reaffirming holding of *Bidlack*); *Central States, Southeast & Southwest Areas Pension Fund v. Kroger Co.,* 226 F.3d 903, 914 (7th Cir. 2000) amended, No. 99-2257, 2001 WL 204762 (7th Cir. Feb. 2, 2001) ("Just as employers may not rely on oral or written side agreements when those agreements contravene the terms of the governing agreement. . .[an employer] ***may not rely on a practice - even one accepted by the Union - that contravenes the express and unambiguous terms of the CBA.***") (citations omitted) (emphasis added).

4

**A. Ump. Lambros Flouted the Plain and Unambiguous Language of Section 22 of the Agreement.**

After considering the plain and unambiguous language of Section 2.4 of the Agreement relating to the calculation of royalties, [6] Ump. Lambros ruled that that "BLET/AMLF cannot be deducted from the gross selling price" because they "are not severance taxes, using the plain and ordinary meaning of the word".[7] (Interim Award, page 5, attached hereto as Exh. "B"). Ump. Lambros then proceeded to rule on Vermilion's claims for breach of contract, fraud and anticipatory repudiation and to fashion remedies (hereinafter collectively referred to as "Vermilion's Claims") without citing to or applying the plain and unambiguous terms of the Agreement. (Exh. B, pp. 6-11.) Upon finding that Black Beauty failed in its obligation to make royalty payments in accordance with the Agreement, Ump. Lambros was **required** to follow the Agreement's terms relating to Vermilion's remedies for default provided in Section 22.1 of the Agreement.[8] Moreover, under

---

[6] The parties submitted cross motions for summary judgment addressing whether BLET and AMLF are deductable as "severance" taxes in the calculation of royalties under the Agreement. At the hearing on the motions, Ump. Lambros reserved ruling on the motions and requested that the parties submit extrinsic evidence on the "severance" tax issue relating to the intent of the parties and the custom and practice in the mining industry. His Interim Award adopts the reasoning set forth in Vermilion's motion and finds the Lease language to be unambiguous.

[7] Vermilion's Motion to Vacate in Part does not seek the vacatur of the ruling and Award relating to the non-deductibility of BLET/AMLF in the calculation of royalties.

[8] Ump. Lambros' Interim Award also violated the Panel's own order of August 24, 2004, which **bifurcated remedies including accounting, damages, or termination** from the November, 2004 hearing. Thus, Ump. Lambros also violated his own order by ruling on the issue of remedies (including termination) prior to Vermilion's presentation of evidence and argument.

5

Section 24.1 of the Agreement, Ump. Lambros' was **bound** to apply substantive Illinois (as specified in Section 26.1) and federal law.

After ruling that Black Beauty's improper deduction of BLET/AMLF from the royalty payments owed to Vermilion was a **breach** of the Agreement,[9] Ump. Lambros *flouted the plain and unambiguous language of the Agreement* relating to Vermilion's remedies for Black Beauty's breach.  Section 22.1(a) of the Agreement clearly and unambiguously states that

> ***if default shall be made in the due and punctual payment of any rent, royalty or any part thereof,*** *when and as the same may become due and payable...****then*** *and in any such event, Lessor at any time thereafter while such default or condition is continuing, may give written notice to Lessee specifying the occurrence giving rise to such Event of Default... and stating that* ***the agreement shall terminate on the date specified in such notice****...Upon the date specified in such notice, this agreement ... shall terminate and all rights of Lessee under this agreement shall cease.*[10]

---

[9] Ump. Lambros ruled that the "plain and ordinary" meaning of "severance" taxes did not include BLET and AMLF and that Black Beauty's conduct in deducting BLET and AMLF from the gross selling price constituted a "*breach for monetary compensation*". Interim Award, pp. 5 and 10.

[10] Vermilion presented uncontested evidence of the notice of default given to Black Beauty in accordance with the Agreement. (Exh. D, pp. 37-40.) After discovering that Black Beauty was improperly deducting BLET/AMLF from its payment of royalties, Vermilion unsuccessfully attempted to resolve the dispute. (See, Group Exh. B to Complaint.) Black Beauty refused to make due and punctual payment of the correct royalties when they were due and payable, and in the future, thereby repudiating its contractual obligations. (See, Group Exh. B to Complaint.)

Rather than applying the plain and unambiguous language of the Agreement relating to remedies for default, Ump. Lambros conflated various legal and equitable notions of "good faith" default, total versus partial breach, "egregious" versus "mistaken" breach  (as well as exceeding his powers in other ways set forth herein) and imposed his brand of justice in substitution for Vermilion's bargained for remedies under the Agreement. (Exh. B, pp. 6–11.)   Thus, Ump. Lambros exceeded his authority *by modifying the terms of a clear and unambiguous contract that needed no interpretation* whatsoever. See, *Anheuser-Busch, Inc., supra* at 1144 (Seventh Circuit vacated an arbitration award where the arbitrator improperly injected his personal notions of fairness into his decision and thus manifested "an infidelity to his obligation" to follow the law and the language of the contract); *Jays Foods, L.L.C. v. Chemical & Allied Prod. Workers' Union, Local 20*, No.97 C 6227, 1998 WL 265098 (N.D. Ill. May 13, 1998) (award vacated on grounds that the arbitrator added a "reasonable cause or business necessity" standard to the language of the agreement and therefore the Award did not draw its essence from the agreement); [11] *Amalgamated Transit Union v. Chicago Transit Auth.,* 342 Ill. App. 3d 176, 794 N.E.2d 861 (1st Dist. 2003) (award vacated where arbitrator disregarded the agreement and added a cap on earnings of the workers).

Similarly, other circuits agree that when an arbitrator fails to follow the "bargained for" language of a contract, the arbitrator has exceeded the scope of [his] power requiring the court to vacate the award. Courts have found that great deference is not the equivalent of a grant of limitless

---

[11] Illinois state court cases decided in accordance with the Illinois Uniform Arbitration Act ("the Illinois Act") are applicable because the language of the FAA is essentially the same. See, *J & K Cement Const., Inc. v. Montalbano Builders, Inc.,* 119 Ill.App.3d 663 ,667, 456 N.E.2d 889, 893 (2d Dist. 1983); *Tyco Lab., Inc. v. DASI Indus.*, *Inc.,* No. 92-5712, 1993 WL 356929 (N.D. Ill. Sept. 9, 1993).

power. *Georgia-Pacific Corp. v. Local 27, United Paperworkers Int'l Union*, 864 F.2d 940, 944 (1st Cir. 1988); *Poland Spring Corp. v. United Food & Commercial Workers Int'l Union,* 314 F.3d 29, 33 (1st Cir. 2002) (citing *Georgia-Pacific, supra 864 F.2d at 944*); *Leed Architectural Prod., Inc. v. United Steelworkers, Local 6674*, 916 F.2d 63, 65 (2d Cir. 1990).

Arbitration awards have been vacated for failing to follow the plain and unambiguous language of the agreement of the parties, thereby failing to enforce the "essence" of the agreement. *Leed Architectural Prod., supra*; *CITGO Asphalt Ref. Co. v. Paper, Allied-Industrial, Chem., & Energy Workers Int'l Union Local No. 2-991*, 385 F.3d 809 (3d Cir. 2004) (award vacated on grounds that the arbitrator's opinion and award was based on "general considerations of fairness and equity" as opposed to the exact terms of the collective bargaining agreement (CBA) and, therefore, failed to derive its essence from the CBA); *MidMichigan Reg'l Med. Center-Clare v. Professional Employees Div. of Local 79*, 183 F.3d 497, 502 (6th Cir. 1999).  It is well established that arbitrators cannot exceed the authority given to them by the underlying contractual agreement. *Salem Hosp. v. Mass. Nurses Ass'n,* 449 F.3d 234 at 240 (1st Cir. 2006); *Lourdes Med. Ctr. v. JNESCO*, No. 04-4494, 2007 WL 1040961 (D.N.J. Apr. 5, 2007); (Award vacated where arbitrator wrote into the Agreement a new definition of "layoff," which directly conflicted with the express provisions of the CBA).

As distinguished from the typical case in which an arbitrator is afforded broad discretion in making rulings and fashioning remedies when issuing the award, Section 24.1 ***bound*** Ump. Lambros to relevant state (Illinois as per Section 26.1) and federal law.  Ump. Lambros' Interim Award, however, fails to comply with Illinois law.  Rather, in the Interim Award, beginning with the second paragraph on page 5 through the sixth paragraph of page eleven, Ump. Lambros muddles extrinsic evidence and legal constructions and theories into confusing rulings on Vermilion's Claims. (Exh. B.)

8

Thus, Ump. Lambros exceeded his powers under the FAA by disregarding the very language of the agreement itself relating to default/termination and Vermilion's Claims. See, *Chicago Newspaper Publishers' Ass'n v. Chicago Web Printing Pressmen's Union # 7,* 821 F.2d 390, 395 (7th Cir. 1987); *Hill v. Norfolk & W. Ry. Co.,* 814 F.2d 1192, 1195 (7th Cir. 1987); *Anheuser-Busch, Inc., supra.* In cases where the arbitrator is required to follow the law, the court may review the award for legal error. *Watts & Son, supra.* Accordingly, those portions of the Interim Award denying Vermilion's Claims and the express remedy of termination must be vacated.

**B.  Ump. Lambros Failed to Rule in Accordance with Illinois Law Pursuant to Section 26 of the Agreement.**

It is a well established rule in Illinois that where a contract purports on its face to be a complete expression of the entire agreement, courts will not add another term about which the agreement is silent. *Pritchett v. Asbestos Claims Mgmt. Corp.,* 332 Ill. App. 3d 890, 897, 773 N.E.2d 1277 (5th Dist. 2002).  Similarly, an arbitrator does not have the authority or the discretion to rewrite the express terms of a contract negotiated and agreed to by the parties. *Watts & Son, Inc., supra.*

**1.  The Agreement and Illinois Law Require a Finding of Breach**

Traditional contract interpretation principles in Illinois require that "an agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used**.** It is not to be changed by extrinsic evidence"**.** *Western Illinois Oil Co. v. Thompson, 26 Ill. 2d 287, 291, 186 N.E.2d 285 (1962).* In interpreting contracts, a court initially looks to the language of a contract alone. See, *Rakowski v. Lucente,* 104 Ill. 2d 317, 323, 472 N.E.2d 791 (1984) (both the meaning of a written agreement and the intent of the parties is to be gathered from the face of the document **without assistance from extrinsic evidence**) (emphasis added).

This rule of contract interpretation has been followed by a number of appellate courts in

numerous cases. A recent case is *Paul B. Episcope, Ltd. v. Law Offices of Campbell & Di Vincenzo*, 373 Ill.App.3d 384, 391, 869 N.E.2d 784 (1st Dist. 2007). There, the First District stated that

> [A]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not changed by extrinsic evidence.' If no ambiguity exists in the writing, the parties' intent must be derived by the trial court from the writing itself, as a matter of law. (Citations omitted.)

Section 22.1 of the Agreement titled "*Default: Termination by Lessor*" says that "[i]f default shall be made in the due and punctual payment of ***any*** rent, ***royalty or any part thereof***" the agreement "***shall terminate***" upon the date specified in Vermilion's notice of default given in accordance with the Agreement. (See, Notice of Default, attached as Exh. "C"). The uncontroverted evidence of Vermilion's notice of default to Black Beauty left no alternative to Ump. Lambros but to rule in accordance with the Agreement and Illinois law and to find that the Agreement had terminated subsequent to Vermilion's Notice of Default and Black Beauty's failure to pay the deficiencies (which it could have done "under protest."[12]

Further, in addition to ignoring the clear and unambiguous language of the Agreement, Ump. Lambros based his award regarding default and termination on unsupported extrinsic evidence and incongruous conclusions of law. (See, Vermilion's Motion to Vacate in Part Arbitration Award, ¶¶ a–j, pp. 2-4.)  Each of Ump. Lambros' findings or conclusions demonstrate that the Interim Award fails to comply with the Agreement or Illinois law requiring this Court to vacate those portions of the Interim Award denying Vermilion's Claims and remedies, including termination.

---

[12] Vermilion submitted its Post-Hearing Brief addressing all of the applicable Illinois law.  (Exh. "D" attached hereto).

**2. The Interim Award Ignores the No-Waiver Clause of the Agreement and Thereby Fails to Fully Compensate Vermilion for Its Losses**

After finding in favor of Vermilion on the threshold issue that BLET and AMLF were **not** deductible in the calculation of royalties, Ump. Lambros denied Vermilion recovery for payment deficiencies prior to November 1, 1999. (Exh. B, p. 7.)  This finding again disregarded the plain language of both the Agreement and the estoppel certificate.[13]

Section 22.4 of the Agreement states that

 [n]o failure by Lessor to insist upon the strict performance of any covenant, agreement, term or condition of this agreement or to exercise any right, power or remedy consequent upon a breach thereof, and no acceptance of full or partial performance or payment of royalties during the continuance of any such breach, shall constitute a waiver of or consent to any such breach or of such covenant, agreement, term or condition. No waiver of any breach shall affect or alter this agreement, but each and every covenant, agreement, term and

---

[13] In his Award, Ump. Lambros made determinations that theories of estoppel and laches barred Vermilion's Claims. (Exh. B, pp. 7 – 11.) The undisputed facts did not support these findings. The uncontroverted evidence relating to the express language of the modification to the Estoppel Certificate executed by Mr.Frederick Keady, President of Vermilion, the uncontroverted testimony of Mr. Keady relating to Vermilion's lack of knowledge of Black Beauty's default at the time of executing the Subordination Agreement for Terre Haute Bank and the applicable Illinois law do not support Ump. Lambros' "estoppel"findings. (See, Vermilion's Post Hearing Brief and record cites therein pp. 44–52, Exh. C attached hereto.) Similarly, no evidence or law was cited to support a finding of laches. Rather, the express language of the Agreement relating to Lessor's non-waiver of rights admitted into evidence barred any "laches" claims that Black Beauty and its party arbitrator argued. (Exh. A, Section 22.1.)

condition of this agreement shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

Ump. Lambros *ignored* the language of Section 22.4.

Additionally, Section 14.1 of the Agreement states:

Lessee shall have the right to mortgage, assign, sublease, or set over any of its estate, interest or rights hereunder or any part thereof…**with the written assumption by the transferee of all of the obligations of Lessee in a form satisfactory to Lessor** … .

(emphasis added)

Upon Black Beauty's assumption of the Agreement[14], Vermilion executed an Estoppel Certificate.[15] Black Beauty asserted that Vermilion was estopped from seeking payment for unpaid royalties upon execution of the Estoppel Certificate.[16] The Estoppel Certificate stated in relevant part that:

---

[14] Ump. Lambros ignored the evidence regarding Black Beauty's failure to comply with Section 14.1.  (See, Exh. D, p. 48, 58.)

[15] Black Beauty alleged that because Vermilion signed the so-called "estoppel certificate" of  July 15, 1999, it was estopped from recovering any underpayments that had begun before that date and continued through December 31, 2004; and alternatively was estopped from recovering underpayments from periods prior to that date. This argument ignores Vermilion's modifications to the estoppel certificate (made at the invitation of Ron Laswell, predecessor lessee CEO). These modifications state that Vermilion expressly does not waive any rights from prior periods regarding the price and volume of coal, and reserved all rights from prior periods. (See, Exh. D.)

[16] Black Beauty also argued that estoppel applied to a Subordination Agreement executed by Vermilion in which Vermilion stated that Black Beauty was not in default of the Agreement. This statement was made prior to discovery of Black Beauty's practice of deducting BLET/AMLF from the calculation of royalties. This estoppel defense must fail for several reasons. The uncontroverted

to the best of Lessor's knowledge, no dispute or default under or breach of the Agreement exists...Lessee has timely paid all rentals and royalties under the agreement which have become due and payable. Lessor has relied upon Lessee's representations rather than Lessor's rights of financial and engineering audit and inspection... and by its execution of this Estoppel Certificate, Lessor *does not waive, and expressly retains all rights* pursuant to the Coal Mining Agreement.

(Emphasis added). (Attached hereto as Exh. "E").

In the Illinois case of *Transcraft Corp. v. Anna Indus. Devel. Co.,* 223 Ill. App. 3d 100, 584 N.E.2d 1033 (5th Dist. 1991), the contract contained a "NO WAIVER" clause very similar to the one at issue in this case which stated:

The failure of either party, in any one or more instances[,] to demand strict performance or observance of any of the terms and conditions of the agreement or to take advantage of any rights hereunder [ ] shall not operate or be construed as a waiver of any such terms and conditions or the relinquishment of any such rights but the same shall continue and remain in full force and effect.

---

testimony of Mr. Keady established that at that time, and all times between December 15, 1999 and August 22, 2002, Vermilion was ignorant regarding Black Beauty's underpayments because (1) it relied upon the false monthly reports submitted by Black Beauty, and (2) it also relied upon a false certificate of compliance, dated Feb. 14, 2000, which was submitted by Black Beauty to Vermilion's lender. (See, Exh. D, pp. 54 – 61.) Further, Black Beauty lacked any legally protected interest in the Feb. 16, 2000 "estoppel" certificate, which was for the sole benefit of Vermilion's lender.

*Id.* at 100.

Ump. Lambros' ruling that Vermilion could not recover for defaults in the payment of royalties for the period prior to Black Beauty's assumption of the Agreement ignores the plain and unambiguous provisions of the Agreement.  Further, the Estoppel Certificate did not constitute a waiver of Vermilion's rights to payment of royalties in accordance with the Agreement.

Again, Ump. Lambros ignored the No Waiver clauses in both the Addendum to the Estoppel Certificate and the Agreement in finding that Vermilion could not recover the underpayments which occurred before the Agreement was assigned to Black Beauty. This decision was made despite the clear and unambiguous language of the Agreement and the Estoppel Certificate and contravenes Illinois law. The award is based on some feeling, policy, body of thought or law that is outside the relevant documents in this case and therefore does not draw its essence from the agreement and must be vacated.

### 3. Illinois Law Requires a Finding that Black Beauty Repudiated the Agreement

Ump. Lambros, in complete opposition to established Illinois law, found that Black Beauty did not repudiate the Agreement. In *Stonecipher v. Pillatsch*, 30 Ill. App. 3d 140, 332 N.E.2d 151 (2d Dist. 1975), the court reiterated the standards relating to the repudiation of a contract and the treatment of such an anticipatory breach under Illinois law, stating as follows:

> When a party bound by an executory contract gives notice of his intention not to comply with his obligations, the other contracting party may accept such notice as an anticipatory breach and treat the contract as ended without waiting for the completion of the contract by its terms. 30 Ill.App.3d at 143.

See, *Lake Shore & Michigan S. Ry. Co. v. Richards* 152 Ill. 59, 80 (1894); *Hull v. Croft*  132 Ill. App. 509, 510 (2d Dist. 1907). See also *Decatur Cemetery Land Co. v. Bumgarner,*  7 Ill.App.3d 10, 12-13, 286 N.E.2d 501 (4th Dist. 1972); *Zatlin v. Davenport,* 71 Ill.App. 292, 294 (3d Dist.

1897); (4 Corbin on Contracts, § 959, at 940-941 (1952). In order to justify the adverse party in treating a renunciation as an anticipatory breach of a contract there must be a definite and unequivocal manifestation of intention that the party will not render the promised performance when the time fixed for it in the contract arrives. (4 Corbin, *supra* at § 973, at 960; 23 Williston on Contracts § 63:45 at 620-21 (4th ed. 2002). A definite statement to the promisee that the promisor either will not or cannot perform the contract will operate as an anticipatory breach. (4 Corbin *supra* at § 959, at 941; 23 Williston *supra* at § 1322, at 134.) *Stonecipher, supra*; *Keep Productions, Inc. v. Arlington Park Towers Hotel Corp.*, 49 Ill. App. 3d 258, 364 N.E.2d 939 (1st Dist. 1977); *Farwell Constr. Co. v. Ticktin,* 59 Ill. App. 3d 954, 376 N.E2d 621 (1st Dist. 1978); 4 Corbin *supra* § 959, at 852; *Restatement (Second) of Contracts* § 25, (1981); *First National Bank & Trust Co. v. First National Bank*, 178 Ill. App. 3d 180, 533 N.E.2d 8 (1st Dist. 1988). See also *Wilmette Partners v. Hamel,* 230 Ill. App. 3d 248, 594 N.E.2d 1177 (1st Dist. 1992).

In *First National Bank*, the court distinguished *Farwell Constr. Co.*, *supra*. The *Farwell* defendants argued their refusal to perform did not constitute an anticipatory breach because (1) the parties disagreed on the interpretation of the contract, and (2) the time within which defendants' duty to perform a condition under the contract had not expired. 178 Ill.App.3d at 186. Similarly, in this case, the evidence proved that the time to perform had come and Black Beauty had the option under the contract to pay over objection and request arbitration. Black Beauty failed on both accounts. There is no question but that under Illinois law, Black Beauty repudiated the Agreement. Ump. Lambros' ruling was inapposite to Illinois law and therefore exceeded his powers requiring that his ruling regarding repudiation be vacated.

**4.    Black Beauty's Actions Constituted Fraud Under Illinois Law**

Illinois law requires that a party with superior knowledge of material facts, when given an opportunity to disclose such facts, is under a duty to disclose them and a failure to do so constitutes fraud. *Ill. Cent. Gulf R.R. Co. v. Dep't. of Local Gov't Affairs,* 169 Ill.App.3d 683, 689-90, 523 N.E.2d 1048 (1st Dist. 1988).  Under Illinois law, actual knowledge will be imputed to a defendant who has acted recklessly with regard to whether a representation is true. *Duhl v. Nash Realty, Inc.,* 102 Ill.App.3d 483, 493, 429 N.E.2d 1267 (1st Dist. 1981).

Contrary to Illinois law, Ump. Lambros determined that Black Beauty did not commit fraud. This ruling was made despite evidence that Black Beauty reported adjusted selling prices on royalty reports provided to Vermilion without disclosing the nature of the adjustments or even that there were any adjustments despite the fact that it was improperly deducting BLET/AMLF as severance taxes. (Exh. D, pp. 54–60.) Black Beauty's internal reporting had blank columns where severance taxes would ordinarily be listed. (Exh. D, p. 57.) A key reason for Vermilion's lack of awareness of those deductions was Black Beauty's submittal of false monthly reports representing the altered, lower price as the actual price Black Beauty received from customers. (Exh. D, p. 57.)

Two other cases have virtually identical facts regarding price disclosure as the instant case (as well as the same defendant) and, taken together, provide a "bright line" test for fraud. None of the three agreements required Peabody to report any price information. See, *Hemenway v. Peabody Coal Co.,* 159 F.3d 255 (7th Cir. 1998); *Reis v. Peabody Coal Co.,* 997 S.W.2d 49 (Mo. Ct. App. 1999).  In *Hemenway*, Peabody in fact reported none. In *Reis* (as in this case), Peabody voluntarily made partial disclosure of altered information, upon which the lessor relied, and Peabody was found to have committed fraud.

A party to a contract is not under a legal obligation to disclose every pertinent fact; however, concealment of a fact which one has a duty to disclose may serve as a substitute element for an affirmative false representation. *Reis, supra*. A duty to disclose arises from a classical fiduciary

16

relationship, from a partial disclosure of information, or from particular circumstances such as where one party to a contract has superior knowledge and is relied upon to disclose this knowledge. *Id.* at 60.

*Reis* involved a voluntary partial disclosure of price information not required by a written agreement. The disclosure made by Peabody in *Reis* was held to be a partial disclosure. Black Beauty argued that *Reis* is distinguishable because here there was no written requirement for any disclosure. Even if there is no written requirement for disclosure in the Agreement, however, once a disclosure is made (here it is the method of calculating royalties), the party with superior knowledge has a duty to disclose material facts related to such disclosure and nondisclosure of such facts constitutes fraud. *Ill. Cent. Gulf R.R. Co., supra.* The court in *Reis* held that "when a party makes a partial disclosure, the party then has a duty to tell the whole truth." *Id.*

Ump. Lambros' ruling on fraud is particularly egregious when considering the decisions of the courts in *Hemenway* and *Reis*, since both cases involved Peabody Coal, the parent of Black Beauty, and were decided after Black Beauty accepted assignment of the Agreement in this case.

Section 26 of the Agreement includes an express covenant of good faith and fair dealing. It states, "It is the intention of both parties to successfully promote and operate an underground coal mine to remove and sell the coal encompassed in this agreement. To that end, both parties agree to cooperate with each other and that each owes the other a duty of ***good faith dealing***." Here, both parties have an express duty of good faith dealing (Section 26.1). Additionally, a duty of good faith and fair dealing is implied in every contract under Illinois law *Dayan v. McDonald's Corp.*, 125 Ill. App. 3d 972, 991, 466 N.E.2d 958 ( 1st Dist. 1984). Its purpose is to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract. *Cramer v. Ins. Exch. Agency,* 174 Ill. 2d 513, 523-24, 675 N.E.2d 897 (1996).

17

The evidence has shown that Black Beauty persistently and flagrantly breached its duty of good faith dealing by vexatiously resisting Vermilion's attempts to enforce the Agreement, by driving up Vermilion's costs of arbitrating this matter, and by retaliating against Vermilion for its efforts to enforce the Agreement.  However, Ump. Lambros' Interim Award ignored Vermilion's demand for the benefit of its bargain in this regard; he rather conjured "quasi-good-faith affirmative defenses" for Black Beauty (not raised by Black Beauty) in the matters of breach, default/termination, repudiation, and fraud, contrary to the express provisions of the Agreement and applicable Illinois law. Ump. Lambros refused to allow Vermilion to present evidence and argument on bifurcated issues of damages and termination prior to his ruling on termination in violation of the Panel's own order of August 24, 2004.

### III.    Those Portions of Ump. Lambros' Award in Contravention of the Panel's Bifurcation Order Prejudiced Vermilion

Pursuant to 9 U.S.C. § 10(a) (3), of the FAA, the Award should be vacated as to those portions denying Vermilion's remedies and damages for default and Black Beauty's breach of its obligations under the express provisions of the Agreement on the grounds that Ump. Lambros refused to hear evidence material and pertinent to the controversy.[17] Vermilion was not given the opportunity to present evidence and argument on damages and remedies prior to the Interim Award resulting from Ump. Lambros' "rush to judgment" regarding the bifurcated issues.[18]  Specifically,

---

[17] This also constitutes represents a violation of Section 10(a) (4) of the FAA.

[18] After the Interim Award and prior to the Panel's entry of the Final Award, Vermilion's counsel sent the letter attached as Exh. "F" to Ump. Lambros identifying Vermilion's conundrum caused by his premature ruling on the damage/remedy issues in the Interim Award, and requested findings of fact and conclusions of law in support of the Interim Award relating to Vermilion's claims for breach of contract, default/termination, fraud, anticipatory repudiation and remedies. Black Beauty

the Award was in contravention of the Panel's Order of August 24, 2004, which bifurcated liability issues from accounting, damages and termination.

In July of 2004, the parties were asked to identify the issues for hearing by the Panel. Accordingly, Vermilion submitted its Issues for Arbitration. (See, Exh. D to Vermilion's Complaint filed in this case).  On August 24, 2004, the Panel issued its order regarding the issues to be arbitrated at the 11/08/04 hearing.  (See, Exh. E to Complaint).  In its order, the Panel bifurcated from the 11/08/04 hearing "remedies for any breach including accounting, damages, or termination." (See, Exh. E, par. 1(c), to Complaint).   Additionally, the Panel reserved its right to determine jurisdiction and hear evidence and argument on certain of Vermilion's other issues at a time following the 11/08/04 hearing. (See, Exh. E,  par. 2, to Complaint).

Contrary to his own order, Ump. Lambros preemptively, and without notice decided matters that were bifurcated for a second hearing, without holding the scheduled hearing, including his ruling against Vermilion on the issue of termination of the Agreement.[19] Vermilion was further prejudiced by Ump. Lambros' ruling on denial of Vermilion's Request for Findings of Facts and Conclusions of Law relating to Vermilion's claims for breach of contract, default/termination, fraud

---

moved to Strike Vermilion's Request. In his Final Decision and Award, Ump. Lambros denied Vermilion's Request for Findings of Facts and Conclusions of Law and Black Beauty's Motion to Strike. (The Final Award is attached hereto as Exh. "G".)

[19] At the hearing, Ump. Lambros improperly allowed Black Beauty to offer testimony and argument on the amount of monies spent by Black Beauty in developing the mines and the persons who would be unemployed if the Lease was terminated.  This was contrary to the Panel's order bifurcating remedies, including termination.  Vermilion was denied any opportunity to offer any evidence of its damages or to rebut Black Beauty's unsupported damage claims.

and anticipatory repudiation, breach of express duty of good faith and fair dealing, and remedies as to those claims. Thus, the Award should be vacated as to those portions of the Award.

## IV.    CONCLUSION

Arbitration of this matter has utterly failed to provide its promised benefits of promptness and economy. Ump. Lambros' awards failed to make Vermilion whole for nearly $200,000 (including interest) of prior period underpayments, without stating any finding of fact or conclusion of law in support of that omission. Vermilion was awarded less than two thirds of its costs of arbitration, and none of the legal fees it incurred in the agonizing and drawn-out arbitration process. Vermilion's additional remedies of termination, and its claims for breach of contract, repudiation, fraud, and breach of Black Beauty's express duty of good faith dealing were brushed off by Ump. Lambros in patent disregard of the stated terms of the Agreement and applicable Illinois law.

**WHEREFORE,** Vermilion respectfully requests that this Court vacate those portions of Judge Lambros' Interim Award denying Vermilion its remedies, including termination, for breach of contract, default, repudiation, fraud, and breach of Black Beauty's express duty of good faith dealing.

Respectfully Submitted,
Vermilion Coal Co.

/s/ Deborah G. Cole
One of the Attorneys for Vermilion Coal Co.

Deborah G. Cole, ARDC No. 6184806
DGCole Law
1400 North LaSalle Street
Chicago, Illinois 60610
Tel: (312) 751-0272
Fax: (312) 751-4133
E-mail: dcole@dgcolelaw.com

John Barr    ARDC No. 00120308
Barr & Barr
1301 East Mound Road, Suite 350
Decatur, IL 62525-0050
Tel:  (217) 875-5311
Fax: (217) 875-5742
E-mail: sej4barr@aol.com

CERTIFICATE OF SERVICE

I hereby certified that on September 28, 2007, I electronically filed the Plaintiff's Memorandum In Support Of Vermilion Coal Company's Motion To Vacate Arbitration Award, In Part, with the Clerk of the Court using CM/ECF System which will send notifications of such filing to the following:

Jean M. Blanton
Ziemer, Stayman, Weitzel & Shoulders, LLP
20 NW First Street, P.O. Box 916
Evansville, Indiana 47706-0916
E-Mail: jblanton@zsws.com

/s/ Deborah G. Cole
ARDC No. 6184806

**E-FILED**
Friday, 28 September, 2007  10:56:46 AM
Clerk, U.S. District Court, ILCD

# EXHIBIT A

## COAL MINING LEASE

THIS LEASE, made as of November 21, 1994, between Vermilion Coal Company, a corporation of Delaware ("Lessor"); and Laswell Coal Co., Inc., an Indiana corporation ("Lessee");

### WITNESSETH

**b 0 3 4**

In consideration of the sum of Ten Dollars ($10.00) cash, receipt of which is hereby acknowledged, and the performance and observation of the terms of this lease as hereinafter set forth to be performed and observed by lessee, and receiving as rent the royalties, rentals, and other payments hereinafter provided for, Lessor hereby leases to Lessee, for the period of twenty years from the date hereof, subject to termination or renewal for up to two (2) additional twenty year periods until all the coal which can be economically mined and removed has been mined and removed and the reclamation thereof has been finally approved by all the state and/or Federal agencies which now have or shall hereafter have jurisdiction or control of such mining operations, and all the bonds therefor have been fully released, all as hereafter provided in Article XX hereof, the sole and exclusive right of mining and removing, by any method of mining, all Illinois No. 6 and Illinois No. 7 seam coal of those certain parcels of land, identified respectively as Area A & B, containing in aggregate 9,371 net acres, more or less, of Illinois Number 6 seam coal; and Area E, containing in the aggregate 2,223 net acres, more or less, of Illinois Number 6 seam coal, as further described in Exhibit A (a map) to this Coal Lease Agreement.

The rights herein leased are limited to such as Lessor possesses and has the lawful right to lease and to such as Lessor owns under the deeds covering said lands or said coal and appurtenant rights, and it is agreed that Lessor does not warrant its title to the leased premises or any portion thereof. However, upon the assertion of an adverse claim to any portion of the leased premises, Lessor shall render all assistance possible to Lessee in defense against such adverse claim. It is further agreed that if a court decree (after exhaustion of appeals) or by agreement of the parties hereto it is determined that the adverse claim is valid and such adverse claim is of such nature that Lessor does not have sufficient title to such portion of said leased premises to permit Lessee's mining of the coal therein, then, to the extent the Lessee has paid royalties to Lessor on coal mined in such portion, such royalties shall be refunded to Lessee.

Lessor also grants to Lessee for the period of this lease all of the coal mining rights and


PLAINTIFF'S EXHIBIT
159


CONFIDENTIAL

privileges that Lessor owns under the deeds by which it now holds title to the lands included herein.

EXCEPTING AND RESERVING, HOWEVER, from this lease, and to the Lessor all of the oil, gas and other minerals and mineral substances, timber, natural gas and electric energy storage values, together and other products and values of every kind and description therein and thereon, with the right to exploit, mine, remove and take away the entire amount and body thereof, for all purposes other than those for which this lease is made with the right to remove the same; PROVIDED, HOWEVER, that exercise of the ownership and rights so excepted and reserved shall not unreasonably interfere with the requirements, convenience and safety of operations of Lessee.

Lessor and Lessee recognize the importance of environmental protection and the necessity of proper ecological balance and to further these objectives Lessee agrees to conduct all operations hereunder on the leased premises with utmost caution and in compliance in every respect with all applicable laws of the State of Illinois and the United States of America now existing or hereafter enacted, and all rules and regulations promulgated thereunder.

IT IS UNDERSTOOD, however, that the lands included in this lease are in an area committed to the mining and removal of coal and other minerals and that coal mining operations and other enterprises have been conducted by a lessee or lessees of Lessor or its predecessors in, upon and under the surface of said lands and in the general vicinity thereof, and, as one of the conditions for this lease, Lessee, its successors and assigns, shall indemnify and save harmless Lessor, its officers, agents and employees, and its successors and assigns, and its or their lessees, from all claims and damages or other relief, caused by or resulting from, directly or indirectly, any unnatural condition upon or under said lands and/or adjacent lands of Lessor as a result of such mining or other activities. IT IS A CONDITION HEREOF, that Lessee, its successors and assigns shall have no claim or right of recovery against Lessor, its successors and/or assigns, and its or their lessees, for any such damage. It is the intention hereof that said land is hereby leased to Lessee, AS IS, IN THE PRESENT CONDITION and subject to the rights of others as hereinabove set forth.

THIS LEASE is subject to the following terms and provisions which Lessee covenants with Lessor to perform and observe, viz:

CONFIDENTIAL

b 0 3 4

V00003

# ARTICLE I

## COVENANT TO DEVELOP; PERMITTING

**Section 1.1 Development.** Lessee shall at all times diligently and energetically open, develop and maintain operations in order that so long as fair prices are obtainable its capacity for mining, preparing and shipping coal shall be sufficient to meet the demands and requirements of the market to the extent that the same can reasonably be done hereunder; and Lessee shall report promptly in writing to Lessor any suspension of operations, reasons therefor and expected duration thereof.

**Section 1.2 Permitting.** Lessee agrees that upon execution of this lease, it will, in its name and at its expense, promptly commence the necessary procedures with the appropriate state and/or federal agencies having jurisdiction of such mining operations and obtain and maintain in effect the requisite permit or permits for the conduct of such mining operations. Lessee also agrees to continue with subsequent required permitting procedures with said state and/or federal agencies to the end that the mining operations contemplated under this lease shall be continuous, insofar as possible under applicable laws, and the regulations promulgated thereunder, until all the coal herein leased, which can be mined and removed by such mining methods as Lessor may approve, has been mined and removed. In the event this Lease shall be terminated or canceled for any reason prior to completion of operations hereunder and Lessee shall have obtained the requisite permit or permits for the conduct of such mining operations from such agencies, then Lessee hereby covenants and agrees that it shall promptly, upon request of Lessor, assign and/or otherwise transfer said permit or permits, pursuant to applicable state and Federal laws and regulations, to such other party or parties as Lessor may designate; provided, however, the assignee shall assume all obligations in connection with said permits, including all bonds associated therewith and release Lessee from such obligation and bonds.

**Section 1.3** Whenever the term "such mining methods as Lessor may approve" is used in this Lease, such term shall mean that: Lessor shall not have any right to approve or disapprove Lessee's mining methods, so long as Lessee's proposed mining methods do not result in material adverse consequences to Lessor or Lessor's successors and assigns, it being specifically understood and agreed that Lessee plans and intends to utilize room and pillaring method of mining for the removal of all coal.

No 0 3 4

CONFIDENTIAL

3

ARTICLE II

PRODUCTION ROYALTY

**Section 2.1** Amount of Royalty. Lessee shall pay to Lessor as rent, a royalty of the greater of:

    (a) Five percent (5.0%) of Lessee's Gross Sales, as hereinafter defined; or
    (b) The Advance Minimum Annual Rental, as set forth in Article III herein, for coal mined hereunder, to be calculated, reported and paid on a quarterly basis.

**Section 2.2** Date for Payment of Royalty; Interest. On or before the twentieth (20th) day of each calendar quarter, Lessee shall pay to Lessor for the coal mined hereunder during the immediately preceding calendar quarter at the higher rate set forth in Section 2.1 above. Lessee will pay interest to Lessor on any royalty amounts due and not paid by the 20th day of the calendar month at the effective prime interest rate as then charged by Morgan Guaranty Trust Company of New York and calculated daily from the date said amounts are due.

**Section 2.3** Reporting of Quantity of Coal Mined and Sold. Lessee shall, on or before the fifteenth (15th) day of each calendar month, furnish to Lessor a written report, certified as to correctness by such agent as Lessee may designate having personal knowledge of the facts, showing the quantity of coal mined hereunder during the immediately preceding calendar month, using as a basis the weights of all coal shipped and ascertaining the quantity of all other coal in a manner satisfactory to the Chief Engineer of Lessor, and accounting properly for changes in raw and clean coal inventories; and Lessee shall comply with any further rules and regulations for the accurate ascertainment and report of the quantity of coal mined hereunder of the selling price thereof that may reasonably be prescribed by said Chief Engineer.

In the event Lessee shall mix coal produced hereunder with other coal prior to shipment, Lessee shall comply with such reasonable rules and regulations as the Chief Engineer of Lessor shall from time to time prescribe for the purpose of ascertaining with reasonable accuracy the quantity of coal produced hereunder.

**Section 2.4** Calculation of Royalty; Gross Selling Price Defined. For the purpose of calculating Gross Sales, the term "Gross Selling Price" as used herein shall mean the actual price

CONFIDENTIAL

0 3 4

V00005

4

Revised Mar. 6, 1995

paid for coal sold to a bona fide purchaser f.o.b. the loading point after preparation, if any, and loading for final destination, less any sales tax and/or severance imposed thereon, but without deduction for selling commissions, advertising, credit losses, or other expenses, but with adjustment for transportation expenses paid by lessee, coal quality bonuses or penalties, and discounts or allowances actually allowed to arms-length wholesalers; provided, however, that if Lessor gives notice to Lessee in writing that in Lessor's reasonably judgment a particular transportation contractor or purchaser is not a bona fide purchaser or arm's length wholesaler or transportation contractor, Lessor may elect to substitute therefor the prevailing market price of coal or such transportation contractor; provided further, that for any coal consumed on or off the leased premises without sale by Lessee the gross selling price for the purpose of computing the royalty shall be the prevailing market price, as determined above, of such coal at the time of shipment from the leased premises or, if used on the leased premises, at the time of use.

The term "bona fide purchaser" shall mean a purchaser who pays valuable consideration in good faith without intending to take unfair advantage of third parties, including Lessor, and in no case shall that phrase include persons or parties affiliated with Lessee, either directly or through any joint ownership.

**Section 2.5  Calculation of Gross Sales**.  Gross Sales shall be defined as Gross Selling Price, multiplied by the number of tons mined and sold from the leased premises during the time period for which the Production Royalty amount is to be calculated.

V00006

5

Revised Mar. 6, 1995

~~(c) Equipment lease expense shall be ordinary, customary and reasonable, and~~ reflect prevailing market and disposal values of leased equipment, and lease imputed interest rates at the going market rate at the time the lease is entered into.

(d) Any cash or noncash expense not directly incurred in the course of Lessee's operation of the Leased Premises shall be excluded as an expense in calculating Gross Operating Profit.

(e) State and Federal Income Tax shall not be included as an expense in calculating Gross Operating Profit.

(f) Anything deductible for taxes, plus costs of land and development thereof, depreciated over a twenty (20) year period.

~~(g) A sample calculation of Gross Operating Profit is set forth as Exhibit C hereto.~~

Section 2.6 **Unmined or Lost Coal**. Tonnage royalty which may be owed by Lessee for coal in place left unmined or rendered unminable or that may be lost or destroyed on the leased premises as provided in Section 7.1 hereof shall be based on the fair market value of such coal as determined above, if properly sized and cleaned, at the time when such coal should have been mined or at the time when such coal is lost or destroyed, as may be appropriate under the terms of this lease.

Lessor's approval of Lessee's mining plan constitutes a waiver of any claim by Lessor that Lessee left unmined coal or rendered coal unminable so long as Lessee reasonably executed and complied with such mining plans. Lessor shall have ninety (90) days from receipt of updated mining maps from Lessee within which to make any claim with respect to Lessee not following or reasonably executing its mining plan under this section; Lessor's failure to make such claim within ninety (90) days shall constitute a waiver and, thereafter, Lessor is forever barred from making any claim as to unmined or unminable coal.

## ARTICLE III

## ADVANCE MINIMUM ANNUAL RENTAL

Section 3.1. **Amount and Payment: Interest**. Lessee shall pay to Lessor, as advance minimum annual rental on account of coal mined or to be mined as advanced minimum annual rental on account of coal mined or to be mined hereunder, the sum of Twenty Thousand Dollars ($20,000) the first year and the sum of Forty Thousand Dollars ($40,000) for

6

the second year, beginning on the date first herein set forth, and ending on the three hundred and sixty-fifth day thereafter. The advance minimum annual rental for the third and subsequent lease contract years are set forth in Table 1 below.

**Section 3.2 Lessee's Right to Drop Leased Acreage.** At any time not less than sixty (60) days prior to any anniversary of this Lease Agreement, Lessee may elect to drop either Areas A & B or Area E, from the lease by giving written notice to Lessor pursuant to the notice provisions hereto. In the event that Lessee elects to drop acreage, the advance minimum annual royalty applicable to the acreage retained by Lessee, as set forth in Table 1 below shall be payable for future lease contract years.

### Table 1--Schedule of Advance Minimum Annual Royalties

| Lease Contract Year | Attributable to Areas A&B | Attributable to Area E | Combined Advance Minimum Royalty for Areas A,B&E |
|---|---|---|---|
| 1 | $ 15,000 | $ 5,000 | $ 20,000 |
| 2 | $ 30,000 | $ 10,000 | $ 40,000 |
| 3 | $ 45,000 | $ 15,000 | $ 50,000 |
| 4 | $ 95,000 | $ 30,000 | $ 100,000 |
| 5 | $ 190,000 | $ 60,000 | $ 200,000 |
| 6 | $ 285,000 | $ 90,000 | $ 300,000 |
| 7 | $ 380,000 | $ 120,000 | $ 400,000 |
| 8 & subsequent | $ 475,000 | $ 150,000 | $ 500,000 |

**Section 3.3 Payment Dates.** Payment of advance minimum annual rental shall be made on each anniversary of this Lease Agreement. Lessee shall pay interest to Lessor on the amount of any advance minimum annual rental due and not paid by the date such rental is due at the effective prime interest rate as then charged by Morgan Guaranty Trust Company of New York and calculated daily from the date said amounts are due.

**Section 3.4 Recoupment.** Lessee shall receive a credit against royalties due on coal mined during each calendar year to the extent of the amount of advance minimum annual rental paid for that calendar year to the extent of the amount of advance minimum annual rental paid for the preceding four (4) calendar years. Accordingly, Lessee shall not be required to remit any royalties until the royalties earned equal such minimum paid by Lessee. However, in no event shall Lessee pay less than the advance minimum annual

Revised Page 7
Jan. 23, 1995

CONFIDENTIAL

Fax:8224215089

royalties as set forth in Section 3.2

**Section 3.5 Failure to Perform; Force Majeure Excuse.** In the event of unavoidable interruption of or delay in its operations, due to strikes, accidents, acts of God, inadequate car supply, or causes of like character not within the control of Lessee, in any year, Lessee shall be excused from its obligation of diligent development and continuous operation pursuant to Section 1.1 for any period of time over thirty days during which Lessee's operations are delayed because of any of such causes. During the pendency of any Force Majeure, Lessee shall be obligated to use its best efforts to mitigate the cause of Force Majeure. However, the parties hereto recognize and agree that Lessee's obligation to pay advance minimum annual rental under the preceding Section 3.1 hereof is absolute, and shall not be subject to any force majeure excuse unless Lessee has previously paid total royalties which exceed the annual minimum royalties.

**Section 3.6 Modification of Minimum Rental.** Whenever, in the opinion of the Chief Engineer of Lessor and such agent as Lessee may designate, the quantity of unmined coal remaining which Lessee is or has become obligated to mine has been reduced or depleted so as to justify a modification, reduction, or suspension of advance minimum annual rental, such advance minimum annual rental may be modified, reduced, or suspended as the Chief Engineer of Lessor may in his sole discretion permit, and Lessee shall mine the same at the rate of production royalty provided for in Article II above.

## ARTICLE IV

## LESSEE'S RECORDS; INSPECTION

**Section 4.1** Lessee shall keep books of account at the mine, or such other place as Lessor may approve in writing, of the quantity of coal mined, used at the mines and shipped hereunder and said books shall be open at all reasonable times for inspection by Lessor or its agents for the purpose of comparing and verifying the reports rendered by Lessee under Article II hereof or for obtaining information as to the quantity of coal mined, used at the times and shipped during the period.

## ARTICLE V

## ENVIRONMENTAL LIABILITIES

**Section 5.1** Lessee shall be responsible for any pollution of air or water resulting from

8

coal and coal products, slack, dirt, slate and other waste materials deposited by it on the leased premises or arising or resulting from Lessee's operations hereunder, and Lessee shall indemnify and save harmless Lessor, its officers, agents and employees, from all claims, demands, prosecutions, fines, and judgments against Lessor, its officers, agents or employees, by reason of any such pollution and shall pay all costs and expenses incurred by Lessor, its officers, agents or employees, in defending any such claims, demands and prosecutions, and, at Lessee's expense, upon request of Lessor, Lessee shall defend Lessor against any and all such claims.

**ARTICLE VI**

**LESSEE'S MINING OPERATIONS**

Lessee covenants that it will use due care and diligence to protect the lands included herein from waste, injury or damage and to that end Lessee shall conduct its operations hereunder pursuant to Sections 6.1 and 6.2 hereof.

**Section 6.1  Mining Practices and Compliance with Laws.** Lessee shall, in accordance with plans of mining and descriptions thereof provided for in Section 6.2 below, but subject to the provisions of the state and/or federal law pertaining to the conduct of the mining of coal, mine the coal in the most effectual, workmanlike and proper manner, according to approved and suitable methods of modern mining utilizing rooms and pillar mining, and so that said mining shall not unreasonably interfere with the proper exercise of the rights hereinbefore excepted and reserved to Lessor; and Lessee shall comply in every respect with the laws of the State of Illinois and the United States of America now existing or hereafter enacted, and all the rules and regulations promulgated thereunder, relating to the conduct of operations for the mining of coal. However, in no event shall Lessee be obliged to mine coal that is not economically profitable for Lessee to mine.

**Section 6.2.  Approval of Mining Plans.** Lessee shall mine the coal in accordance with plans of mining and reclamation and descriptions thereof which shall be submitted by Lessee but not put in operation until approved by all appropriate regulatory authorities. Upon Lessor's request, Lessee shall furnish Lessor:

(i) a copy of Lessee's application for the mining permit, including the reclamation plan required by applicable Illinois law with the maps and drawings attached thereto; and

(ii) a statement of the post mining land use which is proposed to be made of the property herein following reclamation obligations

for review by said Chief Engineer, prior to its being filed with the state and/or federal regulatory agency responsible for issuance of such mining permits. No change in any plan so approved by applicable regulatory agencies shall be submitted to such agencies without the same being submitted to said Chief Engineer for his review.

In the event that Lessee deems it necessary for its mining operations to deviate materially from those set forth in its mining plans which have been previously submitted to Lessor and approved by Lessor, Lessee shall notify Lessor as to the details of such proposed modification of its mining operation for Lessor's review and approval. Should Lessor not object to such proposed deviation within sixty (60) days, the same shall be deemed approved by Lessor.

Should Lessee encounter an emergency which reasonably requires a material modification of its mining plans, Lessee shall notify Lessor of such emergency; unless Lessor objects to such modification within thirty (30) days, Lessor's failure to object shall be deemed as a waiver of Lessor's right to object to said modification.

Lessor shall not unreasonably withhold consent to the mining plans of Lessee. Withholding of consent for the following reasons shall be deemed to be unreasonable:

(a) In order to induce Lessee to modify the economic terms and conditions of this coal lease in favor of Lessor.

(b) In order to influence the sequence of mining Lessor's coal versus third-party coal which Lessor undertakes to include in its mine plan, for economic reasons.

**Section 6.3  <u>Mining Sequence of Coal Seams</u>**. It is conclusively agreed by the parties hereto that notwithstanding the fact that Lessee has the right hereto to mine both the Illinois No. 6 and Illinois No. 7 seams of coal within the leased premises, mining of the Illinois No. 6 seam of coal shall take precedence in the sequence of mining. Any mining plan which undertakes to mine the Illinois No. 7 seam of coal prior to, or concurrently with the nearby Illinois No. 6 seam of coal shall be subject to the express consent of Lessor, which may be withheld for any reason.

CONFIDENTIAL          b 0 3 4

10

V00011

## ARTICLE VII

### LESSEE'S LIABILITY FOR NONCOMPLIANCE

**Section 7.1** If at any time Lessee shall not conduct operations as provided in ARTICLE VI hereof and loss of coal which Lessee is obligated to mine or loss of other coal of Lessor may thereby result or be threatened, the Chief Engineer of Lessor shall have authority to determine where and in what particular those provisions of said ARTICLE VI are being violated, and, in the event of a failure of Lessee to cure such violation within thirty (30) days of receipt of written notice from Lessor specifying such violation, to enter for Lessor and stop the work at such place until Lessee shall comply with said ARTICLE VI; and Lessee shall pay to Lessor the full amount of royalty, at the rate provided in ARTICLE II hereof, on the estimated tonnage of coal lost which Lessee is obligated to mine by reason of failure of Lessee to conduct operation as required by said ARTICLE VI, in the same manner as if said coal had been mined and removed; and Lessee shall compensate Lessor for the full amount of any other coal of Lessor that is lost by reason of the failure of Lessee to conduct operations as required by said ARTICLE VI.

## ARTICLE VIII

### ENGINEERING REQUIREMENTS; AUTHORITY OF CHIEF ENGINEER OF LESSOR; SURVEY DATA; PRESERVATION OF SURVEY CONTROL (TRIANGULATION) STATIONS

**Section 8.1** **Engineering Requirements; Authority of Chief Engineer of Lessor**. Lessee shall employ a competent engineer to make surveys, determine elevations, prepare plans and maps of the mine workings and prepare and keep up, on a scale to the approval of the Chief Engineer of Lessor, a map which shall be posted every three (3) months and shall show accurately and completely, the boundaries of the lands included herein, as submitted by Lessee to applicable governmental authorities. Lessor and its agents shall at all times have access to the maps, plans and tracings of Lessee, and may take therefrom copies of such portions as may be desired.

**Section 8.2** **Survey Data; Preservation of Survey Control (Triangulation) Stations**. Upon Lessor's request, Lessee shall furnish Lessor's Chief Engineer with a copy of all information, including but not limited to, maps, survey field books and traverse sheets, resulting from surveying performed on behalf of the Lessee within the leased premises. Lessee shall use

No. 0 3 4    CONFIDENTIAL

11

due care to avoid the destruction of survey control or triangulation stations. However, if in Lessee's operation hereunder it becomes necessary to destroy one of said survey control or triangulation stations, then Lessor shall be notified at least thirty (30) days in advance of such destruction.

No 3 4

## ARTICLE IX

### FAILURE TO FURNISH PLANS OR MAPS

**Section 9.** If Lessee fails to furnish any plan or map as provided for in ARTICLE VIII hereof for fifteen (15) days after written demand therefor by the Chief Engineer of Lessor, Lessor may at its option employ a competent engineer to make surveys and to prepare such plan or map and Lessee shall pay to Lessor the full amount of expenses so incurred.

CONFIDENTIAL

## ARTICLE X

### PREVENTION OF FIRES; DUTIES OF LESSEE

Lessee shall use all reasonable care and precaution to prevent the occurrence of fires in timer of brush on the surface overlying the lands included herein and to cause the prompt extinguishment of any such fires, and shall cooperate with Lessor and his other Lessees or agents in extinguishing such fires on adjoining lands that may be liable to spread to or over said surface overlying the lands included herein. Lessee shall be responsible for all damage caused by fire to timber or forest growth or in any other respect on the surface overlying the lands included herein or adjoining lands that may be due to negligence of Lessee, its employees, agents or contractors.

## ARTICLE XI

### COAL FROM OTHER LANDS; WHEELAGE

**Section 11.1** In the event Lessee transports or ships coal from any property not owned by Lessor into, over, through or under any of the leased premises, Lessee shall pay to Lessor fifteen cents (15¢) per net ton of that coal, or, one percent (1.0%) of the average gross selling price per net ton of that coal, as gross selling price is defined in Section 2.4 above, whichever is greater, as wheelage for such transportation or shipment. Lessee shall report and make payment, pursuant to the provisions of Section 2.2 and 2.3 above, for coal transported or shipped hereunder. Lessee may transport or ship coal from any property not owned by Lessor into, over, through or under any of the leased premises at the sole discretion of Lessee, however, wheelage fees payable by Lessee to Lessor hereto shall not be subject to recoupment of Advance Minimum

12

Annual Rentals pursuant to Section 3.2 hereof. Furthermore, Lessee shall not deposit refuse derived from any property not owned by Lessor on the leased premises if Lessor serves upon Lessee a written objection thereto. However, nothing in this lease shall preclude Lessee from having the right to deposit gob, coal ash or fly ash (including all other refuse derived from coal burning boilers) into those portions of the underground mine which have been mined by Lessee, so long as Lessee has obtained all applicable governmental permits to do so. Furthermore, Lessor shall receive twenty percent (20%) of all net profits (if any) derived from the placement of said ash or refuse in said mine.

## ARTICLE XII
### INDEMNIFICATION

**Section 12.1**  Lessee shall conduct operations hereunder on its own behalf and not as agent or employee of Lessor and there shall be no privity of contract between Lessor and employees of Lessee. All employees, agents, contractors, subcontractors, and vendors of Lessee, whether on a wage or profit sharing basis, shall be selected, hired, directed, paid, and discharged only by Lessee. Lessee shall and hereby agrees to indemnify and save harmless Lessor, its officer, agents and employees, from and against any and all claims, demands, suits, judgments, recoveries and liabilities for injury to or death of any person or persons whomsoever and for loss of or damage to any property whatsoever, arising or in any manner growing out of the operations or activities of Lessee under or in connection with this lease. Lessee hereby further agrees to indemnify and save harmless Lessor, its officers, agents and employees, from and against any and all penalties, fines, prosecutions, statutory recoveries (whether civil or criminal) and government actions which arise from or are occasioned by the operations or activities of Lessee under or in connection with this lease.

## ARTICLE XIII
### TAXES AND ASSESSMENTS; COAL APPRAISAL REPORTS

**Section 13.1**  <u>Taxes and Assessments</u>. During the term of this lease and any extensions or renewals pursuant to ARTICLE XX hereof, Lessee shall pay and bear and reimburse Lessor for the expense of all taxes and assessments of every kind and character that may be levied or assessed by the Governmental authority against or upon the lands included herein or Lessor's ownership thereof, including, without limitation, excise, privilege or license

13

taxes based upon the acreage of land owned by Lessor in the State of Illinois, any exemption of acreage therefrom to be prorated to the acreage included in this lease; ad valorem taxes; and taxes levied or assessed on the coal mined hereunder, the privilege of mining said coal, the improvements or other property of Lessee in or on said lands, the leasehold rights of Lessee, and the income accruing to Lessee therefrom; and Lessee shall repay to Lessor the amount of any such taxes and assessments as shall be paid by Lessor, provided that, Lessor shall continue to be responsible for real estate taxes levied by Vermillion County and its various taxing districts on the undeveloped coal lands, leased to Lessee hereto, but not the improvements thereupon, which shall be the responsibility of Lessee, along with all other taxes which may be levied (except any taxes due on monies paid by Lessee to Lessor).

**Section 13.2  Method of Payment.**  Lessee shall pay such taxes and assessments to Lessor on or before the last day of each month.  Each monthly payment shall be equivalent to one twelfth (1/12) of Lessee's proportionate leasehold share of such taxes and assessments as estimated and calculated as lessor shall determine.  In case where Lessee's improvements occupy common acreage with the leased premises, taxes for both land and improvements shall be paid by Lessee.

**Section 13.3  Unmined Coal Taxes.**  There is presently no unmined coal tax in the State of Illinois.  In the event that such a tax is enacted, and becomes payable, such tax shall be payable by Lessee, except to the extent it incorporates, and supersedes, taxes on coal lands, in which that portion shall be paid by Lessor.

## ARTICLE XIV
### ASSIGNMENT

CONFIDENTIAL

**Section 14.1**  Lessee shall have the right to mortgage, assign, convey, sublease, or set over any of its estate, interest or rights hereunder or any part thereof, or any of its rights or interests in buildings and other improvements placed upon the leased premises by the Lessee, with the written assumption by the transferee of all the obligations of Lessee in form satisfactory to Lessor, with the clear understanding that such written consent will be subject to the royalty rates and other provisions hereinabove set forth for coal mined from the area, or coal seams therein, which are assigned, conveyed, subleased, or set over.  In the event of the assignment of this lease to a third party, Lessor reserves the right to readjust the terms of this agreement as

V00015

follows:

    (a)  The Minimum Advance Annual Rental shall be Six Hundred Thousand Dollars ($600,000) per year in year 9 and subsequent years.

    (b)  The Production Royalty shall be five percent (5%) of Gross Selling Price times the quantity sold.

If, within ninety (90) days of receiving notice of a proposed assignment, Lessor shall not have elected to readjust the terms hereof, they shall remain as is; provided that Lessee may assign this lease to a qualified coal operating company, which is affiliated with Lessee, without any change in the commercial terms thereof.

    **Section 14.2  Bankruptcy of Lessee.**  No judicial or other sale or transfer of any kind, whether under any writ, order or decree issued by any court or judicial officer or tribunal, or in compliance with any order or decree of any court or equity or in any proceedings in bankruptcy, shall have the effect of transferring this lease or any of the estate, interest or rights of Lessee for any time or term, except with the written consent of Lessor and the written assumption by the transferee of all the obligation of Lessee in form satisfactory to Lessor.

## ARTICLE XV
## WORKER'S COMPENSATION; LESSEE'S DUTIES

    **Section 15.1**  Lessee shall subscribe to and operate under the provisions of the Illinois Worker's Compensation Act, and make all necessary payments thereto, and such coverage shall also include drivers of any trucks which may be hired, rented or leased.  Lessee shall, upon request, furnish to Lessor certificate of such compliance, together with paid premium receipts.

    If at any time the subscription to said Worker's Compensation Act shall cease to be in force and effect, then Lessee shall suspend, and Lessor may stop, all operations of Lessee hereunder until such subscription shall be reinstated.

## ARTICLE XVI
## BLACK LUNG BENEFITS; INDEMNIFICATION; EVIDENCE OF FINANCIAL RESPONSIBILITY

    **Section 16.1**  Lessee hereby guarantees and agrees to indemnify and save harmless Lessor, its officers, agents and employees, from the payment of or any liability for benefits which

CONFIDENTIAL

15

may be required under the Black Lung Benefits Act (30 U.S.C. 901, et seq.) and under any laws or regulations of the State of Illinois, and Lessee agrees that during the primary period and renewals, if any, of this lease, it will furnish annually to Lessor evidence of financial responsibility for such black lung benefits under applicable federal and state laws, as well as regulations issued thereunder. Such evidence of financial responsibility shall consist of the following:

(a) in the event the Worker's Compensation law of the State of Illinois has been included in the list published by the Secretary of Labor of the United States of America under the Black Lung Benefits Act (30 U.S.C. 901, et seq.), such evidence shall consist of a certification from the officers administering the Worker's Compensation program for the State of Illinois certifying as to Lessee's black lung benefits coverage under those Worker's Compensation laws;

(b) in the event the Worker's Compensation laws of the State of Illinois are not included in the list published by the Secretary of Labor of the United States of America under the Black Lung Benefits (30 U.S.C. 901, et seq.), Lessee shall either:

(1) qualify as a self-insurer in accordance with regulations prescribed by said Secretary of Labor, or 

(2) insure and keep insured, with any stock company or mutual company or association, or any other person or fund, including any State fund, which is authorized under the laws of the State to insure Worker's Compensation, all black lung benefits payable under applicable federal and state statutes and regulations issued thereunder, and furnish a satisfactory certificate to Lessor evidencing such insurance coverage.

## ARTICLE XVII

## WAGE AND BENEFITS; INDEMNIFICATION AND BOND

**Section 17.1** Lessee hereby guarantees and agrees to indemnify Lessor, its officers, agents and employees, from payment of or any liability for, or resulting from, wages and benefits which may be due Lessee's employees or contractors.

## ARTICLE XVIII

## INSURANCE; CESSATION OF OPERATIONS

**Section 18.1 Amount of Insurance.** As a condition precedent to the commencement of sinking the mine contemplated hereunder Lessee shall arrange for the maintenance of public liability insurance, with a good solvent casualty insurance company or

16

companies satisfactory to Lessor, which insurance shall indemnify said Lessor against legal liability for loss by reason of personal injury, death or property damage sustained as a result, or by reason, of the operations hereunder, with a minimum limit of Five Million Dollars ($5,000,000.00) for bodily injury, death and property damage and furnish to Lessor certificates of such insurance, together with paid premium receipts. This coverage shall also include any trucks or other equipment hired, rented or leased in operations hereunder.

It is understood and agreed, however, that the minimum limits of coverage set forth above are not intended and will in no manner limit the recoveries of Lessor under the indemnity provisions of ARTICLE V, XII and XVI, above.

Section 18.2  **Cessation or Suspension of Operations**.  If at any time of these insurance coverages shall cease to be in force and effect, then, upon written demand of Lessor, Lessee shall suspend all operations hereunder until such insurance shall be reinstated.

## ARTICLE XIX

## LESSOR'S RIGHT TO INSPECT MINING OPERATIONS

Section 19.1  Lessor, and the Lessor's employees, agents and engineers, shall at all times have the right and privilege of entering the works and mines of Lessee in or upon the lands included herein to inspect, examine, survey or measure the same or any part thereof for the purpose of verifying the reports of Lessee as to the amounts of coal mined or removed, or for any other lawful purpose, and for these purposes to use freely the means of access to said works and mines, without hindrance or molestation.

## ARTICLE XX

## OBLIGATION TO MINE; RENEWAL; DUTY TO RECLAIM; TERMINATION

0 3 4

CONFIDENTIAL

Section 20.1  **Obligation to Mine; Renewal**.  Lessee shall mine and remove all of the coal which can be economically mined and removed hereunder by modern mining methods of room and pillar mining and if, at the expiration of the original period hereof, Lessee has not mined and removed all of the coal which it is or may become obligated to mine, then this lease shall, at the election of Lessee, be renewed for an additional twenty (20) year periods, upon the same terms and provisions, but subject to the full payment of all royalties, rentals and other payments due hereunder, until all of said coal which can be economically mined and removed by

17

approved mining methods has been mined and removed from the leased premises; and whenever during said original period or any renewal thereof, as herein provided, Lessee shall have mined and removed all of said coal by such approved mining methods and shall have paid all royalties, rental and other payments due or accrued hereunder then Lessee's obligation to mine coal and make payment of minimum annual rental hereunder shall terminate.

However, Lessee shall have the right, at any time, and without being in default of this Lease, to cease its mining activities and remove its improvements made without any liability to Lessor, except for royalties already owed Lessor by reason of having mined and removed coal. Provided that, not withstanding the foregoing, the Minimum Annual Rental shall double to $1,000,000 per year on the third lease anniversary following the cessation of any activities by Lessee.

**Section 20.2  <u>Duty to Reclaim; Payment of Amounts Due; Termination</u>**. In the event the lease herein shall not be renewed at the end of the original period hereof or any renewal or extended period thereof, or all of said coal has been mined and removed, then this lease shall continue to be renewed or extended for additional one (1) year periods, at a nominal rental to be determined by Lessor, until all the reclamation of the lands disturbed by mining operations under the lease herein has been completed and finally approved by the state and/or federal agency or agencies having jurisdiction of such mining operations and all the bonds for such reclamation have been fully released by such agency or agencies. Upon such release of all of said bonds this lease shall terminate. Further, in the event Lessee has not made payment of all royalties, rental and other payments due hereunder at the end of the original period hereof or any renewal or extended period thereof, then Lessor, at its option, may extend the term of this lease until all of such payments have been made. Provided, however, this section (20.2) is only applicable if Lessee sinks an underground mine on Lessor's surface property, or utilizes surface mining means to remove said coal.

### ARTICLE XXI
### CANCELLATION OF LEASE

CONFIDENTIAL

**Section 21.1  <u>Cancellation by Lessee</u>**. After Lessee's satisfaction of all mining and reclamation obligations contained in Article XX hereof and when all the merchantable and minable coal hereby leased shall have been mined and Lessee shall have paid all royalties and

004

V00019

R.2

rentals with respect to such coal, Lessee may give Lessor 90 days' notice of its intention to cancel this lease, and, if Lessor shall determine that Lessee has fully performed its obligations under this lease, the same shall be deemed canceled effective the day before the contract anniversary of that contract year.

Section 21.2 <u>Removal of Property Following Cancellation</u>. If this lease is canceled pursuant to Section 21.1, Lessee shall have 90 days in which to remove from the properties leased hereby all Lessee's equipment, buildings and other improvements and personal property and any of the same not so removed shall, at Lessor's option, become the property of Lessor without charge or be removed by Lessor at Lessee's cost and expense; provided, however, that Lessee shall not remove any equipment, buildings, improvements or personal property unless Lessee shall have fully performed all matters to be performed by it hereunder.

**ARTICLE XXII**

**DEFAULT**

Section 22.1 <u>Default; Termination by Lessor</u>. If any one or more of the following events (herein sometimes called Events of Default) shall occur:

(a) If default shall be made in the due and punctual payment of any rent, royalty or any part thereof, when and as the same may become due and payable, or in the payment of taxes and insurance premiums or any other amounts to be borne by Lessee hereunder, or in the furnishing or receipts and certificates of payment therefor when due, or in the furnishing of any of the books, records or reports by Lessee to be furnished under this lease, and such default shall continue for thirty (30) days after notice by Lessor to Lessee; or,

(b) If default shall be made by Lessee in the performance of or compliance with any of the covenants, agreements, terms or conditions contained in this lease, other than those referred to in the foregoing subsection (a) of this Section 22.1, and such default shall continue for a period of sixty (60) days after written notice thereof from Lessor to Lessee, and Lessee shall not within such period commence with due diligence the curing of such default and thereafter shall fail or neglect to prosecute and complete with due diligence and dispatch the curing of such default; or,

(c) If Lessee shall file a voluntary petition in bankruptcy or shall be adjudicated bankrupt or insolvent, or shall file any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future federal, state or other statute, law or regulation, or shall seek or consent to or acquiesce in the

CONFIDENTIAL

19

appointment of any trustee, receiver, or liquidator of Lessee or of all or any substantial part of the property leased hereby or of any or all the rents, revenues, issues, earnings, profits, or income thereof, or shall make any general assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due;

then and in any such event, Lessor at any time thereafter while such default or condition is continuing, may give written notice to Lessee specifying the occurrence giving rise to such Event of Default, or Events of Default, and stating that the lease shall terminate on the date specified in such notice, which shall be at least twenty (20) days after the giving of such notice. Upon the date specified in such notice, this lease and the estate and interest hereby demised shall terminate and all rights of Lessee under this lease shall cease.

Section 22.2  Repossession, etc. by Lessor.  Lessee expressly waives any right to prior notice or any process of law other than the issuance of the warrant of distraint, and Lessee further expressly waives any right to hearing prior to the levy of such warrant and sale thereunder and at any time after such termination of this lease, Lessor, without further notice, may enter and re-enter the premises for all proper purposes and repossess itself by all legal means, including summary proceedings, of its prior and former estate and may remove Lessee and all persons claiming through Lessee from the property leased hereby.

Section 22.3  Survival of Lessee's Obligations; Damages.  No such termination of this lease, or repossession of the property leased hereby, by force, summary proceedings, ejectment or otherwise, shall relieve Lessee of its liability and obligations under this lease and such liability and obligations, including, without limitation, the indemnity commitments contained in ARTICLES V, XII and XVI herein this lease, shall survive any such termination or any such repossession.  In the event of any such termination, Lessee shall pay to Lessor the advance minimum annual rentals, production royalties and other charges required to be paid by Lessee up to the time of such termination of this lease.

Section 22.4  No Waiver, etc. by Lessor.  No failure by Lessor to insist upon the strict performance of any covenant, agreement, term or condition of this lease or to exercise any right, power or remedy consequent upon a breach thereof, and no acceptance of full or partial performance or payment of royalties during the continuance of any such breach, shall constitute a waiver of or consent to any such breach or of such covenant, agreement, term or condition.

CONFIDENTIAL

0 0 3 4



20

No waiver of any breach shall affect or alter this lease, but each and every covenant, agreement, term and condition of this lease shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

Section 22.5  **Injunction Against Breach**.  In the event of any breach or threatened breach by Lessee of any of the covenants, agreements, terms or conditions of this lease, Lessor shall have the right to invoke any rights, powers and remedies allowed at law, in equity or by statute or otherwise, whether or not specifically provided in this lease.

Section 22.6  **Lessor's Remedies Cumulative, etc**.  Each right, power and remedy of Lessor provided for in this lease shall be cumulative and concurrent and shall be in addition to every other right, power or remedy provided for in this lease or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by Lessor of any one or more of the rights, powers or remedies provided for in this lease or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by Lessor of any or all other rights, powers or remedies provided for in this lease or by statute or otherwise.

### ARTICLE XXIII
### CONDEMNATION

b 0 3 4

Section 23.1  If the coal herein leased, or any portion thereof, shall be taken in, or in any manner affected by, condemnation for any public or quasi-public use under any statute or by right of eminent domain, or by private purchase in lieu of condemnation, by a public body vested with the power of eminent domain, then, and in each and every such event, Lessor shall be free to conduct all negotiations for compensation or damages, including without limitation, participation in viewers proceedings and the institution of litigation concerning such taking, with the understanding that in the case of each and every condemnation or taking Lessor shall notify Lessee of same, and Lessor and Lessee shall be paid out of an such award or compensation in damages as follows:

(a)  If the award for the coal in any such condemnation or taking shall exceed the amount of the royalty that would have been due Lessor had the coal been then mined, based upon recent sales by Lessee or, if no such sales exist, based upon recent sales by others of coal of comparable quality, all of such award which is in excess of said royalty amount shall be the property of and be paid to Lessee.

CONFIDENTIAL



21

V00022

(b) If such award for the coal shall be equal to or less than said royalty amount, then all of such award shall be the property of and be retained by Lessor.

(c) Any specific award for Lessee's buildings, structures or improvements, or surface lands acquired by Lessee after the date of this lease shall be paid to Lessee. Any award for surface lands which are owned by Lessor as of the date of this lease shall be the property of the Lessor.

Lessee shall cooperate with Lessor in all matters hereunder, including joining in any litigation or settlement if Lessor determines such to be necessary; provided, that any such condemnation or taking shall not otherwise affect Lessee's duties and obligations under this lease, except as provided herein.

### ARTICLE XXIV
### ARBITRATION

CONFIDENTIAL

**Section 24.1** If there should arise any matters in dispute hereunder, on which Lessor and Lessee cannot finally agree, such matter or matters shall be referred to a board of arbitrators consisting of three (3) disinterested, competent persons, one selected by Lessor and one by Lessee, as hereinafter provided, and the two thus selected shall select the third, who shall have the power of an umpire and be known as umpire-arbitrator. The decision and award of such arbitrators, or any two of them, or, in case of disagreement among all the arbitrators, of the third or umpire-arbitrator, shall be conclusive and binding upon Lessor and Lessee and promptly complied with.

The party desiring arbitration shall give written notice to the other party, stating definitely the point or points in dispute and naming the person selected as arbitrator; and it shall be the duty of the other party, within fifteen (15) days after receiving such notice, to name an arbitrator, and these two shall select the third arbitrator; and in the event the party notified does not name an arbitrator within said period of fifteen (15) days, the party serving such notice may select a second arbitrator and the two thus selected shall select the third arbitrator.

In the event of failure of the two arbitrators, selected as aforesaid, to agree, within twenty (20) days from notice to them of their selection, in choosing the third arbitrator, then such arbitrators shall jointly notify, in writing, the parties of their failure to agree. The parties shall then, within fifteen (15) days from the date of such notification, jointly select the third arbitrator. In the event the parties are unable to so select the third arbitrator, and within said fifteen (15) day period, they shall then jointly select the names of the three (3) potential third arbitrators. None of



these three (3) potential arbitrators shall represent, or have any affiliation with, either party. Once the list of said three (3) potential arbitrators has been prepared, each party shall then strike the name of one (1) potential third arbitrator from said list. The person remaining after the parties have exercised their strikes shall be the umpire-arbitrator.

The umpire-arbitrator thus chosen shall give to Lessor and Lessee written notice as to the time and place of hearing, which hearing shall be not less than ten (10) nor more than twenty (20) days after his selection, and at the time and place appointed shall proceed with the hearing unless, for some good cause of which the arbitrators shall be the judge, it shall be postponed until some later date within a reasonable time. Both Lessor and Lessee shall have full opportunity to be heard, orally and in writing, on any question thus submitted. In arriving at a decision and award, said arbitrators shall be bound by any relevant state and federal law applicable to the substantive issue or issues so submitted for arbitration, and shall make such decision and award in writing, and deliver a copy to both Lessor and Lessee, and shall as a part thereof decide by whom the costs of arbitration shall be borne and paid and the amount of such costs including reasonable compensation for the arbitrators. The binding arbitration provision herein set forth shall not serve to limit or diminish the right of either party to this Lease Agreement to seek injunctive relief for breach hereof.

### ARTICLE XXV
### CHIEF ENGINEER

0 3 4

Whenever the term "Chief Engineer of Lessor" is used in this lease, it is agreed between the parties that such engineer shall be a fully qualified underground coal mining engineer who has been employed previously as a chief underground coal mining engineer for an underground coal mine in the Midwest area of the United States of America, or Frederick D. Keady.

### ARTICLE XXVI
### CONTROLLING LAW

CONFIDENTIAL

**Section 26.1** In all coal mining operations and other activities conducted hereunder Lessee shall comply with all the laws of the United States of America and the State of Illinois now or hereafter enacted, and all rules and regulations promulgated thereunder by any governmental agency, relating to such coal mining operations or other activities. Any disputes as to the meaning and application of any of the provisions of this lease shall be determined under the laws

23



of the State of Illinois.

It is the intention of both parties to successfully promote and operate an underground coal mine to remove and sell the coal encompassed in this agreement. To that end, both parties agree to cooperate with each other and that each owes to the other a duty of good faith dealing.

## ARTICLE XXVII

### NOTICE

**Section 27.1** The giving of any notice to, or making of any demand on, any party to this Lease Agreement shall be sufficient if in writing, addressed to the respective party, and mailed via registered mail, return receipt requested, at the following addresses:

If to Lessor:

President
Vermilion Coal Company
191 Waukegan Road
Northfield, Illinois 60093
Telephone:    708-501-3110
Facsimile:    708-501-5355

If to Lessee:

Ron Laswell, President
Laswell Coal Co., Inc.
11776 Daniel
Terre Haute, Indiana 47802
Telephone:    812-894-2673
Facsimile:    812-894-2442

## ARTICLE XXVIII

### HEADINGS

CONFIDENTIAL

**Section 28.1** The headings of the ARTICLES in this lease are for convenience only and shall not be used to construe or interpret the scope or intent of this lease or in any way affect the same.

## ARTICLE XXIX

### SURVIVAL

4 0 3 4

**Section 29.1** No termination or cancellation of this lease shall relieve either of the parties hereto from any obligations or liabilities incurred by it under this lease as of the time of such termination or cancellation.

## ARTICLE XXX

### TERMS BINDING UPON SUCCESSION AND ASSIGNS

**Section 30.1** All of the terms and provisions hereof to be performed and observed by the respective parties hereto shall be binding upon, and inure to the benefit of, their successors, and assigns.

24

WITNESS the following signatures and seals, as of the date first hereinabove written.

Executed in two counterparts.

**VERMILION COAL COMPANY,**
**LESSOR**

_Frederick D. Keady_

Frederick D. Keady, President

**LASWELL COAL CO., INC., LESSEE**

_Ronald E. Laswell_

Ronald E. Laswell, President

attest

attest

**STATE OF INDIANA**    )
                        )    To wit:
**COUNTY OF VIGO**       )

    I, James O. McDonald, a Notary Public of said County, do certify that Frederick D. Keady, President, who signed the writing above, dated November 21, 1994, for said Vermilion Coal Company, has this day in my said county, before me, acknowledged the said writing to be the act and deed of said Corporation.

    Given under my hand and official seal this 21st day of November, 1994.

_James O. McDonald_

James O. McDonald, NOTARY PUBLIC

My commission expires:

October 5, 1996

A Vigo County, Indiana resident

25

V00026

STATE OF INDIANA     )
                         )     To wit:

COUNTY OF VIGO     )

     I, James O. McDonald, a Notary Public of said County, do certify that Ronald Laswell, President, who signed the writing above for Laswell Coal Co., Inc., dated November 21, 1994, for Laswell Coal Co., Inc., has this day in my said county, before me, acknowledged the said writing to be the act and deed of said Corporation.

     Given under my hand and official seal this 21st day of November, 1994.

                      James O. McDonald, NOTARY PUBLIC

My commission expires:

October 5, 1996         A Vigo County, Indiana resident

b 0 3 4

CONFIDENTIAL

This instrument was prepared by Vermilion Coal Company

26

**E-FILED**
Friday, 28 September, 2007  11:00:36 AM
Clerk, U.S. District Court, ILCD

# EXHIBIT B

## IN RE THE MATTER OF THE ARBITRATION OF

| | |
|---|---|
| VERMILION COAL COMPANY, | ) |
| | ) |
| **Claimant,** | ) |
| | ) |
| and | ) **DECISION and AWARD** |
| | ) |
| BLACK BEAUTY COAL COMPANY, | ) |
| | ) |
| **Respondent.** | ) |

This arbitration involves a lease for coal lands located within the Illinois Coal Basin in Vermilion County, Illinois. Vermilion Coal Company ("Vermilion") is the lessor and Black Beauty Coal Company ("Black Beauty") is the lessee by assignment. The Illinois Coal Basin is known for its high sulfur coal which was in particular demand following the enactment of the Clean Air Act.

Vermilion markets and leases land within the Illinois Basin. Black Beauty operates coal mines and particularly an underground coal mine consisting of two portals, a preparation plant, and train load out facilities on the leased land.

In 1994, Ron Laswell, president of Laswell Coal Company and Fred Keady, president of Vermilion negotiated and entered into the original lease. Under the original lease the rent was paid as a royalty consisting of twenty (20) percent of the lessee's gross operating profit. In 1995, Ron Laswell and Fred Keady negotiated and entered into the amended lease. Under the amended lease the royalty calculation was changed to five (5) percent of the gross selling price.

Shortly thereafter the amended lease was assigned to Catlin Coal Company ("Catlin"), a Laswell Coal Company entity. In 1999, the amended lease was assigned by Catlin to Black Beauty.

The amended lease provides that "any sales tax and/or severance" tax may be deducted in computing gross selling price for purposes of calculating royalties and wheelage fees.

In August 2002, disagreements arose between Vermilion and Black Beauty regarding the deductibility of the Black Lung Excise Tax ("BLET") and Abandoned Mine Land Fee ("AMLF") in computing royalties and wheelage fees. Vermilion and Black Beauty were not able to finally agree on these matters in dispute. Such matters were

referred to a panel of arbitrators as provided in the amended lease following a confrontational exchange between the parties, resulting in Vermilion filing a lawsuit; Black Beauty countering with a demand for arbitration; and the Court in the Circuit County for the Fifth Judicial Circuit of Illinois, Vermilion County, Danville, Illinois (Case No. 03-CH-101) staying the litigation and directing the matter to arbitration as agreed by the parties.

Although ruling on the parties' cross motions for summary judgment was deferred while the case proceeded to a hearing on the merits, there being a substantial controversy on a number of material facts and law applications to those facts, the motions are overruled as are all other pending non-dispositive motions.

Both Ron Laswell and Fred Keady are smart and well versed in the coal mining business. The lease was a product of negotiations both as to the substance, terms and conditions. They crafted the original lease based on a gross operating profit calculation and they left no doubt about the deductibility of the two federal taxes at issue, BLET and AMLF as shown in Exhibit C incorporated into the original lease at Art. II, Sec. 2.5(g). The amended lease had a different concept, one based on price rather than profit. The reference to deductibility of taxes in the amended lease was "any sales tax and/or severance" tax without any attached schedule. Another revision made by Laswell and Keady to the amended lease was the redaction and removal of Sec. 2.5(g). The concept or basis for computing royalties was effectively changed from gross operating profit to gross selling price as of March 6, 1995.

The primary issue of this dispute is whether BLET and AMLF are severance taxes and entitled to deductibility in computing royalties from the gross selling price. Lessor answers this issue with an emphatic "No!" Lessee answers with an emphatic "Yes!" Thus, this dispute comes down to an interpretation of the word "severance" tax; more specifically, whether that term as used in the amended lease includes or excludes federal BLET or AMLF as deductions in gross selling price calculations.

The threshold issue in a dispute between the parties regarding the meaning of a contract provision is whether the contract is ambiguous. *Ford v. Dovenmuehle Mortgage Co.*, 651 N.E.2d 751, 754, 273 Ill. App. 3d 240, 244 (Ill. App. Ct. 1995). A contract is not ambiguous simply because the parties disagree as to its meaning. *Young v. Allstate Ins. Co.*, 812 N.E.2d 741, 748, 351 Ill. App. 3d 151, 157 (Ill. App. Ct. 2004); *Id.* Therefore, the court must determine whether the contract's provisions are susceptible to more than one reasonable interpretation by examining the contract as a whole. *Ford*, 651 N.E.2d at 754, 273 Ill. App. 3d at 244. The court will then examine the plain language of the contract followed by credible evidence concerning the parties' intentions to determine whether the contract's provisions are susceptible to more than one reasonable interpretation. *See Ocean Atl. Dev. Corp. v. Aurora Christian Sch., Inc.*, 322 F.3d 983 (7th Cir. 2003); *See also* Richard A. Lord, Williston on Contracts § 30:4 (4th ed. 2004).

The words "any sales tax and/or severance" tax are not ambiguous.

Unambiguous words within a contract will be given their plain and ordinary meaning. *Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 687 (7th Cir. 2004); *Harrison v. Sears, Roebuck & Co.*, 546 N.E.2d 248, 253 (Ill. App. Ct. 1989). Plain and ordinary meaning may be determined by reference to a dictionary. *Young*, 812 N.E.2d at 749, 351 Ill. App. 3d at 158. The Internet may be used as further reference. *Vencor Hosp. S., Inc. v. Blue Cross & Blue Shield of RI*, 86 F.Supp.2d 1155, 1161 (S.D. Fla. 2000).

The overwhelming evidence and law of record speak of a severance tax as a tax imposed by states. Black's Law Dictionary defines "severance tax" as, "[a] tax imposed on the value of oil, gas, timber, or other natural resources extracted from the earth." 1471 (7th ed. 2004). This definition makes no reference as to whether severance taxes are state or federal taxes. Yet, the Merriam-Webster on-line dictionary defines severance tax as, "a tax levied by a *state* on the extractor of oil, gas, or minerals intended for consumption in other states." (*emphasis* added) http://www.m-w.com. Furthermore, a search of "severance tax" on popular internet search engines, such as Google and Yahoo, produce web pages related to only severance taxes imposed by states, i.e. Michigan, Colorado, Louisiana, Alabama, Tennessee and Wyoming. Accordingly, the plain and ordinary meaning of severance tax is a tax imposed by a *state* on the severance of natural resources from the ground. A thorough review of authorities has indelibly seared the word "severance" tax with a plain and ordinary meaning to be a *state tax* and not a federal tax despite some comparable elements.

The term "severance" tax and the sense of that term are words that are understood to be state taxes. The term or sense of the words "severance" tax are used regularly as meaning state taxes and the term is characteristic specifically of a state tax. The words "severance" tax in conventional and standard usage is generally regarded as a state tax and its usage in the lease cannot be construed to mean a federal tax because of the descriptive term "any." "Any," in the sense used, means any state sales tax and/or severance tax; and, although, the scope of "any" covers the whole world of state severance and state sales taxes, it does not go to another universe of words to include federal taxes.

If the lease said "any taxes" then there would not be a limitation as to scope of taxes. When "any" was restricted to "sales and/or severance" then the scope of those taxes are limited to state taxes because "sales and/or severance" have a common meaning and in and of themselves have come to be known as state taxes.

No analysis of this interpretative and definitive issue of severance tax would be complete without a consideration of the United States Supreme Court case of *Commonwealth Edison Co. v. State of Montana, et al.*, 453 U.S. 609, 101 S.Ct. 2946 (1981). While this case held that Montana's severance tax did not violate either the commerce or the supremacy clause, both the concurring and dissenting opinions make it quite apparent that the court recognized severance taxes to be state taxes on coal and other mineral within the domain of the various states. In its reference to the various

state severance taxes the court said, "In the first place, there is no real distinction in terms of economic effects <u>between severance and other types of state taxes</u> that have been subjected to commerce clause scrutiny." (emphasis added)

Further in its continued reference to state severance taxes and never any analogy to any federal taxes, the court in referring to the *Powerplant and Industrial Fuel Use Act of 1978*, said "Sec. 601a(2) of the Act clearly contemplates the continued existence, not pre-emption of state severance taxes on coal."

In a concurring opinion by Mr. Justice Powell, he said "Furthermore there can be no question that Montana may constitutionally raise general revenue by imposing a severance tax on coal mined in the State. The entire value of the coal, before transportation, originates in this State, and mining of the coal depletes the resource base and wealth of the State, thereby diminishing a source of taxes and economic activity." Mr. Justice Powell went on to say, "In many respects, a severance tax is like a real property tax, which has never been doubted as a legitimate means of raising revenue by the situs State to tax income derived from the use of the property."

Aside from the main concern of this Supreme Court case of whether the Montana severance tax was placing a burden on interstate commerce because most of its coal was being shipped interstate rather than intrastate, the reason that this case is vital in the analysis we have to make here, is that this case addresses the unique feature that makes a severance tax applicable to our fifty states only and not other special purpose taxes enacted by the federal government. While there is other language in the case that speaks to the fact that the federal government has not pre-empted this area of taxation and this case always refers to severance tax as state tax, most persuasive of this fact is the Supreme Court's reference to it being like a property tax.

The illumination upon our interpretation issue comes from the historical trail provided by the Supreme Court partially in its reference, "Most of the States raise revenues by levying a severance tax on mineral production. The first of such tax was imposed by Michigan in 1846. By 1979, 33 States have adopted some type of severance tax."

The distinction one must grasp in this interpretative analysis is that the word "severance" when defining a tax, can only apply to the state, upon which or within which, the coal taken is situated. Quite aside from similarities of other taxes based upon production and sales the justification for the state taxation and that application of the word severance to states only is the diminution of the value of an asset unique to the state. Any other tax imposed on the product of that severance is a special purpose tax to be called whatever term the taxing authority uses but the word severance when applied to a tax has acquired a generic meaning limited to only the 50 states and in certain instances, Indian tribes.

For our purposes, the decisive issue turns on the operating incidence of the tax and that is the coal being a part of the earth belonging to the State and it being taken

away.  No other government taxing authority has an interest in that taking away – only the State owning the resource.

Therefore, it is the finding and conclusion of this Decision that BLET and AMLF cannot be deducted from the gross selling price.  BLET and AMLF are not "severance" taxes, using the plain and ordinary meaning of the word, but are federal special purpose taxes not deductible within terms of this lease.

While this decision gives the word "severance" its plain and ordinary meaning in the eyes of the law as decided by this Panel, the members of which who are not in full agreement and while this plain and ordinary meaning shall now control the affairs of the parties to the lease, the use of the word "severance" against the backdrop of the historical relations among the parties, renders it reasonably possible of misunderstanding, giving to the parties a basis for a good faith difference of views as to whether the word "severance" applied to the federal taxes at issue here.

The lawyers for the parties defined and established the parameters and boundaries of this arbitration process, specifically, the issues to be decided as set forth in the so called bifurcation stipulation.   Having addressed the primary issue of translating the word severance tax, the next phase of this decision examines the remaining stipulated liability issues.  Those issues are breach of contract, fraud and anticipatory repudiation.

In advancing these claims, the lessor, Vermilion says that since November 21, 1994, Black Beauty or its predecessors, without the knowledge or consent of Vermilion deducted BLET and AMLF payments for coal produced and sold pursuant to the lease before calculating the royalties and wheelage due and owing to the lessor.  Vermilion further says it had no knowledge of such action by Black Beauty until August 14, 2002, and that since November 1, 1999 until August 14, 2002, Black Beauty knowingly and intentionally omitted and concealed that it was deducting these taxes in calculating the royalties and wheelage due under the lease.  The assertions by Vermilion claim that Black Beauty knowingly and intentionally misrepresented the royalty and wheelage payments by submitting false monthly reports.   While Vermilion sets forth in its complaint the disagreement between Vermilion and Black Beauty as to whether BLET and AMLF fell within the definition of "severance tax", it claims that in October 2002 and November 2002 Black Beauty repudiated its obligations to calculate royalties and wheelage and to make its payment as required by the lease.

Black Beauty responds that even if the Panel finds Black Beauty and Catlin's interpretation of the lease is incorrect, there is no factual basis for finding Black Beauty committed fraud.   Black Beauty further asserts that during a six year course of performance that included cumulative payments of approximately $3.3 Million without objection during which period Vermilion twice confirmed that royalties and wheelage had been and were being calculated correctly is conduct that does not constitute fraud nor a repudiation and is not an event of default.  On the issue of disclosure, Black Beauty asserts that Vermilion had an extensive right to audit and also imposed an obligation upon Black Beauty to accurately report the amount of coal mined.   It

emphasizes that the reporting requirements addressed the amount of coal produced but did not include a requirement of reporting deductions, thus it cannot be found to engage in fraud for failing to disclose items not included in the lease agreement.

In reviewing these liability issues, initially an examination of the undisputed facts as they relate to the fraud and repudiation claims will direct us to proof imperatives. In 1995, the parties to the original lease, Vermilion and Catlin, amended the lease and production commenced. Until August 2002, and thereafter, Black Beauty deducted, without objection by Vermilion, BLET and AMLF taxes in computing gross selling price for royalty purposes. After over six years of performance, and acceptance of approximately $3.3 Million in royalties and wheelage, Vermilion objected. Thereafter, and to date, Catlin and Black Beauty have paid a total of approximately $5.5 Million in royalties and wheelage.

In late 1999, Black Beauty took over the lease by assignment and expanded the production capacity of the lease land by investing over $50 Million in a new portal. Before assuming the lease, Black Beauty required Vermilion to confirm that there was no dispute or default under the lease. Accordingly, Vermilion executed an estoppel certificate to that effect.

Following Black Beauty's acquisition of the lease, Vermilion refinanced its debt through a new lender, Terre Haute First National Bank. Vermilion's new lender required Black Beauty to subordinate its interest in the lease and the document acknowledged that no default existed under the lease.

In the continuum of events since the inception of the lease in 1994, the estoppel certificate was signed by Vermilion on July 15, 1999, and the bank subordination agreement was signed on February 16, 2000.

Before the dispute over deductibility of BLET and AMLF surfaced in August 2002, nearly eight years passed and from the date of the commencement of coal production nearly six years passed before Vermilion raised an objection to the deduction of BLET and AMLF in the royalty computations, Vermilion received 42 royalties and wheelage reports and payments from May 1996 to October 1999 in the sum of $1,097,774.26. Thereafter, and since Black Beauty took over the lease, Vermilion received 34 royalty and wheelage reports and payments from November 1999 to August 2002 in the sum of $2,177,950.03. Within those periods of time, Vermilion signed the estoppel certificate and requested Black Beauty to execute a subordination agreement.

From the beginning of the lease, Laswell and Catlin deducted BLET and AMLF. Thereafter, Black Beauty deducted as did Catlin, BLET and AMLF. The 76 reports were submitted as required under Article II, Section 2.3 of the Amended Lease for the reporting of quantity of coal mined and sold.

Essentially the above recitations of undisputed facts are the gravamen of the fraud and repudiation claims. Neither the conduct of Catlin nor Black Beauty reach a

level or extreme of culpability or malevolence to support or warrant a finding of fraud or any of its components of malice, willfulness and deception as alleged by the lessor.

Despite the hostility demonstrated between the lessor and lessee during the adversarial protocol of the arbitration proceeding and lessor's persistence in achieving a repudiation of the lease, the evidence overwhelming shows too much has gone into this relationship between the lessor and lessee and the lease to allow the sounding of the death knell for this lease. The law does not allow it. Fifty million dollars has been invested in a second portal to enhance production capability. Until the dispute arose, six years of performance and over $3 Million in royalty payments resulted from the labor of over 200 coal miners and supportive staff. The reports were not deceptive. They reported what the lease required. Whatever event, eight years down the road, caused lessor to question the deduction of BLET and AMLF cannot alter all the events and commitments made earlier. Sure, it would have been more prudent for the reports to have included more detailed and categorized deductions. Unfortunately neither did they nor did the lease so require. Sure, it would have been more prudent for the lessor to have made an inquiry early on as to how the royalty payments were being computed and what if anything was being deducted. Unfortunately, six years of reporting passed before a question was raised. While we are dealing with the question here and interpreting the lease, none of the facts, actions or events constitutes fraud nor a repudiation based on applicable Illinois law nor do Black Beauty nor Catlin's deduction of BLET and AMLF constitute such a material breach as to constitute a repudiation of the lease. Whatever the intentions of the parties were since the outset of the contract, BLET and AMLF were deducted in the royalty computation. Laswell and Catlin did it and Black Beauty did the same thing after it took over the assignment. Now with this decision interpreting the words severance tax, Laswell, Catlin and Black Beauty's performance under a later determined incorrect or erroneous interpretation, while not necessarily excusing them from providing a monetary remedy, does not under the facts and circumstances of this case constitute fraud nor repudiation of the lease.

The Illinois law applied to the above facts and rationale including applicable textual foundations, Restatement (Second) Contracts and Williston on Contracts will be discussed in this analysis but before doing so, I will address the decision compelled by the estoppel certificate.

The estoppel certificate bars any claims preceding its execution, being the period up to the assignment from Catlin to Black Beauty. More specifically, Black Beauty is not obligated for claims of underpayments by Catlin Coal, Inc. or any of the lessees before the assignment to Black Beauty in computing royalties and third party wheelage.

While Vermilion seeks refuge from the estoppel agreement based on its addendum to the agreement, there is no reporting requirement that was violated under the lease which would excuse Vermilion from the estoppel agreement

The principles of law applicable to the facts of this case are deeply imbedded in Illinois law going back to the 1928 case of *Milton v. Stone,* 36 F.2d 583.

In one sentence, the *Milton* case long ago established the ruling applicable to the facts of this case when it said, "Instead of repudiating the contract, this was an offer on the part of defendant to enforce the performance of it, as defendant understood it." I placed emphasis on the four words "as defendant understood it" for those words are the essence of the claim of repudiation in this case. Each lessee here, Laswell, Catlin and Black Beauty understood the contract to mean different things than Vermilion.

Out of this foundational case of *Milton* springs the Illinois rule that an erroneous interpretation asserted in good faith is not repudiation.

The judge in *Milton* cited to the United States Supreme Court cases of *Dingley v. Oler*, 117 U.S. 490 (1886); Roehm v. Horst, 178 U.S. 1, 20 S.Ct. 780 (1900), both of which including the United States Supreme Court case of *Mobley v. New York Life Ins. Co.*, 295 U.S. 632, 55 S.Ct. 876 (1935) are cited and relied upon by the revered Mr. Justice Cardoza in *New York Life Ins. Co. v. Viglas*, 297 U.S. 672, 56 S.Ct. 615 (1936), wherein he wrote, "Repudiation there was none as that term is known to the law." In his emphasis that the element of good faith is inherent in any scrutiny of a repudiation claim, Mr. Justice Cardoza further stated in *New York Life*, "There is nothing to show that the insurer was not acting in good faith in giving notice of its contention that the disability was over."

In clearly stating that good faith is an imperative to be considered in a repudiation consideration, he went onto say, "If it made a mistake there was a breach of a provision of the policy with liability for any damages appropriate there to." In his next sentences, Mr. Justice Cardoza clinched the result of the *New York Life* case which serves as a basis for the result and factual and legal outcome of this case before the Panel, "We do not pause at the moment to fix the proper measure. Enough in this connection that at that stage of the transaction there has been no renunciation and abandonment of the contract as a whole." Id.

These cases are important because they teach us that good faith is an appropriate and necessary consideration in a repudiation claim.

That principle has found its way into the Restatement 2d Contracts which we are told by the United States Court of Appeals for the Seventh Circuit in *In re Michael Krueger*, 192 F.2d 733 (1999), specifically that the Restatement of Contracts forms basis for Illinois contract law. With that authority we can conclude our analysis and decision of the repudiation issue by citing specifically to the Restatement's Chapter 10, Performance and Non-Performance, Sections 250, 243, and 241. Here the Restatement 2d of Contracts has promulgated a set of guidelines for determining whether a breach is of such degree as to constitute a repudiation. In other words, the question is whether a breach is a technical violation which can be cured by monetary compensation or whether the breach goes to the essence of the contract such as to constitute it to be total breach.

The commentaries and illustrations relevant to these sections recognize the basic strictures of contract law as to upholding the sanctity of an agreement but

recognize that in upholding the integrity of an agreement, a standard of objective reasonableness is essential in determining materiality. In other words, a contract's durability will not be rendered brittle by such rules that permit one to escape a contractual obligation on the basis of non-performance which is not of such a degree as to be a total breach. The breach must go the very essence of the deal. The standards for determining the degree of breach is objective reasonableness rather than purely subjective belief.

In this case there are many factors which satisfy the standard of objective reasonableness. The long period of deducting BLET and AMLF by both the original lessees and the later new lessee, the acknowledgment in an estoppel certificate and later a subordination agreement that the lease was not in default with no evidence that any monthly reports fail to comply with the reporting requirements of the lease, 72 payments in excess of $3 Million, over $50 Million invested by lessee, Black Beauty, in the construction of a new portal to increase coal production, the employment of over 200 people to fulfill the lease objectives are all factors in the application of this objective reasonableness standard which are consistent with one of the guideline criteria of comporting with the standards of good faith and fair dealing. Further, in this objectivity analysis, it would be manifestly unfair to impose forfeiture on the lessee given the $50 Million investment in the construction of a new portal compared to the amount of the claimed underpayment in deducting the federal taxes in computing royalty payments which are more sensibly recoverable by monetary compensation rather than ending the contract by declaring a repudiation and forfeiture.

Applying the Restatement guideline standards in determining whether the contract was repudiated, the evidence in this case falls far too short to establish a total breach of the lease. While the conduct of deductions of taxes was premised on a good faith misunderstanding and belief that the taxes were deductible can be remedied by adequately compensating the lessor monetarily, it cannot under the circumstances of this case, end the contractual obligation. As the parties so prudently provided for an arbitration process to resolve disputes of the kind that spawned the problem here, it now has been resolved by the contract interpretation here and the lease should proceed in furtherance of its objectives subject, of course, to a consideration of monetary compensation.

Illinois law with its own cases and their embracing noteworthy authorities including the Restatement compels the analysis here rejecting the claim of repudiation as that evidence having been viewed in its entirety has not established that the breach was so central to the parties' agreement that it defeated the essential purpose of the lease contract.

While Vermilion steadfastly seeks to block out any consideration of good faith misunderstanding of the contract as a relevant consideration of the claims of breach, fraud or repudiation, Vermilion, nonetheless, has forcibly thrust the issue of faithfulness into all of the liability issues by its own complaint allegations and arbitration brief arguments. On page 25 of Vermilion's Arbitration Brief the issue of good faith and bad

9

faith was expressly raised as a dominant and critical issue with these words, "Defendant's intentional acts rise to the level of bad faith and fraud."

Again on page 37 of Vermilion's Post-Hearing Brief, good faith was asserted again as a dominant issue with these words, "Black Beauty breached its obligation of good faith."

There is no evidence upon which anyone can assign bad faith to Ron Laswell as he jumpstarted the coal mining operation under the lease from Vermilion in 1994. For five years until the assignment to Black Beauty from his Catlin Company, Laswell and Catlin deducted BLET and AMFL in the royalty computation. Laswell and Catlin had a good faith belief that they were deductible taxes. That's an issue in this case. Vermilion made it an issue. Thereafter, from 1999 until August 2002, and until the present time, Black Beauty continued to deduct BLET and AMFL the same way that Laswell did, the same way that the lessee before the assignment did. During this total period of eight years, Vermilion never objected nor raised a question until August 2002. The evidence does not support the deception or fraud allegation of Vermilion.

While the determination by this arbitration forum has interpreted the word "severance" favorably for Vermilion and the deduction now constitutes a breach for monetary compensation, the deductions were not fraudulent nor did they constitute a breach of such level to be a repudiation. The deductions in the computation process did not constitute a total breach.

I repeat these findings as they are critical in the final liability issue which Vermilion has placed before the Panel and that is the repudiation issue cast in wording of anticipatory and present upon which Vermilion seeks a finding that the conduct of Black Beauty constitutes an event of default under the Sec. 22.1 of the lease.

Illinois law does not embrace such rigid contract rules with such inflexibility as to ignore the facts and circumstances of the case and the relationships of the parties and business realities of the deal. *Milton, Dingley, Roehm, Mobley, New York Life* and the *Restatement* imbed good faith into the Illinois contract equation. Illinois does not so improvidently construe and interpret contracts as to render disputes to be gaming contests with the loser of an interpretation issue losing all. Illinois law makes appropriate accommodation for compensating for a mistaken interpretation but will come down with the hammer if it's an egregious breach reaching the level of being a total breach which this case is not.

Vermilion ties into the repudiation claim Sec. 22.1 of the lease relating to Notice of Default and seeks to achieve a lease termination based on a notice of default to Black Beauty. Additionally Vermilion seeks a default determination for Black Beauty's failing to agree and accept Vermilion's interpretation of the lease word "severance".

The lessee was not obliged to respond to lessor's notice of default by disavowing its good faith belief. This was not a situation where lessee refused to pay rent. It was

solely a situation where the parties disagreed as to whether certain taxes were deductible in the royalty computation. Again, this was not a total breach.

Vermilion asserts that underpayments based on erroneous royalty calculations substantially impaired the value of the contract and upon Black Beauty's continuing to make payments with deductions that were being made when it inherited the lease by assignment resulted in Vermilion falling into default on its mortgage obligations. Considering that Vermilion received over $3 Million in royalties over six years of performance, with the underpayment of approximately $300,000 based on a good faith erroneous interpretation can hardly support a finding of an event of default upon which a termination of contract can be premised.

The dispute over the meaning of the word "severance" as a deduction should have gone to arbitration for clarification before the notice was sent out. The parties had a bona fide dispute and this lease should not be construed to permit the party who loses a good faith dispute to lose all. It has already been determined that a repudiation did not occur. Accordingly, it was not an event of default, and the notice and demand was untimely. It can become timely if the lessee fails to comply with this arbitration decision.

This joinder and merger of the liability claims and default claim are set forth in Vermilion's Post-Hearing Brief in subpart IV captioned "Repudiation and Default". Here and specifically on page 34 of this Brief, Vermilion states, "Vermilion has sued for anticipatory and present repudiation as a result of Black Beauty's repudiation of so much of the contract as to impair substantially the value of the lease as to Vermilion, the non-repudiating party."

This joinder of claims is further asserted on pages 34 through 39 of Vermilion's Post-Hearing Brief in asserting its grounds for commercial insecurity. Here Vermilion claims, "The grounds for insecurity are reasonable under the facts and evidence. Black Beauty breached its obligation of good faith."

This matter relating to Sec. 22.1 is addressed in this Decision because the lessor, Vermilion chose to combine it with the repudiation claim which has heretofore been thoroughly considered and decided.

All of these issues and claims have been extensively dealt with above factually and with an analysis of controlling Illinois law. This award is issued in accordance with the findings and conclusions above.

The bifurcated liability issues having been addressed and decided in this decision and award, the bifurcated remedial issues including costs of arbitration shall be considered and determined at the bifurcated remedial issues hearing. While the foregoing is the decision and award of the umpire-arbitrator, to the extent the separate decisions and opinions of the other arbitrators do not constitute an agreement by all or at least two of the arbitrators on any issue, this decision and award by the umpire-arbitrator, as to any such issues, shall be conclusive and binding as provided by Article XXIV, Arbitration Sec. 24.1, which provides in pertinent part as follows:

**Section 24.1**   If there should arise any matters in dispute hereunder, on which Lessor and Lessee cannot finally agree, such matter or matters shall be referred to a board of arbitrators consisting of three (3) disinterested, competent persons, one selected by Lessor and one by Lessee, as hereinafter provided, and the two thus selected shall select the third, who shall have the power of an umpire and be known as umpire-arbitrator.   The decision and award of such arbitrators, or any two of them, or, in case of disagreement among all the arbitrators, of the third or umpire-arbitrator, shall be conclusive and binding upon Lessor and Lessee and promptly compiled with.

Scheduling of any issues for hearing before the Panel relating to bifurcated remedial issues should be coordinated with the case administrator.

IT IS SO AWARDED.

DATED:  March 28, 2005

Thomas D. Lambros
Umpire Arbitrator

## OPINION OF PARTY ARBITRATOR, SUSAN GETZENDANNER, CONCURRING IN PART AND DISSENTING IN PART FROM THE DECISION AND AWARD OF THE UMPIRE ARBITRATOR

This arbitration involves a long-term coal lease between the landowner, Vermilion Coal Company ("Vermilion" or the "Lessor") and Black Beauty Coal Company ("Black Beauty" or the "Lessee"). I was appointed a party arbitrator by the Lessor. Black Beauty appointed its party arbitrator and the party arbitrators selected the "umpire arbitrator," who is the Chair of the three member arbitration Panel. The Decision and Award (the "Award") was prepared by the Chair. The party arbitrators were provided an opportunity to concur or dissent.

### Summary of the Award.

The underlying issue in this arbitration is decided in Vermilion's favor. The Vermilion lease allows only the deduction of "sales and/or severance taxes" to arrive at Gross Selling Price of the coal for purposes of calculating the 5% royalty due Lessor. The original lessee, since 1995, and its assignee, Black Beauty, since November 1999, at all times deducted two federal taxes, BLET (black lung tax) and AMLF (reclamation fee). In August of 2002, when Black Beauty for the first time was confronted the issue of its authority to deduct BLET and AMLF, it decided that they were deductible as "severance tax," and that has remained Lessee's position. Vermilion's position is that severance tax is a tax imposed by a state, and not a federal tax.

The Award holds (1) the language of the lease is unambiguous and as a matter of law "severance tax" is a state imposed tax; and (2) that from and after the date the Award becomes final, the Lessee shall calculate royalties without deducting BLET and AMLF. The Award concludes that BLET and AMLF had been improperly deducted from Gross Selling Price, and finds that Vermilion is entitled to an award of monetary damages from and after the assignment of the lease to Black Beauty, but that Vermilion waived any claim for prior damages by executing as estoppel certificate. The amount of damages to be awarded, and Vermilion's demand for an accounting of all prior royalty calculations, at Lessee's cost, and for the costs of this arbitration, are to be determined at the bifurcated remedy hearing.

Next the Award addresses the remaining stipulated liability issues. Those issues are breach of contract, fraud and anticipatory repudiation." (Award at 5.) Under the breach of contract claim, Lessor sought to enforcement termination of the lease under its contractual right to exercise that remedy. Under the remaining claims, Lessor sought expectation damages and as equitable relief termination of the lease.

First the Award considers the fraud and repudiation claims, being its analysis with "an examination of the undisputed facts as they relate to the fraud and repudiation claims. . . ." (Award at 6.) The principal fact cited is that Vermilion did not complain about the deductions until August of 2002. The Award notes that "[a]fter six years of performance, and acceptance of approximately $3.3 Million in royalties and wheelage, Vermilion objected. Thereafter, and to date, Catlin [the original lessee] and Black Beauty have paid a total of approximately $5.5 Million in royalties and wheelage." (Award at 6.) A total of 76 reports of royalty payment were submitted to Vermilion as required under Section 2.3 of the lease for the reporting of quantity of coal mined and sold. (*Id.*)

The other facts noted by the Award are first that in connection with the assignment of the lease to Black Beauty in November 1999, on July 19, 1999, Vermilion executed an estoppel certificate with it hade amended before signing. On February 16, 2000, in connection with a refinancing of bank debt, "Vermilion's new lender required Black Beauty to subordinate its interest in the lease and the document acknowledges that no default existed under the lease." (Id.)

These are the "undisputed facts" that the Award cites as the "gravamen of the fraud and repudiation claims." (Award at 6.) The Award denies the claims of fraud, actual and anticipatory contract repudiation, and anticipatory repudiation based on Lessee's failure to respond to Lessor's Demand for Adequate Assurance. In denying these claims, the Award relies on the Lessee's good faith dispute as to the deductibility of BLET and AMLF, the absence of a "total breach," the lack of materialty of the non-payment, and the harshness of the remedy versus the nature and extent of the failure to pay royalties. The Award cites cases like *Milton v. Stone*, 36 F.2d 583 (1928), and authorities like *Restatement Contracts 2d*, Sections 250, 2143 and 241, that deal with repudiation claims and the concept of "total breach."

2

The final claim considered is Lessor's breach of contract claim under Section 21.1 of the lease. This section, entitled "Default; Termination by Lessor," provides that any failure to pay "any part" of the royalty "shall constitute" a default and, if the default is not cured within 30 days, Lessor may send a notice of termination of the lease. If in 20 days the default still is not cured, the lease terminates on the date set in the notice. Vermilion properly exercised this remedy in May 2003, and according to the notice of termination, the lease terminated effective June 1, 2003.

The claim is denied. To deny this claim, the Award applies the authorities and findings that it relies on to deny the fraud and the repudiation claims, and on the same "undisputed facts" that are the "gravaman of the fraud and repudiation claims."

Although the Award does not address Illinois law that good faith or bad faith are irrelevant to breach of contract, the Award does an end around the issue. It asserts that "Vermilion made it an issue." (Award at 10.) The Award states that while Vermilion has sought to block out any consideration of good faith, "Vermilion, nonetheless, has forcibly thrust the issue of faithfulness into all of the liability issues by its own complaint allegations and arbitration brief arguments." (Award at 9.) "Vermilion ties into the repudiation claim Sec. 22.1 of the lease relating to Notice of Default and seeks to achieve a lease termination based on a notice of default [should be termination] to Black Beauty." (Award at 10.)

Having blamed Vermilion for thrusting the good faith issue into the breach of contract claim, and tying its breach of contract claim to the repudiation claim, the Award treats the breach of contract claim as though it was a claim for repudiation, and denies it for the same reasons. Specifically, the Award holds that where there is a good faith dispute as to the meaning of the lease, and a total breach of a repudiation of the contract has not occurred, the dispute must be arbitrated before an event of default can occur and a notice of termination can be served on the Lessee. Because the arbitration is not yet concluded, the Award held that there "was not an event of default, and the notice [of termination] and demand was untimely. It can become timely if the lessee fails to comply with this arbitration decision." (Award at 11.)

3

The Award construes the lease to deny termination under Section 22.1 on two grounds: (1) "this lease should not be construed to permit the party who loses a good faith dispute to lose all;" and (2) "It has already been determined that a repudiation [of the lease] did not occur." (Award at 10.)

## Summary of Issues on Which I Concur and Dissent.

I concur in the findings of the Award on the proper interpretation of the disputed language of the lease and the Award's conclusion that a "thorough review of authorities has indelibly seared the word 'severance' tax with a plain and ordinary meaning to be a state tax and not a federal tax despite some comparable elements. " (Award at 3.) Thus, as a matter of law the deduction of BLET and AMLF was not permitted under the lease. These findings are in accord with Illinois law.

With respect to monetary damages, I concur in the decision to award monetary damages from the assignment of the lease to Black Beauty to the present. I dissent from the denial of monetary damages for defaults that occurred prior to the assignment of the lease based on the estoppel certificate.

I express no opinion on the denial of Lessor's claims for actual and anticipatory repudiation based on the findings of the "undisputed facts," and the finding of a good faith dispute, lack of materiality, harshness of remedy, and absence of total breach. I express no opinion on the findings denying relief under the Demand for Adequate Assurance based on the finding that Lessor was not rendered commercially insecurity.

I dissent from the denial of Lessor's claim under Section 22.1 of the lease. The breach of contract claim stands on its own merits and is not tied to the repudiation claim. The so-called "undisputed facts," and the finding of a good faith dispute, lack of materiality, harshness of remedy, and absence of total breach, have no relevance to Lessee's default under the lease and Vermilion's exercise of its contractual right to send notice of default and a notice of termination. The Award is contrary to express provisions of the parties' contract, which under Illinois law courts are required to enforce, not re-write.

4

## DISSENTING OPINION

### I.    Illinois Law Requires Enforcement of Express Contract Provisions.

To the extent the Award re-writes the parties' lease and reassigns the duties and reallocates the risks set forth in the contract, it is contrary to Illinois law, which the Panel is required to apply. Under the arbitration and choice of law provisions of the lease, the Award must decide each of the substantive issues being arbitrated under Illinois law. To the extent the Award's findings are not in accordance with Illinois law, the Award is beyond the jurisdiction of the Panel and wrongly decided.

Under Illinois law, express contractual provisions must be enforced, not rewritten. The Seventh Circuit frequently has repeated the obligation of courts to enforce express provisions of a contract. In *Continental Illinois Bank & Trust Co. v. Everett*, 964 F.2d 701, 705 (7th Cir. 1992), the Court explained:

> When the contracting parties draw up their own provisions, court enforce them. People write things down in order to assign duties and allocate risks -- functions vital to economic life yet defeated if courts prefer hypothetical bargains over real ones or use the ambiguities present in all language to frustrate the achievement of certainty.

See also *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990). The lease is unambiguous. The Award is directly contrary to express provisions of the lease, discussed below, and hence violates Illinois law.

### II.    "Good Faith Is Not a Defense to a Breach of Contract Claim.

The Award holds that there is no default if the non-performing party has a good faith belief that it has no obligation to perform. However, "[f]ault is irrelevant to a breach of a contract. Whether one intentionally, carelessly, or innocently breaches a condition, he is still considered in breach of that contract." *Illinois Jurisprudence, Commercial Law*, Section 5:22. Whether Black Beauty breached the lease in good or bad faith, the lease was breached and a default occurred.

### III.    The Award Attempts to Avoid Illinois Law Claiming Vermilion Injected the Good Faith Issue Into Its Section 21.1 Claim

The Award attempts to avoid clear Illinois law that good faith is not relevant to breach of contract by claiming that Vermilion "forcibly thrust the issue of faithfulness into all of the liability

issues," tied the repudiation and breach of contract claims together, and "joined and merged" the repudiation and breach of contract claims. This attempt to infuse the good faith into into the Section 21.1 breach of contract claim fails. Since this is the issue under which the Award claims the right to deny the breach of contract claim, it is worth the time first to go through the Award's claims and then go through what the Award relies on to support its claims.

A. **Award Introduces the Good Faith Issue Into the Section 21.1 Claim and Ties that Claim to the Repudiation Claim**

First the Award states that it was Vermilion that injected good faith into the Section 21.1 claim:

> While Vermilion steadfastly seeks to block out any consideration of good faith misunderstanding of the contract as a relevant consideration of the claims of breach, fraud or repudiation, Vermilion, nonetheless, has forcibly thrust the issue of faithfulness into all of the liability issues by its own complaint allegations and arbitration brief.

(Award at 9.) In this regard, the Award relies on pages 25 and 37 of Vermilion's Brief. These references, the allegations of the complaint, and the arguments made in the Brief, are discussed in subsection B. below..

Next the Award blames Vermilion for tying together the repudiation and breach of contract claims:

> I repeat these findings as they are critical in the final liability issue which Vermilion has placed before the Panel and that is the repudiation issue cast in wording of anticipatory and present upon which Vermilion seeks a finding that the conduct of Black Beauty constitutes an event of default under the Sec. 22.1 of the lease.
>
>        *     *     *
>
> Vermilion ties into the repudiation claim Sec. 22.1 of the lease relating to Notice of Default and seeks to achieve a lease termination based on a notice of default to Black Beauty.

(Award at 10.)

This joinder and merger of the liability claims and default claim are set forth in Vermilion's Post-Hearing Brief in subpart IV captioned "Repudiation and Default." Here and specifically on page 34 of this Brief, Vermilion states, "Vermilion has sued for anticipatory and present repudiation as a result of Black Beauty's repudiation of so much of the contract as to impair substantially the value of the lease as to Vermilion, the non-repudiating party."

This joinder of claims is further asserted on pages 34 through 39 of Vermilion's Post-Hearing Brief in asserting its ground for commercial insecurity. Here Vermilion claims, "The grounds for insecureity are reasonable under the facts and evidence. Black Beauty breached its obligation of good faith."

This matter relating to Sec 22.1 is addressed in this Decision because the lessor, Vermilion chose to combine it with the repudiation claim which has been thoroughly considered and decided.

All of these issues and claims have been extensively dealth with above factually and with an analysis of controlling Illinois law. This award is issued in accordance with the findings and conclusions above.

(Award at 11.)

**B.    There Is No Support for the Award's Conclusion that the Breach of Contract Action Can Be Denied Based on the Same Grounds as the Repudiation Claim.**

The first reference relied on by the Award is page 25 of Vermilion's Brief (the "Brief") where, the Award states, there is a reference to Black Beauty's "intentional acts." This is clearly a reference to the fraud claim and not breach of contract, which does not require proof of any intentional act other than the act of breach.

Next, the Award states that on page 37 of the Brief "good faith was asserted again [by Vermilion] as a dominant issue with these words, 'Black Beauty breached its obligation of good faith'." (Award at 10.) Next the Award relies on the section of the Brief entitled "Repudiation and Default," particularly pages 34-39, which includes page 37. These references will be discussed together.

In the "Repudiation and Default" section of its Brief, Vermilion goes through its claims, in the following order: A. Repudiation; B. Anticipatory Repudiation; C. Substantial Impairment (resuling from

7

repudiation); D. Demand for Adequate Assurance (as a separate basis for finding anticipatory repudiation); E. Grounds for Commercial Insecurity (the prerequisite for a Demand for Adequate Assurance; and F. Notice of Default (quoting Section 22.1 and arguing that "[u]nder the plain language of the Lease, this right [to terminate] became fixed and unconditional after Black Beauty's default and failed to remedy the default.")  (Brief at 34-39.)  Clearly the section on Repudiation and Default separates out the Section 21.1 claim from the claims based on repudiation.

As for the reference to good faith on page 37, that was contained in the sub-section entitled "Grounds for Commercial Insecurity."  Vermilion was explaining its grounds for commercial insecurity in order to support its Demand for Adequate Assurance. Lessee's failure to timely respond to the Demand for Adequate Assurance was pleaded as grounds for anticipatory breach, as discussed on the preceding page of the Brief.  Vermilion concludes its argument by stating that "[t]he grounds for insecurity are reasonable under the facts in evidence.  Black Beauty breached its obligation of good faith."

The obligation of good faith referred to in the Brief is the duty of good faith performance of contractual obligations that is implicit in every contract.  Lessor does refer to this good faith obligation but Lessor did not plead a claim based on the duty of good faith.  Nor could it.  In Illinois contract law, the implied duty of good faith is a gap-filling approach designed for an issue that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.  *Continental Illinois Bank v. Everett*, 964 F.2d at 705 (7th Cir. 1992).

A reference to the obligation of good faith does not incorporate "good faith" as an issue or a defense to a breach of contract claim.  There is no such defense.  Vermilion's reference to Black Beauty's good faith obligation to support its claim of commercial insecurity does not incorporate good faith into Lessor's Section 21.1 claim.

C.    Breach of Contract Under Section 21.1 of the Lease Was Pleaded in Lessor's Original Complaint.

The Award also generally relies on the allegations in the state court complaint filed by Vermilion.  Nothing in the complaint supports the conclusion that the repudiation claims were merged with the Section 21.1 breach of contract claim.

Count I of the state court complaint was a "Claim for Declaratory Judgment and Injunctive Relief Against Black Beauty for Breach of Lease." Vermilion asked the court to "[e]nter a declaratory judgment in favor of Vermilion and against Black Beauty finding that Lessee defaulted in its payment of royalties and wheelage under the Lease and that Vermilion was therefore entitled to terminate the lease." (Complaint at 15.) This is exactly the kind of injunctive relief that the Lessor was specifically entitled to pursue pursuant to the last sentence of the arbitration provision.

Vermilion pleaded the identical claim and sought the identical relief in this arbitration.

Count II of the Complaint is a Claim for an Accounting. Count IV is for Breach of Contract based on the failure to pay full wheelage; Count V is for Fraud and includes a discussion of actual and anticipatory contract repudiation; and Count VI is for Anticipatory Repudiation. Each of these claims is separately pleaded in the arbitration.

Count III of the state court complaint pleads a "Claim Against Black Beauty for Breach of Contract." Paragraph 47 alleges:

> As a result of Lessee's default *in the due and punctual payment of any rent, royalty or any part thereof, when and as the same may become due and payable* Lessor Vermilion terminated the Lease in accordance with Article XXII [Section 22.1] of the Lease. (Emphasis in original.)

The relief sought was for compensatory and consequential damages and entry of a declaratory judgment in favor of Vermilion that "Lessee defaulted in its payment of royalties and wheelage under the Lease and that Vermilion was therefore entitled to terminate the lease." This is the precise claim that Vermilion subgmitted to arbitration.

The claim for anticipatory repudiation was separately pleaded in Count VI of the complaint. The claims were not joined together.

D.    **Vermilion's Arbitration Brief Separately Identified and Briefed the Breach of Contract Claim.**

Whether Black Beauty's deduction of BLET and ALMF before calculating royalties constituted events of default under the lease was identified as a liability issue before the Panel. (Brief at 5.) The Brief asserted: "Under the plain language of the Lease, this right [to issue a notice of termination] became fixed and unconditional after Black Beauty defaulted and failed to remedy the default. Thereafter,

Vermilion was privileged to issue the notices of default [and termination], and thereby terminate plaintiff's tenancies after the expiration of the twentny day period provided in the Lease." (Brief at 39.)

Issues Nos. 6 and 8, identified as reserved for the bifurcated hearing, were, respectively:  "Whether Defendant's failure to cure its default after proper Notice of Default by Plaintiff resulted in the termination of the lease?", and  "Whether as a result of Defendant's default in the due and punctual payment, when and as the same be came due and payable to the Plaintiff, the lease was terminated in accordance with  [Section 22.1] of the lease?"  (Brief at 5.)

These issues make clear that Vermilion's claim was for breach of contract and enforcement of the remedy of termination. There is no support in the complaint or the Brief that would justify the Award's claim that Vermilion "forcibly thrust" the good faith issue into the breach of contract action and tied the liability claims together.

## IV.    Illinois Does Not Excuse A Mistake of Law.

The Award states that it "gives the word 'severance' its plain and ordinary meaning in the eyes of the law," yet concludes that the term was "reasonably possible of misunderstanding, giving to the parties a basis for a good faith difference of views as to whether the word 'severance' applied to the federal taxes at issue here." (Award at 5.)  If, as a matter of law, severance tax is a state imposed tax, there is no room for a "reasonably possible misunderstanding" or a "good faith dispute" that BLET and AMLF were deductible.

The erroneous interpretation of an unambiguous contract is a mistake of law.  Under Illinois law, a mistake of law cannot be excused.  LaSalle National Bank v. Mel Vega, 520 N.E.2d 1129 (Ill.App. 1988).  The Award's use of a "good faith dispute" to save Black Beauty from the consequences of its default under the lease and the notice of termination is contrary to Illinois law.   Even if good faith was relevant to breach of contract, which it is not, Black Beauty should not be allowed to assert its good faith.

10

**V.**    **The Arbitration Provision Is Not An Exclusive Remedy And It Is Not A Condition Precedent to a Default.**

To avoid the clear, unambiguous definition of a "default," the fact that under that definition a default occurred, and the consequences of the default under Section 21.1, the Award holds that there was no default and hence there could not be a timely notice of termination. In order to accomplish this, the Award construes the arbitration provision of the lease to find that arbitration is the *sine qua non* of default. This argument was not made by Black Beauty; it is the device created by the Award to avoid the explicit provisions of the contract.

**A.**    **Arbitration Does Not Trump Other Remedies.**

Nothing in the arbitration provision supports the Award's conclusion that the parties must first arbitrate the good faith dispute to determine whose interpretation of the lease prevails before there can be a default.

The Award is inconsistent in its analysis because it does not use the arbitration provision to deny monetary damages on the ground that no default has occurred. Instead, the Award holds that the "deduction [of BLET and AMLF] now constitutes a breach for monetary compensation." (Award at 10.) It does this without explicitly acknowledging that the breach is in fact a default under Section 21.1. So the arbitration provision is used only to make the notice of termination untimely.

The lease provides that unresolved matters in dispute "shall be submitted" to arbitration. (Section 24.1.) This language makes arbitraton a binding, but not an exclusive, remedy. The remedy of termination is a self-executing remedy. Explicit provisions of the lease, described below, make it clear that other rights and remedies available to the Lessor, whether under the lease or under law, may be exercised cumulatively or in any order desired by the Lessor.

On its face, the arbitration provision clarifies that it is not an exclusive remedy. The last sentence of the arbitration provision states: "The binding arbitration provision herein set forth shall not serve to limit or diminish the right of either party to this Lease Agreement to seek injunctive relief for breach hereof."

Lessor had the option of going to court to seek injunctive relief of breach of contract, such as to enforce the termination of the

11

lease in accordance with the notice of termination, or any other form of relief that could be obtained under injunctive relief. That is exactly what Lessor did. It filed a suit for a declaratory judgment that the lease was terminated.

If Vermilion could go to court without first arbitrating the dispute on the contract language, it follows that it is entitled to exercise any remedy without first arbitrating the contract language dispute.

**B.     Arbitration Is Not a Condition Precedent to a Default.**

The use of the arbitration provision to avoid the fact that a default occurred has no support in the provision itself, or the lease in its entirety. The arbitration provision does not say that arbitration is a condition precedent to the exercise of the remedy of termination or any other remedy provided under the lease or the law. Some coal leases do contain such language. An example of such a lease is the lease at issue in *Reis v. Peabody Coal Co.*, 997 S.W. 2d 49, 68 (Mo. Ct. App. 1999). (Interestingly, *Reis* is yet another case involving Peabody's improper deduction of BLET and AMLF in calculating the sales price of coal for purposes of determining royalties where the arbitration found in favor of the landowner/lessor and that ruling was upheld on appeal.)

The *Reis* court described the Peabody lease in that case as follows: "The lease requires the parties, as a condition precedent to bringing a legal action, to have questions arising under the lease decided by arbitration." In *Reis* the lessor was compelled to arbitrate rather than go to court. In contrast, Vermilion was entitled to terminate the lease without further written notice and to repossess the property through summary proceedings in the state court. It was allowed to go to court to enforce termination. And that is what Vermilion did before agreeing to stay the litigation pending the arbitration.

The arbitration provision must be construed within the context of the entire lease. The remedy and default provisions of the contract are inconsistent with the Award's use of the arbitration provision. The lease creates a self-help remedy of notice of termination. That remedy is cumulative and can be exercised at any time, regardless of whether arbitration has occurred. See discussion of the specific provisions of the lease in Sections VI and VII below.

Again, had the parties wanted arbitration to preceed before any other remedy was pursued by Lessor, the lease, like the lease in *Reis*, could have so provided.

C.    There Is No Good Reason to Construe the Arbitration Provision to Deny Breach and Deny Termination.

The reason behind the construction is acknowledged by the Award: "The Parties had a bona fide dispute and this lease should not be construed to permit the party who loses a good faith dispute to lose all." (Award at 11.)  Termination is a harsh remedy, but it is provided for under Section 21.1 of the lease.  The parties are assumed to have understood the nature of the remedy when it was agreed to.  The Lessee would not "lose all" on termination. Importantly, *easily and without any economic risk, termination could have avoided termination.*  See discussion of the harshness of the remedy in Section IX, below.

## VI.    The Award Re-writes the Default/Termination Provision of the Lease.

The Award holds that there was no event of default that could trigger the Lessor's right to send a notice of termination of the lease.  This reading of the contract violates the express provisions of the Lease and hence has no basis in Illinois law.

A.    Section 22.1: "Default; Termination by Lessor."

This section provides that Lessee's failure to pay "any part" of the royalties due under the Lease "shall constitute" a default or an event of default unless the failure to pay is cured within 30 days of notice of default.  If there is no cure, a default or an Event of Default has occurred, and the Lessor has the right to send a notice of termination:

> Lessor at any time thereafter while such default or condition is continuing, may give written notice to Lessee specifing the occurrence given rise to such Event of Default, or Events of  Default, and stating that the lease shall terminate on the date specified in such notice, which shall be at least twenty (20) days after the giving of such notice.

(Section 22.1.) The section concludes:  If within the 20 day notice period the default is not cured, "[u]pon the date specified in such notice, the lease and the estate and interest hereby demised shall terminate and all rights of Lessee under this lease shall cease." This provision of the lease clearly contemplates a continuing default that can trigger a notice of default, which, if the default is not cured within 30 days, can ripen into a notice of termination.

The unambiguous language of the lease provides for a notice

13

of termination that specifies the date of termination, and if there is no cure during the notice period, "the lease shall terminate" on the date set forth in the notice. Nothing more is required to accomplish termination.

**B.    Section 22.2 Allows Lessor Re-entry to the Property Without Further Notice And to Repossession Under Summary Proceedings in State Court.**

Termination is a self-executing self-help remedy. Section 22.2 specifically allows for re-entry and repossession of the property at any time following termination:

> [A]t any time after such termination of this lease, Lessor, without further notice, may enter and re-enter the premises for all proper purposes and repossess itself by all legal means, including summary proceedings, of its prior and former estate and may remove Lessee and all persons claiming through Lessee from the property leased hereby.

The right to repossess the property by summary proceedings allows Lessor to legally repossess the property through state court proceedings. Repossession does not require that the underlying dispute must be first resolved by arbitration.

Notwithstanding the express provisions of the lease governing events of default, notice of default, notice of termination, and right to repossession, the Award denies the occurrence of a default or an event of default (which are one and the same thing) and nullifies the notice of termination. There is no ambiguity in the definition of a default or how to exercise of a notice of default and termination. These provisions create and allow enforcement of the self-help remedy of termination.

**VII.    In Denying Termination, the Award Disregards Express Remedy Provisions of the Lease.**

**A.    Section 22.5:  All Rights May Be Invoked.**

Section 22.5 of the lease provides that in the event of "any breach or threatened breach" by Lessee of any covenant of the lease, "Lessor shall have the right to invoke any rights, powers and remedies allowed at law, in equity or by statute or otherwise, whether or not specifically provided in this lease." This provision permits Lessor to exercise any right, power or remedy, including seeking injunctive relief from a court, without going to arbitration.

14

B.    Section 22.6:  Remedies Are Cumulative.

This Section expressly makes Lessor's remedies cumulative:

> Each right, power and remedy of Lessor provided for in this lease shall be cumulative and concurrent and shall be in addition to every other right, power or remedy provided for in this lease or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by Lessor of any one or more of the rights, powers or remedies provided for in this lease or now or hereafter existing at laws or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by Lessor of any or all other rights, powers or remedies provided for in this lease or by statute or otherwise.

By the plain language of this section, one remedy cannot be denied because of the existence of another remedy, such as the arbitration provision.  Lessor's remedies are not required to be exercised in any particular order.  The Lessor can pick and choose its remedies, including remedies not specifically included in the lease.

C.    Section 22.4:  Remedies Cannot Be Waived.

A third provision, Section 22.4, makes it clear that the Lessor may "insist upon the strict performance of any covenant, agreement, term or condition of this lease [and] exercise any right, power or remedy consequent upon a breach thereof. . . ."  This Section specifically provides that no failure to insist on strict performance and no acceptance of full or partial performance "during the continuation of any such breach, shall constitute a waiver of or consent to any such breach. . . ."

On its face, Section 22.4 acknowledges that there can be both an existing breach and a "continuation of any such breach."  There could never be a continuing breach if it takes an arbitration decision to declare a breach.  The provision does not say that arbitration must occur before a default can be declared.

The totality of these express provisions of the lease make it clear that Lessor can "insist upon the strict performance" of the duty to pay full royalties and can "exercise any right, power or remedy consequent upon a breach."  Lessor can pursue any and all remedies under the lease or the law before, during, or after the arbitration of the underlying dispute.  Termination for a failure to pay full royalties is a self-operating, self-help remedy.

15

## VIII.    Conditions Not Contained in or Consistent with the Express Provisions of the Lease Cannot Be Read Into the Lease.

The Award adds conditions to the express provisions of the lease in order to deny that an event of default has occured. The first is that there is no default if there is a good faith dispute. The second is that there is no default unless there is a "total breach" or contract repudiation. There is also some hint that fraudulent conduct may also be required before there can be a default. (Award at 9.)

### A.    "No Default If There Is Good Faith" Condition.

The condition that there a default cannot occur if the non-performing party in good faith believe there is no breach has no basis in Illinois law. This issue is fully discussed above. The issue of good faith may have reliance to anticipatory repudiation, but not to breach of contract.

### B.    The Materiality Condition.

The Award introduces concepts of materiality, total breach and repudiation as prerequisites for a default that would allow a notice of termination. These are all the same thing: If the breach is immaterial, there is no total breach and if there is no total breach there is no repudiation. Materiality of the breach is an issue in claims of total breach and repudiation.

If Lessor was rely entirely on its claim of repudiation, and seeking termination as an equitable remedy and expectation damages, perhaps then, as the Award states with respect to repudiation, "[t]he breach must go to the very essense of the deal." (Award at 9.)   Lessor is not relying on its repudiation claim to achieve termination. In its contract claim it is not asserting that it is entitled to expectation damages or termination because there has been a total breach. Lessor is not seeking equitable relief but enforcement of the properly exercised remedy under Section 21.1. It is not asking the Panel to formulate an appropriate remedy.

The lease defined its own standard of materiality. It provides that any failure to pay any part of the rent consitutes a default. The lease does not say that there has to be a non-payment of a material part of the royalty before a default can be declared. There is no room for a court to find that "any part" means "a material part" of the royalty. A default is not defined as a "total breach" of the lease; nor does it require a repudiation of the lease. The Award improperly writes these conditions into Section 22.1. (Award 10.)

C.    The Fraud Condition.

The Award notes that the deduction of BLET and AMLF "now constitutes a breach for monetary compensation, the deductions were not fraudulent nor did they constitute a breach of such level to be repudiation.  The deductions in the computation process did not constitute a total breach."  (Award at 9.)  There is nothing in the lease that requires that the deductions have to be fraudulent before there can be a default that results in termination.

IX.    The Award Improperly Construes the Lease to Avoid a Harsh Remedy Allowed Under the Lease.

The Award makes frequent mention of the Lessee's substantial investment in the lease coal property and concludes that a non-performing party who mistakenly but in good faith disputes that a default has occurred should not have to "lose all."  (Award at 11.)   The harshness of the remedy is part and parcel of the default provision of the lease and the parties are presumed to intend the consequences of their agreements.  But most importantly, the remedy easily could have been avoided by Black Beauty by paying under protest.  And Black Beauty failed to act after the termination notice was sent.  A party that could have protected itself should not seek strained interpretations of explicit contract provisions.  Finally, under Illinois law the Lessee does not "lose all."

A.    Lessee Could Have Contractually Protected Itself Against Notice of Termination.

Following Learned Hand's advice, as noted by the Seventh Circuit in *Hemenway v. Peabody Coal Company*, 159 F.3d 255, 258 (7th Cir. 1996), Black Beauty could have protected itself:

> Learned Hand remarked that "in commercial transactions it does not in the end promote justice to seek strained interpretations in aid of those who do not protect themselves."

17

The Lessee could have protected itself against a breach based on performance that was undertaken in good faith. Courts often deal with contracts that limit breaching conduct to only negligence or other defined conduct. The lease could have said: "A failure to promptly pay full royalties when due shall constitute a breach unless the Lessee's failure to pay was based on a good faith belief that it was properly calculating royalties. Or it could have said: "Termination is a remedy available only upon a showing that the lessor's decision to pay less than full royalties is made in bad faith."

      B.      **Lessee Easily, and Without Risk, Could Have Avoided Termination.**

The fact, ignored by the Award, is that termination easily could have been avoided by Lessee. The fact that Lessee did not protect itself is not the concern of the arbitrators. It had a choice, and it failed to take advantage.

      1.      **Lessee Should Have Paid Under Protest.**

From the beginning of the dispute, Vermilion indicated that it would accept payment under protest. Black Beauty in fact made payment under protest, which it later reversed in reliance on its interpretation of the contract. Secondly, in accordance with Lessor's Demand for Adequate Assurance, Lessee could have paid the full royalty under protest, subject to being reimbursed if the deductions were proper.

Payment under protest would not have exposed Lessee to any economic risk. The Lessee, if proven correct in taking the deductions, would be able to recoup any payments made under protest by deducting those payments in an orderly fashion from future advanced and earned royalties due to the Lessor under the 20-60 year contract. The failure to pay under protest transfers the economic burden of the Lessee's unilateral decision not to pay entirely on the Lessor, the inherently weaker party.

18

There is no answer to the question of why a sophisticated, wealthy coal operator with 1400 leases in the Illinois basin took a chance on termination when it could have avoided termination by paying under protest. However, the Lessor does not have to prove why the Lessee acted so recklessly. That it did so is not in doubt.

      2.      Lessor Could Have Sought to Enjoin Termination.

Even after the 20 day notice of termination was issued, Lessee could have taken action to avoid termination. Under Illinois law, a party to an arbitration provision may demand arbitration and then file a lawsuit in state court to enjoin any threatened action of the other party that would render the arbitration useless. I was involved in just such a case in the Circuit Court of Cook County that involved an interpretation of contract language and the issuance of a termination notice. The termination notice would have run if the non-breaching party had to wait for arbitration. The client's remedy was to go to state court and seek an injunction staying the running of the termination period. I am looking for a copy of the opinion and will attached it, or a summary of the case, as an exhibit to this Dissenting Opinion.

A major company with an important contract does not let a termination period mature because it thinks its interpretation of the contract is correct. Good faith beliefs do not cancel the other party's rights under the contract.

Black Beauty let the termination notice period run. It did nothing. Lessee did not even file an arbitration demand until days after the termination became effective. Lessee has no right to the assistance of the arbitration panel to avoid termination when by taking action it could have avoided that consequence.

19

C.    Lessor Is Not Entitled to a Windfall Under Illinois Law.

The Award is wrong in stating that Black Beauty would lose all. Illinois law holds that the Lessor would not be entitled to a windfall on the termination. The Award simply assumes that Lessee will suffer the lose of its entire $50 million investment, and that result is not allowed under Illinois law.

X.    The "Undisputed Facts" that Are the "Gravaman of Fraud and Repudiation Claims" are Not Relevant to the Section 21.1 Claim.

Since the Award adopts its entire analysis denying the fraud and repudiation claims to support its denial of the Section 21.1 claim, the "undisputed facts" recited at page 6 of the Award must be addressed. The fact that Vermilion did not discover the deductions until August of 2002 cannot be used against it. The lease has a "No Waiver" provision that specifically states that Lessor's failure to complain and demand strict performance of the lease, and its acceptance of partial payment of royalties, does not waive any claim Lessor can bring based on the default of the contract.

Of note is the fact that the Award does not say that there was any way Vermilion could have learned about the deductions based on the royalty reports it received from the original lessee and Black Beauty. There was no red flag waived in Vermilion's eyes that would have prompted an earlier discovery of the deductions. In the *Reis* and *Hemenway* cases referred to above, the land owners did not discover the improper deductions for 13 years in one case and 20 years in the other case. While it is true that Vermilion had the right to audit the books and records, so did the landowners in *Reis* and *Heminway*. In both cases, the land owner prevailed.

To the extent the Award relies on the estoppel certificate executed by Vermilion in connection with the assignment of the lease to Black Beauty as an undisputed fact that relates to the fraud and repudiation claims, the Award never discusses the content of

the Lessor's addendum to that certificate that changed it from a guaranty that there were no defaults under the lease to a statement that to the best of Vermilion's knowledge there were no defaults. See Part XII below for a further discussion of the estoppel certificate.

How the Award relies on the refinancing, and Vermilion's statement to the new lender that there were no defaults under the lease, and the fact that Black Beauty subordinated its position to the Bank, is never explained.  The bank financing did not prejudice Black Beauty because before the refinancing it was already subordinated to Lessor's debt, only before the refinancing the amount of the debt was much larger.  So how the refinancing figures into the claims for fraud and repudiation, and how it relates to the breach of contract claim, is impossible to judge.

XI.    <u>The Lessor Is Entitled to the Benefit of Its Bargain.</u>

Arbitrators, like courts, are not free to rewrite contracts.  As stated by the Seventh Circuit in *Hemenway v. Peabody Coal Company*, 159 F.3d 255, 258 (7th Cir. 1996):

> Contracts allocate risks,and judicial decisions changing those allocations after the fact not only lead to expensive litigation... but also make the institution of contract less useful ex ante.  Parties to contracts may prefer simple-minded textualism to costly disputes later on, even knowing that a plain-language reading sometimes goes wrong, and they may make adjustments -- in other parts of the contract, or in the royalty rate -- to compensate for this possibility.  Or perhaps they just made a mistake and now rue the choice.  Learned Hand remarked that "in commercial transactions it does not in the end promote justice to seek strained interpretations in aid of those who do not protect themselves. (Citations omitted.)

21

*Hemenway* was another case involving Peabody Coal Company, which is Black Beauty's parent, where the Court held that BLET and AMLF were not deductible from the sales price of the coal before calculating royalties.

Lessor's bargain in this case was its agreement to allow a coal producer to mine a unique coal property in Illinois for 20 to 60 years in exchange for the coal producer's promise to pay royalties in accordance with the terms of the lease. The Lessor turned over to the discretion of the coal producer a property that, when first leased in 1994 held 91,000,000 tons of low sulfur coal. It was and is a very valuable property -- all given up by Lessor in exchange for the Lessee's promise to pay royalties pursuant to the royalty provision of the lease.

The dynamic of a long term coal lease is that the Lessor controls the cash flow and holds both the assets and the cash derived from those assets. The Lessor is the party with the economic power. The Lessor is a land owner who had given up his valuable asset in exchange for a promise to pay a royalty. The Lessor is the inherently weaker party. The Lessor is dependent on the Lessor to pay the royalty. The royalty is the only return on the Lessor's very substantial investment in the property. If the Lessor unilaterally decides not to pay the full royalty, only the threat of a severe consequence would allow the Lessor to protect itself against non-payment.

The termination remedy puts the burden of accurately calculating royalties, and the economic burden to pay those royalties, on the Lessor. The swiftness and the certitude of the termination remedy is necessary to balance the Lessor's dependence on the Lessor's payment of royalties.

XII.    **As a Matter of Law, the Estoppel Certificate Is Not A Waiver of Claims for Damages for Defaults by the Original Lessee.**

A.    **The Assignment of the Lease Required An Assumption of the Liabilites of Original Lessee.**

The lease required that in the event of an assignment of the lease, there must be a "written assumption by the transferee of all the obligations of Lessee in form satisfactory to Lessor . . . ." (Section 14.1.)   There is no dispute that Black Beauty accepted the assignment of the lease and assumed all liabilities that existed at the time of the assignment.  Black Beauty claims that the past liabilities were waived by Vermilion by the estoppel certificate.

The Award holds that Vermilion waived its right to seek damages from Black Beauty for historic claims:  "Before assuming the lease, Black Beauty required Vermilion to confirm that there was no dispute or default under the lease.  Accordingly, Vermilion executed an estoppel certificate to that effect."  (Award at 4-5.) Vermilion did not execute an estoppel certificate that confirmed there were no disputes or defaults under the lease.

The certificate, in the form it was presented to Vermilion, was a straight-forward statement that there were no disputes or defaults under the lease.  But Vermilion did not execute that certificate.  It added an addendum, a disclaimer that must be read as part of the certificate, that made it clear that the statement was based on Vermilion's present knowledge.

B.    **The Disclaimer Eliminates Any Waiver of Unknown Historic Claims.**

The disclaimer informed the Lessee that the statement -- there are no defaults under the lease – was a statement made to the best of Lessor's knowledge.  There is no dispute that Lessor had no knowledge of any default under the lease until August, 2002, many

23

years after the assignment of the lease to Black Beauty. The statement, "to the best of my knowledge there is no default," was a true statement. It was not a misrepresentation. It did not guarantee there were no defaults. The most that Lessee could rely on is that "to the best of Lessor's knowledge, there are no default." That is a waiver of default known to the Lessor. It is not a waiver of any and all defaults.

The disclaimer also informed Black Beauty that Lessor's knowledge was based on the royalty reports issued by the original lessee and that Lessor had not exercised any of its rights to conduct an audit of the books and record of the original lessee. This information alerted Black Beauty that if it really wanted to know if there were any defaults, it should review the books and records of the original lessee. Black Beauty failed to examine those books and records.

Finally, the disclaimer stated that by signing the certificate Lessor was not giving up any of its rights under the lease. One of those rights was the "No Waiver" provision in Section 22.4 that specifically provides that no failure to insist on strict performance and no acceptance of full or partial performance during the continuation of "any such breach, shall constitute a waiver of or consent to any such breach. . . ."

Lessee presumably knew that the lease required it to assume past liabilities and that there was a no waiver provision in the contract. The estopple certificate on its face, as amended by the disclaimer, does not as a matter of law constitute a waiver of past claims of which Lessor had no knowledge. The only impediment to a claim for past damages is the applicable statute of limitations.

C.    There Is No Connection Between the Certificate and the
       Lessee's Reporting Requirements Under the Lease.

The Award concludes that Vermilion cannot seek refuge from the estoppel certificate based on the addendum because "there is no reporting requirement that was violated under the lease which would excuse Vermilion from the estopel agreement." (Award at 6.)

24

IN THE MATTER OF THE       )

 ARBITRATION BETWEEN     )

VERMILION COAL COMPANY and  )
BLACK BEAUTY COAL COMPANY  )

Arbitration Panel:

Hon. Thomas Lambros – Umpire
Hon. Susan Getzendanner
G. Daniel Kelley, Jr.

---

## DISSENTING OPINION

---

G. Daniel Kelley, Jr.
ICE MILLER
One American Square
Box 82001
Indianapolis, Indiana 46282
(317) 236-2100

# TABLE OF CONTENTS

Page

DISSENTING OPINION .................................................................................1

I.   Royalty/Wheelage Issues ......................................................................1

     Contentions .......................................................................................1

     1994 Lease .......................................................................................2

     1995 Amendment .............................................................................3

     Stipulated Correction .......................................................................4

     Binding Federal and State Law ........................................................4

     Legal And Plain Meaning .................................................................7

     Language In The Context/History Of The Documents ..................13

     A Sales Tax And A Severance Tax – A Type Of Excise Tax .........15

II.  Mandatory Arbitration And Failure To Comply/Cure – Are Conditions To
     Any Breach....................................................................................17

III. Conclusion.....................................................................................21

## I.

### Royalty/Wheelage Issue

The Umpire Arbitrator has determined that the plain, unambiguous meaning of the words "any sales and/or severance tax", a question of law, does not encompass any federal severance tax or any federal sales tax, but only such a state tax. For the reasons set forth hereafter, this decision is not correct under Illinois law which we are bound to apply correctly. The Umpire Decision does not determine an issue, properly raised on the record, that would make it unnecessary to consider any questions or issues concerning breach or default, even if a decision were reached that federal severance taxes, the black lung excise tax (BLET) and the reclamation fee (the abandoned mine reclamation fee, AMLF), were not to be deducted from the gross selling price in making the earned royalty or the wheelage calculations.

**Contentions.** Both parties contend that the terms "any sales and/or severance tax thereon" are clear and unambiguous. Black Beauty contends that the clear and ordinary meaning of "any sales and/or severance tax thereon" encompasses any severance tax, whether federal, state or local, on the removal or sale of the coal and that BLET and AMLF[1] are assessed on the removal (severance) of a ton of coal from the earth with the tax rate being a flat rate per ton or a percent of the sales price. Initially, Vermilion's primary thrust was that BLET and AMLF are excise taxes and therefore cannot be severance taxes (see Vermilion's initial summary judgment brief), or that the BLET and AMLF are triggered by the first sale after severance and therefore

---

[1]See 26 U.S.C. § 4121 as to the black lung excise tax where the tax has varied since its enactment in 1978 and as to the "reclamation fee", see 30 U.S.C. § 1332(a) enacted by the 1977 Federal Surface Mining Reclamation and Control Act. Both taxes are at set at minimums with caps set at a percent of the first sale after the coal is removed or severed.

are not severance taxes. (*Id.*) Subsequently, Vermilion variously contended that a severance tax can only be a state or Indian tribe tax, but at other times states: "there could be a federal severance tax, but there is none." Vermilion Post-Hearing Brief, p. 9. Finally, Vermilion in its Post-Hearing Brief contends that AMLF's are not taxes, that the word "any" is ambiguous because it does not modify severance tax, that "and/or" is ambiguous and that the words "severance tax" are not in the plural and are therefore ambiguous. (Vermilion's Post-Hearing Brief, pp. 11-12).

**1994 Lease.** The original Coal Lease in question, effective November 21, 1994, was between Vermilion Coal Company and Laswell Coal Co., Inc. and executed by their respective president, Fred Keady and Ron Laswell, which lease Laswell Coal then assigned to Catlin Coal Inc. on November 28th, (Ex. 1 and Ex. 92). The original earned royalty was "twenty percent (20%) of Lessee's Gross Operating Profit as hereinafter defined . . . ." Section 2.1(a).[2] The wheelage to be paid on coal mined from property not owned by Lessor but transported or shipped "into, over, through or under any of the Leased Premises" was the greater of 1% of the average Gross Selling Price per ton as defined in Section 2.4.[3] or 15¢ a ton." § 11.1. "Gross Selling Price" allowed deductions for "any sales tax imposed thereon or other expense". Mr. Keady testified that the inclusion of "other expense" as a deduction was a mistake. Exhibit C to the original

---

[2] The Gross Operating Profit was defined pursuant to Section 2.5 as "the Gross Selling Price, less cash operating cost of production, less an allowance for depreciation subject to certain adjustments with the sample calculation set forth on Exhibit C."

[3] The Gross Selling Price was defined in Section 2.4 as meaning "the actual price paid for coal sold to a bona fide purchaser FOB the loading point after preparation, if any, and loading for final destination, **less any sales tax imposed thereon, or other expense**, but with adjustment for transportation expenses paid by Lessee, coal quality bonuses or penalties and discounts or allowances actually allowed to arm's-length wholesalers." To be noted is that in the original Lease, there was no statement that the Gross Selling Price was to be multiplied against the number of tons of coal mined and sold.

-2-

Lease deducted "black lung taxes" (BLET), the "reclamation tax" (AMLF) and other expenses.

**1995 Amendment.** In 1995, Ron Laswell and Fred Keady determined to change the earned royalty from a percent of gross operating profit to a percent of gross sales (Gross Selling Price x tons, like the wheelage rate had been) which amendment was initiated by Mr. Keady drafting revisions and sending to Mr. Laswell the revisions on March 3, 1995 (Ex. E-V). Subsequently on March 6, 1995, Jim McDonald, attorney for Catlin Coal and Ron Laswell, sent a letter to Mr. Keady concerning further changes to the revisions, including the following:

> Paragraph 2 of the lease, pages 4 and 5 have been further revised pursuant to your and Ron's telephone discussion. On page 5, second line, after the word 'sales', 'and/or severance' was added. With this revision sales and/or severance tax will be deducted in arriving at the 'Gross Selling Price', is defined in Section 2.4".

The redrafted Section 2.1 then provided for an earned royalty of 5% "of Lessee's Gross Sales as hereinafter defined . . . ." Section 2.5 then defined Gross Sales as "Gross Selling Price, multiplied by the number of tons mined and sold. . . ." Then, the provision over which the present dispute centers is the Amended Section 2.4 which was changed to the following by adding the underlined portion:

> "**Calculation of Royalties: Gross Selling Price Defined.** For the purpose of calculating gross sales, the term 'Gross Selling Price' as used herein shall mean the actual price paid for coal sold to a bona fide purchaser FOB the loading point after preparation, if any, and loading for final destination, less any sales tax and/or severance imposed thereon, but without deduction for selling commissions, advertising, credit losses or other expenses, but with adjustment for transportation expenses paid by Lessee, coal quality bonuses or penalties, and discounts or allowances actually allowed to arm's-length wholesalers; . . ."

- 3 -

While the Amendment changed the earned royalty from a percent of net to a percent of the gross revenue based on "gross selling price" as defined, the percent of gross sales (using the Gross Selling Price) remained the calculation for wheelage. However, the Gross Selling Price definition was changed – severance taxes were added as a deduction to the gross selling price and limiting language was added "but without deduction for selling commissions, advertising, credit losses or other expenses". The net profit calculation obviously was thrown out along with the Exhibit C deductions for "black lung taxes" and "reclamation tax".

**Stipulated Correction.** As indicated above, Mr. Keady drafted and presented the first draft of the 1995 changes excluding as deductions – "selling commissions, advertising, credit losses and other expense" to which Mr. Laswell and his attorney added the deduction of "and/or severance" after "any sales". However, the signed amendment was not in accordance with the instructions on Mr. McDonald's letter. The words "and/or severance" were to be added after the word "sales" so that the particular language should have read "any sales and/or severance tax thereon" rather than "any sales tax and/or severance". The parties have so stipulated. TR., November 8, 2004, pp. 44-45.

**Binding Federal and State Law.** The amended lease places a specific, limiting requirement upon the arbitrators' authority to follow applicable law: "In arriving at a decision, an award, said arbitrators shall be bound by any relevant state and federal law applicable to the substantive issue or issues so submitted to arbitration. . . ." (§ 24.1) So we must correctly discern and follow, as we are bound to do, applicable state and

- 4 -

federal law. Interestingly, the parties clearly contemplated the applicability of both state and federal law.

Under Illinois law applicable per § 26.D, whether a contract is unambiguous and the determination of unambiguous meaning are questions of law. The Illinois Supreme Court has determined that where there is an integration clause to a contract, the "four corners rule" would be applied and "facially clear, complete and unambiguous language would be enforced without the aid of extrinsic evidence," while noting without disapproval that the Illinois Appellate Court in many decisions has followed a provisional approach – "if after 'provisionally' reviewing the parol evidence, the trial judge finds that an 'extrinsic ambiguity' is present, then the parol evidence rule is admitted to aid the trier-of-fact in resolving the ambiguity." *Air Safety, Inc. v. Teachers Realty Corporation*, 185 Ill.2d 457, 706 N.E.2d 882, 884-886 (Ill. 1999). *See also, River's Edge Homeowners' Association v. City of Naperville*, 353 Ill.App.3d 874, 819 N.E.2d 806 (November 29, 2004 still pending appeal).

Generally, the parol evidence rule is related to meaning issues while integration is related to the scope of the contract. Both parol evidence and integration questions are matters of substantive law. Parol evidence may be relevant to determining integration. But integration is a threshold determination for the applicability of the parol evidence rule. Even in the face of an integration clause, if there is an ambiguity or a mistake, parol evidence is admissible.

- 5 -

Here, the parties discovered a mistake – hence, the stipulation that the Amended Lease was not correctly worded at the critical spot. This was based upon attorney McDonald's letter of March 6, 1995[4]

Neither the coal lease nor the amendment has an integration clause and as indicated above in the absence of an integration clause, Illinois may follow the provisional admission approach. Further, Illinois law supports using parol evidence to determine integration. *See Stevens v. Fanning*, 59 Ill.App.2d 285, 207 N.E.2d 136, 140 (Ill. App. 1965) ("whether the written contract was intended to be the complete and final agreement, must be determined from the language of the contract and the circumstances of the case. 'If it is silent in essential particulars, parol evidence is admissible to establish the missing parts, although inadmissible to contradict those unambiguous terms. . . .'") *See also, Monahan, Survey of Illinois Law: Contracts – A Disagreement Over Agreements: The Conflict in Illinois Law Regarding The Parol Evidence Rule and Contract Interpretation*, 27 S.Ill.L.J. 687 (2003).

While Illinois law "presumes" the parties to have used terms having no technical or legal meaning, *The Village of Glenview v. Northfield Woods, Water & Utility Co.*, 576 N.E.2d 238, 244 (Ill. App. 1991), obviously, this is a rebuttable, not a conclusive, presumption. Just what evidence determines this has not been much discussed under Illinois law. But as we shall see, the context here as well as the terms themselves and the required analysis rebut the presumption – demonstrating that these are legal terms which must be given legal meaning (which as it turns out is no different than the plain meaning).

---

[4] It also seems that there were other agreements outside the written word of the amended lease per Mr. Keady/Vermilion Coal's estoppel certificate.

**Legal And Plain Meaning.** The precise group of words, the meaning of which we must discern, are "less any sales and/or severance tax imposed thereon. . . ." This language contemplates two levels of inquiry – first, what do the terms "any severance tax" or "any sales tax" mean and second, whether the specific tax in question (here BLET and AMLF) are either of the taxes as defined – which in turn contemplate the review of applicable statutes, regulations and case law. Obviously, these words mean any tax on the sale of, or any tax on the severance (removal) of, the coal mined under the coal lease or any tax which might be combination of such taxes. But embedded in the two levels of the inquiry are more subtle issues – is the legislature's description of a tax relevant or binding in determining the type of tax? Can a tax be two types of a tax (*i.e.*, a sales tax and a severance tax)? Or is a severance tax or a sales tax a type of excise tax? Is there something inherent in a type of tax which implies that it is only a state tax or that a state is the only taxing entity with authority to pass the tax? Does the use of the funds from the tax determine the type of tax?

Moreover, the principals of the parties here were both long time participants in the leasing and mining of coal. The coal lease is a long, sophisticated legal document transferring rights to mine and sell the coal (and all that such entails under complicated legal concepts) encompassing multiple coal seams over acreage in the thousands involving the investment of millions, and creating cash flows in the millions.

This all takes on a very, very legal hue in meaning and even more so when other tax provisions and other language in the Lease and Amendment are considered. *See infra*, pp. 13-15. So, looking for the plain, ordinary meaning is a mistake of law because these terms and the several levels of inquiry encompass legal terms and legal analysis.

- 7 -

The parties here and the Umpire in the pursuit of plain meaning have been forced to look to applicable federal and state law to discern the meaning of these tax terms.[5] In addition to a plain English dictionary, the Umpire's decision looks to *Black's Law Dictionary*, the various state statute websites and relies extensively on a United States Supreme Court opinion to arrive at a determination of unambiguous meaning that the terms "severance tax" refer only to a state tax (and a tribal tax) as do the terms "sales tax" (whether tribal also is unclear). The Umpire's unambiguous meaning adds the words "state" in front of sales and "state" in front of severance so that the contract would read "any state sales and/or state severance tax". This certainly does not comport with the unambiguous meaning of these terms, whether the ordinary meaning or the legal meaning.

It is possible that taxing authority limits for a particular government might be implied or inferred from designating one type of tax or another – for instance, the Constitution of the United States restricts the power of Congress to directly tax (unapportioned) property but allows an "excise" tax or indirect type of tax.[6] So, the terms "property tax" could infer only a state or local tax. But a severance tax and a sales tax are excise (indirect) taxes and it cannot be implied that by using such terms, the parties were referring only to state taxes.

---

[5] Neither Vermilion nor Black Beauty have cited to this panel any case that had before it the question of the meaning of "any sales and/or severance tax" in a coal lease royalty context or for that matter even similar terms in any other context; nor have the parties cited any case that had before it the question of whether BLET or AMLF are or are not severance taxes or sales taxes; and this arbitrator has found none.

[6] *See infra*, pp. 15-17.

Generally, the definition or meaning of a type of tax does not include, infer or imply, a determination of the various taxing entity's authority to enact such tax or which entities have exercised such authority – such is not for definition but for analysis. Both legal and non-legal dictionary definitions demonstrate this.

Most dictionary definitions which define a severance tax and a sales tax (and some do not) do so without qualification as to the taxing entity. Again, a definition of a severance tax or sales tax has nothing to do with the authority of or the actual practice of various taxing entities. *Black's Law Dictionary* defines "tax" as "a monetary charge imposed by government on persons, entities or property to yield a public revenue. More broadly, the term embraces all governmental impositions. . . ." Then in alphabetical order, more than 50 taxes are defined. A "sales tax" is defined as "a tax imposed on the sale of goods and services, usu., measured as a percentage of their price." A "severance tax" is defined as "a tax imposed on the value of oil, gas, timber or other natural resources extracted from the earth." *See also, Webster's Third New International Unabridged Dictionary* defining "severance tax" as "a tax on the taking and use of natural resources imposed at the time the mineral or other product is extracted or severed from the earth" and "sales tax" as "a tax on the privilege of freedom of making sales of tangible personal property that is usu. measured by a percentage . . . of the purchase price, is collected for the government imposing the tax by the seller, and is distinguished from a tax imposed on the property itself." The *American Heritage Dictionary*, 2nd College Edition, provides no definition of "severance tax" and defines "sales tax" as "a tax levied on the retail price of merchandise and collected by the retailer."

The Umpire points to the definition in the *Marion-Webster On-Line Dictionary* of a severance tax as "a tax levied by a state on the extractor of oil, gas or minerals intended for consumption in other states" as including within the definition of the tax – the type of the taxing entity. It doesn't mention either a tribe and the United States as enacting such taxes – but we know such entities have enacted both. More important, the tax as described – a state taxing the severance of minerals which are to be consumed in another state – defines an unconstitutional tax which discriminates against interstate commerce under the United States Constitution[7] – demonstrating the errors which result when ordinary dictionaries stray into the legal world. Further, none defines "sales tax" as being only a state tax. Hence, as indicated by the Umpire, the dictionaries were not enough to add the word "state" to "any severance tax."

The Umpire's reliance on *Commonwealth Edison Co. v. State of Montana, et al.*, 453 U.S. 609 (1981) to conclude that the plain meaning of "any severance tax" is actually "any state severance" because coal is assertedly only a state resource – is misplaced. First, the case does not involve a question of the meaning of the terms "severance tax". Second, the case involved questions as to Montana's authority to impose a severance tax **on federal coal** (most coal in Montana is federal coal[8]) and whether the Montana severance tax discriminated against or burdened interstate commerce. No question was raised even indirectly concerning a federal severance tax. The Court concluded that Congress had explicitly allowed the states to impose severance taxes on the mining of **federal coal** in order for the states to defer the

---

[7] *See State of Montana, infra.*

[8] The Court noted "Buried beneath Montana are large deposits of low sulfur coal, most of it on federal land." 453 U.S. at 610.

- 10 -

expenses of "additional facilities and services caused by increased coal production
. . . ."   453 U.S. at 609.   Hence, that the Court always referred to "a state," not "a
federal," severance tax, has no significance.

But what *Montana* teaches is that **coal is not exclusively a part of the earth
belonging to a state** – indeed the vast majority of the coal west of the Mississippi is in
fact owned by the federal government (non-federal coal is generally not owned by state
governments but by private parties) and that states only have the authority to tax the
severance of federal coal if the federal government has chosen to allow it.   Hence,
**major premises of the Umpire's decision –**

> that the word severance "can only apply to" the state in
> which the severed coal was situated[9] –
>
> and that "no other government taxing authority has an
> interest . . . ."[10]

**are not correct** – and provide no basis to limit the meaning by adding the word "state"
to "any severance tax," much less to "any sales tax."

Both the BLET and the AMLF are taxes imposed by the federal government on
the severance of coal[11] – to defray the social and governmental costs brought on by the

---

[9] "The distinction one must grasp in this interpretative analysis is that the **word
"severance" when defining a tax, can only apply to the state, upon which** or within which,
**the coal taken is situated** . . . the **justification for the state taxation** and [the] application of
the word severance to states only **is the diminution of the value of an asset unique to the
state** . . . but the word "severance" when applied to a tax has acquired a generic meaning
limited to only the 50 states and in certain instances, Indian tribes.

[10] "For our purposes, **the decisive issue turns on** the operating incident of the tax and
that is **the coal being a part of the earth belonging to the State** and it being taken away.   **No
other government taxing authority has an interest** in that taking away – only the state
owning the resource." (Umpire's Decision, pp. 4-5, emphasis added.)

[11] Both BLET and AMLF are imposed upon the coal's severance with the tax amount
determined by the first sale.   *See* 26 C.F.R. § 48.1, 4121-1(a) and 36 C.F.R. § 70.12.   BLET
imposes liability for the tax on the person who under State law owns  the coal "immediately after

- 11 -

mining of the coal, much like the state severance taxes allowed on federal coal are to defray the governmental services and expenses necessitated by the coal mining activity. In fact, the abandoned mine land fees (50% or more) are returned to the states in order to reclaim the pre-SMCRA abandoned mine lands. The legislative history supports that these taxes relating to the increased cost of governmental services and other matters were viewed as a federal severance tax.[12]

---

the coal is **severed** from the ground with the amount determined first sale." Similarly, AMLF is imposed upon the operator per ton of coal produced by surface coal mining "or" by underground mining and the amount of the tax is determined by the first sale "after it is severed."

[12] *See* Hearing before the Subcommittee on Energy in the Environment of the Committee of Interior on Insular Affairs House of Representatives Hearing, 95th Congress (1977). (Statement of Aubrey J. Wagner, Chairman, Tennessee Valley Authority) ("Creation of the abandoned mine reclamation fund, which would be funded primarily by a **federal severance tax** on coal is good . . . Although this **severance tax** will not substantially increase the cost of coal, it will cause the fund to receive far more money than would be needed to achieve realistic goals.") (emphasis added); 123 Cong.Rec. S. 8083 (daily ed. May 20, 1977) (Statement of Sen. Long) ("[The] **fee**, which, from my point of view, **is completely indistinguishable from a severance tax** on a natural resource . . . [T]his fee . . . is the same thing we in Louisiana call a severance tax."); 123 Cong. Rec. H.37262 (daily ed. April 28, 1977) (Statement of Rep. Regula) ("Likewise, the abandoned mine reclamation fund provisions allowing a return to the states of up to 50% of the **severance fees** collected is a step in the right direction.") (emphasis added); Committee on Interior Insular Affairs, United States Senate, 29nd. Cong., 1st Sess., The Issues Related to Surface Mining, a Summary Review with Selected Readings. (Comm. Print 1971). (Sen. Baker requested the consideration of "the establishment of a **severance tax** on all coal and on other fuels at the federal level.") (emphasis added); H.R. Rep. No. 93-1072 (1974) ("The largest contributions to be made to the fund will come from a **severance fee** . . .") (emphasis added) Hearings on S.2777 before the Subcommittee on Minerals, Matters and Fuels of the Committee on Interior and Insular Affairs, United States Senate, 92nd. Cong. (1971) (Statement of Joel M. Pickelner, Legislative Information Specialist of the National Wildlife Federation) ("The ideal way of generating the funds would be to levy a per ton **severance tax** on all future mining, with the revenue going into a trust fund to reclaim previously stripped lands.") (emphasis added); Hearings before the Subcommittee on Mines and Mining of the Committee of Interior and Insular Affairs House of Representatives (1971) (Letter from American Mining Congress requested by Representative Skubitz regarding its position on the imposition of a national severance tax on strip mined coal whereby the American Mining Congress stated, "It opposed the imposition of a **national severance** *tax*.") (emphasis added); Hearings on H.R. 2 before the Subcommittee on Energy and the Environmental of the Committee on Interior and Insular Affairs House of Representatives (1977) (Statement of Rep. Regula) ("In the event there is some type of **severance tax** in this bill, I hope recognition would be given to the states that already have this kind of tax for reclamation of orphan lands and allow credit for it.") (emphasis added).

The terms "special purpose tax" may well be descriptive of the use of tax funds and legislatures many times name a tax by the purpose of the funds. Such does not define the type of tax under applicable tax law. No doubt the social security tax is a special purpose tax, but it is an income tax. Also, as we have seen in this proceeding, various states which have severance taxes have termed them to be excise taxes or vice versa[13] and the Black Lung tax is described as an excise tax, but these descriptions are not determinative of whether the tax is a severance tax. (See, infra, pp. 15-17.)

**Language In The Context/History Of The Documents.** A major aspect of the "four corners" rule is that word or phrases cannot be viewed in isolation and the meaning of words must be consistent with context and consistent with other similar language or subjects within the documents – here the original lease and the amendment. In looking to the four corners – when a specific taxing authority was being referenced by the parties so as to limit the meaning of a tax or to designate a tax by a specific taxing authority – then such terms were used by the parties; but when the meaning was more general, such terms were not used. See Section 13.1 through 13.3. The potential for a future tax by "Illinois" on "unmined coal" was specifically covered. (§ 13.3) Illinois had no severance or sales tax for coal. The entirety of the leased coal was in Illinois. Yet, "severance tax" was added as a deduction in the Amendment,

---

[13] Many of the state severance taxes are specifically designated as an excise tax. *See* Alabama 1971 Coal Severance Tax, Code of Ala. § 40-13-2 ("there is hereby levied . . . **an excise** and privilege tax on every person severing coal in Alabama" Arizona Severance Tax, A.R.S. § 42-5202 ("there is levied on any severor, and the Department shall collect, **an excise tax** denominated as a **severance tax**". These are but a few examples of the various state severance taxes that are designated as an excise tax.

- 13 -

without any qualification. Also, the Amended Lease clearly contemplated both federal and state law being applicable.[14]

Interestingly, Lessee was responsible for all taxes levied against the land by "governmental authority" – including any "excise" tax, as well as any tax on the "privilege of mining the coal" (*i.e.*, a severance tax) § 13.1, again without any limitation as to State or Federal taxing authorities – just like providing for the deductibility of "any sales tax" or "any severance tax". This added deduction was in face of both parties being knowledgeable in the coal industry and having previously dealt with the deductibility of the "reclamation tax" and the "black lung tax" to arrive at a net profit for royalty calculations. Further, the new language expressly specified non-deductible items but did not specify AML or BLET as non-deductible. **Nothing in the four corners supports inferring or implying a limitation on "any sales tax" or "on any severance tax".**

The evidence used by the parties to correct the mistake in the Amended Lease, the letter from attorney McDonald – as correctly setting forth the intent and now a part of the "four corners" – clearly stated that the insertion of "and/or severance" tax was so that severance taxes "will be deducted"; clearly referring to what was going to take place, not to potential future legislative enactments as in § 13.3. Again, Illinois had no

---

[14] In my mind, it is significant that Mr. Keady's initial response, once the disagreement as to the deductibility of BLET and AMLF surfaced, was that these taxes were excise taxes, not that severance taxes encompass only state severance taxes. *See* Ex. U, Mr. Keady's September 30, 2002 letter. This is not contemporaneous or prior negotiations encompassed by the parol evidence rule – rather, it is an admission.

severance or sales tax for coal.[15]  So in this context, the addition of "any severance tax" as being deductible takes on significance and meaning.  This is particularly so when the parties did not limit the taxing authority to only a state or county sales or severance tax – as they did for other taxes elsewhere in the Lease.

**A Sales Tax And A Severance Tax – A Type of Excise Tax.**  During the summary judgment briefing, Vermilion's primary thrust was that BLET and AMLF are federal excise taxes not **severance taxes.**  *See* Argument, Part A.  **"BLET and AMLF are Federal Excise Taxes Not Severance Taxes,"**  Vermilion Summary Judgment Memorandum, p. 7 (heading).  Implicit in Vermilion's argument is that a severance tax cannot be an excise tax and vice versa.  The reality is the opposite – excise taxes are a broad form of a tax, including many different types of taxes, such as gift and estate taxes, sales taxes and severance taxes.  Further, most of the state severance taxes are stated to be an excise tax.[16]  So a severance tax is in fact a form of excise tax.

The category of excise taxes arose early in the history of the United States, indeed from the Constitution and was used to differentiate a direct tax.  The word "excise" appears in Article I, § 8 of the Constitution establishing the general power of the government to "lay and collect taxes, duties, impose and excises. . . "which is limited by § 2 requiring "direct" taxes to be apportioned and § 9 which requires such

---

[15] Both Mr. Keady and his counsel have stated that if Congress had passed a federal severance tax, such would be encompassed within the words "any severance tax", but they claimed not so here, because BLET and AMLF are excise taxes.

[16] Many of the state severance taxes are specifically designated as an excise tax.  *See* Alabama 1971 Coal Severance Tax, Code of Ala. § 40-13-2 ("there is hereby levied . . . **an excise** and privilege tax on every person severing coal in Alabama" Arizona Severance Tax, A.R.S. § 42-5202 ('there is levied on any severor, and the Department shall collect, **an excise tax** denominated as a **severance tax".** These are but a few examples of the various state severance taxes that are designated as an excise tax.

- 15 -

taxes to be "in proportion to the census" as required by the Constitution. The Supreme Court has consistently held "that a tax imposed upon a particular use of property or the exercise of a single power over property incident to ownership, is an excise and need not be apportioned. . . ." *Fromley v. McCaughn*, 280 U.S. 124, 36 (1929) (holding that a tax on gifts and transfers of property gift is not a direct tax but applicable only to a limited exercise of property rights). A review of the Internal Revenue Code reveals many and various types of excise taxes in addition to gift and estate taxes. *See* particularly, **"Title D, Miscellaneous Excise Taxes"**, 29 U.S.C. §§ 4061 thru 5270, including a **sales tax** on the sale of "gas guzzlers", a tax on gambling, a sales tax on the sale of certain chemicals, as well as on consumption or use of the chemical and list could go on and on. So the fact that a sales tax and severance tax may be a form of excise tax adds nothing to the deliberations. At the same time, Vermilion cannot be heard to argue that the AMLF is not tax, but a fee – having argued and presented various authorities, including various cases, that the "reclamation fee" is an excise tax.

Vermilion has also argued that BLET and ALMF are "excise taxes . . . triggered by the first sale of the personal property, not its severance." Vermilion's Brief in Support of its Motion for Partial Summary Judgment states (p. 11): "The natural resource related meaning of the word 'severance' is the removal of a natural resource from the earth and its accompanying conversion to personal property. As cited in many of the cases that pertain to BLET and AMLF, the payment of these excise taxes are (sic) triggered by the first sale of the personal property, not its severance." "Triggered" is not correct – rather, the amount of the tax is set by the first sale.[17]  Neither tax (the AMLF

---

[17] *See* n. 11, *supra*.

- 16 -

and BLET) can be determined – that is, whether the flat rate or percent of value is to be the amount of the tax – until value is established by the first sale of the coal. Moreover, it is inconceivable that there would be any tax in the absence of the sale of the severed mineral – when there is cash to pay the tax. Indeed, the typical severance tax statute requires a severance and a sale before the imposition of the severance tax. *See Yankee Atomic Electric v. New Mexico and Arizona Land Company,* 632 F.2d 855 (10th Cir. 1980) (demonstrating that New Mexico's resources excise tax, severance tax and oil and gas severance tax were predicated "upon privilege of severance and sale," not merely severance. (AMSA 1978, §§ 725, *et seq.,* 726 *et seq.* and 730 *et seq.*). Vermilion has not demonstrated any severance tax which is imposed in the absence of a sale, whether by federal, state, tribe or other government or otherwise. Moreover, even were this true, it would simply transpose the BLET and AMLF into a form of sales tax or a combined form of severance and sales tax.

## II.

### Mandatory Arbitration And Failure To Comply/Cure – Are Conditions To Any Breach

As indicated earlier, even if BLET and AMLF should not have been deducted, there was no breach or default.

In regard to the coal Lease's mandatory arbitration requirement of "matters in dispute" and its effect on the question of default, cure or breach, this issue is well within any assertion of breach, default, failure to cure, material default or anticipatory repudiation – all are liability issues on which Vermilion carries the burden. Moreover, despite assertions to the contrary, Black Beauty clearly raised this issue and told

Vermilion about its burden in this regard.[18]  The requirement that the arbitrators first determine "matters in dispute" under the Lease before the disputed performance is due, or in default, or before cure is required and before there can be a breach (an uncured default) – results from the language of the various lease provisions.  The words "any matters in dispute", "default" and "breach", are used in the Lease in distinctly different contexts and with distinctly different meanings which inescapably lead to the conclusion that – the arbitration of a matter in dispute is required before the disputed obligation is due or in default and that there must be a failure to comply with the decision or cure before there can be a breach (*i.e.*, there can be no breach until a cure period lapses and the default is uncured).  This is not a question of whether arbitration is an exclusive remedy, rather there has been no breach.

Section 24.1 (Arbitration) mandates that "any matters in dispute" must be arbitrated ("shall be referred to a Board of Arbitrators") and that the decision be "promptly complied with".  To be noted is that the words "default" and "breach" are not used in reference to what must be arbitrated – but rather any **"matters in dispute" must be arbitrated**.  At the same time, the last sentence of § 24.1 provides that the "binding arbitration provision herein" will not limit the right of either party to "seek injunctive relief for **breach hereof**" (which, of course, begs the question of what is a

---

[18] See Black Beauty's Response to Vermilion's Purported Issues for Arbitration, p. 3, "If the Panel determines that BLET and AMLF are not deductible under the terms of the Lease . . . , **Vermilion will still have to set forth a theory and provide evidence that Black Beauty is not entitled to have good faith dispute resolved in arbitration** before being found in **default.**  Vermilion will also have to show that submitting a good faith dispute to arbitration somehow constitutes anticipatory or actual repudiation.")

"breach"?). *See also*, § 22.5 re "Injunction Against Breach".[19]  Section 22.1 gives the Lessee the right to **cure any default** within 30 days of a notice as to non-payment of rent or royalties, or 60 days of a notice as to any other alleged default.  § 22.6 provides that all remedies "shall be cumulative and concurrent . . . ."[20]

The only conclusion which harmonizes these various provisions is that any "matter in dispute" must go to arbitration before there can be a default with respect to a disputed obligation and then a failure to "promptly comply with" the decision before there can be a breach (an uncured default).  Since any "default" is curable and notice is required before there is a default and before cure is required – only an uncured default is a "breach."  Again, the term "dispute" is distinctly different from the terms "default" or "breach".  Clearly, a dispute precedes a default, and the arbitration decision must precede the opportunity to comply (cure) and an uncured default must occur for there to be a breach.  This result is even more certain when the procedure for the arbitration is considered – this was designed to be quick and short (within 60 days) so that disputes would be quickly resolved and cured in the event arbitrators determine that the disputed performance is due.

So, it is explicit in the Lease that the parties **"shall" arbitrate** "any matters in dispute" **before any default** can be found, and must have an opportunity to cure (comply with the decision) **before a breach** (*i.e.*, an uncured default).  Whether this is

---

[19] "In the event of any breach or threatened breach by Lessee of the covenants, agreements, terms or conditions of this Lease, Lessor shall have the right to invoke any rights, powers and remedies allowed at law, in equity . . . ."

[20] Section 22.6 provides in part as follows:  "Each right, power and remedy of Lessor provided for in this Lease shall be cumulative and concurrent and shall be an addition to every other right, power or remedy. . . ."

ambiguous or unambiguous, makes no difference.  At the very least, these are implied conditions.  See, *Engis Corporation v. Engis LTD*, 800 F.Supp. 627, 631 (N.D. Ill. 1992) ("[B]ecause contracts have both implied and express terms, the authority of an arbitrator to interpret a contract includes the power to 'discover' implied terms.")

Moreover, under Illinois law, in a declaratory judgment action a contractual cure period is delayed until final determination.  See, *Richards v. Electric Controls Corp.*, 325 N.E.2d 775, 788 (Ill. App. 1975).  ("There does not appear to be sufficient grounds to permit [plaintiff] to unilaterally terminate the agreement before the pending declaratory judgment action has been finally adjudicated, in the absence of a showing that [defendant] seeks to ignore the determination of the court when it is finally clarified by judicial action, and in light of the substantial basis for the dispute between [plaintiff] and [defendant] as to the construction of the various portions of the agreement in question.")  As the court in *Richards* reasoned, it is the very purpose of a judicial action to obtain resolution of a controversy without requiring the litigants to irrevocably jeopardize their rights.  Even more so here – where matters in dispute are required to be arbitrated before compliance with the disputed obligation (cure) is required and there can be no breach until the opportunity to cure has expired.]

It has also been argued that the cumulative or concurrent remedy provision controverts that arbitration of a matter in dispute is a condition precedent to the disputed performance being due and there being any breach (uncured default).  But it is not a matter of concurrent remedies for a breach.  There is simply no breach until after the arbitrators determine "a matter in dispute" after which no compliance or cure occur.

- 20 -

**Indeed, there has already been a ruling** (or Vermilion has agreed) that matters in dispute must first be determined by arbitration – before there can be a breach for which injunctive relief can be sought. **Vermilion filed an action in an Illinois state court seeking injunctive relief for a breach, but the Illinois judge required that matters in dispute go to arbitration first** (whether by Vermilion's stipulation or otherwise).

## III.

## Conclusion

For the foregoing reasons, we should determine that BLET and the AMLF were properly deducted, and even if not, there has been no breach or that Vermilion is estopped to assert such breach, or to claim any damages.

G. Daniel Kelley, Jr.
Arbitrator

- 21 -

E-FILED
Friday, 28 September, 2007  11:01:18 AM
Clerk, U.S. District Court, ILCD

# EXHIBIT C

Exhibit A

# Vermilion Coal Company

### An Iron Carbide Technologies Company

1979 Johns Drive
Telephone: 847-832-9007

Glenview, IL 60025
Facsimile: 847-832-9010

May 12, 2003

<u>Via Certified Mail</u>

Black Beauty Coal Company
Attn: Dan Hermann, President
414 S. Fares Avenue
Evansville IN 47714

### <u>Notice of Lessee's Default of Coal Mining Lease Dated Nov. 21, 1994 (the "Lease")</u>

Dear Mr. Hermann:

Vermilion Coal Company is the Lessor ("Lessor"), and Black Beauty Coal Company is the Lessee ("Lessee"), pursuant to the above captioned Lease. Lessee has defaulted in the performance of its Lease obligations by its actions including:

1.     Improperly deducting a $0.30 per ton "Loading Fee" from the Gross Selling Price ("GSP") of coal from the Vermilion Grove mine before calculating the amount of Gross Proceeds upon which royalties and wheelage payable to Lessor are calculated; and,

2.     Deducting Black Lung Excise Taxes ("BLET") and Abandoned Mine Land Fees ("AMLF") from the Gross Selling Price ("GSP") as defined in the Lease, resulting in reduced payments to Lessor.

Lessor has demanded that Lessee cease its wrongful calculation of royalty and wheelage, and to repay prior period underpayments. Lessee, over Lessor's objections, has refused to pay the correct amount of royalty and wheelage or to pay amounts due from prior periods. Moreover, Lessee has continued its wrongful practice of deducting BLET and AMLF from GSP before calculating the amount of royalty and wheelage payable to Lessor and has anticipatorily repudiated its obligation to make future payments to Lessor in accordance with the Lease.

Lessee is hereby notified that Lessee's actions constitute events of default under the stated terms of the Lease. **As a result of Lessee's default of its Lease obligations, the Lease will be terminated effective June 1, 2003.** Lessor has instituted legal proceedings against Lessee and is seeking legal and equitable remedies for Lessee's wrongful conduct.

Lessee may remain in possession of the Leased Premises as a tenant-at-will ("Tenant") after the effective date of termination, under the same economic terms as the terminated lease until the matter is adjudicated by the trial court, *provided that* Tenant pays Lessor the disputed amounts of $380,692.81 that arose from prior period underpayments, plus accrued interest to the payment date; and observes all the other terms of the Lease.

BB068136

Lessor reserves the right, at its sole discretion, to change any term or terms of Tenant's occupancy (including the fact of occupancy itself) subject only to reasonable notice after the effective date of termination. Lessor also reserves all further remedies available to it under law or equity.

Sincerely,

Frederick D. Keady P.E.
President

BB068137

**E-FILED**
Friday, 28 September, 2007  11:06:48 AM
Clerk, U.S. District Court, ILCD

# EXHIBIT D

| VERMILION COAL COMPANY, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | Arbitration Panel: |
| v. | ) | |
| | ) | Hon. Thomas Lambros- Umpire |
| BLACK BEAUTY COAL COMPANY, | ) | Hon. Susan Getzendanner |
| | ) | G. Daniel Kelley, Jr., Esq. |
| Defendant. | ) | |
| | ) | |

## VERMILION COAL COMPANY'S POST HEARING BRIEF

## BACKGROUND

This case began with a simple breach that seems to have resulted from gross negligence, sharp dealing or fraud. Vermilion Coal Company (sometimes referred to as "Vermilion, Lessor or Plaintiff"), discovered the breach and demanded that Black Beauty Coal Company (sometimes referred to as "Black Beauty, Lessee or Defendant") make restitution and cure the conduct that was in breach. (Tr.354-366). At that point, Black beauty had the clear chance to cure at no risk to itself by paying the disputed prior period amounts and ongoing royalty and wheelage under protest, and filing an arbitration demand for a declaration of its rights. But it did not.

Black Beauty refused to cure its breach. (Tr.366-413). Vermilion was commercially insecure, because Black Beauty's breach put it at risk of, and ultimately did cause Vermilion to fall into default of its first mortgage and other debts. (Tr.414-415, 1548). That caused loss of credit standing, and shame to Vermilion and its principals. (Tr.414-415). Vermilion had also discovered numerous additional breaches that the Panel elected not to consider in its initial hearing of this arbitration, but of which the Panel has reserved jurisdiction; and

-1-

further intensified its commercial insecurity. (See Vermilion's Issues for Arbitration Hearing dated July 13, 2004; Order of Panel August 24, 2004). Vermilion chose from among the remedies available to it, and demanded adequate assurance of specific performance. (Tr. 354).

Initially, in attempting to resolve the dispute, Vermilion did not demand arbitration, because it seemed imprudent to spend its last few dollars to begin an arbitration with a determined, delinquent counter-party who appeared to be acting in bad faith; and which would likely yield less in recoveries than the cost of the arbitration.  (T.353-355, 415). Instead, Vermilion made good faith attempts to obtain Lessee's compliance with its contractual obligations and to work with Lessee by providing requested authorities for Vermilion's position. ( Tr. 281, 283-284, 354-360, 390,394 - 397, 427-428).

Black Beauty refused to provide the adequate assurance of specific performance that Vermilion demanded within a reasonable period of time (anticipatory repudiation); and continued to breach (present repudiation).  Black Beauty's conduct then ripened into repudiation. Black Beauty chose this risky course of action, and cannot now look to this Panel to protect it from the readily foreseeable consequences of its risky and aggressive choice. Vermilion acted prudently and reasonably--Black Beauty acted rashly and opportunistically.

Since Black Beauty was aware of Vermilion's debt service obligations, it was also able to calculate the effects of its royalty and wheelage payments on Vermilion's ability to service its debt. (A possible motive for Black Beauty's conduct may have been to force Vermilion to default so that it would have an opportunity to acquire Vermilion's 26,000 cares of coal land.)

Vermilion acted diligently. It engaged litigation counsel shortly after Black Beauty set off its $111,000 provisional payment against the minimum royalty due November 21, 2002. ( Tr. 411). Vermilion sent a second demand for adequate assurance December 20, 2002, shortly before it fell into default on its first mortgage payment to Terre Haute bank. (Tr. 411, 415).  Counsel spent several months reviewing applicable facts and law before Vermilion acted by changing its position and serving Black Beauty a Notice of Default on May 12, 2003. (Tr. 424-425, 506).

Section 22.1(a) of the Lease defines a default as a breach in payment that is not cured within 30 days of lessor's demand. (Tr. 125). Therefore, Black Beauty's breach ripened into a default 30 days after Vermilion's October 20, 2002 demand (Tr. 126). Section 22.1 of the Lease further provides a period to be prescribed by lessor of not less than twenty days to cure a default, and provides by its stated terms for termination if the default is not cured within the prescribed period. Black Beauty continued to act with impunity, and ignored the Notice of Default served upon it by Vermilion. (Tr. 506-514, ). The Lease, in accordance with its own terms was terminated. Vermilion also filed a lawsuit for equitable and injunctive relief pursuant to Sections 22 and the last sentence of Section 24 of the Lease in the Circuit Court of Vermilion County Illinois on May 12, 2003.   Black Beauty was allowed to remain on the leased premises as tenant-at-will pending resolution of the dispute. (Tr. 514, 841-844). Black Beauty (wrongly, we believe) persuaded the Vermilion County Circuit Court to order arbitration, and Vermilion and Black beauty then entered into an agreed order to that effect. Judge Clary retained jurisdiction of the case pending the outcome of the arbitration.

## CONTRACT ISSUES SUBMITTED TO THE PANEL FOR RULING

1.      Whether Black Lung Excise Tax ("Black Lung") and Abandoned Mine Land Fees ("Reclamation Fees") are "sales and /or severance tax" to be deducted from the Gross Sales Price ("GSP") Black Beauty ("Defendant") actually receives from bona fide purchasers for coal sold f.o.b. the loading point after preparation, if any, and loading for the final destination before calculating royalty and wheelage fees to be paid to Plaintiff Vermilion Coal Company ("Plaintiff") in accordance with Article II, Section 2.4 of the Lease.

> (a) Whether Defendant breached its express and implied duty of good faith and fair dealing under the Lease by its conduct in deducting Loading Fees, Black Lung and Reclamation Fees from GSP?

2.      Whether Defendant's actions including the reporting of GSP and calculations of royalty and wheelage fees owed to Plaintiff constitute "Events of Default" under Section XXII of the Lease entitling Plaintiff to seek any and all remedies for Defendant's default, including, without limitation, termination of the Lease?

3.      Whether Defendant's unequivocal and expressed statement of its intent to continue in its conduct of deducting Black Lung and Reclamation Fees from its calculation of royalty and wheelage fees owed to Plaintiff under the Lease after Defendant received Plaintiff's demands for adequate assurance of specific performance constitute Defendant's actual repudiation of the Lease?

4.      Whether Defendant's unequivocal and expressed statements of its intent to continue in its conduct of deducting Black Lung and Reclamation Fees from its

-4-

calculation of royalty and wheelage fees owed to Plaintiff under the Lease after
receipt of Plaintiff's demands for adequate assurance of specific performance
constitute Defendant's anticipatory repudiation of the Lease?

5.      Whether Plaintiff's filing of a complaint in state court prior to Defendant's
notice of Defendant's arbitration demand constitutes the "filing of an action" under
the legal doctrine of anticipatory repudiation of the Lease?

6.      *Whether Defendant's failure to cure its default after proper Notice of
Default by Plaintiff resulted in the termination of the Coal Mining Lease.[1]

7.      Whether Black Beauty's deduction of Black Lung and Reclamation Fees *or
any other costs* from the f.o.b. Gross Selling Price for coal produced and sold
pursuant to the Lease, before calculating the royalties and wheelage due and
owing to Plaintiff, constitute events of default under the Lease?

8.      *Whether, as a result of Defendant's default in the due and punctual
payment of any rent, royalty or any part thereof, when and as the same became
due and payable to Plaintiff, the Lease was terminated in accordance with Article
XXIV of the Lease.

9.      Whether Catlin's underpayment of wheelage fees during the years of 1997,
1998 and 1999 in which Catlin paid wheelage for third party coal mined pursuant
to the Lease at the rate of $0.15 per ton when the Gross Selling Price received by
the Lessee pursuant to the Lease was substantially greater than $15.00 per ton

---

[1]Pursuant to the Panel's Order of August 24, 2004, Remedies for any breach
including accounting, damages, or termination were bifurcated from the 11/08/04
hearing.  These issues are marked with an asterisk (*).

(In accordance with the stated terms of the Lease, the Lessee is obligated to pay wheelage at the greater of $0.15 per ton or 1.0% of Gross Selling Price) was a breach of their contractual obligations to Vermilion.

10.    Whether Black Beauty's clear and unequivocal refusal to calculate and make royalty and wheelage payments owed to Vermilion in accordance with the Lease constitutes Defendant's anticipatory repudiation of the Lease, and thus renders Black Beauty in default under the terms and conditions of the Lease.[2]

## ARGUMENT

### I.    Contract Interpretation

The matters in dispute between the parties which have been submitted to the arbitration Panel concern interpretation of the contract between the parties - the Lease. The issues submitted to the Panel for ruling include breach of contract issues and fraud underlying the breach of contract.  In particular, the Panel must rule on the interpretation of the language in Section 2.4 of the Lease regarding the calculation of royalties and determine whether the phrase  "any sales tax and/or severance [tax]"  allows Black Lung and Reclamation Fees or other costs to be deducted from the calculation of royalties and wheelage under the Lease.

In its Motion for Partial Summary Judgment, Vermilion argued that the language of the contract is clear and unambiguous and that the "plain meaning" of the term "severance"

---

[2]Vermilion has the burden of proof by a preponderance of the evidence, regarding the propositions set forth in its submissions.  Black Beauty has the burden of proof regarding its affirmative defense of estoppel that it raised and presented evidence on solely in defense of Vermilion's claims regarding Black Beauty's liability for amounts owed for improper deductions taken by Catlin Coal, Inc..

tax does not include Black Lung and Reclamation Fees. [3]  In declining to rule on the motions for summary judgment, the Panel asked the parties to submit evidence regarding the intent of the parties[4] and the custom and practices in the coal mining industry in order to assist the Panel in resolving any ambiguity in the interpretation of Lease terms.

**A.    If The Panel Finds The Lease Is Ambiguous, Parol Evidence Is Admissible To Aid The Trier Of Fact In Resolving The Ambiguity.**

Once an ambiguity is found by the tryer of fact, various forms of extrinsic evidence may be admitted to resolve the ambiguity.  As explained by the Illinois Supreme Court in *Air Safety, Inc. v. Teachers Realty Corp.,* 185 Ill. 2d 457, 462-63, 706 N.E.2d 882 (1999):

> If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence. *Farm Credit Bank v. Whitlock,* 144 Ill. 2d 440, 447, 581 N.E.2d 664 (1991). If, however, the trial court finds that the language of the contract is susceptible to more than one meaning, then an ambiguity is present. *Whitlock, 144 Ill. 2d at 447.* Only then may parol evidence  be admitted to aid the trier of fact in resolving the ambiguity. *Whitlock,* 144 Ill. 2d at 447.

---

[3]Vermilion's Motion for Partial Summary Judgment sets forth detailed legal argument in support of the proposition that, as a matter of law, severance taxes are taxes imposed by a state or Indian tribe on the severance of natural resources from the land.   Black Lung excise taxes and Reclamation Fees are not severance taxes.  If the Panel determines that the language is clear and unambiguous as a matter of law, it does not need to consider the extrinsic evidence in order to enter its ruling.

[4] In accordance with Section 26.1 of the Lease, any disputes as to the meaning and application of any of the provisions of the Lease are to be determined under the laws of the State of Illinois.  Under Illinois law, the intent of the parties controls the determination of whether a contract exists. *Connecticut Gen. Life Ins. v. Chicago Title & Trust, 714 F.2d 48, 50* (7th Cir. (Ill.) 1983). Thus, if the parties in an action for breach of contract dispute the meaning of the language as contained in the contract, the issue of whether a contract exists and the terms of the contract must be decided as questions of fact.

Admissible parol evidence in such a case is limited to facts and transactions which either preceded or were contemporaneous with the execution of the contract. *Arthur Rubloff & Co. v. Comco Corp.*, 63 Ill. App. 3d 362, 367-68, 380 N.E.2d 15 (2d Dist. 1978)("If the contract language is ambiguous, prior and contemporaneous transactions and facts may be considered to ascertain the particular intent and scope in which the parties used particular terms.")

The parties' testimony explaining what they intended when they executed the contract or lease is not admissible. As explained by the Seventh Circuit in *Hemenway v. Peabody Coal Co.*, 159 F.3d 255 (7th Cir. 1998): "Evidence about the beliefs, wishes, hopes, and fears of its negotiators and managers would be inadmissible, for only objective evidence may be used to elaborate on a contract's meaning." 159 F.3d at 259.

In *Home Insurance Co. v. Chicago and Northwestern Trans. Co.*, 56 F.3d 763 (7th Cir. 1995), the Seventh Circuit further explained the difference between the admissible "objective" evidence and inadmissible "subjective" evidence: "Subjective" evidence of ambiguity is "the testimony of the parties themselves as to what they believe the contract means," which is invariably self-serving, inherently difficult to verify and thus, inadmissible. *AM International, Inc. v. Graphic Management Associates, Inc., 44 F.3d 572, 575 (7th Cir. 1995),* "Objective" evidence, on the other hand, is evidence of ambiguity "that can be supplied by disinterested third parties," such as custom or usage of the trade. *AM International, Inc., 44 F.3d at 575.*

In determining whether an ambiguity exists, it is significant that the mere fact of the parties' disagreement does not, by itself, establish the ambiguity:

-8-

> Moreover, the mere fact that parties disagree on a term of a contract is not a sign that the term is ambiguous, and unless the agreement unequivocally specifies its own meanings, the court must interpret the words of the contract with their common and generally accepted meanings.

*U S G Interiors, Inc. v. Commercial & Architectural Products, Inc.,* 241 Ill. App. 3d 944, 949, 609 N.E.2d 811 (1st Dist. 1993). A contract term is ambiguous when it may reasonably be interpreted in more than one way.

### 1. "Severance Tax" Does Not Mean "Any Production Tax."

Historically, a severance tax is imposed by the state to recompense the state for the diminution of the state's natural resources and to raise general revenue. (Tr. at 1603-04). *See,* Walter Hellerstein, *"Political Perspectives on State and Local Taxation of Natural Resources,"* 19 Ga. L. Rev. 31 (1984). The "severing" of coal refers to the permanent taking of the coal from the ground. The coal cannot be replaced. Hence the compensation is to the state for the depletion of its coal resources.

There are other taxes that are triggered by the production of coal, such as Black Lung and Reclamation Fees, but these are not taxes to compensate the federal government for the severance of the coal from the ground, the depletion of the nation's reservoir of coal. There could be a federal severance tax, but there is none.[5] According to former U.S.

---

[5]The concept of a national or federal severance tax has been put forward in Congress. In 1969, Senator Metcalf from Montana offered Senate Bill 910 which sought to impose a 5% federal severance tax on the gross income from mining, with amounts paid as state severance taxes available as tax credits against the federal tax being proposed. Senator Metcalf's bill was offered in an effort to encourage states like Montana to impose reasonable severance taxes upon mineral producers to encourage mining companies to stay in resource-rich states rather than to operate in states where there are no severance taxes. 129 H.R. 6625, 96th Cong., 2d Sess. (1980);*See,* Walter Hellerstein, *"Political Perspectives on State and Local Taxation of Natural Resources,"* 19 Ga. L. Rev. 31 (1984).Three House bills were introduced that were identical to H.R. 6625. Two slightly different Senate bills limited the application to coal produced on

Senator J. Bennett Johnston, no federal severance taxes exist for the mining of coal, and severance taxes are mechanisms used by state governments for general revenues. (Tr. 1588).[6] See, *Genesis, Inc., v. Tax Commissioner of the State of West Virginia,* 599 S.E.2d 689, 694 (S. Ct. App (W. Va.) 2004)(the Court in reversing the assessment of an excess severance tax against a taxpayer stated that there are no federal tax counterparts to the state severance tax).

Instead, Black Lung and Reclamation Fees are specific taxes or fees designed to compensate for past sins caused by coal mining , black lung disease in underground mine workers and the land left desecrated by coal mining operations**.** Black Lung and Reclamation Fees are not taxes that compensate any state, tribal or federal entity for the depletion of natural resources.  Rather they are special purpose taxes or fees that are calculated on the value or quantity of the coal that is mined

---

Indian lands or lands owned by the federal government. None of the bills were passed and Professor Hellerstein concludes in his article that "federal legislation that sought to limit all state and local taxes on natural resources in accord with some federally-defined norms of fiscal balance would represent an unprecedented restraint upon the freedom to shape their own fiscal policies that states and localities have traditionally enjoyed in our federal system." *Id.* at Note 69.

[6]Professor Hellerstein defines severance tax has been defined as "an excise tax levied on the amount of a natural resource extracted from the lands and water's within a state's jurisdiction, including federal lands within a state....[A] severance tax, unlike a specific user tax, is not designed to be a quid pro quo for a particular benefit or service rendered by the state. Rather, it is a general revenue tax that is used not for any specific end, but to defer the overall social, environmental, and economic costs associated with producing that natural resource." Walter Hellerstein, *"State Taxation of Energy Resources: Are Consuming States Getting Burned?"* 36 Vand. L. Rev. 55 (1983).

**2.    Reclamation Fees Are Not Taxes and Have Never Been Referred to as a "Severance" Taxes.**

Abandoned Mine Reclamation Fees are a "reclamation fee." A Reclamation Fee is not a tax. It is a fee, a special purpose fee. Can a fee become a severance tax because some people consider the fee to be a severance tax? In ordinary conversation perhaps, but not in a legal document that defines the rights of the parties for 20 years. A fee is not a tax. (Exh. 159, ¶2.4).

**3.    The Word "any" Is Ambiguous**

The parties have stipulated that the Lease before this Panel should have been amended to read "any sales and/or severance tax." Apart from the phrase "severance tax," which was given endless attention during the hearing of this case, the broader phrase contains other ambiguities.

The first of these is the use of the word "any." Black Beauty argues the word "any" means "any sales tax" AND "any severance tax." An equally plausible reading of the phrase is "any sales tax" and/or "severance tax." This latter reading suggests the narrow meaning of the term severance tax was intended by the parties rather than the broader, more generic possibility.

**4.    The Term "and/or" Adds Further Ambiguity.**

The use of "and/or" in the phrase "any sales and/or severance tax" means the phrase can be read as "any sales **and** severance tax," and it can also be read "any sales **or** severance tax." The California Supreme Court in *In re Rufus Bell,* 19 Cal. 2d 488, 499, 122 P.2d 22 (1942), had this to say about "and/or": "It is true that the expression has proved convenient in contracts and other instruments where, by its intentional equivocation, it can

anticipate alternative possibilities without the cumbersome itemization of each one. (Citation omitted.) It lends itself, however, as much to ambiguity as to brevity."

### 5.    The Use Of The Singular Form Of "Tax" Adds Further Ambiguity.

Black Beauty has consistently argued, and Laswell testified, that the term "severance tax" was intended to encompass any and all taxes resulting from the severance of coal from the ground.  (Laswell Dep., pp. 32-33).  If that was really true, common sense would dictate use of the plural form of tax,  i.e. **"severance taxes,"** rather than "severance tax."  If Mr. Laswell intended that any and all taxes which arose from the severance of coal from the ground be deductible, surely he would, at a minimum, have provided for the deduction of "severance **taxes**" rather than "severance **tax**."  Laswell's use of the singular word  "tax" supports Vermillion's interpretation of the phrase and, at a minimum, demonstrates yet another ambiguity which must be construed against Laswell, the drafter of the amendment.

### B.    The Lease Amendment Must Be Construed Against Mr.Laswell, the Original Lessee As The Drafter

Laswell testified to his responsibility for the words used in the amendment. (Laswell Dep., pp. 41-45 ).   A cardinal rule of construction holds that ambiguities should be construed against the drafter.

"[A]ny ambiguity in the terms of a contract must be resolved against the drafter of the disputed provision. *Duldulao v. St. Mary of Nazareth Hospital Center*, 115 Ill. 2d 482, 493, 505 N.E.2d 314 (1987). See also, *Donahue v. Rockford Showcase & Fixture Co.,* 87 Ill. App.2d 47, 51, 232 N.E.2d 278 (2d Dist. 1967):  "The contract will be construed most strongly against the party who prepared it for the reason that he chose the words to be used

-12-

and is therefor more responsible for the existence of ambiguity." [7]

## II.    Contract Formation

### A.    <u>Mutual Consent</u>

In resolving an ambiguity, the Panel may consider *objective* evidence of the parties' intent at the time of entering into the contract. When considering the intent of the parties to the original Lease, the Panel must decide whether the evidence proves that mutual consent or agreement existed at the time of contracting. "Mutual consent or agreement arises out of the intent of the parties as shown by the reasonable meaning of the words and conduct of the parties, and not from any unexpressed intention or understanding of either party." Ill. Forms of Jury Instruction §10.03(1); *Robbins v. Lynch*, 836 F.2d 330 (7th Cir. [Ill] 1988). The Panel must consider the objective indicia of intent in determining whether a contract has been formed.

"An enforceable contract must include a meeting of the minds or mutual assent as to the terms of the contract." *Academy Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 30, 578 N.E.2d 981 (1991). Under this interpretation of the parties' lease, there was no "meeting of the minds" by Mr. Keady and Mr. Laswell as to this very critical term of the parties' agreement. While Messrs. Keady and Laswell clearly intended to enter into a binding agreement, "if the content of their agreement is unduly uncertain and indefinite no contract

---

[7] Although counsel have not found any cases which address the factual scenario presented here -- where the drafter's successor in interest is the party against whom the rule is applied – nonetheless, the drafter's assignment of the lease to another party provides no basis for ignoring the rule. Black Beauty, as Laswell's assignee, now stands in his shoes and must be charged with the responsibility for the dispute caused by Laswell's choice of ambiguous language.

is formed." *Academy Chicago, id.* at 29, citing, 1 Williston § 37; 1 Corbin § 95. The Illinois Supreme Court in *Academy Chicago* concluded there was no enforceable contract in that case because "[t]he parties did not and do not share a common understanding of the essential terms of the □ agreement." 144 Ill.2d at 30.

If the Panel concludes Mr. Keady and Mr. Laswell intended different things by the term "severance" tax, there has been no meeting of the minds and no contract came into existence. The evidence before this Panel would also support the conclusion that the dispute between Mr. Keady and Mr. Laswell resulted from a simple "misunderstanding" involving the meaning of the term "severance tax." (Laswell Dep. pp. 44-45, Tr. 237-240 ). In other words, the Panel could find that Mr. Keady reasonably believed and intended that the term "severance tax" in Section 2.4 mean a state-imposed Severance Tax, as that term is commonly known, while Mr. Laswell intended the same term to mean any tax which resulted from the "severance" of coal from the land. If the Panel were to conclude that this is what occurred, the result would be rescission of the parties' agreement.

- The Evidence Supports a Finding that Mr. Keady Intended The Term "Severance Tax" to Mean a State-Imposed Severance Tax. (Tr. 237-240), V Exh.E;V Exh (1); V Exh. (2).

- The Evidence Also Supports a Finding that Mr. Laswell Intended the Term "Severance Tax" to Mean Any Tax Which Resulted From the "Severance" of Coal From The Land. (Laswell Dep. pp. 33-35,44-45; Tr. 1816).

- If The Panel Concludes That The Original Parties to the Lease Reasonably Attributed Different Meanings To the Term "Severance Tax," There Was No "Meeting of the Minds" and Therefore No Contract Was Ever Formed Between Mr. Keady and

-14-

Mr. Laswell.

Under this "misunderstanding" interpretation, the parties' dispute regarding the meaning of "severance tax" is directly analogous to the facts presented in the famous contract in *Raffles v. Wichelhaus, 2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864)*. The *Raffles* contract was clear on its face. It called for the shipment of cotton from one port to another on the ship *Peerless*. Only there were at least two ships named *Peerless*, a fact neither party was aware of and it was impossible to tell which one the contract referred to. The contract was unclear because "clarity in a contract is a property of the correspondence between the contract and the things or activities that it regulates, and not just of the semantic surface." *AM International Inc. v. Graphic Management Assoc., Inc.,* 44 F.3d 572, 575 (7th Cir. 1995). "[W]hen parties agree to terms that reasonably appear to each of them to be unequivocal but are not, cases like that of the ship *Peerless* where the ambiguity is buried, □ the possibility of rescission on grounds of mutual misunderstanding, or, the term we prefer, latent ambiguity, arises." *Colfax Envelope Corp. v. Local No. 458-3M, Chicago Graphic Communications International Union, AFL-CIO,* 20 F.3d 750, 753 (7th Cir. 1994).

In the case before this Panel, the extrinsic evidence presented by the parties supports the conclusion that use of the term "severance tax" produced a latent ambiguity and that when Mr. Keady and Mr. Laswell agreed to use that term it appeared to each of them to be unequivocal when in fact it was not. The conclusion that the parties attributed different, inconsistent meanings to the term "severance tax" necessarily compels the further conclusion that there was no "meeting of the minds" and that an enforceable agreement

-15-

never came into existence.[8]

## B.    Intent of the Parties

The meaning of the terms in the Lease are to be determined by analyzing objective

evidence to determine the intent of the parties. The Panel must examine evidence including

the parties' conduct, the language of the lease, and the circumstances under which the

parties entered into the contract. *Michigan Ave. Nat. Bank v. Evans, Inc.,* 176, Ill. App. 3d

1047, 531 N.E.2d 872 (1st Dist. 1988), appeal denied, 125 Ill. 2d 567, 537 N.E.2d 811

(1989).  In construing a lease, the primary objective is to determine and give effect to the

---

[8]Black Beauty did not raise in its submissions or present any evidence relating to defenses to formation.  In questioning counsel during Vermilion's presentation of its case in chief, however, Panel members raised questions which might arguably suggest that the Panel had certain questions relating to such issues.  Although it is Vermilion's position that such issues are not before the Panel and should not affect the ruling on Vermilion's issues, Vermilion contends that even if such issues such as mistake of fact had been raised by Black Beauty, they would not be successful to convince the Panel that the Laswell interpretation of the contract is correct, but rather that no contract was formed between the parties.

Under Illinois law, if one party to a contract has knowledge of facts that are material to the contractual agreement between the parties, he has a duty to disclose those facts to the other party. *Puskar v. Hughes,* 179 Ill. App. 522, 533 N.E.2d 962 (2d Dist. 1989). Even if Laswell's misrepresentation was innocent, if the Panel finds that Laswell had knowledge of facts material to the Lease but did not disclose those facts to Mr. Keady, then the Panel must find that Vermilion may revoke the Lease and rescission may be a remedy. *Id.* Moreover, if the Panel were to find that, at the time that Laswell and Mr. Keady executed the Lease, both parties made a mistake regarding the meaning of the word severance tax in the calculation of royalties and wheelage under the Lease - a material contract term - then the Panel must find that no valid contract was formed. *Casanas v. Nelson*, 140 Ill. App. 3d 341, 489 N.E.2d 358 (2d Dist. 1986).

A mutual mistake exists if the contract has been written in terms that do not conform to the understanding of both parties. See *Raffles v. Wichelhaus, 2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864)* and the arguments set forth in Section II. A, p. 14 herein. Such a finding could arguably affect the Panel's jurisdiction to enter a ruling in this matter. See, *Medtronic Ave. Inc., v. Cordis Corporation,* 367 F. 3d 147; 2004 U.S. App. LEXIS 8533 (2004).

intentions of the parties at the time the lease was entered into. *Id.* The intention of the parties must be determined, if possible, from the language of the lease, and words are to be given their plain and generally accepted meaning. *Cory v. Minton,* 49 Ill.App.3d 312, 364 N.E.2d 311 (1st Dist. 1977).

### 1. The Parties to the Lease Did Not Express their Understanding to Each Other.

Ron Laswell testified that he wanted to be able to deduct Black Lung Tax and Reclamation Fees. (Laswell Dep. 23-24; Tr. 1815) He wanted to deduct Black Lung and Reclamation Fees because he thought he had no control over them. (Laswell Dep. pp. 49-50, 78-79). He told his lawyer that this is what he wanted. (Laswell Dep. pp. 45, 47-50; Tr. 1823-24). In fact, Mr. Laswell testified that he told Mr. McDonald that he wanted the lease to clearly provide that black lung excise taxes and abandoned mine land fees to be deductible in computing royalties. (Laswell Dep. p. 49). The lawyer, however, was inexperienced in coal leases and he relied on his client to protect his own interests. (Tr. 1824.) Laswell chose "severance tax," intending that it mean "all taxes on the production of coal." (Laswell Dep. pp. 33-35,44-45; Tr. 1816). He believed that Black Lung and Reclamation Fees were "severance taxes." (Laswell Dep. P. 33). Laswell never told Keady that he intended  "severance tax" to include all taxes on the value of the coal as it is extracted, or that he intended severance tax to include Black Lung and Reclamation Fees. (Laswell Dep. pp.44,  47, 37-38; Tr. 221-222, 432).

Fred Keady testified that he agreed to the proposed amendment, intending that "severance" refers to a state severance tax in the event such a tax were enacted by the

State of Illinois. (Tr. 230-231,433 ).[9]  Keady told Laswell at the time he agreed to the amendment that the deduction of sales and/or severance tax would have little economic impact on Vermillion. (Tr. 221, 437).  Black Beauty conceded through its lawyer's closing argument that Keady's testimony on this point was truthful – in fact, a Freudian moment.[10] (Tr. 2126-2127)  Beyond this communication between Keady and Laswell, the private intent of each principal was not communicated to the other.

> ## 2.    Keady's Intent that "Severance Tax" Referred to a State Severance Tax Was Well Grounded.

Black Beauty argues that Keady could not reasonably expect that Laswell would seek to amend the agreement to deduct a non-existent tax.  Yet , the lease executed by Mr. Laswell contains language that specifically addresses an unmined coal tax in Section 13.3 stating "[T] is presently no unmined coal tax in the State of Illinois. In the event that such tax is enacted, and becomes payable, such tax shall be payable by Lessee..." (Exhibit 159).

In addition, one of Black Beauty's experts testified that it is common to provide for the deduction of taxes that have not yet been enacted. (Tr. 1635-36).  Thus, Keady's belief that Laswell wanted protection against the possibility that Illinois might adopt a severance tax is reasonable and credible.

---

[9]Mr. Keady testified that his understanding of the definition of a severance tax is in the mining industy was based in part on industry publications, including one published by the United States Bureau of Mines, Exh. V Exh. E(1), which contains a definition of severance tax wholly within the context of state taxes, and without any mention of Federal severance tax.

[10]Black Beauty's argument was that there was the reason there was no economic impact was that the costs of Black Lung and Reclamation Fees are passthroughs to the taxing agency and therefore the royalty is not affected by the inclusion of a severance tax.

In addition, Keady's agreement to deduct sales tax was also a decision that would not impact Vermillion. Most coal sales are to users, such as to PSI, and there is no sales tax imposed on the transaction. In fact, Diane Goebel, a senior supervisor in Black Beauty's accounting department testified that as a matter of policy, BB does not deduct sales tax. (Tr.1038-1039).[11]  So while Laswell bargained to deduct sales tax and Keady agreed to deduct sales tax, it was an insignificant item.

### 3.    Keady's Intent is Supported by the Term Sheet.

The term sheet also supports Keady's intent. (Laswell Dep. Exh. #4, V Exh. A, Pl. Exh. 68). He began the negotiations by demanding that there be no deductions from gross selling price before calculating royalties. (Tr. 191, 7814 ). Laswell does not recall the term sheet, yet there is no reason to doubt that he received it. (Laswell Dep. p 16 ). It was the same term sheet that Keady had sent Black Beauty and other potential lessees and it expressed his contract goals. (Tr. 184-191).

Although the term sheet does not allow for the deduction of any taxes, Mr. Keady testified that the itemization of sales tax as a deduction from gross selling price is not even necessary because sales taxes are not considered part of the selling price of the coal. (Tr. 217-218)  As Keady explained, sales tax is a tax imposed on the buyer, and the seller is legally required to collect the tax and hold it in trust for the taxing authority. (Tr.472-473). The amount of the sales tax is not part of the seller's income. So to agree to deduct sales tax is to agree to the obvious. It does not contradict Keady's goal of no deductions.

---

[11]    Obviously she was mistaken. Plaintiff's Exh. 152 contained in the Hermann deposition exhibits clearly shows the deduction of a small amount of sales tax.

-19-

Keady agreed to deduct "severance tax" because he believed that the deduction would not impact Vermillion. (Tr. 218). Illinois did not have a severance tax and Keady was willing to take the risk that one might someday be enacted. (Tr. 220-222). Actual events support Keady's view of the risk. In 1981, Illinois came within one vote of enacting a severance tax. (Tr. 1635).

If Keady had agreed to a deduction of Black Lung and Reclamation Fees, that would have been inconsistent with the term sheet and with his original intent expressed in the term sheet. Keady's interpretation of the amendment is consistent with the history of the negotiations.

### 4.    Uncommunicated Intent Is Inadmissible.

Ron Laswell testified that he did not tell Mr. Keady that he intended to deduct Black Lung and Reclamation Fees as severance taxes when calculating royalties and wheelage under the Lease (Laswell Dep. pp.44, 47, 37-38; Tr. 221-222, 432). Moreover, Mr. Keady testified that during the lease negotiations, Laswell was provided with a sample calculation which specifically enumerated out all of the potential costs of production.[12] (Tr. 210-212, 222). Laswell failed to disclose the material fact that he intended the term "severance tax" to allow for the deduction of all production costs, including Black Lung and Reclamation Fees when calculating royalties and wheelage - one of the most important provisions in the Lease from the perspective of the Lessor.

---

[12]Mr. Keady testified that the sample calculation referenced Black Lung and Reclamation Fees as costs. No reference was made to "severance" taxes on the sample calculation. (Tr. 212 ).

Given the context of the actual language of the entire lease, including the original lease, given the custom and practice in the coal industry, including the Illinois Basin, and given the form of leases actually used in the Illinois Basin, it is clear that "severance tax" did not communicate Laswell's intent to include all production taxes.

### 5.    Custom and Usage

Courts interpreting ambiguous contracts often look at the customs and usages of the relevant industry in their efforts to discern the parties' intent.

> A custom or usage becomes binding upon parties if it has been uniformly acquiesced in and applied by the parties for such a period of time so as to indicate that the custom was contemplated by the parties at the time formation of the contract was undertaken. A custom or usage should be established by the testimony of several witnesses.

*Dean Management, Inc., v. TBS Construction, Inc.,* 339 Ill. App. 3d 263, 271, 790 N.E.2d 934 (2d Dist. 2003),  citing, *Ledbetter v. Crudup,* 114 Ill. App. 3d 401, 403, 449 N.E.2d 265 (1983).

> Custom and usage is an aid to finding the intent of the parties when the contract was made. See *Chicago Bridge & Iron Co. v. Reliance Insurance Co.,* 46 Ill. 2d 522, 531-32, 264 N.E.2d 134 (1970). Custom and usage may only be relied upon to interpret an agreement if the practice was "so well known, uniform, long-established and generally acquiesced in as to induce the belief that the parties contracted with reference to it." *Nielsen v. United Services Automobile Assoc.,* 244 Ill. App. 3d 658, 664, 612 N.E.2d 526, 183 Ill. Dec. 874 (1993). Evidence of custom and usage is only admissible to explain uncertain or ambiguous terms. When terms of a contract are clear, those terms alone determine the obligations of the parties. *Nielsen,* 244 Ill. App. 3d at 663-64.

*Gray v. Mundelein College, 296 Ill. App. 3d 795, 805, 695 N.E.2d 1379 (3d Dist. 1998).*

The evidence shows that there is no question that Black Lung tax and Reclamation Fees were deducted from the GSP by both Catlin Coal Company, Inc. And Black Beauty. There is no question that Vermilion received checks for royalties that were a percentage of

-21-

gross selling price after the deductions of Black Lung and Reclamation Fees. The question, however, is whether Black Lung and Reclamation Fees were deducted as "severance tax" and whether Vermilion somehow acquiesced in the deduction of Black Lung tax and Reclamation Fees as "severance tax." The evidence shows that Vermilion never agreed to the deduction of these costs as "severance tax" and never acquiesced to such deductions once it learned of such practices by its Lessee.

There is no documentary evidence in the record of how Catlin Coal Company, Inc. accounted for the deductions it took in calculating GSP. Mr. Laswell simply testified that he told Donna Bradbury to take the deductions without the knowledge or consent of Vermilion. ( Laswell Dep. pp.36-38).The production reports provided to Vermilion regarding royalty payments owed to Vermilion did not indicate any deductions for "severance tax", Black Lung tax or Reclamation Fees. ( V Exh. H, Tr. 247-254).  No evidence was introduced by Black Beauty to show how Catlin was taking these deductions.  Presumably, Catlin Coal Company, Inc. Could have been accounting for the deduction of Black Lung *as* Black Lung, or as "excise tax" as substantiated in the financial records produced by its accountants during the acquisition and contained in the closing book as Annex 28 (Tr. 1388-1391). Further, there was no way that Vermilion could deduce that Catlin was treating Black Lung tax and reclamation Fees as "severance tax" or even that deductions for Black Lung and reclamation Fees were being taken from the calculation of royalties.

Black Beauty has pointed to no document from the time that Catlin Coal was lessee that it claims would have alerted Vermilion to the deduction of these costs. Mr. Keady testified that the average price stated in the monthly reports submitted to Vermilion by Catlin Coal was an average of a wide range of prices being paid by a number of customers for

-22-

coal in a wide range of quality. (Tr. 247-261). Mr. Keady could not tell that the average price was being reduced by deductions for Black Lung tax and Reclamation Fees as "severance tax." (Tr. 247-261).

As Lessee, Black Beauty continued to deduct Black Lung and reclamation Fees from the calculation of royalties and in the calculation of wheelage. Again, Black Beauty has not produced *one single document* from its accounting records, or otherwise, dated prior to August of 2002 which refers to Black Lung or Reclamation Fees as "severance tax" or which shows the deduction for Black Lung or Reclamation Fees from the calculation of royalties and wheelage under the Vermilion Lease! Rather, the record shows that on its internal accounting forms, deductions were taken for "surtaxes" which, according to the testimony of Black Beauty employees Hermann, Marchino, Goebel, Jacques, Galli (recently named Group Executive for Midwest Operations replacing Dan Hermann) and O'Donnell means Black Lung tax and Reclamation Fees. (Tr. 690-691, 693-698, 701-709, 733-737, 769-777, 784-787, 896, 918-924, 937, 946, 1033-1048, 1094-1099, 1113- 1111123, 1138, 1154-1157, 1167-1168, 1183-1184, 1200-1217,1234-1239,1767-1768).

Black Beauty seeks to avoid this obvious inconsistency with its claim that it deducted Black Lung and Reclamation Fees as severance taxes by saying that it hired Donna Bradbury to help Black Beauty set up the accounting records for the Vermilion mine. (Tr. 1704-1705). Yet, none of the internal accounting records or documents or the reports provided to Vermilion illustrate even a remote resemblance between the Catlin Coal and the Black Beauty reports. See, V Exhibit H, (V00922-V00926), Exhibit H(a) (17 pages including Mined Tons and F.O.B. Price reports, SIR Invoices, Premium/Penalty-2002 Actual report also included in Plaintiff's Exhibit 63)) and Exh. H (a)2 (8 pages of SIR Invoices). The

-23-

inference Black Beauty wants the Panel to draw is that Donna Bradbury would have accounted for the deduction of Black Lung tax and Reclamation Fees as a deduction of "severance" taxes because that is how Catlin Coal was deducted them, but there is no evidence to show that there is any relationship between the accounting and reporting methods of Catlin Coal and Black Beauty. Accordingly, the inference in unsubstantiated by the evidence.

What we do know from the evidence is that the internal accounting records actually used by Black Beauty were the same as the records used for Black Beauty's other leases. (Tr. 701-709). From the very beginning of its assumption of the Vermilion lease, Black Beauty was deducting Black Lung tax and Reclamation Fees as "surtaxes." (Tr. 690-691, 693-698, 701-709, 733-737, 769-777, 784-787, 896, 918-924, 937, 946, 1033-1048, 1094-1099, 1113- 1111123, 1138, 1154-1157, 1167-1168,   1183-1184, 1200-1217,1234-1239,1767-1768). Black Beauty never used Donna Bradbury's accounting system.

The very justification for the deduction of these taxes as "severance" taxes came just days after Mr. Keady's August 14, 2002 meeting at Black Beauty's offices. (Tr. 1219-1222, Exh. 174). The "best defense" which was based on a 24 hour review, came from Charles Compton. See Exh. 174. Mr. Compton relied on Black's Law Dictionary's definition of "severance." See, Exh. 174, V Exhibit W, V Exhibit Z. Mr. Compton did not rely in any of his letters on the common practices of Black Beauty with respect to the treatment of Black Lung or Reclamation Fees as "surtaxes" or make any reference to custom and practice in the coal mining industry in the Illinois Basin. See, Exh. 174, V Exhibit W, V Exhibit Z. He did not rely on Black Beauty's purported long term practice of deducting these taxes as "severance" taxes. See, Exh. 174, V Exhibit W, V Exhibit Z. Rather, the only reasonable

-24-

inference that can be drawn from the evidence is that Mr. Compton read Section 2.4 of the Lease and he knew it permitted only the deduction of sales and/or severance tax, and that the "surtaxes" being deducted by Black Beauty could only be justified if the "surtaxes" were described as "severance" tax.[13]

Black Beauty's deduction of severance taxes or of Black Lung and Reclamation Fees was not reported on the monthly royalty reports sent to Vermilion. See, V Exhibit N. Black Beauty has not pointed to any specific monthly report that it claims should have raised a red flag and caused Vermilion to inquire. Mr. Keady's testimony is that a red flag was not raised until the Vermilion Grove mine was developed and the coal produced was a single grade of coal sold to a single buyer at a single FOB point under a long term sales contract. (Tr. 270-281). His undisputed testimony is that this occurred early in 2002. (Tr. 270-281) and led to his beginning to investigate the pricing issue.

Vermilion's position supported by the evidence is that Black Beauty never considered Black Lung and Reclamation Fees to be severance taxes and did not decide to deduct Black Lung and Reclamation Fees because they were "severance" taxes. Defendant deducted them because Black Beauty typically deducted these costs.[14] Black Beauty's typical lease specifically provided for the deduction of these taxes, by name, in the definition of f.o.b. mine price which in some leases is also referred to as the gross realization price.

---

[13]This theory is defeated by Professor Maxfield, Black Beauty's expert who testified that a "surtax" is a tax on a tax and Black Lung and Reclamation Fees are not surtaxes. (Maxfield Dep. pp. 148-149).

[14]If Black Beauty deducted Black Lung and Reclamation Fees because that is what Mr. Laswell did, that does not absolve Black Beauty from liability for breach o contract. Black Beauty should have negotiated with Vermilion regarding the deduction of Black Lung tax and Reclamation Fees.

-25-

Although Black Beauty attempted to argue that the f.o.b. mine price is "carved in stone" based on industry practices, the recently produced e-mails attached as Group Exhibit A illustrate that Black Beauty negotiates the defined term "f.o.b. mine price." See, Exh.158; Exh. 75. Black Beauty's argument at this hearing was that Black Lung and Reclamation Fees are always deducted in the Illinois Basin. As the evidence has shown, however, Black Beauty has taken the deductions without regard to the language of the Lease.

Black Beauty conducted due diligence when it acquired Catlin. Presumably, Black Beauty reviewed the leases, saw that the Vermilion lease provided for the deduction of severance tax, and knew that Catlin was deducting Black Lung and Reclamation Fees. However, it knew of no lease (and has not introduced even *one* such lease into evidence) that deducted these costs as "severance" taxes. Yet, Black Beauty chose not to inquire and instead it chose to rely on an "estoppel" certificate that contained an Addendum stating that to the "best of Lessor's knowledge" that there were no breaches of the Lease by Lessee, but that Lessor had relied on Lessee's representations and had not performed any independent audit or inspection. See, Exh.72.

Moreover, in response to the Panel's request for expert testimony regarding custom and practice in the coal mining industry, Vermilion's expert reports were offered and admitted into evidence. Vermilion should ultimately prevail on its claim for breach of contract because the expert reports submitted to the Panel for Vermilion establish that Black Lung and Reclamation Fees are not sales taxes or severance taxes under the industry-accepted definitions for sales taxes or severance taxes. In contrast, the expert witness testimony offered by Black Beauty is lacking, in that Black Beauty's experts fail to rely upon any objective industry standard stating that Black Lung taxes and Reclamation Fees are sales

-26-

taxes or severance taxes.

Vermilion Coal submitted expert witness reports from nine different experts covering numerous facets of the coal mining industry, including legal experts, accounting experts, and even the report of a former U.S. Senator. The conclusions reached by all of these experts were consistent and clear: Black Lung excise taxes and Reclamation Fees are not sales taxes or severance taxes under the commonly accepted industry definitions of sales tax or severance tax.

Former U.S. Senator J. Bennett Johnston stated in his expert report that Black Lung and Reclamation Fees were not sales taxes or severance taxes. (Tr. 1588). Mr. Johnston based his analysis on the legislative history of the acts authorizing the collection of Black Lung taxes and Reclamation Fees, the budgetary allocation of the proceeds of Black Lung and Reclamation Fees, and the procedures for collection of Black Lung Taxes and Reclamation Fees, including a credit given to mine operators for the payment of state severance taxes. As noted by former Sen. Johnston, as well as the expert opinions of Casey Kaptur, Thomas Breecher and Forrest Hill, severance taxes are taxes typically imposed at the state governmental level to compensate the state for the removal of its natural resources and to raise general revenue. (Tr. 1588, 1599, 1603-04, 1625).

All of Vermilion Coal's experts relied upon objective sources of information to form their opinions as to the standard industry practices for the coal mining industry, including legislative history, industry publications, commonly accepted definitions and even Black Beauty's own accounting records. After making an analysis of all of these objective sources, Vermilion Coal's experts' opinions should lead the Panel to the same conclusion— Black Beauty violated the terms of its agreement with Vermilion Coal when Black Beauty

-27-

deducted Black Lung Taxes and Reclamation Fees from the royalty and wheelage payments to Vermilion Coal, based on the wholly baseless claim that Black Lung taxes and Reclamation Fees were severance taxes.

By contrast, Black Beauty's two expert witnesses made no analysis of objective industry information.    In fact, Black Beauty's expert witnesses relied on completely subjective information, including their own work product.[15]  Interestingly, the lease language upon which Black Beauty's expert Vernon Partenheimer relied actually supports Vermilion Coal's claim for unpaid royalty and wheelage.  The language in the lease agreement upon which Mr. Partenheimer relies specifically describes fees relating to the Surface Mining and Control Reclamation Act of 1977 (special use fees equivalent to BLET and AMLF) as deductible, and distinguishes such fees from the imposition of severance taxes.  (Tr. 1918-26).

Finally, among the e-mails produced on the day of closing arguments are e-mails relating to actions taken by management of Black Beauty in lobbying against a proposed "severance tax" on coal in the state of Indiana.  Group Exhibit C.  Positions taken by Black Beauty as set forth in the attached e-mails are consistent with the arguments advanced by Vermilion regarding the definition of severance taxes as "state" imposed taxes.  These e-mails bring into question the credibility of testimony given by Black Beauty management

---

[15] Mr. Rhine testified regarding the leases that he purportedly based his opinion upon but refused to produce them on the basis that the documents were subject to the attorney-client privilege.  After hearing argument on Vermilion's Motion to Compel Production of the leases as required under the federal rules or to strike the testimony, Judge Lambros ordered the production of the leases.  To date, despite the letters between counsel attached as Exhibit B, the leases have not been produced.  Accordingly, Vermilion renews its request that, consistent with Judge Lambros' order, the testimony of Mr. Rhine be stricken from the record.

including Dan Hermann and Wayne Parke in this action. Based upon the credibility of Vermilion Coal's experts, and the inherent weaknesses in the opinions of Black Beauty's experts, the Panel should adopt the opinions expressed by Vermilion Coal's experts, and find in favor of Vermilion Coal on its claims for breach of contract.

### 6.    Economic Reality

"[R]oyalties on excise taxes are not such a startling proposition that courts have bridled at giving the contractual language its most natural reading." *Hemenway*, supra, 159 F.3d at 261. Although Black Beauty has tried to convince this Panel that paying royalties on "passthroughs" is unheard of in the industry, some leases allow for these deductions (usually small landowners) and some leases do not - the right to deduct, whether fair or unfair, it is what is negotiated.  While in the abstract it seems silly that a Lessee would agree to pay a royalty on the tax that it merely collects and pays to the government.  But, Judges Posner and Easterbrook notwithstanding, it is not jarring - *it is a pricing mechanism.*  The royalty could be a 5.3% with deductions for Black Lung and Reclamation Fees.[16]

The lack of a minimum per ton royalty (presumably omitted by McDonald in his redraft) presented Black Beauty an economic motive to chisel Vermilion's price down. Not permitting Black Beauty a severance tax deduction would not have been inequitable in this particular case, because other Vermilion County landowners with 4% of FOB Mine Price (defined term) royalty still received a minimum-per-ton royalty of $1.00 per ton (Taylor lease Tr. 948, Plaintiff's Exhibit 158). Vermilion would just receive the same per ton royalty as the others, even though its lease specified a 5.0% rather than a 4.0% royalty. If Vermilion had

---

[16]In fact, Black Beauty itself has provision in some of its sales contracts that provide escalation clauses to allow for this type of pricing mechanism. Exh. 79.

such an arrangement the per-ton royalty would have been $1.25 (5%/4% x $1.00/t). [The minimum per-ton royalty was not included in the original 20% GOP lease, likely because it was not relevant.]

The Cincinnati Gas & Electric sales contract (Tr. 2064, Plaintiff's Exhibit 79) provided regular programmed price increases. These have the effect of protecting the producer from margin erosion that could result from the passthrough of taxes and impositions that would then be further taxed. For example, if a severance tax were enacted, the direct cost would be able to be passed through to a buyer, but Black Lung and Reclamation would be imposed on the higher sales price. Courts have shown no compunction in affording taxing entities the privilege of collecting a "tax-on-a-tax" (a true surtax). These sales contracts, like Black Beauty's "typical lease" (Plaintiff's Exhibit 158) enumerated separately and in detail each and every tax that was deductible from the defined term "FOB Mine Price".

Black Beauty alleges that large landowners had no more negotiating power than small landowners. The evidence shows the opposite. Western Pocahontas and Wasson were large landowners, like Vermilion. They had leases denominated in percent of gross selling price, or equivalent terms. Let's call them "old style leases". Black Beauty scrupulously observed the letter of the Wasson leases (Tr. p 1117), and gave Western-Pocahontas (amended Sentry/Peabody Lease; Tr p 1776 ) a higher royalty in consideration of permitting its leases to be conformed to the defined Term "FOB Mine Price". On the other hand, Mr. Buyno, a small landowner, gave Laswell a lease (Tr p 826) that could be read to allow deduction of practically every governmental imposition of any sort.

-30-

III.    **Course of Performance and Breach**

Courts interpreting ambiguous contracts sometimes examine the parties' "course of performance" to ascertain their intent.  Black Beauty relies on this line of cases (BB Pre-Hearing Bf. at 7-8) to argue that Vermilion's acceptance of royalties from which the disputed items had been deducted supports Black Beauty's interpretation of the Lease.  This case law in fact is no help to Black Beauty.

In *Riemer Bros., Inc., v. Marlis Construction Co.*, 64 Ill. App. 3d 80,  380 N.E.2d 1160 (2d Dist. 1978), the dispute before the court involved the meaning of a contractual provision which specified "Import, grade and compact clay fill $ 2.75 cu yd."  The court found this language was ambiguous with reference to the point in time and manner of measuring the clay.  In considering whether the parties' "course of performance" would help resolve the ambiguity, the court wrote:

> The only possible course of performance evidence consists of the interim Riemer bills for the fill which were based upon loose measure computed by in-place measure plus a 20% shrinkage factor.  However, no evidence was adduced to indicate that Marlis knew it was being billed on this basis; and Markus' testimony on behalf of Marlis indicates that he did not know the basis of the interim bills.  Thus, we conclude that there is no relevant course of performance evidence in this case.

Emphasis supplied.  *Id.* at 1163.

Here, similar to the facts in *Riemer*, Vermilion did not have the necessary facts and knowledge to realize that Black Beauty was deducting Black Lung and Reclamation Fees before computing the royalty payments.(Tr.   270-281).  The "course of performance" between Vermilion and Black Beauty would be relevant only if Vermilion had accepted the reduced royalties with full knowledge of the deductions and without complaint.  Because Black Beauty did not disclose the deductions it was making, Vermilion's silence until

-31-

approximately spring of 2002, after the Vermilion Grove portal was in production cannot be used against it.

### A. Vermilion has Substantially Performed Its Contractual Obligations Under the Lease

The evidence has shown that Vermilion substantially performed what was required of it in order to be entitled to the Lessee's performance of its contractual obligations under the Lease. As the party bringing the action for breach of contract, Vermilion is entitled to compensatory damages or the "benefit of its bargain." *Hutchinson v. Brotman-Sherman Theatres, Inc.*, 94 Ill App. 3d 1066, 419 N.E.2d 530 (1st Dist. 1981). The evidence has shown that Vermilion has met its burden of proving that it substantially performed all obligations required of it under the contract and that Black Beauty has failed to perform its obligations under the Lease and has acted in breach of its obligations under the Lease. As a result of Black Beauty's breach, Vermilion has and is continuing to sustain damages.

### B. Black Beauty Has Refused To Substantially Perform Its Lease Obligations In The Manner Bargained For By Vermilion.

In contrast, the evidence has shown that Black Beauty has failed to substantially perform its contractual obligations in the manner bargained for by Vermilion. Additionally, the evidence has shown that Black Beauty has improperly deducted items including loading fees, agent fees, Black Lung, and Reclamation Fees from the calculation of royalties and wheelage owed to Vermilion under the Lease and has not performed the essential terms of the Lease in good faith.

On the day of closing arguments in this case, Black Beauty produced a number of e-mails in response to Vermilion's production requests.[18] Many of these e-mails relate to the claims brought before the Panel.  For example, D(1)-(4) indicate that PSI, the customer for the Vermilion Grove coal, is paying Black Beauty "only $27.03 and "shorting' them freight of $3.18.  This e-mail details pricing that is in stark contrast to the prices reported by Black Beauty to Vermilion for the applicable period of time - f.o.b. mine prices of $18.36/ton for coal from the Riola portal and $22.05/ton for coal from the Vermilion Grove portal.  Additionally, Black Beauty regularly deducts freight, but it seems they bill the customer and are paid separately for freight, which makes the deduction questionable.[19]

Additional evidence that Black Beauty has failed to perform its Lease obligations in the manner bargained for by Vermilion is in the set of e-mails attached as Group Exhibit E. The e-mail from Diane Goebel to Dan Hermann was sent two days before Mr. Keady's meeting with Black Beauty to discuss the royalty calculations.  The tenor of the e-mail suggests that Black Beauty may not be performing its contractual obligations in good faith.[20]

---

[18]Black Beauty produced literally thousands of e-mails.  The most salient have been attached hereto as Group Exhibit D.

[19]Vermilion has attached the Advanced and Earned Royalty Report for the relevant period of time (attached as Exhibit D(5)) to substantiate the amounts alleged above in response to the late production of the e-mails.

[20]Additional e-mails produced and attached as Group Exhibits F and G illustrate Black Beauty propensity to "fudge" pricing, quality and freight adversely affecting Vermilion's royalty and wheelage amounts and to perform poorly as a lessee for underground mining operations in violation of the Lease causing Vermilion to be commercially insecure in the Lessee's performance of its contractual obligations.

Under Illinois law, a defense of substantial performance rests on a party's good faith efforts to comply with the terms of the contract. Willful or intentional deviation from the terms of the contract do not excuse a party's nonperformance. *Watson Lumber Company v. Mouser*, 30 Ill. App. 3d 100, 333 N.E.2d 19, 24 (5th Dist. 1975).

### C.    The Lease Includes a Nonwaiver Clause.

Section 22.4 of the Vermilion Lease states, "<u>No Waiver, etc by Lessor.</u> No failure by Lessor to insist upon the strict performance of any covenant, agreement, term or condition of this lease or to exercise any right, power or remedy consequent upon a breach thereof, and no acceptance of full or partial performance or payment of royalties during the continuance of such breach, shall constitute a waiver of or consent to any such breach or of such covenant, agreement, term or condition."

## IV.    Repudiation and Default

### A.    Black Beauty's Actions in Refusing to Pay Royalties and Wheelage in Accordance with the Lease, and in Continuing to Breach After Vermilion Demanded Adequate Assurance of Specific Performance Constituted Repudiation of its Contractual Obligations

Vermilion has sued for anticipatory and present repudiation as a result of Black Beauty's repudiation of so much of the contract as to impair substantially the value of the Lease to Vermilion, the nonrepudiating party. Under Illinois law, a "repudiation" is a statement or action proving a clear and absolute intention not to perform one's obligations under the contract. *Stonecipher v. Pillatsch*, 30 Ill.App.3d 140, 142-43, 332 N.E.2d 151 (2d Dist. 1975) ("A definite statement to the promisee that the promisor either will not or cannot perform the contract will operate as an anticipatory breach.") Black Beauty has anticipatorily

-34-

and presently repudiated its obligations to perform under the Lease by expressing an unequivocal intent not to perform its obligation to make payments of royalties and wheelage in accordance with Section 2.4 of the Lease and by failing to provide adequate assurance of due performance within a reasonable time after receiving a justified demand to do so.  The evidence has shown that Black Beauty breached its obligation to perform under the Lease and expressly and unequivocally repudiated its obligation to perform in the future. (Tr. 1544-1545).

B.    **Anticipatory Repudiation**

Anticipatory repudiation requires an overt communication of intention or other conduct that demonstrates a clear determination not to perform under the contract.  *Keep Productions, Inc. v. Arlington Park Towers Hotel Corp.*, 49 Ill. App.3d 258, 264, 364 N.E.2d 939 (1st Dist. 1977).("Illinois courts have recognized that when a party to an executory contract manifests a definite and unequivocal intent that it will not render its performance under the contract when the time fixed for performance arrives, the other contracting party may treat the contract as ended.")

After repudiation, the other party to the contract may resort to any remedy for breach, even if the repudiating party has been notified that the other party will await performance and has urged retraction.  *Wilmette Partners v. Hamel d/b/a Russ's Construction and Excavating*, 230 Ill. App.3d 248, 594 N.E.2d 1177, 1186-87 (1st Dist. 1992).  (Citations omitted.) ("Upon repudiation, the promisee may, among others, elect to treat the repudiation as a breach putting an end to the contract for all purposes of performance.  A promisee may pursue such an election by either promptly filing suit or by detrimentally changing his position in reliance on the repudiation.")  The nonrepudiating party may await performance

-35-

for a reasonable time (30 days) without waiving the repudiation.  During such time, the repudiating party may retract the repudiation and complete performance. *Id.*

### C.    Substantial Impairment

The test of whether the value of a contract is substantially impaired is whether material inconvenience or injustice will result if Plaintiff is forced to wait and receive Defendant's performance without the part or aspect of the contract that was repudiated. In this instance, the Panel must decide that Black Beauty's repudiation of its obligation to pay royalties and wheelage by making improper deductions and continuing to make them after Vermilion's demand for adequate assurance of specific performance , which resulted in Vermilion falling into default on its mortgage obligations. [Also the admissions in many of the late-produced e-mails suggest further substantial impairment.]

### D.    Demand for Adequate Assurance

Vermilion states  that Black Beauty anticipatorily repudiated the Lease because Defendant refused to provide Plaintiff with adequate assurance of specific performance after Vermilion so demanded . (Tr. 1544-1545).  The evidence has shown that a repudiation occurred after (1) Vermilion had reasonable grounds for insecurity about Black Beauty's performance of the contract; (2) Vermilion demanded in writing that Black Beauty provide adequate assurance of performance; and (3) Defendant refused  to provide adequate assurance of performance within a reasonable time (30 days) after receipt of the demand. (Tr.1543-1545). *Bodine Sewer v. Eastern Illinois Precast, Inc.*, 143 Ill. App. 3d 920 , 493 N.E. 2d 705 (4th Dist. 1986); *Nasco, Inc . V. Dahltron Corp.*, 74 Ill. App. 3d 302, 392 N.E.2d 1110 (2d Dist. 1979).

Vermilion's demand for adequate assurance was reasonable under the circumstances to assure Plaintiff that Black Beauty would perform under the Lease. Adequate assurance required Black Beauty to provide good faith assurances that Defendant would perform its contractual obligations, which Black Beauty refused to do. (Tr. 1543-1545).

### E.    Grounds for Commercial Insecurity

In the instant case, Vermilion had the right to continue to expect Black Beauty to perform the contract. Knowledge of Black Beauty's refusal to perform in accordance with the express provisions of Section 2.4 regarding the calculation of royalties and wheelage owed to Vermilion reasonably caused doubt as to Black Beauty's willingness to carry out the contract fully and constituted grounds for Vermilion's commercial insecurity. (Tr.1544-1545). The basis for the right to demand adequate assurances because of grounds for insecurity is that the parties bargain for performance, and not merely for a promise of performance. The grounds for insecurity are reasonable under the facts in evidence. Black Beauty breached its obligation of good faith.

### F.    Notice of Default

Section 22.1 of the Lease relating to default provides in relevant part that

> [i]f default shall be made in the due and punctual payment of any rent, royalty or any part thereof, when and as the same may become due and payable... and such default shall continue for thirty (30) days after notice by Lessor to Lessee...then and in any such event, Lessor at any time thereafter while such defaults or condition is continuing, may give written notice to Lessee specifying the occurrence giving rise to such Event of Default, or Events of Default, and stating that the lease shall terminate on the date specified in such notice, which shall be at least twenty (20) days after the giving of such notice. Upon the date

-37-

specified in such notice, this lease and the estate and interest hereby demised shall terminate and all rights of Lessee under this lease shall cease.

On May 12, 2003, Vermilion sent a Notice of Lessee's Default of Coal Mining Lease Dated Nov. 21, 1994 (the "Lease") to Mr. Dan Hermann, President of Black Beauty Coal Company. (Tr. 841-844, 1559-1560); Exhibit 82.  Despite Black Beauty's receipt of the Notice of Default, Black Beauty (seemingly, on purpose) did not take any action to cure the default within the twenty day period under the contract.  Black Beauty did nothing except send the notice to its counsel who did nothing within the twenty days required under the Lease and specified in the Notice of Default. See, §22.1, V Exhibit AB.

The purpose of notice of default in the usual case is to give the party allegedly in default an opportunity to remedy the default and meet his obligation, *Bintz Company v. Mueggler, 1944, 65 Idaho 760, 154 P.2d 513,* and notice in the prescribed manner is not required where a party has actual notice and has not suffered prejudice. *Quinn v. Hartford Accident & Indemnity Co., 71 Idaho 449, 232 P.2d 965.  (emphasis supplied).*

The termination clause in the Lease contains conditional limitations.  The Lease provides that if a notice of default is sent, the Leases automatically expires on the happening of a specified contingency - the arrival of the termination date fixed in the notice. See, *TSS-Seedman's, Inc. v. Elota Realty Co.*, 72 N.Y.2d 1024; 531 N.E.2d 646 (Ct. App. N.Y. 1988). *(see, Perrotta v Western Regional Off-Track Betting Corp., 98 AD2d 1, 5; 2 Rasch, New York Landlord and Tenant § § 23:29, 23:30 [3d ed]; 14 Carmody-Wait [*1027] 2d, NY Prac § 90:15).*  Under the particular clauses here, it is not the Lessee's conduct which, at the option of the Lessor, operates on the lease to effect its termination. See,

-38-

*Perrotta v Western Regional Off-Track Betting Corp.*, supra, at 5). Rather, it is by the passage of time -- the period of time specified in the termination notice -- that the Lease automatically comes to an end; without service of a notice specifying the date of expiration of the lease there can be no termination and the lease remains in effect *(see,* 2 Rasch, New York Landlord and Tenant § 23:29 [3d ed]).

The Lease provisions make the formal issuance of a notice of default a condition precedent to the lease's termination. However, this procedural requirement should not be confused with the Lessor's substantive right to terminate the tenancy. Under the plain language of the Lease, this right became fixed and unconditional after Black Beauty defaulted and failed to remedy the default. Thereafter, Vermilion was privileged to issue the notices of default, and thereby terminate plaintiff's tenancies after the expiration of the twenty day period provided in the Lease. See, *In the Matter of Patrick K. Ranalli v. Burns*, 157 A.D.2d 936; 550 N.Y.S.2d 192 (S.Ct. N.Y., App. Div. 1990) ("If Tenant shall make default in the payment of the rent reserved herein or any item of additional rent herein mentioned, or any part of either, and such default shall continue for fifteen (15) days after written notice to Tenant* than *[sic]* and in any such event Landlord may give to Tenant ten (10) days notice of intention to end the term of this lease and thereupon at the expiration of said ten (10) days the term of the this *[sic]* lease shall, unless Tenant has cured such default, expire as fully and completely as if that day were the day herein definitely *[sic]* fixed for the expiration of said term, and Tenant shall then quit the premises and surrender the same, but shall remain liable as hereinafter provided.")

-39-

V.    **Black Beauty Has Not Proven Any Defenses to Its Obligation to Perform Under the Lease**

A.    **Vermilion did not Waive Black Beauty's Breach by Vermilion's Continued Performance**

Black Beauty has argued that by accepting performance by Black Beauty and its predecessor Lessee, Vermilion has waived its rights to make claims against Lessee. The critical aspect of this proposition is that "waiver" requires knowledge. One cannot waive a right if one is not aware that the right exists, i.e. in this case, the assignment(s) which did not comply with the terms of the Lease and constituted a breach thereof, could not be waived until Vermilion had knowledge that a breach had occurred. See, e.g., *The Wolfram Partnership, Ltd. v. Lasalle National Bank*, 328 Ill. App. 3d 207,223-24 (1st Dist. 2002)("Waiver is the express or implied voluntary and intentional relinquishment of a known and existing right. *Galesburg Clinic, 302 Ill. App. 3d at 1019, 706 N.E.2d at 1037; Lake County Grading Co. of Libertyville, Inc. v. Advance Mechanical Contractors, Inc., 275 Ill. App. 3d 452, 462, 654 N.E.2d 1109, 1118, 211 Ill. Dec. 299 (1995).*

Parties to a contract may waive provisions contained in the contract for their benefit and such waiver may be established by conduct indicating that strict compliance with those contractual provisions will not be required. *Whalen v. K-Mart Corp., 166 Ill. App. 3d 339, 343, 519 N.E.2d 991, 994, 116 Ill. Dec. 776 (1988).* The doctrine serves to prevent the waiving party from lulling another into a false belief that strict compliance with a contractual obligation will not be required and then suing for noncompliance. *Lake County Grading Co., 275 Ill. App. 3d at 463, 654 N.E.2d at 1118; Wagner Excello Foods, Inc. v. Fearn International, Inc., 235 Ill. App. 3d 224, 233, 601 N.E.2d 956, 962, 176 Ill. Dec. 258 (1992);* 12 Ill. L & Prac. Contracts § 452, at 314 (1983).")(emphasis supplied).

-40-

Waiver is the voluntary relinquishment or surrender of some **known right.** Its constituent elements are an existing right; **knowledge of such right**; and an intention to relinquish or surrender it. And one in possession of a right of that kind may effectively waive it by acts, conduct, declarations, acquiescence, or silence where duty requires that he speak. *Yates v. American Republics Corporation*, 163 F.2d 178, 180 (10th Cir. 1947). Waiver is of two kinds, express and implied. And to constitute implied waiver, there must be unequivocal and decisive acts or conduct of the party clearly evincing an intent to waive, or acts or conduct amounting [*4] to an estoppel on his part. *Victor Products Corp. v. Yates-American Machine Co., 4 Cir., 54 F.2d 1062; Rosenthal v. New York Life Insurance Co., 8 Cir., 99 F.2d 578; Dougherty v. Thomas, 313 P. 287, 169 A. 219; Cure v. Midland Life Insurance Co., 109 Kan. 259, 198 P. 940; Surry v. Baker, 132 Wash. 188, 231 P. 791; Musgrave v. Equitable Life Insurance Society, 124 Kan. 804, 262 P. 571; Schwab v. Brotherhood of American Yeomen, 305 Mo. 148 264 S.W. 690; State v. Shain, 334 Mo. 385, 66 S.W.2d 871.*

An intention to relinquish or surrender some **known right** being the foundation of a waiver, the question whether a party against whom waiver is asserted intended by his acts and conduct to waive is ordinarily one of fact to be determined by the court or jury, as the case may be. *McGrath v. Quinn, 218 Mass. 27, 105 N.E. 555; State v. Gardner, 32 Wash. 550, 73 P. 690, 98 Am.St.Rep. 858; Ketcham v. Oil Field Supply Co., 99 Okl. 201, 226 P. 93; Grippo v. Davis, 92 Conn. 693, 104 A. 165; Dougherty v. Thomas, supra; Bankers Trust Co. v. Economy Coal Co., 224 Iowa 36, 276 N.W. 16; State v. Becker, 336 Mo. 59, 77 S.W.2d 100; Briggs v. Modern Woodmen of America, 336 Mo. 879, 82 S.W.2d 898."* (Emphasis supplied.)

-41-

As a defense to Black Beauty's nonperformance under the Lease, Black Beauty claimed that, while it may not have fully performed all of its contractual obligations in accordance with Vermilion's interpretation of the Lease terms, Vermilion continued to perform its contractual obligations, even though Vermilion knew, or should have known, that Lessee had not fully performed as the Lease required.  However, Illinois law establishes that a party to a contract waives the right to relief from breach only when the facts and circumstances establish an intentional relinquishment of a known right, arising either expressly or by conduct inconsistent with an intent to enforce the right.  Under such circumstances, the Panel must determine whether a waiver of a contractual provision has in fact occurred by focusing its attention on the intent of the non-breaching party. *Wikoff v. Vanderveld*, 897 F. 2d 232, 242 (7th Cir. (Ill.) 1990).

In order to establish that Vermilion intended to waive strict performance of Black Beauty's performance under the Lease, Black Beauty must prove that (1)Vermilion had a right that could be waived, (2)Vermilion had actual or constructive knowledge of the right, and (3) Vermilion intended to relinquish that right. However, if the Panel finds that Vermilion could not have discovered Black Beauty's incomplete performance (i.e. that Black Beauty was improperly deducting Black Lung, Reclamation Fees, loading fees, agent fees or other costs from the calculation of royalties and wheelage), by reasonably careful inspection, then the Panel should find in favor of Vermilion and against Black Beauty on this issue. *MBC, Inc. v. Space Center Minnesota,* 177 Ill. App. 3d 226, 532 N.E. 2d 255 (1st Dist. 1988).

Waiver is the intentional relinquishment of a known right. Id. Thus, in order to establish that Vermilion waived its right to strict enforcement of the Lease, Black Beauty would have to show that Vermilion had knowledge of its rights and intended to waive them.

-42-

The evidence has shown that Vermilion did not know or have reason to know of Black Beauty's false reporting of the sales price until the Vermilion Grove portal was opened and almost all of the coal from that mine was being shipped to one customer PSI - a publicly traded company which created an opportunity for Vermilion to compare the sales price as reported by the customer against the sales price being reported to Vermilion by Black Beauty. (Tr. 270-281). The evidence has shown that Vermilion did not knowingly waive its right to Black Beauty's strict performance of its Lease obligations.

### B. Vermilion's Acceptance of Royalties Under the Lease did not Constitute a Waiver of Black Beauty's Nonperformance

As a defense to Black Beauty's nonperformance of its duty to calculate royalties and wheelage in accordance with the strict terms of the Lease, Black Beauty has argued that Vermilion's acceptance of monies paid to it under the Lease and Lessor's reliance on representations from the Lessee instead of conducting a costly audit or inspection somehow act as a bar to Vermilion's right to demand performance in accordance with the Lease terms. For Black Beauty to prevail on this defense, the Panel must find that, after Black Beauty's defective performance, Vermilion either (1) continued to recognize the Lease or (2) retained the benefits of the contract for an unreasonable time after it knew, or should have known, of the defective performance. *Quake Const., Inc. v. American Airlines,Inc.,* 141 Ill. 2d 281, 565 N.E.2d 990 (1990).

This defense is effective only if Black Beauty had proved any evidence that Vermilion knew of the defective performance and (1) continued to recognize the existence of the contract or (2) retained the benefits of the contract for an unreasonable time after it knew or should have known that the original performance was defective. As the evidence has

-43-

shown, Black Beauty has not met its burden on this issue.

## C.    Laches Is Not An Issue In This Proceeding

During closing arguments in this case, the Honorable Judge Lambros inquired as to the inference, if any, the Panel should draw from the length of time which elapsed from the inception of the lease until Vermilion questioned Black Beauty's calculation of royalties. (Tr. 1052-53). Vermilion's response to this is threefold: (1) laches has never been an issue in this proceeding; (2) laches is an affirmative defense and, since it was never raised by Black Beauty, it has been waived; and (3) even if not waived, the doctrine of laches is inapplicable.

Given the fact that Black Beauty never filed an answer to Vermilion's complaint, it is not easy to specify what is "at issue" in this case. Nonetheless, a cursory review of the parties' motions for summary judgment and other pleadings before this court demonstrates that Black Beauty has never argued Vermilion is barred from recovery by virtue of laches.

Laches is an affirmative defense that must be raised by the opposing party. *City of Chicago v. Alessia*, 348 Ill. App. 3d 218, 807 N.E.2d 1150, 1159 (1st Dist. 2004). Like any affirmative defense, the burden is on the defendant to establish laches by a preponderance of the evidence. *Anderson v. Lybeck,* 15 Ill. 2d 227, 154 N.E.2d 259 (1958). [21]

Where a litigant fails to raise an affirmative defense, it "has waived the defense and it may not be considered even though the evidence may suggest the existence of the

---

[21] Although the parties in this proceeding have agreed to be bound by the Federal Rules of Civil Procedure in this arbitration proceeding, the Panel can take judicial notice of the fact that as stated in Section 2-613(d) of the Illinois Code of Civil Procedure, "[t]he facts constituting any affirmative defense, such as … laches, … must be plainly set forth in the answer or reply." §735 ILCS 5/2-613.

defense." *Afshar, Inc. v. Condor Air Cargo, Inc.*, 250 Ill. App. 3d 229, 621 N.E.2d 126 (1st Dist. 1993), citing *Spagat v. Schak*, 130 Ill. App. 3d 130, 134, 473 N.E.2d 988 (2d Dist. 1985).

Finally, even if not waived by defendant, laches does not apply here by its terms. Laches has been defined as "[a] neglect or omission to assert a right, taken in conjunction with a lapse of time of more or less duration, and other circumstances causing prejudice to an adverse party, as will operate to bar relief in equity." *Sundance Homes, Inc. v. County of Du Page*, 195 Ill.2d 257, 46 N.E.2d 254 (2001), quoting *Meyers v. Kissner*, 149 Ill.2d 1, 594 N.E.2d 336 (1992).

The doctrine is based on the equitable doctrine that courts are reluctant to come to the aid of a party who has knowingly slept on his rights to the detriment of the opposing party. *McDunn v. Williams*, 156 Ill.2d 288, 620 N.E.2d 385 (1993)(emphasis supplied). As a general rule, to charge a party with laches, it is essential that the party have knowledge of the facts upon which his claim is based yet fail to proceed in a timely manner. (*Senese v. Climatemp, Inc.*, 222 Ill. App. 3d 302; 582 N.E.2d 1180 (1st Dist. 1991), affirmed in part, reversed in part after remand, 289 Ill. App.3d 570, 682 N.E.2d 226 (1st Dist. 1997).

Laches is inapplicable here because, as the evidence clearly demonstrated, Mr. Keady did not knowingly sleep on his rights. He had no knowledge of "the facts upon which his claim is based" until spring of 2002, at which point he promptly raised his concerns with Black Beauty. (Tr. 270-281). Moreover, the form of reports issued by Catlin and later the reports sent by Black Beauty failed to disclose material facts known to Catlin and Black Beauty regarding the calculation of royalties - that deductions were being taken. See, Exh. V Exhibit H, (V00922-V00926); Exh.143, Advanced and Earned Royalty Report ;Exhibit H(a)

-45-

(17 pages including Mined Tons and F.O.B. Price reports, SIR Invoices, Premium/Penalty-2002 Actual report also included in Plaintiff's Exhibit 63)) and Exh. H (a)2 (8 pages of SIR Invoices). Neither the reports provided to Vermilion nor the internal reports (which were not even available to Vermilion as Lessor), alerted Vermilion to the deductions being taken by the lessee.  Even Mr. Herman testified that no report provided to Vermilion by Black Beauty showed the deduction of Black Lung or Reclamation Fees as "severance tax." [22]

Additionally, in order to assert the defense of laches, Black Beauty would have to prove that Vermilion's alleged delay caused substantial harm to Black Beauty.  *Finke v. Woodard*, 122 Ill. App. 3d 911, 462 N.E.2d 13 (4th Dist. 1984); *Pinelli v. Alpine Development Corp.*, 70 Ill. App. 3d 980, 388 N.E.2d 943 (1st Dist. 1979).   Black Beauty offered no evidence that it was harmed or prejudiced by Vermilion's alleged delay in notifying Black Beauty of Defendant's. [23]

---

[22] Q: Do you know whether any report ever given by Black Beauty Coal Company to Vermilion relating to the calculations of royalties under the Lease lists Black Lung excise tax and Abandoned Mine Land Fees under deductions for severance tax?
   A:   List them in a report where the heading would say severance tax?
   Q:   Or show in any way that Black Lung excise tax or Abandoned Mine Land Fees are being deducted as severance tax, either underneath the column severance tax or otherwise?
   A:   No, because we refer to them as surtaxes in our reporting. (Tr. 770).

[23] In closing, counsel for Black Beauty essentially conceded that Vermilion had no obligation to perform an audit or inspection of Catlin's books and records.  Mr. Shoulders argued that Black Beauty was only concerned that Mr. Keady affirmatively spoke up and executed the July 1999 Estoppel Certificate and later in 2000 the Collateral Assignment of Rents, Profits and Proceeds with Terre Haute Bank which contained certain representations to the Bank that the Lease was in full force and effect and that Lessee was not in breach .Counsel argued "He doesn't just keep his mouth shut, he says no defaults. Did he have some duty to pick up the phone before he says no default." "Could cut Fred some slack if he portrayed himself as an innocent victim and that Laswell....But

-46-

Prejudice that results from delayed notice is an affirmative defense. *Id.* A delay in enforcing a party's rights constitutes laches if it works to the disadvantage of another. *Finke v. Woodard, supra.* Whether a party's delay is sufficient to constitute laches depends on the circumstances of each case, and requires an examination of when the party became aware of the reasons that would support rescission of the contract. *Pinelli v. Alpine Development Corp, supra.; Finke v. Woodard, supra.* Laches will not be found if the delay is short of the statutory period of limitations and there has been no change of circumstances. *Pinelli v. Alpine Development Corp, supra.* It is not applicable in cases, *such as the present case, when there has been no prejudicial change in circumstances. Finke v. Woodard, supra.*

**D.    Black Beauty Has Failed to Prove an Estoppel Claim Under Illinois Law**[24]

Under Illinois law, "[t]he test used to evaluate an estoppel claim is whether, considering all the circumstances of the specific case, conscience and honest dealing require that a party be estopped." *Hubble v. O'Connor,* 684 N.E.2d 816, 823 (Ill. Ct. App. 1997). To make out an estoppel claim, Black Beauty must prove the following:

> (1)voluntary words or conduct by the estopped party amounting to a misrepresentation or concealment of material facts; (2)actual or implied knowledge of the estopped party that the representations were not true; (3) lack of knowledge of the true facts by the innocent party

---

that isn't all he did. He gave the estoppel certificate. That is the killer. That is why Fred should not be able to recover." Arguably, Black Beauty would have had no complaint about the delay in raising the issue if Vermilion had not given the Estoppel Certificate and executed the Collateral Assignment. (Tr. 2142-2144).

[24] The arguments in Section V.D through H also address Vermilion's claims regarding its submission to the Panel regarding whether Black Beauty can unilaterally modify Plaintiff's rights under the Lease by the form and substance of the Assignment drafted by counsel for Black Beauty Coal Company from the original or the intermediate lessee(only as this issue relates to estoppel).

> both at time made or at time acted upon; (4) intent, or a reasonable expectation, on the part of the estopped party that the innocent party would act on the representations; (5) a reasonable, good faith, detrimental change of position by the innocent party based on the misrepresentations; and (6) prejudice to the innocent party.

Id. At 825.  Moreover, a party relying on estoppel must show that it detrimentally relied upon the conduct or statements of the estopped party and that such reliance was in good faith. *Id.*

In the present case, Black Beauty has failed to allege or prove the elements of estoppel.  Even if plead, Black Beauty has failed to meet its burden of proof and this Panel must not consider the "estoppel" defense.

E.    **The Form of Assignment Drafted By Black Beauty's Attorneys Did Not Conform to the Requirements of the Lease**

Section 14.1 of Article XIV of the Lease which governs assignments states that:

> Lessee shall have the right to mortgage, assign, convey, sublease, or set over any of its estate, interests or rights hereunder or any part thereof, or any of its rights or interests in buildings and other improvements placed upon the leased premises by the Lessee, *with the written assumption by the transferee of all the obligations of Lessee in form satisfactory to Lessor,* with the clear understanding that such written consent will be subject to the royalty rates and other provisions hereinabove set forth for coal mined from the area...

(Emphasis added).

The evidence has shown that the form of assignment from Catlin Coal, LLC (with Black Beauty as the sole member) to Black Beauty, which was drafted by counsel for Black Beauty did not conform to the Lease because it did not contain an assumption of liabilities as required by Section 14.1. (Tr. 1472-1473).  Moreover, the Estoppel Certificate stated that it was being requested by Catlin Coal Company, Inc. "In order to induce Black Beauty Coal Company to enter into a business transaction with Catlin Coal Co., Inc."  Exh. 150.  The actual transfer of the leasehold interests to Black Beauty was from Catlin Coal, LLC (Black

-48-

Beauty sole member), a party who was not even disclosed in the Estoppel Certificate. See, Exh. 150..  Additionally, Vermilion was not advised of the form and substance of the Assignment drafted by Black Beauty's counsel and did not give its written consent to the assignment between Catlin Coal LLC (Black Beauty sole member) and Black Beauty. (Tr. 303-304, 1478-1479).

F.    **The Estoppel Certificate Drafted by Black Beauty's Attorneys at the Time of Assignment of the Lease Did Not Insulate Black Beauty From Liability for the Liabilities of the Prior Period Lessee**

Black Beauty claims that the Estoppel certificate prepared by Black Beauty's attorneys in connection with the purchase of Catlin Coal Company, Inc. for execution by Vermilion as Lessor was the "instrument" by which Black Beauty was shielded from the liabilities of the prior Lessee, Catlin Coal, Inc. (Tr. 1472)  This argument  is fatally flawed when considering the facts and the law.

In order to sustain a claim for promissory estoppel, Defendant must allege and prove detrimental reliance. *Parkside Senior Services, L.L.C. v. National Development & Consultants, Ltd.*, 303 Ill App. 3d 1022, 1026, 709 N.E.2d 605 (1999).  Promissory estoppel arises when (1) an unambiguous promise was made, (2) the defendant relied on the promise, (3) the defendant's reliance on the promise was reasonable, and (4) the defendant suffered a detriment.  *People v. Fako,* 312 Ill. App. 3d 313, 318, 726 N.E. 2d 734 (2000), citing *People v. Raymond,* 202 Ill. App. 3d 704 ,708, 560 N.E.2d 26,(1990); *Pickus Construction & Equipment v. American Overhead Door*, 326 Ill. App. 3d 518, 523, 761 N.E.2d 356,(2001); *Pokora v. Warehouse Direct, Inc.*, 322 Ill. App. 3d 870, 879, 751 N.E.2d 1204,(2001). Whether detrimental reliance has occurred is determined according to the

specific facts of each case. *Parkside Senior Services, L.L.C. v. National Development & Consultants, Ltd.*, 303 Ill. App. 3d 1022, 1026, 709 N.E.2d 605,(1999), citing *Home Electronic Co. v. Hall & Underdown Heating & Air Conditioning Co.*, 86 N.C. App. 540, 544, 358 S.E.2d 539 (1987); *DiLorenzo v. Valve & Primer Corp.*, 347 Ill. App. 3d 194, 807 N.E.2d 673 (5th Dist. 2004).

### G.   The Estoppel Certificate Was Qualified and Contained a Non-Waiver Clause

In this case, the evidence has shown that Mr. Keady's "promise" in the Estoppel Certificate was NOT unambiguous, it was expressly qualified. Specifically, paragraph 3 of the Addendum to Estoppel Certificate stated that

> to the best of Lessor's knowledge, no dispute or default under or breach of the Lease exists...Lessee had timely paid all rentals and royalties under the lease which have become due and payable. Lessor has relied upon Lessee's representations rather than Lessor's rights of financial and engineering audit and inspection... and by its execution of this Estoppel Certificate, Lessor *does not waive, and expressly retains all rights* pursuant to the Coal Mining Lease.

(Emphasis added). Exh. 150. Defendant has offered no evidence that Mr. Keady's unambiguous qualified statement was detrimentally relied on by Black Beauty.

Further, Black Beauty has not submitted any affirmative defenses to the Vermilion's issues submitted to the Panel in this arbitration, therefore the Panel should not consider the evidence in support of the "estoppel" arguments. Additionally, the Addendum contained an explicit non-waiver provision that could only be overcome through a separate written agreement signed by both parties. *Roboserve, Inc. v. Kato Kagaku Co., Ltd.,* 121 F. 3d 1027, (7th Cir. Ill. 1997), *cert. denied,* 519 U.S. 928, 117 S. Ct. 297 (1996). Non-waiver clauses are enforceable in Illinois. *Monarch Coaches, Inc. v. ITT Industrial Credit,* 818 F. 2d

11, 13 (7th Cir. 1987).   Non-waiver clauses may be strictly construed even when full compliance with the contract has not been required for a lengthy period of time. *Transcraft Corp. V. Anna Indus. Dev. Corp.*, 584 N.E.2d 1033, 1035 (Ill Ct. App. 1991) (non-waiver clause still binding though contract breached continuously for over twenty years*)*.   No evidence has been submitted by Black Beauty to support an argument that the non-waiver clause in the Addendum is unenforceable.   Therefore, the Panel must exclude and not consider evidence of the affirmative defense of estoppel.

In addition to the non-waiver statements contained in the Estoppel Certificate, the Lease contained a non-waiver clause.  Specifically, Section 22.4 titled No Waiver, etc. by Lessor states:

> No failure by Lessor to insist upon the strict performance of any covenant, agreement, term or condition of this lease or to exercise any right, power or remedy consequent upon a breach thereof, and no acceptance of full or partial performance or payment of royalties during the continuance of any such breach, shall constitute a waiver of or consent to any such breach or of such covenant, agreement, term or condition. No waiver of any breach shall affect or alter this lease, but each and every covenant, agreement, term and condition of this lease shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

The non-waiver language of the Addendum and the non-waiver clause of the Lease require that the Panel disregard Black Beauty's estoppel arguments.

Further, under Illinois law, waiver is defined as the intentional relinquishment of a known right. *Ryder v. Bank of Hickory Hills,* 585 N.E.2d 46 (Ill. 1991)(a case considering whether a bank waived its rights to accelerate the plaintiffs' loans because of the bank's cooperative conduct with the plaintiffs). The Illinois Supreme Court in *Ryder* said,

> Since the plaintiffs are claiming waiver, they had the burden of proving at trial that the Bank knew of its acceleration rights, and those facts

-51-

which evidenced an intention by the Bank to waive such rights. Implied waiver of a legal right must be proved by a clear, unequivocal, and decisive act of the party who is alleged to have committed waiver.

In this case, Black Beauty has offered no such evidence and Vermilion cannot be found to have waived its rights under the Lease as a result of its execution of the Estoppel Certificate.

**H.     Vermilion Is Not Estopped From Claiming That Black Beauty Is Responsible for the Liabilities of the Prior Period Lessee Based on the Representations and Warranties Made By Vermilion To the Terre Haute National Bank in the Subordination Agreement with the Bank**

An additional "estoppel" argument raised by Black Beauty at the hearing involved Vermilion's  execution of a Collateral Assignment of Rents, Profits and Proceeds in connection with the refinancing of loan with Terre Haute National Bank.(Tr. 1536-1541). Black Beauty claims that as a result of a statement made to Terre Haute Bank by Vermilion on February 16, 2000 that "the Lease  is in full force and effect, Black Beauty Coal Company is the Lessee thereunder and neither Lessor nor Lessee is in breach thereunder," Vermilion is estopped from making its claims for breach against Black Beauty.  For the reasons stated above under Illinois law, Black Beauty has failed to plead and prove the elements of estoppel as to Vermilion's statement made to its bank.   Moreover, as a result of the refinancing, Black Beauty actually benefitted from its execution of the Subordination and Attornment Agreement because the amount to which Black Beauty subordinated its interests with the Bank was less that a previous subordination amount. (Tr.1536-1541). Accordingly, there was no detrimental reliance and Black Beauty must again fail in its attempt to claim estoppel as a defense.

## FRAUD ISSUES SUBMITTED TO THE PANEL FOR RULING

1.      Whether Black Beauty engaged in a scheme to defraud the Plaintiff despite the fact that Black Beauty owed a duty to Plaintiff to fairly and accurately disclose to Plaintiff how Black Beauty was calculating said royalties. Specifically, whether Black Beauty (the only party in a position to know how the royalties were being calculated):

a.      knowingly and intentionally failed to disclose that Black Lung and Reclamation Fees were being deducted by Defendant from the Gross Selling Price;

b.      knowingly and intentionally calculated a false and misleading _f.o.b. Mine_ price that it then used to compute Plaintiff's royalties and wheelage;

c.      knowingly and intentionally withheld from Plaintiff that Defendant was altering its actual Gross Selling Price to a lower price that it then used to compute Plaintiff's royalties and wheelage; and,

d.      knowingly and intentionally transmitted a false and misleading monthly report to Plaintiff.(reporting is required by Section 2.3 of the Lease).

2.      Whether Black Beauty's fraudulent scheme was furthered by the misleading and deceptive written monthly statements that Black Beauty sent to Vermilion. The reports submitted by Black Beauty fraudulently failed to disclose the actual Gross Selling Price of the coal; fraudulently failed to disclose the fact that Black Beauty was improperly deducting its Black Lung and Reclamation Fees and other operating costs of Defendant from said Gross Selling Price in calculating and determining the royalties and wheelage to be paid to the Plaintiff;

-53-

and, fraudulently presented an amount ( $/ton f.o.b. mine) that Black Beauty had altered to a lower amount and purported to be the Gross Selling Price per ton.

3.      Whether Black Beauty knowingly and intentionally misrepresented the royalty and wheelage payments owed to Vermilion in its misleading and deceptive written monthly statements.

4.      Whether Black Beauty intended for Vermilion to rely on these misleading and deceptive written monthly statements and to continue in its performance of its obligations as Plaintiff under the Lease.

5.      Whether Black Beauty acted in reckless disregard of Vermilion's rights as Lessor in accordance with the Lease.

## VI.     Fraud Underlying Black Beauty's Breach of Contract

### A.     In the Course of Breaching the Contract, Black Beauty Also Committed a Fraud Against Vermilion

At the time of entering into the contract with Catlin Coal, Inc., Black Beauty required, as a part of the transaction, that Vermilion execute and Estoppel Certificate prepared by Black Beauty's lawyers. (Tr.712-715, 751-752, 812-818, 1412).   The Estoppel Certificate was a document required to be executed by the purchase agreement with Catlin Coal, Inc. (Laswell Dep. 53-58).   When executing the Estoppel Certificate, Vermilion attached an Addendum which contained  qualified representations regarding Lessee's performance of its obligations under the Lease (Tr.287-307); See, Exh.150.  The Estoppel Certificate further stated that Lessor had relied on representations of the Lessee  and had not performed an independent investigation or audit of Catlin Coal, Inc.'s financial reports or statements. See, Exh. 150.

-54-

Despite the qualified representations of Lessor contained in the Addendum, Black Beauty did not independently inspect or audit the financial records of Catlin Coal, Inc. relating to the calculation of royalties and wheelage owed to Vermilion at the time of the transaction relating to the assignment (Tr. 713-716, 815-8190).   As a part of its due diligence, however,   Black Beauty not only drafted the Estoppel Certificate, but also obtained financial records from Catlin Coal, Inc.(Tr.1388-1391).   The financial records provided to Black Beauty by Catlin Coal, Inc.'s accountants revealed that Black Lung and Reclamation Fees were *not* identified or treated as "severance taxes" by Catlin Coal, Inc. (Tr. 1389).   Moreover, the reports relating to royalty calculations provided by Catlin Coal, Inc. to Vermilion did not reference or identify *any* deductions being taken or adjustments being made for severance taxes, Black Lung or Reclamation Fees.   See, Exh. V Exhibit H, (V00922-V00926).

The Catlin financial records were not produced by Black Beauty pursuant to Vermilion's discovery requests in this arbitration, and their existence and whereabouts continue to be a mystery. In a January 13, 2003 letter, Charles Compton stated "Asserted Wheelage Underpayment by Catlin.   Without addressing the accounting validity of this assertion, which we do not have adequate records to do, as a matter of contract, Black Beauty did not assume pre-existing payment obligations from Catlin." However, the Catlin closing documents (Tr. 2041; "Big Closing Book" , pages 6 & 34) include all the books and records of Catlin in the list of acquired assets.

Further,  Mr. Laswell testified that he did not tell Vermilion that Catlin Coal, Inc. was deducting Black Lung and Reclamation Fees from the calculation of royalties and wheelage owed to Vermilion under the Lease (Laswell Dep., 36-38). Additionally, the affidavit of

Donna Bradbury established that Catlin deducted Black Lung and Reclamation Fees as "severance taxes" from the calculation of royalties and wheelage owed to Vermilion but did not advise Vermilion of *any* such deductions. See, Affidavit of Donna Bradbury, attached to BB Motion for Summary Judgment.  Reports provided to Vermilion by Catlin Coal , Inc.  did not disclose any deductions (Exh. V Exh. H, Tr. 247-254).  Moreover, even if Vermilion had reviewed Catlin Coal, Inc.'s internal financial records or reports relating to the calculation of royalties owed to Vermilion, the form of report generated by Catlin Coal, Inc. did not reveal any adjustments or deductions for "severance taxes", Black Lung taxes or Reclamation Fees ( V Exh. H, Tr. 247-254).

Black Beauty hired Catlin Coal's internal person, Ms. Donna Bradbury, to assist in the transition including the continuation of practices relating to the calculation of amounts owed to Vermilion for royalties and wheelage (Tr.743).  Black Beauty argued that after the assignment of the Lease from Catlin Coal, Inc. to Catlin Coal, LLC and then from Catlin Coal, LLC to Catlin Coal, LLC (with Black Beauty as the sole member), and then from Catlin Coal, LLC to Black Beauty, Defendant continued to calculate royalties and wheelage in the same manner as its predecessor in interest (Tr. 743-747).  Moreover, Black Beauty argued that the Estoppel Certificate was the instrument pursuant to which Defendant, through its attorney, later asserted that Black Beauty did not assume any prior period liabilities for unpaid royalties or wheelage when accepting assignment of the Lease (Tr.1396-1398).  The evidence shows that the assignment from Catlin Coal, LLC (with Black Beauty as the sole member) to Black Beauty did not include an assumption of liabilities as required under Section 14.1of the Lease and the assignee did not advise Vermilion in writing or otherwise of the assignment as required under Section14.1of the Lease (Tr.1472-1473).

-56-

The internal accounting records and the reporting forms provided to Vermilion by Defendant illustrate that Black Beauty did *not* continue in the same reporting practices engaged in by Catlin Coal, Inc. in reporting royalties and wheelage owed to Vermilion under the Lease. See, Exh. V Exhibit H, (V00922-V00926); Exh.143, Advanced and Earned Royalty Report ;Exhibit H(a) (17 pages including Mined Tons and F.O.B. Price reports, SIR Invoices, Premium/Penalty-2002 Actual report also included in Plaintiff's Exhibit 63)) and Exh. H (a)2 (8 pages of SIR Invoices). Whereas Catlin Coal, Inc. reports Vermilion did not report  the Gross Selling Price ( "GSP" as defined in Section 2.4 of the Lease), reports generated by Black Beauty as Lessee reported an " F.O.B. Mine $" which Vermilion reasonably understood to be the GSP.[25]  Black Beauty has continued to take improper deductions for items including, without limitation, Black Lung taxes, Reclamation Fees, loading fees and agent fees in violation of the Lease.  In August of 2002, Vermilion first discovered Black Beauty's actions relating to improper deductions taken by Black Beauty when calculating royalties and wheelage (Tr. 270-281).

### 1.    Black Beauty Falsely Misrepresented or Concealed Material Facts

Black Beauty failed to disclose or falsely represented material facts at the time of assignment and throughout its tenancy as Lessee.  First, the Estoppel Certificate prepared by Black Beauty failed to advise Vermilion that the transaction involved an assignment from Catlin Coal ,LLC (Black Beauty sole member) to Black Beauty as Lessee *not* from Catlin

---

25 The standard contract utilized by Black Beauty with other Lessors typically contained a definition of "f.o.b. mine price" which allowed Black Beauty to make several specifically enumerated deductions from the calculation of royalties owed to a Lessor. See, Exh.158.  Black Beauty simply substituted its definition of f.o.b. mine price for GSP as defined in the Lease into its calculations of royalties and wheelage owed to Vermilion and in its reports to Vermilion without notice to or the consent of Vermilion.

Coal, Inc. to Black Beauty as stated on the face of the Estoppel Certificate (Tr.1472-1473). This was a material misrepresentation because the Lease requires that the form of any assignment be approved by the Lessor in writing. Exh. 159, §14.1. Further, as stated by Black Beauty's attorney after Vermilion's discovery of the improper deductions, Black Beauty took the position that it had not "by any instrument" accepted the liabilities of the prior Lessee. (Tr.1396-1398). Mr. Compton testified that the instrument being referred to was the Estoppel Certificate. The record also shows that the assignment between Catlin Coal LLC ( Black Beauty sole member) to Black Beauty did not contain an assumption of liabilities in violation of Section 14.1 of the Lease. (Tr.1472-1473).

Thus, during its tenancy as Lessee, Black Beauty misrepresented or concealed material facts including, without limitation, the following:

a.   knowingly and intentionally failing to disclose that Black Lung and Reclamation Fees were being deducted by Defendant from the Gross Selling Price;

b.   knowingly and intentionally calculating a false and misleading _f.o.b. Mine_ price that it then used to compute Plaintiff's royalties and wheelage;

c.   knowingly and intentionally withholding from Plaintiff that Defendant was altering its actual Gross Selling Price to a lower price that it then used to compute Plaintiff's royalties and wheelage; and,

d.   knowingly and intentionally transmitting a false and misleading monthly report to Plaintiff.(reporting is required by Section 2.3 of the Lease).

All of the above are false statements of material facts.

### 2. Black Beauty Made Misrepresentations of or Concealed Material Facts In Reckless Disregard of Their Veracity

As Lessee, Black Beauty knew or should have known that (a) the only deductions allowed under the Lease when calculating royalties are for "sales and/or severance tax"; (b) the Lease does not contain a definition of f.o.b. mine price; (c) the term "severance" tax as used in the coal mining industry does not include Black Lung and Reclamation Fees; (d) Black Lung and Reclamation Fees are not "sales and/or severance" tax; (e) Black Lung tax and Reclamation Fees are not allowable deductions from the GSP as defined in the Lease; (f) Vermilion was not aware that Black Lung taxes and Reclamation Fees were being deducted from the calculation of royalties and wheelage by Lessee; and, (g) the amounts stated as f.o.b. mine $ in the monthly reports submitted by Lessee to Vermilion are not the GSP as required under Section 2.4 of the Lease.  Black Beauty knowingly made material misrepresentations of material facts to Vermilion in reckless disregard of whether such facts were true or false.

Moreover, Black Beauty made the statements with the intent to deceive or induce Vermilion to  execute the Estoppel Certificate and to permit Black Beauty to operate the Lease Premises as lessee. (Tr. 1396-1398 ).  Vermilion justifiably relied on Black Beauty's statements and allowed Defendant to act as lessee of Vermilion's property.  Vermilion has sustained damages as the result of its reliance on Black Beauty's statements.

### 3.    Black Beauty Had a Duty to Disclose Material Facts to Vermilion

As Assignee of the Lease, Black Beauty performed due diligence during the acquisition which revealed that Black Lung taxes and Reclamation Fees were costs incurred by Lessee as disclosed in Catlin Coal Company, Inc.'s financial reports from its

-59-

accountants. (Tr.1388-1391) . Black Beauty reviewed Lessee's Lease with Vermilion which allowed deduction of sales and/or severance tax from the GSP when calculating royalties or wheelage under the Lease. At the time of assignment, Black Beauty knew or should have known that Black Lung tax and Reclamation Fees were not "sales and/or severance tax." (Tr. 897-899). The evidence demonstrates that Black Beauty never referred to Black Lung or Reclamation Fees as "severance tax" until August of 2002, (Tr.1219-1222, Exh. 174).Additionally, as Black Beauty's experts testified, the practice in the coal mining industry, including in the Illinois Basin was to make specific reference to any adjustments or deductions from the calculations of royalties and wheelage to the Lessor. (Partenheimer Dep. p. 59; Raymond Dep. Pp. 25-26, 2931-32, 39-43). [26]

Black Beauty had superior knowledge of material facts. Defendant had the opportunity to disclose such facts to Lessor and was under a duty to disclose such facts to Vermilion. Black Beauty's nondisclosure of material facts constitutes fraud. *Ill. C. Gulf R. Co. V. Dept. Of Local Gov.*, 169 Ill. App. 3d 683, 523 N.E.2d 1048, 1052 (1st Dist. 1988).

### 4.    Lessee's Method of Calculating Royalties is an Essential Element to the Lease

An essential or "material" element of the Lease is the payment of royalties and wheelage to the Lessor. At the time of accepting the assignment, Black Beauty knew that any deductions or adjustments to the GSP could only occur in accordance with the Lease and with the knowledge and consent of Vermilion. Vermilion had no knowledge of any

---

26 Mr. Raymond testified that the general practice as he understands it in the industry is to show deductions on royalty statements sent to landowners. (Raymond

deductions or adjustments to the GSP by Catlin Coal Company, Inc. or Black Beauty or that Black Beauty was taking assignment of the Lease without Black Beauty's assumption of prior period liabilities of Lessee. Black Beauty's misrepresentations, concealment, and withholding of material facts relating to Lessee's calculation of royalties under the Lease constitute fraud. *Soules v. General Motors Corp.*, 19 Ill. 2d 282, 402 N.E. 2d 599, 601 (1980).

### 5.    Black Beauty Had Knowledge of the Falsity of representations Made to Vermilion

At the time of making the above misrepresentations or concealment of material facts, Black Beauty had actual or implied knowledge that the representations were false.  Black Beauty made the misrepresentations knowing that such statements were false or with reckless disregard of whether they were false by failing to obtain actual knowledge as to the truth or falsity of the statement. (Tr.687-688).  Under Illinois law, actual knowledge will be imputed to a defendant who has acted recklessly with regard to whether a representation in true. *Duhl v. Nash Realty Inc.,* 102 Ill App. 3d 483, 429 N.E.2d 1267, 1275 (1st Dist. 1981).

### 6.    Black Beauty Intended to Induce Vermilion's Reliance or to Induce Vermilion to Act on Defendant's Misrepresentations or Concealment of Material Facts

Black Beauty intended to induce Vermilion's reliance on its false misrepresentations and its concealment of material facts when reporting its method of calculating royalties and wheelage under the Lease. When considering Black Beauty's "intention," the Panel must refer to the fact that Black Beauty desired to cause the consequences of his actions.  See *Duhl v. Nash Realty, Inc.,* 102 Ill App. 3d 483, 429 N.E.2d 1267, 1274 (1st Dist. 1981).

Dep. at 42) .

Plaintiff may offer circumstantial evidence of intent and the inferences that can be drawn from it. See *Lane v. Fabert,* 178 Ill App. 3d 698, 533 N.E.2d 546, 551 (4th Dist. 1989).

**7.    Vermilion Actually Relied on Black Beauty's Representations and Plaintiff's reliance was Justifiable**

Vermilion actually relied to its own detriment on Black Beauty's misrepresentations regarding Defendant's calculations of royalties and wheelage under the Lease. (Tr.503-505). Vermilion believed that the amounts reported to Vermilion in the monthly reports submitted to it by Black Beauty reflected the actual price sold to customers without adjustments. (Tr.503); See, Exh.143, Advanced and Earned Royalty Report ;Exhibit H(a) (17 pages including Mined Tons and F.O.B. Price reports, SIR Invoices, Premium/Penalty-2002 Actual report also included in Plaintiff's Exhibit 63)) and Exh. H (a)2 (8 pages of SIR Invoices). Under the circumstances, Vermilion's reliance on Black Beauty's representations was reasonable and therefore justified. In the exercise of ordinary diligence, Vermilion could not have discovered Black Beauty's misrepresentations. Black Beauty has not offered any evidence that shows that in any internal written policy or report, Black Beauty categorized Black Lung taxes or Reclamation Fee as "severance taxes" prior to August of 2002. Furthermore, Defendant did not identify Black Lung or Reclamation Fees as adjustments to or deductions from the calculations of royalties or wheelage in any documents provided to Vermilion. Black Beauty had accepted assignment of the Lease and had the duty both express and implied to perform its contractual obligations in good faith. Thus, Vermilion had a right to rely on Black Beauty's representations.

-62-

8.    **Vermilion Did Not Have a Duty to Investigate the Truth of Black Beauty's Representations**

Black Beauty has attempted to avoid the consequences of its fraudulent conduct by arguing that Vermilion had a duty to investigate or make inquiry into Lessee's actions in calculating royalties and wheelage owed to Vermilion under the Lease. Under Illinois law, such a duty can only exist if either 91) the circumstances were such that the slightest inspection or a mere casual glance would have revealed the falsity of the representation; or (2) the circumstances were such as to prompt a reasonable person to inquire further into the truth of the representations. *West v. Western Cas. And Sur. Co.,* 846 F.2d 387, 394 (7th Cir. (Ill.) 1988); See *Chicago Title & Trust Co. V. First Arlington,* 118 Ill. App. 3d 401, 454 N.E.2d 723, 729 (1st Dist. 1983).

In cases such as the present case, a plaintiff is excused from the duty to investigate if the defendant has either: (1)discouraged the plaintiff from further investigation of the facts by creating a false sense of security; or (2) obstructed the plaintiff from further investigation of the facts. See *Brown v. Broadway Perryville Lumber Co.,* 156 Ill. App. 3d 16, 508 N.E.2d 1170,1175 (2d Dist. 1987).

9.    **Vermilion Has Suffered Actual Loss As a Result of Black Beauty's Conduct**

Vermilion was induced to rely on Black Beauty's representations to its detriment. Vermilion would not have consented to the assignment or executed the Estoppel Certificate if Plaintiff had known that Black Beauty intended to insulate itself from the liabilities of assignee. Additionally, Vermilion would not have agreed to Black Beauty as Lessee if Vermilion had known of Black Beauty method of calculating royalties and wheelage including its deduction of Black Lung or Reclamation Fees as severance taxes from the

-63-

GSP or its deduction of loading fees or agent fees its calculation of royalties. Vermilion has

sustained an actual loss as a result of Black Beauty's conduct.

**B.    Vermilion is Entitled to Recover Punitive Damages for Black Beauty's Fraud Underlying Defendants' Breach of Contract**

Under Illinois law, punitive damages may not be awarded in an action for breach of

contract. *Bank of Lincolnwood v. Comdisco, Inc.,* 111 Ill. App. 3d 822, 444 N.E.2d 657, 662

(1st Dist. 1982).  If the Panel finds that, in addition to breaching the contract with Vermilion,

Black Beauty through the actions of its officer's or employee, acted fraudulently toward

Plaintiff, however, then the Panel may consider whether or not Defendant's fraudulent

conduct justifies an award of punitive damages.  *Mattyasovsky v. West Towns Bus Co.,* 61

Ill 2d 31, 330 N.E.2d 509 (1975); *Kennan v. Checker Taxi Co., Inc.,* 250 Ill App. 3d 155, 620

N.E.2d 1208, 1212 (1st Dist. 1993).  Once the independent tort of fraud is proven, the Panel

must determine whether the tort was committed with malice, wantonness, or oppression.

*Bank of Lincolnwood v. Comdisco, Inc., supra.*

The circumstances of this case merit a determination by the Panel that an award of

punitive damages is justified.  Black Beauty authorized and organized the doing and the

manner of the wrongful action of its officers and employees.  Moreover, the employees who

incorrectly deducted Black Lung taxes, Reclamation Fees, loading fees and agent fees from

the calculation of royalties and wheelage included persons acting in a managerial capacity

and were acting in the scope of their employment with the knowledge and consent of Black

Beauty whose managerial agents of the corporation ratified and approved the action of the

persons doing the actual calculations. (Tr. Tr.  690-691, 693-698, 701-709, 733-737, 769-

777, 784-787, 896, 918-924, 937, 946, 1033-1048, 1094-1099, 1113- 1111123, 1138, 1154-

1157, 1167-1168, 1183-1184, 1200-1217,1234-1239,1767-1768). See *Mattyasovsky v. West Towns Bus Co.,* 61 Ill 2d 31, 330 N.E.2d 509 (1975).

Vermilion has demonstrated that Black Beauty's false representations were made wantonly and willfully. Moreover, Black Beauty's conduct involved the willful violation of its duty to act in good faith and in breach of its fiduciary obligations to Plaintiff. Accordingly, punitive damages are recoverable and should be awarded by this Panel. See, *Home Sav. & Loan Ass'n of Joliet v. Schneider, 108 Ill. 2d 277, 483 N.E.2d 1225, 1228 (1985).*

## CONCLUSION

When applying the law to the evidence submitted by Vermilion at the hearing in this matter, Vermilion believes that the Panel will find that Black Beauty improperly deducted Black Lung and Reclamation Fees from the calculation of royalties and wheelage under Section 2.4 of the Lease. When the Panel considers the law, industry practices and the parties' intentions, Vermilion believes that the evidence has shown that Black Beauty breached the contract and refused to cure and willfully continued its breach; defaulted in its contractual obligations, and refused to cure its default. Moreover, Defendant's actions constituted present I and anticipatory breach of the Lease. Defendant's intentional acts rose to the level of bad faith and fraud. Vermilion respectfully requests that the Panel rule in favor of Vermilion on each of the issues submitted to arbitration by Vermilion. [27]

---

[27] Included in the issues submitted to the Panel were accounting and damage issues which, in accordance with the Order of August 24, 2004, were bifurcated from the 11/08/04 hearing. The bifurcated issues include the following:

(1)    Vermilion seeks an accounting from Black Beauty for all royalty and wheelage payments made, or which should have been made, under the Lease and to properly account for all coal which Black Beauty has mined from the Leased Property since November 21, 1994, to insure that all royalty payments due and owing to Plaintiff have been properly accounted for, and fully paid.

a.   A true and complete recapitulation of the number of run-of-mine ("Raw") tons of Royalty coal and Wheelage coal that were produced each month from the Riola and Vermilion Grove mines since January 1, 1996, along with a month-end inventory of Raw coal; and,

b.   A true and complete recapitulation of the number of Raw tons that were prepared for shipment and placed into prepared ("Clean") coal inventory at each mine.

c.   A true and complete summary of the contracted-for selling price ("Contract Price") with each buyer of the coal produced and shipped pursuant to the Lease; all contractually-required adjustments ("Price Adjustments")to the Contract Price for coal quality or other reasons; the actual Gross Selling Price that was received by the Defendant for each ton of coal shipped from the Riola and Vermilion Grove mines in each month since January 1, 1996; and a complete reconciliation of any Price Adjustments for which the consideration of settlement was other than cash; and,

d.   A true and complete reconciliation of the number of leased and third-party acres mined each month since January 1, 1996 with a proper map identification of the acreage mined and raw tons of coal produced from each area; and,

e.   A detailed recapitulation of the method of calculating the amount of royalty and wheelage due and payable to Vermilion by Defendant, on a monthly basis, for each month since January 1, 1996.

(2) If Black Lung and Reclamation Fees are not "sales and/or severance tax" then what is the amount:

    a.  Of prior period royalty and wheelage the Defendant owes to Plaintiff?

    b.  Of interest on prior period amounts that Defendant owes to Plaintiff?

(3) What amount of damages is Plaintiff entitled to recover for Defendant's actions including, without limitation, any expectation damages suffered by Plaintiff as a result of Defendant's default and Defendant's actual and anticipatory repudiation of its contractual obligation under the Lease?

Respectfully submitted,

Vermilion Coal Company

By: _____

Deborah G. Cole
One of its Attorneys

DGCole Law
Attorney for Plaintiff
1400 North LaSalle Street
Chicago, IL. 60610
(312)751-0272

Fred L. Hubbard
Attorney for Plaintiff
415 N. Gilbert Street
Danville IL 61834-0012
(217) 446-0144

George A. Barton
Law Offices of George A. Barton, P.C.
Attorney for Plaintiff
700 Plaza Center Bldg.
800 West 47th Street
Kansas City, MO 64112
(816)300-6255

-67-

12/27/2004 16:05 FAX                                                    ☑002

## Beverly Conroy

| | |
|---|---|
| **From:** | Mike ODonnell |
| **Sent:** | Friday, February 07, 2003 7:44 AM |
| **To:** | 'Andrew Myers' |
| **Subject:** | RE: lease |

Andy, I should have a draft responce to your comments today, and will forword the lease to you very soon.

Mike

-----Original Message-----
From: Andrew Myers [mailto:MyersAW@TEMPLETONCOAL.COM]
Sent: Wednesday, January 29, 2003 10:31 AM
To: Mike ODonnell
Subject: lease

Mike,

These are my thoughts on the lease I have before me. Overall I think we have a good document that needs just a little tweaking. Before I go into details. Did we talk about possibly exercising an option to lease for the entire area (3400 acres) and then BBCC would select the acres to put under lease. I would really prefer to do this if you are agreeable. As the lease is currently written you have the right to drop acres and prorate advanced royalties on the remainder which leaves me not knowing from year to year what we have or don't have for budgeting purposes. I would not mind separate leases for separate areas if you thought that was reasonable. Let me know what you think about this concept.

As to the lease:

1) Is 12 miles reasonable for the "Coal Field"? I looked at some old leases and 3 to 5 miles was the number being used in them. At one time "adjacent and contiguous" was the terminology and was an understandable request of the mining company. Then I guess there were law suits and the mining companies lost out and decided to use a distance. The net effect now is that the mining company can hold property indefinitely so long as mining is occurring within the limits of the radius selected and may not have any intention of ever mining the coal. Of course the argument can be made that that is why advanced royalties are there for the protection of the Lessor, but this lease allows for the advanced royalty to terminate upon the payment of any earned royalty. Conceivably, All 3400 acres could be held in perpetuity by having "mining operations", as defined in the lease as an active permit, within 12 miles of the leased area if as little as one acre is mined and earned royalty is paid. I think this covers a pretty broad area when given a 12 mile radius around a 3400 acre lease that runs close to 6 miles east to west.

2) The Advanced Royalty is subject to an awful lot of conditions. It is paid only until the payment of any earned royalty, which we think is unacceptable. In every lease we have ever had, without exception, advanced royalties are paid each year and future earned royalties are credited against the advance. They are paid regardless of the mining activity occurring. Also, if I read the lease correctly, the only advanced royalty BBCC would be obligated to pay is the royalty for the primary term. As I write, mining operations are already occurring within the 12 mile radius and permits are sure to be issued within 5 years on our leased area, which means at the end of the primary term the lease is automatically extended to the secondary term and beyond without regard to any advanced royalty payments in the secondary term.

3) I would like to see this lease limited to strip mining only. Underground mining should be under separate lease. Augering should be performed by mutual agreement only and by written agreement as a supplement to this lease.

4) Paragraph 1C seems to be a little broad. This could be seen as a right to build haul roads across our farms for an unlimited and uncompensated period of time. In general the

1

Exhibit **A(1)**

lease does not seem to address the issue of farms and crop damage in an equitable manner. Most leases that I have dealt with pay for crop damages in advance of actual mining of the area and then are granted a "period of reclamation and revegetation" followed by an acreage payment if held longer than said period.

5) I think paragraph 3.2 is a pretty good effort at getting to what I was hoping to accomplish. I was wondering if an additional phrase was needed to address the lease being terminated without mining the area or if this area was part of the area dropped under paragraph 1H?

6) There is a typo in the earned royalty that says "Seventy five Cents ($0.80)".

7) I received your example of the F.O.B Mine Price calculation. Seems pretty clear to me and will take it to Tom to look at shortly.

8) Would a title search or title insurance be acceptable in lieu of abstracts. Some of those go back an awfully long way and could get fairly expensive to bring forward?

9) I didn't see anything concerning assignment of this lease. We generally allow assignment of leases with written approval, which is not "unreasonably withheld", but it does not release the lessee of any obligations of the terms of the lease.


I hope these requests seem reasonable to you. Please give some thought to a one year option to lease under the terms of the lease we are trying to prepare here today. I think it will help to resolve some of the other issues above. I am looking forward to your response and apologize again for the delay.

Andy

2

Exhibit A (2)

**Beverly Conroy**

| | |
|---|---|
| **From:** | Mike ODonnell |
| **Sent:** | Monday, January 20, 2003 2:03 PM |
| **To:** | Diane Goebel |
| **Subject:** | FW: lease |

Diane, would you provide the F.O.B. sample as requested by Andy.
Thanks, Mike.

-----Original Message-----
From: Andrew Myers [mailto:MyersAW@TEMPLETONCOAL.COM]
Sent: Monday, January 20, 2003 12:20 PM
To: Mike ODonnell
Subject: lease

Mike,

Also, could you send me a sample of a report showing the F.O.B. mine price calculation
with reductions as they would be if you were paying earned royalty now.  I think it would
be nice to see how the percentage royalty would be affected by current taxes, fees, etc.
I realize this would not necessarily be the same in the future, but it would give us an
idea of what things would look like now.

Andy

Exhibit A (3)



*Fred L. Hubbard*
*Attorney at Law*
*415 North Gilbert Street*
*P.O. Box 12*
*Danville, Illinois 61834-0012*
*217-446-0144   Fax: 217-477-0573*



December 9, 2004

**VIA FACSIMILE: (812) 421-5089**

ZIEMER, STAYMAN, WEITZEL & SHOULDERS, LLP.
Attn: Mr. Charles A. Compton
20 N.W. FIRST STREET
PO BOX 916
EVANSVILLE, IN 47706-0916

**Re: Leases Referred to by Mr. Rhine and
    His Testimony on Cross Examination**

Dear Charles:

After conferring with the other lawyers representing Vermilion
Coal Company, we have determined that we cannot accept an
affidavit from Mr. Rhine attempting to excerpt portions of a
lease which we cannot see.  We also cannot accept his testimony
being based upon a handful of leases that aren't further
identified and of which we cannot get copies.  Since he has based
his testimony on specific documents, we believe the Panel should
see those documents and we should be entitled to see the
documents as counsel for the claimant.  Accordingly, I presume
that either Mr. Rhine's testimony will be stricken or that you
will be able to furnish those documents.


Sincerely yours,

Fred L. Hubbard

FLH:jml
cc :Ms. Deborah Cole
   :Mr. George A. Barton
   :Mr. Frederick D. Keady

Exh· B (1)

# ZIEMER, STAYMAN, WEITZEL & SHOULDERS, LLP

**ATTORNEYS AT LAW**
20 N.W. FIRST STREET • P.O. BOX 916
EVANSVILLE, INDIANA 47706-0916

TELEPHONE: (812) 424-7575
FACSIMILE: (812) 421-5089
WEBSITE: WWW.ZSWS.COM

TED C. ZIEMER, JR.
ROBERT F. STAYMAN
STEPHAN E. WEITZEL
PATRICK A. SHOULDERS (1)
DAVID V. MILLER
WM. MICHAEL SCHIFF (1)
MARCO L. DELUCIO
STEVEN K. HAHN
JAMES P. CASEY
TIMOTHY J. HUBERT
MARY LEE SCHIFF (2)
DAVID A. GUERRETTAZ
ROBERT L. BURKART
CHARLES A. COMPTON

SARAH LINK HARD''(4)
DIRCK H. STAHL
CHAD J. SULLIVAN (3)
KEITH W. VONDER HE
NICK J. CIRIGNANO
ALLYSON R. BREEDEN
JEAN M. CUNNINGHAM
KATHRYN W. DANIEL

(1) ALSO ADMITTED IN KENTUCKY
(2) ALSO ADMITTED IN OHIO
(3) ALSO ADMITTED IN ILLINOIS AND MISSOURI
(4) ALSO ADMITTED IN GEORGIA

WRITER'S EMAIL: ccompton@zsws.com

December 20, 2004

**VIA FACSIMILE:  (217) 477-0573**
**and FIRST CLASS MAIL**

Fred L. Hubbard, Esq.
415 N. Gilbert Street
P.O. Box 12
Danville, IL  61834-0012

    Re:    **John Rhine Testimony**

Dear Fred:

    I am in receipt of your December 9, 2004 letter regarding John Rhine. I was somewhat surprised to receive the letter because I thought with the production of Mr. Rhine's Affidavit on the final day of the hearing that this issue was resolved. Black Beauty is nonetheless investigating with Mr. Rhine whether additional steps can be taken to address the position set forth in your most recent letter. Black Beauty believes Mr. Rhine's testimony is admissible, but nonetheless will seek to reach a resolution of this issue so that it need not be brought before the Panel. I will advise you further when I have additional information.

    Sincerely,

    ZIEMER, STAYMAN, WEITZEL & SHOULDERS, LLP

    Charles A. Compton

CAC/bk
cc:    File



Exh. B(a)

**rom:** Eric Fry
**ent:** Wednesday, October 23, 2002 11:25 AM
**o:** Bruce Evans; Bryce West; Mark Yingling; John Ross
**ubject:** FW: Elections / Phil Croft

Original Message-----
**m:** Nathan Noland [mailto:incoalco@in.net]
**t:** Wednesday, October 23, 2002 9:29 AM
Wayne Parke; Tommy Sutton; Randy Beck; Mike Templeman; Mike Schiele; Kent Holcomb; Jim McConnell; Felson Bowman; Eric Fr
Coovert; David Joest; Andrew Myers; Lennie Underwood
Jim Buck; Alex Messamore; Dana Meier; George Boyles; Joe Craig; John Endress; Lonnie Nelson; Mike Owen; Rusty Ashcraft
**ject:** Elections / Phil Croft

tlemen:

veryone is aware the fall elections will be held on November 5, 2002.  For those of you in Senator Waterman's district I urge you to
ort Phil Croft and to encourage your employee's to do the same.  Phil has worked extremely hard, but has not received financial
ort from his caucus as promised.  The Senate Democrats have used virtually what monies they have to support incumbent Senator
are receiving strong challenges from the Senate Republicans.

ator Waterman is currently touting a 50 cent per ton coal severance tax in his campaign.  Without question this is a proposal that the
stry cannot support under any circumstances.

Indiana COAL PAC did not make any direct contributions to Phil Croft simply because we did not have sufficient monies to do so.
e I planned on having a coal industry fundraiser for Phil I did not go forward because the Senate Democrats were not giving Phil an
ningful support until the last two weeks, and now it is too late to help.  At the Senate Democrats urging the ISTA has contributed
nd $15,000 to help with the Croft campaign and at least one mailing district wide has been paid for.

'e seen a recent poll, and while Phil is trailing Senator Waterman's support is not very solid.  It is not a lost cause.

**○ urge you to contact all of your vendors and ask them to put out the word to support Phil Croft.  You can do this even if y**
**t have employees in the district, because there is a good chance your vendors might.  Please do everything you can to hel**

Noland

electronic-mail message contains confidential information intended only for the use of the individual or entity named.  If the reader of this messa
 the intended recipient, the reader is hereby notified that any diessemination, distribution, copying or other use of this message is strictly prohibit
 hereby instructed to return or destroy this copy of this message.

C (1)

Beverly Conroy

| | |
|---|---|
| From: | Nathan Noland [incoalco@in.net] |
| Sent: | Friday, January 31, 2003 4:14 PM |
| To: | Wayne Parke; Tommy Sutton; Randy Beck; Mike Schiele; Lennie Underwood; Kent Holcomb; Jim McConnell; Felson Bowman; Eric Fry; Don Coovert; David Joest; Andrew Myers; Dan Garrett; Larry Klobuka |
| Cc: | Rusty Ashcraft; Mike Owen; Lonnie Nelson; John Endress; Joe Craig; George Boyles; Dana Meier; Alex Messamore; Jim Buck; Mike Stanley; Matt Pride; John Stachura; Jim Ricketts; Greg Xanders; Sue Shadley; Rosemary Wilson; Mark Sebree; Larry Kaelin; John Hasselden; Hal Quinn; Dennis Wilzbacher; Bruce Evans; Dan Hermann |
| Subject: | Legislative Report |
| Attachments: | Last Action Report.doc |

is past week was very busy at the General Assembly. A lot of bills were heard in Committee and several have been passed out for fl
tion. The following is a summary of actions affecting legislation of interest to the coal industry that took place this week. Attached is a
mplete listing of bills we are watching.

**1064 – report of health or safety violations.** The bill was returned to second reading and amended to exempt coal operators from
e requirements in the legislation. The bill also passed third reading overwhelmingly.

**1166 – Center for Coal Technology Research.** Amendments have been prepared for committee consideration to remove general
d appropriations and to create a review panel for projects applying for clean coal technology grants. Four legislators are working with
closely to earmark some funding for the center out of other state revenues. One potential source of monies are civil penalties paid by
ctric utilities in HB 1529, which will be heard on Wednesday of next week. Another source may be sales tax collections from vending
chines. Final committee action on HB 1166 is expected February 10, 2003.

**1543 – wetlands regulation.** 1543 was combined into HB 1221 in the House Environment Committee this week, but is being held l
e author until the wetlands portion of the bill can be "cleaned up". This version of wetland regulation is not as favorable as SB 491. We
t with the author this week and proposed an amendment to exempt mine operations permitted under IC 14-34 from the requirements
e bill. Response was positive and a final word on whether he will seek the amendment will come early next week. In the meantime we
l be working with others in the wetlands coalition to improve the bill where possible.

**1552 – various natural resources issues.** 1552, which contains a two year extension of the current level of reclamation fees pass
t of committee and has been reassigned to the Ways and Means Committee. Ways and Means is not expected to change the
:lamation fee portion of the legislation when they hear the bill.

**1553 – Indiana Bureau of Mines.** The author of the bill has agreed to delete any fee provisions from the bill in exchange for a
ovision that will give the mining board the authority to assess mine operators for the cost of purchasing and maintaining mine rescue
uipment. The purpose of the fee proposal was to hire an additional two inspectors, which will now be deleted from the legislation. Th
is expected to be heard in committee on February 4th and amended as described.

**467 – coal trucks.** The bill has not been scheduled for any committee meeting, but several meetings took place this last week with
e author of the legislation. Originally the bill was introduced "to get coal operators attention" according to the bill's author, but now the
thor thinks that requiring coal truck washers at every coal mine is the right thing to do. Meetings will continue next week in an effort to
:isfy the author's concerns without mandatory legislation.

**discussion of severance taxes on coal and mineral aggregates has started within the House Ways and Means Committee,**
marily due to the introduction of HB 2006. **While I think it is very unlikely that severance taxes will be implemented to help**
:al government I am concerned that some believe it may be a way to help fund state government. **Meetings have been**
heduled with Ways and Means staff and the Speaker early next week to discuss the implications of any coal severance taxes
lecessary I may be alerting each of you to write, call, or otherwise communicate with various legislators if the tax concept is
riously considered.

ease let me know if you have any questions.

t Noland

*C (2)*

## Beverly Conroy

**From:** Indiana Coal Council, Inc. [bigcoal@ameritech.net]
**Sent:** Friday, January 31, 2003 2:04 PM
**To:** Dan Hermann
**Subject:** RE: Coal Severance Tax in Indiana

Cinergy is somewhat focused and are trying to help us on the issue.  The others seem more concerned about the fines and merger legislation and don't seem interested in severance taxes at this time.  I am continuing efforts to get their attention and hopefully they will help in the lobby effort.  Never hurts for you to tell your customers what is going on - it helps if folks within the utility fuels sections start pushing their lobbyist to help out.

Nat

This electronic-mail message contains confidential information intended only for the use of the individual or entity named.  If the reader of this message is not the intended recipient, the reader is hereby notified that any diessemination, distribution, copying or other use of this message is strictly prohibited and is hereby instructed to return or destroy this copy of this message.

-----Original Message-----
From: Dan Hermann [mailto:DHermann@bbcoal.com]
Sent: Friday, January 31, 2003 2:43 PM
To: Indiana Coal Council, Inc.
Subject: RE: Coal Severance Tax in Indiana

Nat

It is certainly ok to pass along my comments.  Gene Aimone asked if you were aware of the utilities position or their lobbing efforts on a this issue.

Dan

-----Original Message-----
From: Indiana Coal Council, Inc. [mailto:bigcoal@ameritech.net]
Sent: Friday, January 31, 2003 1:54 PM
To: Dan Hermann
Subject: RE: Coal Severance Tax in Indiana

Dan,

I concur one hundred percent.  Do you have any problems with me passing on your note to the Speaker and Chairman of House Ways and Means in a meeting I have set up with them next week.  The heart of the argument I intend to make is that they are only helping Illinois become a dominant coal mining state again when they drive up our costs with a severance tax.  I intend to leave them copies of the press release announcing the Warren notices sent out at Sycamore Mine.

Nat

This electronic-mail message contains confidential information intended only for the use of the individual or entity named.  If the reader of this message is not the intended recipient, the reader is hereby notified that any diessemination, distribution, copying or other use of this message is strictly prohibited and is hereby instructed to return or destroy this copy of this message.

-----Original Message-----
From: Dan Hermann [mailto:DHermann@bbcoal.com]
Sent: Friday, January 31, 2003 10:14 AM
To: Wayne Parke; bigcoal@Ameritech.Net
Subject: Coal Severance Tax in Indiana

1

*C (3)*

Nat

This electronic-mail message contains confidential information intended only for the use
of the individual or entity named.  If the reader of this message is not the intended
recipient, the reader is hereby notified that any diessemination, distribution, copying or
other use of this message is strictly prohibited and is hereby instructed to return or
destroy this copy of this message.

-----Original Message-----
From: Dan Hermann [mailto:DHermann@bbcoal.com]
Sent: Friday, January 31, 2003 10:14 AM
To: Wayne Parke; bigcoal@Ameritech.Net
Subject: Coal Severance Tax in Indiana

Nat

I wanted to pass along my concerns and comments to proposed House Bill 2006 on a coal
severance tax.

The Indiana Coal Industry provides very attractive employment opportunities in rural areas
of southern Indiana.  In some areas these jobs are the higher paying jobs in their
community.  In addition due to the large capital requirements of a mining operation other
sectors such as the equipment dealers, rebuild shops, engineering firms, abstract
companies, law firms etc. account for a number of additional well paying jobs which
support our industry.  Unfortunately the coal industry is a very fragile industry.  As you
are aware a number of the major coal companies have exited the Indiana market in favor of
more attractive regions such as the Powder River Basin (PRB). A number of smaller
producers have gone out of business.  A coal severance tax could be a death sentence for
our industry and lead to the loss of a substantial number of high paying jobs to
individuals employed in our industry and the job sectors which support our industry.

The view by certain legislators that a coal severance tax could be passed on to utilities
who could in turn pass it on through their rate base so the net impact would not hurt the
coal industry is greatly flawed. Although it is very difficult to determine if the Utility
Industry will be deregulated in the future Utilities are obligated to keep there
generating cost as low as possible for the Indiana rate payers and to be competitive for
outside power
sales.   A severance tax would tip the scales and make coal mined outside
of Indiana more attractive than Indiana coal leading to a loss of jobs in Indiana. Coal
mined in Indiana and shipped outside the state or coal mined for industrial users would be
further penalized on a competitive basis.

At a time when our country is on the verge of war in the middle east and we must find ways
to be less dependant on foreign oil driving a low cost domestic source of fuel out of
business does not seem like a prudent path for the State of Indiana to head down.

C (4)

**Beverly Conroy**

| | |
|---|---|
| **From:** | Dan Hermann |
| **Sent:** | Friday, January 31, 2003 1:51 PM |
| **To:** | 'Indiana Coal Council, Inc.' |
| **Subject:** | RE: Coal Severance Tax in Indiana |

Nat

Thanks for the information.  I will have our marketing department contact each of the fuels dapartment that we deal with.

Dan

-----Original Message-----
From: Indiana Coal Council, Inc. [mailto:bigcoal@ameritech.net]
Sent: Friday, January 31, 2003 2:04 PM
To: Dan Hermann
Subject: RE: Coal Severance Tax in Indiana

Cinergy is somewhat focused and are trying to help us on the issue.  The others seem more concerned about the fines and merger legislation and don't seem interested in severance taxes at this time.  I am continuing efforts to get their attention and hopefully they will help in the lobby effort.  Never hurts for you to tell your customers what is going on - it helps if folks within the utility fuels sections start pushing their lobbyist to help out.

Nat

This electronic-mail message contains confidential information intended only for the use of the individual or entity named.  If the reader of this message is not the intended recipient, the reader is hereby notified that any diessemination, distribution, copying or other use of this message is strictly prohibited and is hereby instructed to return or destroy this copy of this message.

-----Original Message-----
From: Dan Hermann [mailto:DHermann@bbcoal.com]
Sent: Friday, January 31, 2003 2:43 PM
To: Indiana Coal Council, Inc.
Subject: RE: Coal Severance Tax in Indiana

Nat

It is certainly ok to pass along my comments.  Gene Aimone asked if you were aware of the utilities position or their lobbing efforts on a this issue.

Dan

-----Original Message-----
From: Indiana Coal Council, Inc. [mailto:bigcoal@ameritech.net]
Sent: Friday, January 31, 2003 1:54 PM
To: Dan Hermann
Subject: RE: Coal Severance Tax in Indiana

Dan,

I concur one hundred percent.  Do you have any problems with me passing on your note to the Speaker and Chairman of House Ways and Means in a meeting I have set up with them next week.  The heart of the argument I intend to make is that they are only helping Illinois become a dominant coal mining state again when they drive up our costs with a severance tax.  I intend to leave them copies of the press release announcing the Warren notices sent out at Sycamore Mine.

*C(5)*

**Beverly Conroy**

| | |
|---|---|
| **From:** | Dan Hermann |
| **Sent:** | Friday, January 31, 2003 1:43 PM |
| **To:** | 'Indiana Coal Council, Inc.' |
| **Subject:** | RE: Coal Severance Tax in Indiana |

Nat

It is certainly ok to pass along my comments.  Gene Aimone asked if you were aware of the
utilities position or their lobbing efforts on a this issue.

Dan

-----Original Message-----
From: Indiana Coal Council, Inc. [mailto:bigcoal@ameritech.net]
Sent: Friday, January 31, 2003 1:54 PM
To: Dan Hermann
Subject: RE: Coal Severance Tax in Indiana

Dan,

I concur one hundred percent.  Do you have any problems with me passing on your note to
the Speaker and Chairman of House Ways and Means in a meeting I have set up with them next
week.  The heart of the argument I intend to make is that they are only helping Illinois
become a dominant coal mining state again when they drive up our costs with a severance
tax.  I intend to leave them copies of the press release announcing the Warren notices
sent out at Sycamore Mine.

Nat

This electronic-mail message contains confidential information intended only for the use
of the individual or entity named.  If the reader of this message is not the intended
recipient, the reader is hereby notified that any diessemination, distribution, copying or
other use of this message is strictly prohibited and is hereby instructed to return or
destroy this copy of this message.

-----Original Message-----
From: Dan Hermann [mailto:DHermann@bbcoal.com]
Sent: Friday, January 31, 2003 10:14 AM
To: Wayne Parke; bigcoal@Ameritech.Net
Subject: Coal Severance Tax in Indiana

Nat

I wanted to pass along my concerns and comments to proposed House Bill 2006 on a coal
severance tax.

The Indiana Coal Industry provides very attractive employment opportunities in rural areas
of southern Indiana.  In some areas these jobs are the higher paying jobs in their
community.  In addition due to the large capital requirements of a mining operation other
sectors such as the equipment dealers, rebuild shops, engineering firms, abstract
companies, law firms etc. account for a number of additional well paying jobs which
support our industry.  Unfortunately the coal industry is a very fragile industry.  As you
are aware a number of the major coal companies have exited the Indiana market in favor of
more attractive regions such as the Powder River Basin (PRB). A number of smaller
producers have gone out of business.  A coal severance tax could be a death sentence for
our industry and lead to the loss of a substantial number of high paying jobs to
individuals employed in our industry and the job sectors which support our industry.

The view by certain legislators that a coal severance tax could be passed on to utilities
who could in turn pass it on through their rate base so the net impact would not hurt the
coal industry is greatly flawed. Although it is very difficult to determine if the Utility

1

C (6)

12/27/2004 16:22 FAX                    @008

Industry will be deregulated in the future Utilities are obligated to keep there generating cost as low as possible for the Indiana rate payers and to be competitive for outside power
sales.    A severance tax would tip the scales and make coal mined outside of Indiana more attractive than Indiana coal leading to a loss of jobs in Indiana. Coal mined in Indiana and shipped outside the state or coal mined for industrial users would be further penalized on a competitive basis.

At a time when our country is on the verge of war in the middle east and we must find ways to be less dependant on foreign oil driving a low cost domestic source of fuel out of business does not seem like a prudent path for the State of Indiana to head down.

2

C (7)

**Beverly Conroy**

| | |
|---|---|
| **From:** | Cathy Bailey |
| **Sent:** | Wednesday, January 29, 2003 9:25 AM |
| **To:** | 'Coe, Jane' |
| **Subject:** | RE: Riola spot order |

Next check is fine.

Thanks for your help.

Cathy


-----Original Message-----
From: Coe, Jane [mailto:Jane.Coe@Cinergy.COM]
Sent: Wednesday, January 29, 2003 9:14 AM
To: Cathy Bailey
Subject: RE: Riola spot order


I didn't realize that, but it has now been changed.  Next check okay, or do you want me to
ask Sharon to rerun?

-----Original Message-----
From: Cathy Bailey [mailto:cbailey@bbcoal.com]
Sent: Tuesday, January 28, 2003 5:35 PM
To: Coe, Jane
Subject: Riola spot order


Jane,

I was told the Riola Spot order to Cayuga would work just like the regular Riola Contract
in that we would get paid freight from you and pay Curry.

Jan 1-15 we were only paid 27.03.  We are short the $3.18 freight.

Can you check and get back to me.

Tx
Cathy

1

Exh. BO)

☑003

**From:** Step, Becky [Becky.Step@Cinergy.COM]
**Sent:** Thursday, February 06, 2003 4:50 PM
**To:** Cathy Bailey
**Cc:** Western, Sherri
**Subject:** Freight for Vermilion Grove

Cathy, this email is to document our discussion of the method to reimburse Black Beauty the CSX freight costs for transporting Vermilion Grove coal to Cayuga Station. As we explained the Vermilion Grove coal is to be a delivered cost to Cayuga and to accomplis it, CSX will invoice Black Beauty the freight costs and Black Beauty will pay CSX the freight. PSI will then reimburse Black Beauty se freight costs.

e timing of the CSX freight bill and the PSI payments was brought up, with PSI is offering this solution to that issue. Through our ment process in ComTrac, the tons delivered from Vermilion Grove to Cayuga will trigger a freight payment to Black Beauty for 3 arate time periods: 1 -10th, 11-20th and 21st to month end, for each month. The 3 payments will be made by ACH wire to the bank ount designated by Black Beauty. It usually takes about 4-5 days to process the accounting records and receive the money in the ount, based on a typical month. So, for example, if the Vermilion Grove shipments totals 4 trains in the first 10 days, and the freight e is $2.21/T, then Black Beauty would have $88,400 ACH wired and be in their account by say the 15th.

sed on PSI's experience with CSX, their bills are grouped together, with various due date, which PSI usually pays twice per month. I ears based on PSI's past history that CSX's bills are about 10 days past the ship date.

would like to offer this procedure of paying the CSX freight over the three time periods per month initially. However, if Black Beauty eriences any problems with this method, PSI is willing to work with Black Beauty to come up with some alternative solution that will ress those concerns.

ɔu have any questions, concerning this matter, please feel free to call me at 317 838 1782.

nk you,

ky Step

D (2)

**From:** Cathy Bailey
**Sent:** Friday, February 07, 2003 10:40 AM
**To:** 'Step, Becky'
**Subject:** RE: Freight for Vermilion Grove

cky,

alled and left Jeff Heath a message to go ahead with paperwork and get this going.  You should be hearing from him.

:hy

-----Original Message-----
**From:** Step, Becky [mailto:Becky.Step@Cinergy.COM]
**Sent:** Thursday, February 06, 2003 4:50 PM
**To:** Cathy Bailey
**Cc:** Western, Sherri
**Subject:** Freight for Vermilion Grove

Hi Cathy,  this email is to document our discussion of the method to reimburse Black Beauty the CSX freight costs for transporting Vermilion Grove coal to Cayuga Station.  As we explained the Vermilion Grove coal is to be a delivered cost to Cayuga and to accomplish that, CSX will invoice Black Beauty the freight costs and Black Beauty will pay CSX the freight. PSI will then reimburse Black Beauty those freight costs.

The timing of the CSX freight bill and the PSI payments was brought up, with PSI is offering this solution to that issue. Through our payment process in ComTrac, the tons delivered from Vermilion Grove to Cayuga will trigger a freight payment to Black Beauty for 3 separate time periods:  1 -10th, 11-20th and 21st to month end,  for each month.  The 3 payments will be made by ACH wire to the bank  account designated by Black Beauty.  It usually takes about 4-5 days to process the accounting records and receive the money in the account, based on a typical month.  So, for example,  if the Vermilion Grove shipments totals 4 trains in the first 10 days, and the freight rate is $2.21/T, then Black Beauty would have $88,400 ACH wired and be in their account by say the 15th.

Based on PSI's experience with CSX, their bills are grouped together, with various due date,  which PSI usually pays twice per month.  It appears based on PSI's past history that CSX's bills are about 10 days past the ship date.

PSI would like to offer this procedure of paying the CSX freight over the three time periods per month initially.  However, if Black Beauty experiences any problems with this method, PSI is willing to work with Black Beauty to come up with some alternative  solution that will address those concerns.

If you have any questions, concerning this matter, please feel free to call me at 317 838 1782.

Thank you,

Becky Step

D (3)

**From:**    Cathy Bailey
**Sent:**    Friday, February 07, 2003 10:38 AM
**To:**      Greg Wing
**Subject:** FW: Freight for Vermilion Grove

eg,

re is a note from PSI on that freight.  I talked with Mark and I think we want to try and accomodate PSI on this.  You should be receivi
mething from CSX on this soon.

thy

--Original Message-----
om: Step, Becky [mailto:Becky.Step@Cinergy.COM]
nt: Thursday, February 06, 2003 4:50 PM
: Cathy Bailey
: Western, Sherri
bject: Freight for Vermilion Grove

Cathy,  this email is to document our discussion of the method to reimburse Black Beauty the CSX freight costs for transporting
rmilion Grove coal to Cayuga Station.  As we explained the Vermilion Grove coal is to be a delivered cost to Cayuga and to accompli
t, CSX will invoice Black Beauty the freight costs and Black Beauty will pay CSX the freight.  PSI will then reimburse Black Beauty
se freight costs.

e timing of the CSX freight bill and the PSI payments was brought up, with PSI is offering this solution to that issue.  Through our
rment process in ComTrac, the tons delivered from Vermilion Grove to Cayuga will trigger a freight payment to Black Beauty for 3
parate time periods:  1 -10th, 11-20th and 21st to month end,  for each month.  The 3 payments will be made by ACH wire to the bank
count designated by Black Beauty.  It usually takes about 4-5 days to process the accounting records and receive the money in the
count, based on a typical month.  So, for example, if the Vermilion Grove shipments totals 4 trains in the first 10 days, and the freight
e is $2.21/T, then Black Beauty would have $88,400 ACH wired and be in their account by say the 15th.

sed on PSI's experience with CSX, their bills are grouped together, with various due date,  which PSI usually pays twice per month.  I
pears based on PSI's past history that CSX's bills are about 10 days past the ship date.

I would like to offer this procedure of paying the CSX freight over the three time periods per month initially.  However, if Black Beauty
periences any problems with this method, PSI is willing to work with Black Beauty to come up with some alternative  solution that will
dress those concerns.

ou have any questions, concerning this matter, please feel free to call me at 317 838 1782.

ank you,

cky Step

'17/2004



12/27/2004 15:48 FAX    ☑006
2:07-cv-02082-MPM-DGB   #16-5   Page 85 of 102
SEP. 12. 2003 10:19AM    NO. 4565   P. 2

THIS DOCUMENT SUPPLIED BY VERMILLION COAL CO

COPY OF MONTHLY REPORT SHOWING PRICE FOR JAN 2003 & OTHER MONTHS.

## BLACK BEAUTY COAL COMPANY
### ADVANCED & EARNED ROYALTY REPORT

MINE: RIOLA COMPLEX
LEASE: VERMILION COAL COMPANY
VENDOR: TERRE HAUTE FIRST NATIONAL BANK
DUE: 20TH

**WHEELAGE PAYMENT**

| MONTH 2003 | SOLD TONS | FOB MINE $ (If Applicable) | @$0.1561% CHECK AMT |
|---|---|---|---|
| Black Beauty | | | |
| January ** | 61,212.47 | 18.3594 | 11,238.49 |
| February ** | 71,089.16 | 20.9438 | 14,900.42 |
| March ** | 71,282.02 | 20.7986 | 14,823.66 |
| April ** | 40,975.38 | 20.1044 | 8,956.95 |
| May ** | - | 20.8185 | - |
| June ** | 11,173.09 | 21.4460 | 2,396.18 |
| July ** | 60,595.27 | 19.9861 | 12,110.63 |
| August ** | 69,712.87 | 19.8914 | 13,866.87 |
| September ** | | | $ |
| October ** | | | $ |
| November ** | | | $ |
| December ** | | | $ |
| **Total** | 385,060.46 | | $ 77,395.20 |

**EARNED ROYALTY PAYMENT**

| MONTH 2003 | SOLD TONS | FOB MINE $ | @5% CHECK AMT | RECOUPED AMOUNT | ADVANCE BALANCE |
|---|---|---|---|---|---|
| Black Beauty | | | | | $437,103.10 |
| January | 85,366.01 | 18.3594 | - | - | $437,103.10 |
| January ** | | 22.0452 | - | 94,093.54 | $343,009.56 |
| February | 90,698.06 | 20.9438 | - | 103,334.33 | $343,097.56 |
| February ** | | 22.7913 | - | | $239,651.23 |
| March | 92,703.19 | 20.7986 | - | 98,010.45 | $141,640.78 |
| March ** | 13,898.17 | 21.1450 | - | 13,970.82 | $127,669.96 |
| April | 53,788.81 | 20.1044 | - | 60,397.35 | $67,272.61 |
| April ** | | 22.4568 | - | 60,440.15 | $6,832.46 |
| May | 59,634.61 | 20.2688 | - | 6,832.46 | |
| May ** | 65,633.07 | 20.8185 | 61,485.61 | - | |
| June | 52,671.49 | 21.4460 | 56,479.64 | - | |
| June ** | 68,578.25 | 21.3547 | 72,872.10 | - | |
| July | 18,735.44 | 19.9861 | 18,722.42 | - | |
| July ** | 78,687.95 | 20.3191 | 79,943.42 | - | |
| August | 2,855.38 | 19.8914 | 2,042.23 | - | |
| August ** | 81,608.57 | 17.5921 | 72,652.91 | - | |
| September | | | $ | $ | $ |
| September ** | | | $ | $ | $ |
| October | | | $ | $ | $ |
| October ** | | | $ | $ | $ |
| November | | | $ | $ | $ |
| November ** | | | $ | $ | $ |
| December | | | $ | $ | $ |
| December ** | | | $ | $ | $ |
| **Total** | 765,053.10 | | | $437,103.10 | |

| ** = Vermilion Grove

NOTE: Advanced Royalty Payment of $400,000 made on 11/2/2000.
NOTE: Advanced Royalty Payment of $500,000 made on 11/14/2001.
NOTE: Advanced Royalty Payment of $600,000.00 made on 11/18/2002.

D (5)

**Beverly Conroy**

| | |
|---|---|
| **From:** | Diane Goebel |
| **Sent:** | Monday, August 12, 2002 11:14 AM |
| **To:** | Dan Hermann |
| **Subject:** | Earned Royalties |

Dan,

I have now been handling the earned royalties on my own since about April. It used to be clear cut who was responsible for what .... Lisa prepared, Dee Ann was responsible, then Shellye prepared, Lori was responsible. Whenever a problem or audit arose, Dee Ann or then Lori was responsible for handling. However, now it is not quite so clear. Julie checks me ... but it is not to the extent as before. Plus she is new and I don't really know how far her responsibility extends.

We have had something come up this past week. Fred Keady with Vermilion Coal has let Dave Yager know that he does not agree with our numbers and is coming in Wednesday to go thru our system. Wayne has really stepped up to the plate to help out. Mr. Keady actually asked that Wayne be involved, but Wayne could have easily said no. He is not responsible for earned royalties, but he now knows more than he probably wants to. Wayne headed up a meeting with everyone we felt needed to be in it and I think we are in good shape. In other words, we squeaked thru this one.

My problem is ... Wayne may not always be able to help. When we need a "senior" person to make a decision (such as additional money owed, deductions taken that maybe should not have been, etc), where do I go? Who, in your opinion, do I report to concerning earned royalties ?

Thanks for your help,

Diane

E (1)

everly Conroy

**From:** Diane Goebel
**Sent:** Wednesday, October 02, 2002 10:38 AM
**To:** Jim Marchino; Julie Jaques; Dee Ann Johnson
**Subject:** FW: Black Lung Excise Tax & AML Fees

om Fred Keady ... for your reading pleasure. Sounds a little bitter, don't you think ?

ane

-----Original Message-----
om: Dave Yager
nt: Tuesday, October 01, 2002 1:52 PM
: Dan Hermann; Wayne Parke; Mark Hinkle; Mike ODonnell; Diane Goebel
bject: FW: Black Lung Excise Tax & AML Fees

-----Original Message-----
om: Frederick Keady [mailto:fkeady@attglobal.net]
nt: Tuesday, October 01, 2002 8:35 AM
: Dave Yager
: fastfred@soltec.net
bject: Black Lung Excise Tax & AML Fees

ave:

1 up to my ears in documents here, so things are going a little slow, but we're slogging along.

save time, I'll email the docs to you this afternoon, (Some few may need ot be faxed.) and Fed Ex the hard copies.

tachments will likely need to be sent separately, because of email file size constraints, unless BBCC's network permits FT
nsmission. Don't worry, they'll all be properly indexed. I apologize for the delay. Expect 1000-2000 pages (and that's after
rsh editing).

disappointing that, after spending more than twenty man-days of time so far, we have we not found a single shred of
thority that either Black Lung Excise or AML Fees are considered severance or sales taxes.

ere is also no trace whatsoever in the English language literatureof that triumph of comparative etymology, the word
*irtax"*. It should have been obvious that  was making a stretch bacause of the use of the French prefix.

ie very IRS Form 720 quarterly tax forms that an accounting clerk in your office completes, are labelled *Excise Tax Return*
bold face letters more than 1/2 inch high.

ncerely,

ederick Keady P.E., President
rmilion Coal Company

E (2)

**From:** Beth Harris
**Sent:** Monday, January 06, 2003 8:00 AM
**To:** 'Vic Daiber'
**Subject:** RE:

-----Original Message-----
**From:** Vic Daiber [mailto:vdaiber@arclar.Com]
**Sent:** Monday, January 06, 2003 6:38 AM
**To:** Beth Harris
**Subject:**

How do you allocate royalties between the 2 mines?  I have been looking over the sales and I can not see where Tampa and TVA
is split out from the mines.
[Beth Harris]


Vic:

You will have to talk to Phyllis about the royalties.  I only pay the advance royalty.  And when I request payment then I let them
know which mine it should be charged to.


Beth Harris

F (1)

**Beverly Conroy**

| | |
|---|---|
| **From:** | Dick Reisinger |
| **Sent:** | Monday, January 06, 2003 7:13 AM |
| **To:** | Eric Quam; Mark Hinkle |
| **Subject:** | VG Truck Coal to Riola |

Eric/Mark,

We need to give some thought as to how we are going to handle the accounting end of things on shipments from VG to Riola.  This will have an impact on sales, royalties, etc for each mine.  Do we consider the coal 'purchased' on Riola's end and establish a value based on tons, quality, etc per the PSI agreement for VG?  If so, do we need to sample the trucks that are leaving here?

Please advise....

Thanks,

Dick

F (2)

**Beverly Conroy**

| | |
|---|---|
| **From:** | Dick Reisinger |
| **Sent:** | Monday, January 06, 2003 4:00 PM |
| **To:** | Mark Hinkle |
| **Subject:** | VG Coal to Riola |

Mark,

Ezra made it to VG late today...we talked about some of the issues that will arise, particularly with royalties and such.  Eric suggested that we talk to Dave Yager on this issue before getting back to you.

Dick

F (3)

**Beverly Conroy**

| | |
|---|---|
| From: | Frank, Roger [Roger.Frank@Cinergy.COM] |
| Sent: | Tuesday, February 04, 2003 7:13 AM |
| To: | Brad Cook; David Elkins; Dick Reisinger; Eric Quam; Jane Coe; Lisa Parsons; Lonnie Hefner; Pete Massa; Robert Cooper; Tom Knapke |
| Subject: | FW: Riola complex update - Some coal shown was actually washed for another customer. See attached. |
| Attachments: | riolacomplex.xls |

--Original Message-----
m:    Lisa Parsons [mailto:lparsons@bbcoal.com]
t:    Monday, February 03, 2003 8:53 AM
    Frank, Roger; Elkins, David
    Mark Hinkle; Gene Aimone
ject:    Riola complex update - Some coal shown was actually washed for another customer.  See attached.

riolacomplex.xls>>

F (4)

**Beverly Conroy**

| | |
|---|---|
| **From:** | Jim Marchino |
| **Sent:** | Thursday, January 24, 2002 7:06 AM |
| **To:** | Tom Peck |
| **Subject:** | RE: royalties |

FYI - Diane and Dave Yeager already done this on Monday.  Dave was going to get with you on it.

Jim

-----Original Message-----
From: Tom Peck
Sent: Thursday, January 24, 2002 6:36 AM
To: Jim Marchino
Subject: RE: royalties

Jim

I have sent my royalty sheet to Shellye explaining to her that I have been off by a large amount.  I have asked her to please insert the correct rates per landowner so that I may have a better estimate.  I told her that I had gotton the rates that I was using from Lori Hurt.  I have not heard back from her yet.

Tom

-----Original Message-----
From: Jim Marchino
Sent: Monday, January 21, 2002 7:40 PM
To: Tom Peck
Subject: royalties

Tom, FYI, I just finished reviewing the royalties for Francisco - your actual ended up at $95,910.40 which is $676.52 lower than what shellye estimated and what I recorded.  I do agree that this looks very low.  Only $316.00 was related to the "negative royalties"  so it isn't this.  Have you talked to Shellye about it yet?

Thanks
Jim

| **Tracking:** | **Recipient** | **Read** |
|---|---|---|
| | Tom Peck | Read: 1/24/2002 1:14 PM |

F ¹ (5)

**Beverly Conroy**

| | |
|---|---|
| **From:** | Diane Goebel |
| **Sent:** | Tuesday, June 11, 2002 10:35 AM |
| **To:** | Jim Marchino |
| **Subject:** | Earned Royalties |

Jim,

Is there anywhere I can double check the loading fees and additional freight for each mine.  Shellye goes thru at the first of the month for estimates & writes the numbers on the SIRS report ... but then that's it.  We are in such a hurry at that time, I don't feel comfortable that there are not any errors.

Diane

1

F (6)

**Beverly Conroy**

| | |
|---|---|
| **From:** | Lisa Parsons |
| **Sent:** | Monday, January 06, 2003 7:03 AM |
| **To:** | Cathy Bailey |
| **Subject:** | RE: Riola price from VG and Riola |

$24.54 is the blended price. $24.60 is the Riola price not blended.  We will be using
$24.54 on 2003 coal.


-----Original Message-----
From: Cathy Bailey
Sent: Friday, January 03, 2003 5:30 PM
To: Lisa Parsons
Subject: Riola price from VG and Riola


Lisa,

On your Outlook you had a price on the Riola contract of $24.60.  Then I received the e-
mail Jane sent Mark.

Is the price from VG to Cayuga and Riola to Cayuga the $24.54?

tx
Cathy

F (7)

**Beverly Conroy**

_____

| | |
|---|---|
| **From:** | Diane Goebel |
| **Sent:** | Wednesday, February 05, 2003 10:28 AM |
| **To:** | Shellye Davis |
| **Subject:** | RE: Royalties |

That's not allowed !!!

dg

-----Original Message-----
From: Shellye Davis
Sent: Wednesday, February 05, 2003 9:56 AM
To: Diane Goebel
Subject: Royalties

before you begin to finalize royalties, please check with me.  they are making some
changes to the Recaps.

thanks!

1

F (8)

**Beverly Conroy**

| | |
|---|---|
| **From:** | Cathy Bailey |
| **Sent:** | Friday, January 03, 2003 5:30 PM |
| **To:** | Lisa Parsons |
| **Subject:** | Riola price from VG and Riola |

Lisa,

On your Outlook you had a price on the Riola contract of $24.60. Then I received the e-mail Jane sent Mark.

Is the price from VG to Cayuga and Riola to Cayuga the $24.54?

tx
Cathy

1

F (9)

Beverly Conroy

| | |
|---|---|
| From: | Lisa Parsons |
| Sent: | Monday, February 03, 2003 7:53 AM |
| To: | Roger Frank (E-mail); David Elkins (E-mail) |
| Cc: | Mark Hinkle; Gene Aimone |
| Subject: | Riola complex update - Some coal shown was actually washed for another customer. See attached. |
| Attachments: | riolacomplex.xls |

F (40)

**Beverly Conroy**

| | |
|---|---|
| **From:** | Tom Peck |
| **Sent:** | Monday, January 06, 2003 6:17 AM |
| **To:** | Jim Marchino |
| **Subject:** | RE: cost report |

Jim

What is going on with my falcon royalty?  $362,000 for 21,000 tons.  Even if the dollar amount is right I would have had to sell 176,050 falcon tons for the month and I only sold 184,196 total tons.  This can't be right.

Tom

-----Original Message-----
From: Jim Marchino
Sent: Sunday, January 05, 2003 11:54 AM
To: John Ross; Tom Peck; Pat Pohlman; Mike Engleman; Dick Reisinger; Jon Dever
Cc: Wayne Parke; Jerry Kempf; Greg Wing
Subject: cost report

The cost reports in Mobius should be basically complete.  There may be a few minor yet,
Please review them as soon as possible.  For the company, profits are down several million
dollars from budget, and, from our forecast that we just submitted on 1/2/03.  Hopefully
we (accounting) missed something.  I've looked over the numbers and haven't found anything
significantly wrong.  Any adjustments need to be recorded before the 12:00 noon close on
Monday, so if you find anything that doesn't look right, let me (or someone here) know as
soon as possible.


Thanks again for your help.

Jim

F (11)

## Beverly Conroy

| | |
|---|---|
| **From:** | Dan Hermann |
| **Sent:** | Wednesday, October 30, 2002 5:29 PM |
| **To:** | 'Irl Engelhardt' |
| **Subject:** | RE: |

Irl

Thanks for your quick feed back and comments.  The first item on my agenda this morning was to meet with Wayne and Jerry.  We spent several hours mapping out a program to improve our safety record.  After reviewing and fine tuning our plan with our safety supervisors, mine superintendents and Dave Bierbauer we plan to implement.

Your comments on Wayne address several points; 1) Some valid points were raised on the underground models which we are following up on to make sure we have our model right. 2) As to why we allowed our selves to get in the position we are in at Vermillion Grove I don't think Wayne is the only one to be critical of.  I think our entire group should have handled better. Our focus was on production and mining condition. 3) At Riola the answer as to the mine reorientation did have sound basis behind it.  At Riola we had not experienced horizontal stress like we had at VG.  When we experienced the problem at VG in working with our consultants part of the solution was to change the mine orientation.  As Riola started advancing to the west as an added precaution we changed the orientation for Riola. 4)I feel there has been greater focus on the underground in the short time frame Wayne has taken over.

I have talked to Rick Navere briefly and have a call in to Roger for additional information on Horizon, Hawthorne and Lynnville.  The collective properties provide a substantial opportunity to extend surface lives.

We will continue to work on the Willow Lake budget, but as mentioned the initial reaction and acceptance of John has been very good.

I am unclear on your comment on capital.  We are continuing to review the budget and make any further cuts.  In the out years do you want us to remove contingencies? As mentioned we added to try to address the unknown but we can handle how ever you prefer.

Dan

-----Original Message-----
From: Irl Engelhardt [mailto:IEngelhardt@PeabodyEnergy.com]
Sent: Tuesday, October 29, 2002 6:03 PM
To: Dan Hermann; Roger B. Walcott
Cc: Richard M. Whiting; Rick Navarre
Subject:


Dan

I would like to offer several thoughts about the budget review session.  I apologize in advance for the criptic form of the message.

1.  Congratulations on a good year.  Your team posted the best results in the industry.

2.  The budget prepared by your team was the best to date!  Kudos and thank you's to everyone involved.

3.  The safety program needs new energy.  I agree that you have done it before and make improvements again in the area of safety.  The goals need to be aggressive for 2003.

4.  Wayne's explanations showed a lack of understanding, involvement or something:

    -- The Air Quality budget showed overproducing for the entire five

1



years. He couldn't explain where the    one hour travel time saving for
each employee was in the budget.

   -- His explanation that we reoriented the Riola mine because it was
the thing to do at Vermillion Grove    was a pure hip-shot at best. Did
he have any engineering to back it up?

   -- He doesn't seem to have a well thought out mine plan for
Vermillion Grove. He should have studied    the quality isopachs and
spotted the fusion and moisture problems. The mine plan revision to insert
a    panel adjacent to the mains where we had operating and quality
problems shows a lack of teamwork    with engineering.

   -- I am worried about building another underground mine with him in charge.

5. Jerry Kempf and Mark Yingling are very impressive individuals. I respect Gene's
judgement and understanding of the business. Together, they have the best knowledge of
surface mining in the Midwest. We strongly support your strategy of assembling large
surface mining reserves.

6. Roger will follow up with you to complete the Horizon deals by year end if possible.
We would like to target some form of Hawthorn deal in the first quarter and a Lynnville
deal later in 2003.

7. Please review the Willow Lake budget closely. John is good; however, he is not
experienced with WL's finances.

8. The SG&A budget appears to be increasing significantly. Given all of P's cuts that
will become apparent soon, we would ask you to look at it again.

9. The capital budget seems very robust in this business environment.
Would you look at it again? Certainly, the contingencies can be eliminated.

10. You are doing a great job as Chief Executive Officer. We are honored to be
associated with you.

Irl


E-mail Disclaimer -----
The information contained in this e-mail, and in any accompanying documents, may
constitute confidential and/or legally privileged information. The information is
intended only for use by the designated recipient. If you are not the intended recipient
(or responsible for the delivery of the message to the intended recipient), you are hereby
notified that any dissemination, distribution, copying, or other use of, or taking of any
action in reliance on this e-mail is strictly prohibited. If you have received this email
communication in error, please notify the sender immediately and delete the message from
your system.

2

G (2)

**Beverly Conroy**

| | |
|---|---|
| **From:** | Irl Engelhardt [IEngelhardt@PeabodyEnergy.com] |
| **Sent:** | Tuesday, October 29, 2002 6:03 PM |
| **To:** | Dan Hermann; Roger B. Walcott |
| **Cc:** | Richard M. Whiting; Rick Navarre |

Dan

I would like to offer several thoughts about the budget review session.  I apologize in advance for the criptic form of the message.

1.  Congratulations on a good year.  Your team posted the best results in the industry.

2.  The budget prepared by your team was the best to date!  Kudos and thank you's to everyone involved.

3.  The safety program needs new energy.  I agree that you have done it before and make improvements again in the area of safety.  The goals need to be aggressive for 2003.

4.  Wayne's explanations showed a lack of understanding, involvement or something:

        -- The Air Quality budget showed overproducing for the entire five years.  He couldn't explain where the    one hour travel time saving for each employee was in the budget.

        -- His explanation that we reoriented the Riola mine because it was the thing to do at Vermillion Grove    was a pure hip-shot at best.  Did he have any engineering to back it up?

        -- He doesn't seem to have a well thought out mine plan for Vermillion Grove.  He should have studied    the quality isopachs and spotted the fusion and moisture problems.  The mine plan revision to insert a    panel adjacent to the mains where we had operating and quality problems shows a lack of teamwork   with engineering.

        -- I am worried about building another underground mine with him in charge.

5.  Jerry Kempf and Mark Yingling are very impressive individuals.  I respect Gene's judgement and understanding of the business.  Together, they have the best knowledge of surface mining in the Midwest.  We strongly support your strategy of assembling large surface mining reserves.

6.  Roger will follow up with you to complete the Horizon deals by year end if possible.  We would like to target some form of Hawthorn deal in the first quarter and a Lynnville deal later in 2003.

7.  Please review the Willow Lake budget closely.  John is good; however, he is not experienced with WL's finances.

8.  The SG&A budget appears to be increasing significantly.  Given all of P's cuts that will become apparent soon, we would ask you to look at it again.

9.  The capital budget seems very robust in this business environment.  Would you look at it again?  Certainly, the contingencies can be eliminated.

10.  You are doing a great job as Chief Executive Officer.  We are honored to be associated with you.

Irl

G (3)

E-mail Disclaimer -----
The information contained in this e-mail, and in any accompanying documents, may
constitute confidential and/or legally privileged information.  The information is
intended only for use by the designated recipient.  If you are not the intended recipient
(or responsible for the delivery of the message to the intended recipient), you are hereby
notified that any dissemination, distribution, copying, or other use of, or taking of any
action in reliance on this e-mail is strictly prohibited. If you have received this email
communication in error, please notify the sender immediately and delete the message from
your system.

2

G (4)

E-FILED
Friday, 28 September, 2007  11:07:10 AM
Clerk, U.S. District Court, ILCD

# EXHIBIT E

Received:  7/ 9/99;   7:20AM;
FROM : CATLIN COAL

812 894 3665 => AIC/AICI/VCC/READY;   #2
PHONE NO. : 812 894 3665
Jul. 09 1999 09:09AM P2

**ANNEX 20**
**ESTOPPEL CERTIFICATE**

THIS ESTOPPEL CERTIFICATE ("Certificate") is given this ____ day of _____,
1999, by Vermilion Coal Co. ("Lessor"), in order to induce Black Beauty Coal Company ("Black
Beauty") to enter into a business transaction with Catlin Coal Co., Inc. ("Lessee").

Lessor hereby certifies to the following:

1.     Attached as Exhibit A to this Certificate is a true, complete and correct copy of that
certain Lease Agreement, dated _____ between Lessee and Lessor (the "Lease")
including all amendments, if any, and except as set forth in Exhibit A there are no other amendments
and modifications thereto.

2.     The Lease is in full force and effect and represents the valid obligation of Lessor
enforceable in accordance with the terms.

3.     No dispute or default under or breach of the Lease exists and no event has occurred
which, with the passage of time or the giving of notice, or both, would constitute a breach of or event
of default under any provisions of the Lease.  Lessee has timely paid all rentals and royalties under
the Lease which have become due and payable.

4.     Lessor has not assigned its interest in the Lease or conveyed its interest in the
underlying real estate.

5.     There has not been filed by or against Lessor a petition in bankruptcy, voluntary or
otherwise, any assignment for benefit of creditors, any petition seeking reorganization arrangement
of the bankruptcy laws of the United States or state thereof, or any other action brought under said
bankruptcy laws with respect to said Lessor.

6.     Lessor acknowledges that this Certificate is issued for the benefit of Black Beauty
in connection with a business transaction between Lessee, or its successor, and Black Beauty, of
which the Lease and the underlying leased premises are a part, and that Black Beauty is relying on
the representations set forth in this Certificate in connection therewith.

Lessor so certifies this 20th day of July, 1999.

SEE ADDENDUM ATTACHED HERETO AND
MADE A PART HEREOF AS                    "Lessor"
EXHIBIT B
                                          Vermilion Coal Co.

                                          By: _____
                                          Its: PRESIDENT

A:\annex20estoppel.catlin.wpd

V00917

**Exhibit B to Annex 20**
**Addendum to Estoppel Certificate**

1. The following further amendments to the Coal Mining Lease dated November 21, 1994 apply, in addition to those tendered herewith:

   a) An amendment dated _____ that allows, but does not require Lessee to pay real estate taxes, and setoff said taxes against coal royalties.

   b) Section 14.1 of the Coal Mining Lease affords Lessor the right to increase the amount of the Minimum Advance Annual Rental to $600,000 in year 9 (beginning November 21, 2002) and subsequent years. Notice to that effect is tendered herewith.

2. Section 2 of the Estoppel Certificate is correct and complete as stated.

3. To the best of Lessor's knowledge, no dispute or default under or breach of the Lease exists and no event has occurred which, with the passage of time or the giving of notice, or both, would constitute a breach of or event of default under any provisions of the Lease; and Lessee has timely paid all rentals and royalties under the lease which have become due and payable. Lessor has relied upon Lessee's representations rather than Lessor's rights of financial and engineering audit and inspection pursuant to, inter alia, sections 4.1, 8.1, 8.2, and 19.1 of the Coal Mining Lease in this regard, and, by its execution of this Estoppel Certificate, Lessor does not waive, and expressly retains all rights pursuant to the Coal Mining Lease.

4. Lessor has not assigned its interest in the Lease or conveyed its interest in the underlying real estate, except for the purpose of securing debt. Lessor is in the process of refinancing its existing mortgages, and expects the replacement mortgage to be in place not later that August 31, 1999.

5. Certain delinquent tax liens arising from the nonpayment of second half 1995 real estate taxes (payable in September, 1996) were sold to third-party tax buyers in November 1996. The resulting tax certificates were redeemed by Westwind Capital Corporation ("Westwind"), agent for Iron Carbide Technologies, Inc. (ICTech"), the parent company of Lessor, and will be retired upon the completion of Lessor's refinancing as set forth in section 4 herein. Lessor, ICTech and Westwind represent and warrant that Lessee's rights pursuant to the Coal Mining Lease will be unaffected by said redemption.

6. Correct and complete as stated, to the best of Lessor's knowledge.

Lessor and its affiliates so certify this 15th day of July 1999

VERMILION COAL COMPANY

By its President

IRON CARBIDE TECHNOLOGIES INC.

By its Chairman and CEO

WESTWIND CAPITAL CORPORATION

By its President

E-FILED
Friday, 28 September, 2007  11:08:30 AM
Clerk, U.S. District Court, ILCD

# EXHIBIT F

# DGCOLE LAW

**Deborah G. Cole**
1400 North LaSalle Street
Chicago, Illinois 60610
Telephone: 312.751.0272
Fax: 312.751.4133
e-mail:dgcolelaw@sbcglobal.net

November 2, 2006

Hon. Thomas Lambros
Janik & Dorman
9200 South Hills Blvd.
Suite 300
Cleveland, OH 44147-3521

Re:    *Vermilion Coal Company v. Black Beauty Coal Company Arbitration*

Dear Judge Lambros:

Vermilion has recently learned that on November 6, 2006, the Panel will convene via conference call to consider the pending motions submitted by the parties. The parties have fully briefed issues relating to the costs of arbitration. Vermilion has voluntarily dismissed its reserved Issues pursuant to FRCP 41(a) (1). No final order has been entered by the Panel as of this date.

On August 24, 2004, the Panel entered an Order regarding issues to be arbitrated at the 11/08/04 hearing. Specifically, the Order bifurcated certain liability issues to be presented at the hearing from Vermilion's issues relating to "remedies for any breach including accounting, damages, or termination." Accordingly, Vermilion did not present any evidence or argument at the arbitration hearing or in its post hearing submissions relating to the bifurcated remedial issues.

Page 11 of your Decision and Award (the "Decision") contains the statement that "the bifurcated remedial issues including costs of arbitration shall be considered and determined at the bifurcated remedial issues hearing." On page 12, the parties are instructed to schedule any issues for hearing before the Panel relating to bifurcated remedial issues with the case administrator.

Upon receipt of the Decision, Vermilion and Black Beauty calculated and reached a resolution regarding amounts due to Vermilion after reversing Black Beauty's AMLF and BLET deductions, for the period beginning November 1, 1999 in accordance with the Decision, with interest. However, since Vermilion did not present evidence or argument on issues relating to accounting, damages, termination or other remedies provided by law or as specifically set forth in the Lease as a result of the bifurcation of liability and damage/remedial issues, Vermilion was uncertain as to how to proceed in light of those portions of the Decision in which determinations were made regarding bifurcated remedial issues (i.e. termination). Moreover, the instruction that Vermilion coordinate with the case administrator the scheduling of a hearing on remedial issues which had already been decided appeared to be moot.

Accordingly, Vermilion respectfully requests that the Final Order of the Panel in this arbitration proceeding include the following:

1. In accordance with the Decision and Award, the parties have resolved the accounting issues relating to the reversal of Black Beauty's deductions of AMLF/BLET with interest. Black Beauty shall not deduct BLET or AMLF from any payments made to Vermilion/Lessor for royalties and wheelage under the Lease;

2. A decision as to by whom the costs of arbitration shall be borne and paid and the amount of such costs including reasonable compensation for the arbitrators.

3. Findings of Fact and Conclusions of Law regarding those portions of the Decision and Award dated March 28, 2005 (the "Decision") relating to Vermilion's claims for breach of contract, default/termination, fraud and anticipatory repudiation, breach of express duty of good faith dealing, and remedies addressing the areas outlined in Exhibit A attached hereto.

4. A termination of the Panel's jurisdiction over the issues submitted by the parties' to arbitration.

On behalf of my client, thank you for the Panel's anticipated attention to this matter.


Sincerely,

*Deborah G. Cole*

Deborah G. Cole
Attorney for Vermilion Coal Company




cc:    Hon. Susan Getzendanner
       G. Daniel Kelley, Jr., Esq.
       Charles Compton
       Patrick Shoulders
       Fred L. Hubbard
       George A. Barton
       Beverly Conroy
       Frederick D. Keady

**Vermilion's Issues Regarding Findings of Fact and Conclusions of Law In Support of the Decision and Award (the "Decision") Relating to Vermilion's Claims for Breach of Contract, Default/Termination, Fraud, Anticipatory Repudiation and Remedies**

Vermilion respectfully requests that the Final Order entered by the Panel in the *Vermilion Coal Company v. Black Beauty Coal Company Arbitration* include Findings or Fact and Conclusions of Law regarding the following:

**Underpayments That Arose From Periods Prior to Nov. 1, 1999:**    The Decision includes a finding that the estoppel certificate of July 15, 1999, as modified by Vermilion's addendum, acts to estop Vermilion from underpayments prior to that time. The evidence shows that the Lease includes a non-waiver clause (Section 22.4)[1]. Please identify the findings of fact and conclusions of law that support the finding that the estoppel certificate constituted a waiver of Vermilion's rights to recover for prior period underpayments.

**Default/Termination:**    The Decision states, *"The evidence overwhelming shows too much has gone into this relationship between the lessor and lessee and the lease to allow the sounding of the death knell for this lease. The facts do not support it. The law does not allow it."* However, Section 22.1 of the Agreement specifically defines events of default, and the rights and remedies of the parties in the event of an uncured default.[2] The evidence shows that Vermilion acted timely in furtherance of its rights in accordance with the stated terms of the Agreement. Vermilion sent Black Beauty a notice of default, which Black Beauty ignored, even though it could have paid under protest and filed a demand for arbitration, and thereby assumed the foreseeable risk of the consequence of termination. Please identify the findings of fact and conclusions of law that support the finding that Black Beauty's default in the payment of that portion of the royalties and wheelage which constituted amounts deducted for BLET and AMLF was not an event of default entitling Vermilion to the remedy of termination as set forth in Section 22.1 (a) of the Lease.

---

[1] Section 22.4 titled "No Waiver, etc. by Lessor states that "no failure by Lessor to insist upon the strict performance of any covenant, agreement, term or condition of this lease *or to exercise any right, power or remedy* consequent upon a breach thereof, and *no acceptance of full or partial performance or payment of royalties during the continuance of any such breach,* shall constitute a waiver or consent to any such breach ..." (Emphasis added).

[2] Section 22.1 titled "Default: Termination by Lessor" states in paragraph (a) that If default shall be made in the due and punctual payment of *any* rent, royalty *or any part thereof,* when and as the same may become due and payable...and such default shall continue for thirty (30) days after notice by Lessor to Lessee...then and in any such event, Lessor at any time thereafter while such default or condition is continuing, may give written notice to Lessee specifying the occurrence giving rise to such Event of Default, or Events of Default, and stating *that the lease shall terminate on the date specified in such notice,* which shall be at least twenty days after the giving of such notice. (Emphasis added).

**EXHIBIT A**

3

The Decision states, "*The dispute over the meaning of the word "severance" as a deduction should have gone to arbitration for clarification before the notice was sent out. The parties had a bona fide dispute and this lease should not be construed to permit the party who loses a good faith dispute to lose all. It has already been determined that a repudiation did not occur. Accordingly, it was not an event of default, and the notice and demand was untimely.*" In addition to Section 22.1 of the Lease cited herein, Section 22.6[3] of the Lease states that Vermilion's remedies are cumulative and does not require that Lessor obtain an award in arbitration prior to exercising remedies for non-payment of amounts due for royalties or wheelage. Please clarify the findings of fact and conclusions of law that support the finding that Black Beauty had a good faith belief that it was entitled to deduct BLET and AMLF from the calculation of royalties and wheelage and that absent a determination by an arbitration panel or court, Lessee was entitled to make such deductions and that such conduct was not an event of default under the Lease.

The Decision states that, "*While the conduct of deductions of taxes was premised on a good faith misunderstanding and belief that the taxes were deductible can be remedied by adequately compensating the lessor monetarily, it cannot under the circumstances of this case end the contractual relationship.*" This finding that the Lease was not terminated effectively precluded Vermilion from offering evidence relating to the bifurcated remedies of termination and damages resulting from Black Beauty's breach. Please state the findings of fact and the conclusions of law that support the determination that Black Beauty had a  "good faith" misunderstanding and that monetarily compensating Vermilion for Black Beauty's improper deduction of BLET and AMLF from the calculation of royalties and wheelage is an "adequate" compensatory remedy for Black Beauty's breach.[4]

**Fraud/Repudiation:**    (1) The Decision states, "*The reports were not deceptive. They reported what the lease required.*" Section 24 of the Agreement states, in part, "In arriving at a decision and award, said arbitrators shall be bound by applicable state and federal law applicable to the substantive issue or issues submitted for arbitration, and shall make such decision and award in writing…" Vermilion cited the case of *Reis v Peabody Coal Co.*, 997 S.W.2d 49 (Mo. Ct. App. 1999) throughout these proceedings. The court in the *Reis* case found that Peabody had partially disclosed selling price information by reporting an adjusted selling upon which royalties were computed without

---

[3] Section 22.6 titled "Lessor's Remedies Cumulative, etc." states that "each right, power and remedy of Lessor provided for in this lease shall be cumulative and concurrent and shall be in addition to every other right, power or remedy provided for in this lease or now or hereafter existing at law or in equity or by statute of otherwise, and the exercise or beginning of the exercise by Lessor of any one or more of the rights, powers or remedies provided for in this lease or now or hereafter existing at law or in equity or otherwise shall not preclude the simultaneous or later exercise by Lessor of any or all other rights, powers or remedies provided for in this lease or by statute or otherwise.

[4] Vermilion's costs of arbitration are detailed in its Bill of Costs. It will take many years of Black Beauty's royalty and wheelage payments before Vermilion recovers for amounts spent in pursuing arbitration simply to make Black Beauty perform its contractual obligations.

disclosing the fact or details of the adjustments, even though, having partially disclosed information it was not otherwise obligated to disclose, it was obligated to do so. Here, the evidence shows facts that Black Beauty's reports partially disclosed altered prices. Please clarify the findings of fact and conclusions of law that support the denial of Vermilion's claim for fraud distinguishing the case of *Reis v Peabody*.

(2)    The Decision states, "*None of the facts, actions or events constitutes fraud nor a repudiation based on applicable Illinois law nor do Black Beauty nor Catlin's deduction of BLET and AMLF constitute such a material breach as to constitute a repudiation of the lease.*"   Please identify the Illinois law being referenced in this statement.

(3)    The Decision states, "*While Vermilion sets forth in its complaint the disagreement between Vermilion and Black Beauty as to whether BLET and AMLF fell within the definition of "severance tax", it claims that in October 2002 and November 2002 Black Beauty repudiated its obligations to calculate royalties and wheelage and to make its payment as required by the lease.*" The evidence shows that Vermilion made numerous demands on Black Beauty beginning in August 2002 for it to pay the correct amount of royalties and wheelage; and demanded adequate assurance of specific performance in October 2002 and January 2003. Black Beauty ignored Vermilion's demands for adequate assurance, and affirmatively stated that it refused to pay the correct amount of royalty and wheelage based on its wrong interpretation of the lease. Black Beauty submitted citations of law in support of its "interpretation" that actually contained Vermilion's definition of severance tax as a state tax. Moreover, both section *251* of the *Restatement (Second) of Contracts* (1981) and section *2-609 of the Uniform Commercial Code* entitle an obligee who has reasonable grounds to believe that the obligor will commit a breach by non-performance to demand that the obligor give "adequate assurance of due performance". See, *C.L. Maddox, Inc. v. Coalfield Servs.*, 51 F. 3d 76 (7th Cir. Ill 1995);[5] See also, *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 705 N.E.2d 656 (1998)[6]. Please clarify the findings of fact and

---

[5] In the C.L. Maddox case, Judge Posner stated that "In a contract governed by the Uniform Commercial Code (which this one was not, *Althoff Industries, Inc. v. Elgin Medical Center, Inc., 95 Ill. App. 3d 517, 420 N.E.2d 800, 804-05, 51 Ill. Dec. 386 (Ill. App. 1981)),* Coalfield's self-help remedy would have been to demand assurances of performance (in this case of payment). *UCC § 2-609; Chronister Oil Co. v. Unocal Refining & Marketing, 34 F.3d 462, 464 (7th Cir. 1994),* and cases cited there. The principle of section 2-609 is generalized to all contracts in *section 251 of the Restatement (Second) of Contracts* (1981). See 2 Farnsworth, supra, §§ 8.23, 8.23a, pp.491-95. The *Restatement* of course is not law, and we cannot find any Illinois cases discussing section 251. But the principle strikes us as a sound one, and we have no reason to doubt that it would be so regarded by the courts of Illinois. *(citing) B & C Electric, Inc. v. Pullman Bank & Trust Co., 96 Ill. App. 3d 321, 421 N.E.2d 206, 211, 51 Ill. Dec. 698 (Ill. App. 1981); First National Bank v. Continental Illinois National Bank, 933 F.2d 466, 469 (7th Cir. 1991)* (interpreting Illinois law)... in cases based on *section 2-609 of the Uniform Commercial Code,* the claim [anticipatory repudiation] is based on silence in the face of a request for the equivalent of assurances." *C.L. Maddox, supra. at* 81.

[6] The United States Court of Appeals certified and the New York State Court of Appeals accepted and answered in the affirmative the question, "Does a party have the right to demand adequate assurance of future performance when reasonable grounds arise to believe that the other party will commit a breach by non-performance of a contract governed by New York law, where the other party is

conclusions of law that support the denial of Vermilion's claim for anticipatory repudiation following Black Beauty's failure to respond to Vermilion's demand for adequate assurance.

The Decision cites *Milton et al v H.C. Stone Lumber Co*, 36 F.2d 583 (S.D. Ill. 1928). In this 1929 case, the party that apparently breached a contract is the plaintiff that alleges anticipatory repudiation. Milton did not make any demand for adequate assurance, and sought expectation damages for a contract that it, itself failed to perform. Please clarify how this case relates to the present case.

The award cites *Sections 241, 243, and 250* of the *Restatement (Second) of Contracts* (1981). *Section 241 (a)-(e)* of the *Restatement (Second)* defines significant circumstances in determining whether a failure to perform or to offer performance is "material". The *Comments and Illustrations* following *Section 241* state that adherence to the standards is not conclusive. The evidence in this arbitration shows that the Lease specifies events of default. Please clarify the conclusions of law which explain how a failure to make a due and punctual payment of any royalty, or any part thereof, as required by Section 21.2 of the Lease is not a "material" failure to render performance under the cited *Section 241* of the *Restatement (Second)*.

The Decision cites *Section 243* of the *Restatement (Second)*. *Section 243 (1)* of the *Restatement (Second)* states, (1)  With respect to performances to be exchanged under an exchange of promises, a breach by non-performance gives rise to a claim for damages for total breach only if it discharges the injured party's remaining duties to render such performance, other than a duty to render an agreed equivalent under § 240.  *Section 243 (2)* of the *Restatement (Second)* states, "Except as stated in Subsection (3), a breach by non-performance accompanied or followed by a repudiation gives rise to a claim for damages for total breach."  Section 2 (b) of the Illustrations construing subsection (2) states, "Where a repudiation accompanies or follows a breach that would, if the injured party so chose, give rise to a claim for damages for total breach under Subsection (1), both Subsections (1) and (2) apply.  In that case, the injured party

---

solvent and the contract is not governed by the U.C.C.?" In dicta the Court stated that § 2-609 of the UCC "allows a party to a contract for the sale of goods to demand assurance of future performance from the other party when reasonable grounds for insecurity exist (*see, UCC 2-609*; II Farnsworth, Contracts § 8.23).  When adequate assurance is not forthcoming, repudiation is deemed confirmed, and the non-breaching party is allowed to take reasonable actions as though a repudiation had occurred (*see,* 4 Anderson, *Uniform Commercial Code § 2-609:*3 [3d ed 1997 rev])... Indeed, *UCC 2-609* has been considered so effective in bridging the doctrinal, exceptional and operational gap related to the doctrine of anticipatory breach that some States have imported the complementary regimen of demand for adequate assurance to common-law categories of contract law, using *UCC 2-609* as the synapse (*see, e.g., Lo Re v Tel-Air Communications, 200 NJ Super 59, 490 A2d 344* [finding support in *UCC 2-609* and *Restatement (Second) of Contracts § 251* for applying doctrine of adequate assurance to contract to purchase radio station]; *Conference Ctr. v TRC--The Research Corp. of New England, 189 Conn 212, 455 A2d 857* [analogizing to *UCC 2-609*, as supported by *Restatement (Second) of Contracts § 251*, in context of constructive eviction])." *Id.* at 660.

cannot avoid the consequence described above of having a claim for damages for total breach under the rule stated in Subsection (2)." Please identify the findings of fact and conclusions of law that support the finding in the Decision that Black Beauty's breach in the failure to pay a portion of the royalties and wheelage due under the Lease was not a total breach.

The Award cites *Section 250* of the *Restatement (Second)*. *Comment (a)* on *Section 250* states, "A statement by a party to the other that he will not or cannot perform without a breach, or a voluntary affirmative act that renders him unable or apparently unable to perform without a breach may impair the value of the contract to the other party. It may have several consequences under this Restatement. If it accompanies a breach by non-performance that would otherwise only give rise to a claim for damages for partial breach, it may give rise to a claim for damages for total breach instead." See, also *Stonecipher v. Pillatsch*, 30 Ill. App. 3d 140, 332 N.E.2d 151, 1975 Ill. App. LEXIS 2583 (Ill. App. Ct. 2d Dist. 1975) **(**When a party bound by an executory contract gives notice of his intention not to comply with his obligations, the other contracting party may accept such notice as an anticipatory breach and treat the contract as ended without waiting for the completion of the contract by its terms…A definite statement to the promisee that the promisor either will not or cannot perform the contract will operate as an anticipatory breach. *citing*, Corbin on Contracts § 959, at 941; Williston on Contracts § 1322, at 134.); *Farwell v Ticktin*, 376 N.E.2d 621 (Ill. App. Ct. 1st Dist. 1978) (When a party to an executory contract gives notice of his intention not to comply with his obligations or otherwise repudiates his obligations before the time of performance, the other party may treat such notice as an anticipatory breach and regard the contract as terminated); *Keep Productions, Inc. v. Arlington Park Towers Hotel Corp.*, 49 Ill. App. 3d 258, 364 N.E.2d 939, 1977 Ill. App. LEXIS 2759, 7 Ill. Dec. 648 (Ill. App. Ct. 1st Dist. 1977). Please identify the findings of fact and the conclusions of law that support the finding that Black Beauty's statements that it would not cease in its practice of deducting BLET and AMLF as "severance" taxes did not constitute a repudiation of its duties to pay all amount due as royalties and wheelage under the Lease and did not constitute statements that gave Vermilion a claim for total breach under *Sections 243* and *250* of the *Restatement* (Second) and applicable Illinois law.

**Breach of Express Duty of Good Faith and Fair Dealing:** Section 26 of the Lease includes an express duty of good faith dealing. It states, "It is the intention of both parties to successfully promote and operate an underground coal mine to remove and sell the coal encompassed in this agreement. To that end, both parties owe the other a duty of good faith dealing." In its pleadings and arguments Vermilion alleged that Black Beauty had breached this express duty. Please identify the findings of fact and the conclusions of law that support the finding that Black Beauty did not breach its duty of good faith and fair dealing under the Lease.

7

E-FILED
Friday, 28 September, 2007  11:11:13 AM
Clerk, U.S. District Court, ILCD

# EXHIBIT G

**IN RE THE MATTER OF THE ARBITRATION OF**

| | | |
|---|---|---|
| VERMILION COAL COMPANY, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | FINAL DECISION |
| and | ) | AND AWARD |
| | ) | ON BIFURCATED |
| BLACK BEAUTY COAL COMPANY, | ) | REMEDIAL ISSUES |
| | ) | |
| Respondent. | ) | |

## I.    INTRODUCTION

The March 28, 2005 Decision and Award explicitly and sufficiently sets forth ample findings of fact and conclusions of law to support the finding that Black Beauty did <u>not</u> repudiate or breach the Lease, irrespective of Vermillion's success on the threshold issue relating to the deductibility of the severance taxes.

Accordingly, the merits of the underlying liability issues will not be revisited. However, the pending motions relating to the bifurcated remedial issues of costs and issues will be addressed in this Final Decision and Award.

## II.    BACKGROUND

On March 28, 2005, the Decision and Award memorializing the Panel's determination of the threshold liability issues presented to the Panel at the November 8, 2004, Arbitration Hearing. By agreement of the parties, all remaining remedial issues were bifurcated from the November 8, 2004 hearing and were to be decided by the Panel at a later date.

On or about June 28, 2006, Vermillion Coal Co. ("Vermilion") voluntarily dismissed the remaining liability issues that were not heard by the Panel at the November 8, 2004 hearing. Accordingly, the only remaining issues to be determined by the Panel relate to the respective motions for costs filed by Vermilion and Black Beauty Coal Company ("Black Beauty"). Both parties have

submitted extensive briefing arguing that they are each entitled to costs as the prevailing party, and have opposed the other party's respective motion for same.

On November 6, 2006, the Panel convened telephonically and deliberated on the motions before it relating to the bifurcated remedial issue of costs: 1) Vermilion's Motion to Finalize Order and for an Award of Costs and Attorney's Fees; 2) Black Beauty's Cross Motion for Costs; 3) Vermilion's November 2, 2006 Request for Findings of Facts and Conclusions of Law; and 4) Black Beauty's Motion to Strike Vermilion's Request for Findings of Facts and Conclusions of Law.

### III.   THE UMPIRE ARBITRATOR'S DECISION

In accordance with the applicable provisions of the Lease, as well as controlling Illinois law, the issues pending before the Panel are hereby determined, decided, and resolved as follows:

1) Vermilion's Motion to Finalize Order and for an Award of Costs and Attorney's Fees is GRANTED IN PART AND DENIED IN PART, with an award of $308,955.01 being awarded to Vermilion for "costs" to be paid by Black Beauty;

2) Black Beauty is ORDERED to pay the Panel's outstanding arbitrator fees from July 2006 to present;[1]

3) Black Beauty's Cross Motion for Costs is DENIED and OVERRULED in its entirety;

4) Vermilion's November 2, 2006 Request for Findings of Facts and Conclusions of Law is DENIED and OVERRULED; and

5) Black Beauty's Motion to Strike Vermilion's Request for Findings of Facts and Conclusions of Law is DENIED and OVERRULED.

---

[1] As Vermillion has been awarded its "costs" pursuant to this Decision, Vermillion's award does not include reimbursement for Vermillion's portion of the outstanding arbitration fees and Black Beauty is being ordered to pay these "costs" directly, as opposed to ordering Vermillion to pay its portion, only to then be reimbursed of said cost by Black Beauty.

# IV.   ANALYSIS AND DISCUSSION

Section 24.1 of the Lease reads:

> In arriving at a decision and award, said arbitrators shall be bound by any relevant state and federal law applicable to the substantive issue or issues so submitted for arbitration, and shall make such decision and award in writing, and deliver a copy to both Lessor and Lessee, and *shall as part thereof decide by whom the costs of arbitration shall be borne and paid and the amounts of such costs* including reasonable compensation for the arbitrators. (*emphasis* added)

Illinois follows the "American Rule" – absent statutory authority or a contractual agreement between the parties, each party to litigation *must* bear its own attorney fees and costs, and may not recover those fees and costs from an adversary. *Scholtens v. Schneider,* 173 Ill.2d 375, 384, 671 N.E.2d 657 (1996); *Saltiel v. Olsen,* 85 Ill.2d 484, 488-89, 426 N.E.2d 1204 (1981). A court may <u>not</u> award attorney fees as a matter of contractual construction in the absence of *specific language. Thread & Gage Co. v. Kucinski,* 451 N.E.2d 1292 (1st Dist. Ill., 1983).

Likewise, The Illinois Arbitration Act ("the Act") specifically states that:

> Unless otherwise provided in the agreement to arbitrate, the arbitrators' expenses and fees, together with other expenses, *not including attorney's fees,* incurred in the conduct of the arbitration, shall be paid as provided in the award. (*emphasis* added)

710 ILCS 5/10 (West 1992).

Thus, absent a contrary provision in the arbitration agreement, the Act authorizes arbitrators to assess all fees and costs associated with an arbitration proceeding, *except for attorney fees*. With respect to attorney fees, the Act neither permits nor prohibits the arbitrators' assessment of attorney fees. Rather, the Act delegates this decision to the parties. As such, an arbitrator's authority to assess attorney fees derives solely from the agreement to arbitrate. *See Hahn v. A.G. Becker Paribas, Inc.,* 164 Ill.App.3d 660, 668, 518 N.E.2d 218, 223 (1987)(under

Section 10 of the Act, attorney fees are not to be included in an arbitration award unless otherwise provided in the arbitration agreement).

In the present matter, Section 24.1 of the Lease provides that the Panel *shall* decide which party will bear the "costs" of the arbitration. The Lease does not specifically identify "attorney fees" as being "costs" as required by the Illinois case law or the Uniform Arbitration Act. Nor does the Lease require that costs be awarded. The Lease simply requires that the Panel make a decision as to "costs." Since Illinois law does not recognize attorney fees as "costs," the Panel has determined that attorney fees are <u>not</u> to be awarded in the present matter.

Likewise, in the absence of statutory authority, expert fees are not taxable as "costs." *See Lee Sterns Co v. Zimmerman*, 660 N.E.2nd 170 (Ill. App. 1995); *Naiditch v. Shaf Home Builders, Inc.*, 512 N.E.2d 1027 (Ill. App. 1987); *see also J.B. Esker & Sons, Inc. v. CLE-PA's Partnership*, 757 N.E.2d 1271 (Ill. App. 2001)(holding that "costs" does not encompass expert fees). The above analysis also applies to expert fees. Therefore, the Panel has determined that consulting and expert fees are <u>not</u> to be awarded in the present matter.

The issue then becomes what "costs" should be awarded by the Panel, and to whom should such costs be owed. The Panel's March 28, 2005, Decision makes clear that Vermillion was the "prevailing party" on the main threshold legal issue underlying the arbitration – i.e., whether BLET and AMLF was a severance tax and should be deducted in computing royalties from the gross selling price. Based on that consideration, the Panel *may* award Vermillion its costs if it so decides.

The March 28, 2005 Decision also makes clear, however, that Black Beauty's actions did <u>not</u> rise to the level of a *material* breach, and therefore, Vermillion was <u>not</u> the prevailing party on the issue of contract renunciation. To that end, the March 28, 2005 Decision held in pertinent part:

> While the determination by this arbitration forum has interpreted the word "severance" favorably for Vermilion and the deduction now constitutes a breach for monetary compensation, the deductions were not fraudulent nor did they constitute a breach of such level to be a repudiation. The deductions in the computation process did not constitute a total breach. (Decision and Award, p. 10 ¶ 3)

Accordingly, termination of the contract was not an appropriate remedy under these circumstances.

To the extent that Vermillion relies on Section 22.1 of the Lease to support its position that termination of the contract was appropriate, Vermillion overlooks several issues. It should first be noted that it was determined that there was a good faith dispute as to the deductibility of BLET and ALMF – the March 28, 2005 Decision noted that "the parties had a bona fide dispute" and Black Beauty's position was a "good faith erroneous interpretation" of the Lease. As a result, Black Beauty was entitled to arbitrate this good faith dispute without repudiating the Lease.

On this issue, the March 28, 2005 Decision states in relevant part:

> Vermilion ties into the repudiation claim Sec. 22.1 of the lease relating to Notice of Default and seeks to achieve a lease termination based on a notice of default to Black Beauty. Additionally Vermilion seeks a default determination for Black Beauty's failing to agree and accept Vermilion's interpretation of the lease word "severance".

> The lessee was not obliged to respond to lessor's notice of default by disavowing its good faith belief. This was not a situation where lessee refused to pay rent. It was solely a situation where the parties disagreed as to whether certain taxes were deductible in the royalty computation. Again, this was not a total breach. (Decision and Award, p. 10 ¶ 6-7)

More importantly, the majority of the Panel was not persuaded by Vermillion's persistent push for termination of the Lease, which inevitably prolonged and extended the costs throughout the course of the arbitration. As a result, it is believed that Vermillion "invited" some of the costs it accumulated by seeking renunciation of the Lease, alleging anticipatory repudiation and an entitlement to terminate the Lease based upon Black Beauty's conduct.

Specifically, Vermillion expanded the scope of the litigation in attempt to terminate the Lease and recover damages in excess of $90 million (as well as the forfeiture of Black Beauty's $50 million in improvements to the mining portal), yet the Panel's decision resulted in award of approximately $380,000 to Vermillion, which accounts for less than 1% of Vermillion's prayer for relief. Moreover,

Laswell, Catlin, and Black Beauty all deducted BLET and AMLF in like fashion. Only after 6 years of performance of the Lease, as well as $3.3 million in royalties, did Vermillion object. Furthermore, the amended lease was based on price rather than profit, did not include §2.5(g), and included general language of "any sales tax and/or severance" tax which inevitably led to the parties' divergent interpretation of the Lease provisions regarding the severance tax.

Accordingly, termination of the contract was not warranted and Vermillion's reliance on Section 22.1 is both misplaced and ignores the findings set forth in its March 28, 2005 Decision.

In light of the foregoing, the amount of costs expended by Vermillion in prevailing on the threshold issue of the severance tax has been quantified, and as such, Vermillion is entitled to its "costs" as that term is defined by Illinois law and the terms of the Lease.

Based on the foregoing, an award of $308,955.01 to Vermillion is warranted as the prevailing party (on the threshold issue) based upon:

| | |
|---|---|
| $189,990.34 | Vermillion's Arbitrator fees and its share of Umpire fees[2] |
| $8,205.86 | Vermillion's Storage fees |
| $41,231.20 | Vermillion's hearing related expenses paid by Mr. Keady |
| $69,527.61 | Vermillion's costs for transcripts, copying, etc. |
| $308,955.01 | |

Accordingly, Vermilion's Motion to Finalize Order and for an Award of Costs and Attorney's Fees is granted in part and denied in part, with an award of $308,955.01 being awarded to Vermilion for "costs" as outlined above.

In turn, Black Beauty's Cross Motion for Costs is denied and overruled in its entirety.

As the March 28, 2005 Decision and Award contained extensive Findings of Fact and Conclusions of Law, there is no reason to repeat the Findings of Fact and Conclusions of Law that were clearly set forth in that Decision. Accordingly, Vermilion's November 2, 2006 Request for Findings of Fact and Conclusions of Law is denied and overruled, as is Black Beauty's Motion to Strike.

---

[2] As outlined in Section III, above, Vermillion award for costs does not include Vermillion's portion of the outstanding arbitrator/arbitration fees as those fees will be assessed to Black Beauty directly.

Finally, it should be noted that there was disagreement among the arbitrators and both Arbitrator Getzendanner and Arbitrator Kelley dissent from this Final Decision and Award on Bifurcated Remedial Issues for unrelated reasons. (A copy of Arbitrator Getzendanner's dissenting opinion (Attachment 1) and Arbitrator Kelley's concurring and dissenting opinion (Attachment 2) are attached and follows this Final Decision and Award.)

Section 24.1 of the Lease states in pertinent part:

> The decision and award . . . in case of disagreement among all the arbitrators, of the third or umpire-arbitrator, shall be conclusive and binding upon Lessor and Lessee and promptly complied with.

As a majority of the Panel cannot agree on either the components of arbitration "costs," the appropriate sums of those costs, nor the party whom is entitled to be awarded those costs, this Final Decision and Award issued by the Umpire-Arbitrator is conclusive, binding, and dispositive on all remaining issues before the Panel.

## V.    CONCLUSION

Now that the bifurcated remedial issues have been resolved, all issues before the Panel have been resolved as contemplated by the Lease and the powers vested in the Panel. All liability determinations have been completed and the parties' respective motions for costs have been addressed and decided.

Accordingly, these arbitration proceedings before this Panel are now concluded, and no additional order is necessary to bring these proceedings to finality.

IT IS SO AWARDED.

_Thomas D. Lambros_
_____
Thomas D. Lambros – Umpire Arbitrator


DATED:  January 31, 2007

## Dissenting Opinion of Party Arbitrator Susan Getzendanner

The issue is what are the "costs of arbitration" to which Vermilion is entitled. I believe that the issue must be decided under the language of the arbitration agreement. I respectfully dissent from the analysis and conclusion of the Panel's Final Award.

It is the agreement to arbitrate, not the federal rules or the AAA rules, that governs Vermilion's entitlement to be paid the "costs of arbitration." Here, the agreement to arbitrate specified as follows:

> In arriving at a decision and award, said arbitrators [two party arbitrators and one neutral arbitrator] . . . . shall make such decision and award in writing, . . . and shall as a part thereof decide by whom the costs of arbitration shall be borne and paid and the amount of such costs including reasonable compensation for the arbitrators.

Vermilion's first argument was based on the breathe of this language. It then, possibly confusingly, argued "prevailing party" under Rule 54 (b), what costs are taxable under federal law, 28 U.S.C. § 1920, and an equitable entitlement to attorneys fees based on a "frivolous defense." Vermilion's first argument is persuasive.

The arbitration agreement is quite unlike the "taxation of costs" under 28 U.S.C. § 1920, which states: "A judge or clerk of any court of the United States **may tax** as costs the following," and what follows is a detailed list that includes numerous kinds of costs that may awarded, for example, fees for court appointed experts. The court or clerk of the court is free to pick and choose. The arbitration agreement does not permit the arbitrators to award only certain costs – it says only that the arbitrators shall determine by whom the "costs of arbitration shall be borne and paid." The language is broad and mandatory.[1]

---

[1]    For example, witness fees of experts not appointed by the court are not recoverable under the federal rules. But they are recoverable as "costs of arbitration" under the broad language of the agreement to arbitrate..

1

ATTACHMENT 1

Rule 54 (b) specifically provides that "except when express provision therefore is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party **unless the court otherwise directs.**" So under this Rule, the court is allowed to award costs other than attorneys' fees to the "prevailing party," unless the court "otherwise directs." Again the arbitration agreement does not permit the arbitrators to direct what specific costs of arbitration shall be paid and there is no provision forbidding attorneys fees as costs. In fact, Rule 54 (b) treats attorneys' fees as "costs" and then specifically excludes the recovery of attorneys fees as costs., with the caveat that fees may be awarded by the court.

Because the arbitration agreement speaks broadly of the costs of arbitration, a fair reading of the provision would require the full costs of the arbitration to be borne and paid by one of the parties to the arbitration. Under the agreement, costs of arbitration shall be awarded as part of the arbitrators' written decision and award. So "costs" is not the usually deminimus figure awarded to the prevailing party by a court. Such costs never come close to the real costs of a litigation. Here the costs of the arbitration must include what the arbitration actually cost. Vermilion is entitled to be made whole. It can only be restored to its position before the arbitration by being paid the entire cost of the arbitration.

There is no justification to deny Vermillion 100% of its costs because the Panel concludes that its chief executive was intent on pursuing termination of the lease and that goal was what drove the expense of the arbitration. Vermilion did not set up Black Beauty to be vulnerable to a termination remedy or expectation damages. Black Beauty easily could have limited the arbitration to the contract construction issue and to a remedy of full payment of the royalty. All Black Beauty had to do was pay the disputed part of the royalty under protest. It was Black Beauty that created its vulnerability to a greater scope of remedies beyond the amount due to the breach of contract.

Surely, Vermilion was intent on obtaining the termination remedy. But Vermilion did not start out that way. Vermilion tried for almost a year to get Black Beauty to concede the royalty issue or at the very least to pay the full royalty under protest and to prosecute that protest in an arbitration proceeding. All Black Beauty had to do was to pay the full royalty under protest and to pursue arbitration of the underlying issue.

2

It was not until after months of fruitless attempts to negotiate that Vermilion began to exercise its rights under the lease. Those rights included the right to gave a notice of breach based on the failure to pay the full royalty, or "any part thereof." This notice was ignored by Black Beauty and the breach, under the terms of the lease, ripened into an event of default.

Next, Vermilion demanded adequate assurance. I had not previously encountered a demand for adequate assurance, which is a UCC concept. But in 1995, Judge Posner stated that it was likely that Illinois would apply the same concept to contracts other than sales contracts. A demand for adequate assurance is a powerful tool of the non-breaching party.

Vermilion's demand stated on its face that it would be satisfied if Black Beauty would pay the full royalty under protest. So all Black Beauty had to do was pay Vermilion the full royalty under protest and then prosecute that protest in arbitration. The amount involved was so small (less than 5% of the royalty) that Black Beauty's failure to pay under protest is incomprehensible.

As a last resort, Vermilion gave notice of termination. The contract provided that once the notice is given, the breaching party has so many days to respond, and if there is no timely response, the lease is terminated. Termination is a self-executing remedy under the lease, and under the lease all remedies are cumulative. All Black Beauty had to do was respond to the notice and pay under protest. Incredibly, Black Beauty failed timely to respond to the notice of termination.

Vermilion, which had sued Black Beauty, as it was entitled to under the lease, agreed to arbitration of the issues raised in the litigation. By the time the arbitration demand was filed, the lease had been terminated in accordance with the terms of the lease. Is termination a harsh remedy for a "small breach" of contract? Yes. But it is an express remedy under the contract. This simple point has been ignored by the Panel.

The remedy is not harsh when you consider that all Black Beauty had to do to avoid termination was to pay under protest. What would be harsh on the facts of this case is to penalize Vermilion for pursuing an arbitration that should have been avoided from the get-go, and from pursuing remedies that Black Beauty

3

easily could have eliminated from the arbitration.

Vermilion was forced to arbitrate the contract dispute. Accepting the Panel's generous conclusion that Black Beauty deducted the federal taxes based on past practices without thinking about whether they were severance taxes deductible under the lease, that does not mean Black Beauty was acting in good faith after Vermilion asserted that the deduction was improper. Black Beauty should have read the lease and reached the same conclusion that the Chairman of the Panel reached -- without a doubt, plainly and unambiguously, the federal taxes were not severance taxes.

Black Beauty had no principled argument to support its position that the deduction was proper. It ignored the fact that in the industry severance taxes are state or Indian tribe taxes. It ignored its own internal records that showed "No severance taxes in Illinois." Instead Black Beauty relied on its corporate lawyer's reading of Black's Law Dictionary and two cases that on their face did not support the notion that the federal taxes were severance taxes.

Was Vermilion not forced to seek the remedy of termination? Without a doubt. It would have been malpractice not to pursue the remedy of termination. Black Beauty had two opportunities to respond to Vermilion's notices of default and of termination, and two opportunities to respond to Vermilion's demands for adequate assurance. The remedy of termination was pursued based entirely on Black Beauty's actions. Vermilion pursued termination in good faith. It is entitled to its full costs of the arbitration.

Dated: January ___, 2007.

_____
Susan Getzendanner

4

VERMILION COAL COMPANY )
)
       Plaintiff, )
)
       v. )
)
BLACK BEAUTY COAL COMPANY, )
)
       Defendant. )

Arbitration Panel:

Hon. Thomas Lambros - Umpire
Hon. Susan Getzendanner
G. Daniel Kelley

---

### CONCURRING AND DISSENTING DECISION
### BY ARBITRATOR KELLEY

---

I concur in part and dissent in part.

The umpire decision awarding $300,000 plus of the claimed $1.5 million costs to Vermilion is appropriate on several grounds, while inappropriate on others. The attorney and expert fees were exceedingly excessive – having three law firms (including a St. Louis firm and a Chicago firm), having four to five experts who presented essentially no admissible evidence and were not even offered as such, trying to turn a simple good faith commercial dispute case into a fraud, putative damage, material breach and repudiation case, three experienced trial attorneys spending five to six days over two weeks in Cleveland reading depositions, etc., etc., etc. These excessive efforts on matters plainly invalid factually and legally – were unsuccessful. Vermilion lost on all issues but the simple issue of contract meaning which could have been heard and decided – in three months and with comparatively no fees.

This record presents an extraordinary amount of ineffective attorney and expert efforts in a largely losing cause, all no doubt at the express direction of Mr. Keady who

has extensive leasing and litigation experience on the same issue as here concerning tax deductions to arrive at a royalty under a coal lease. (I think Mr. Keady was involved in reported litigation on this subject, which was covered on Mr. Keady's cross, but I don't think I should spend the time to go through many, many boxes of material accumulated in this case to find all this.) Indeed, the efforts to turn this case, a simple "run-of-the mill" contract dispute, into a high stakes, "bet-the-$50 million-mine-crap-shoot" began immediately as Mr. Keady first raised the issue. All this was done despite Mr. Keady's having knowingly stood by for years accepting the performance which he belatedly decided was somehow fraudulent.

Viewed in this context, awarding but 20% ($300,000 plus) of the $1.5 million requested costs -- is easily justified. However, there is no clear and unambiguous language in the Lease giving us the authority (and we have none in law, either) to award attorney or expert fees. Considering this in the context of the foregoing, the award of $300,000 plus in costs is not justified or supported. This award will serve only to encourage more of what we should discourage.

In regard to Vermilion's Request for Findings, etc., there can be no doubt that the panel's prior decision was final long, long before that request -- so this panel no longer had (has) jurisdiction to change that decision. In fact, I suspect the case might be made that this panel has no jurisdiction now to award costs with the motion having come (November '06) so long after the decision (March '05). While Vermilion has unilaterally dismissed the "remaining" issues, the only colorable, open issues related to other claims not within our jurisdiction pursuant to the notice or the complaint.

G. Daniel Kelley

One American Square
Suite 3100
Indianapolis, IN  46282
(317) 236-2100